**PARR LAW GROUP**
SHAWN R. PARR (SBN 206616)
KATHLEEN CARD (SBN 164083)
NATALIA LITCHEV (SBN 230775)
SUJATA T. REUTER (SBN 232148)
150 Almaden Boulevard, Suite 1380
San Jose, California 95113
Telephone: (408) 267-4500
Facsimile: (408) 267-4535

Attorney for Plaintiff and Proposed Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ANITA HUNTER,

                 Plaintiff,

         v.

EDWARD H. OKUN, OKUN HOLDINGS,
INC., INVESTMENT PROPERTIES OF
AMERICA, LLC, RICHARD B. SIMRING,
and DOES 1 through DOES 50, inclusive,

                 Defendants.

CASE NO.    C07 02795 JW

**PLAINTIFF'S DECLARATION IN
SUPPORT OF OPPOSITION TO
MOTION TO DISMISS, OR
ALTERNATIVELY, REQUEST FOR
CONTINUANCE AND DISCOVERY**

Date:          September 24, 2007
Time:         9:00 A.M.
Courtroom: 8, 4th Floor
Judge:       Hon. James Ware

I, ANITA HUNTER, declare as follows:

       1.     I am the Plaintiff in the above captioned matter.

       2.     I have personal knowledge of the facts as stated herein and if called as a witness, I could and would competently testify to said facts.

       3.     On or about March 27, 2007, in order to accomplish a 1031 real estate exchange, I entered into an Exchange Agreement with 1031 Advance Inc. ("Advance") in San Jose, California, to facilitate the exchange of my real property. A true and correct copy of the agreement is attached hereto as Exhibit 1 and incorporated herein by this reference.

       4.     Pursuant to the terms of the Exchange Agreement, I authorized my agent to hold

Parr Law Group
150 Almaden Blvd.
Suite 1380
San Jose, CA 95113
Ph 408-267-4500
Fax 408-267-4535

1

PLAINTIFF'S DECLARATION IN SUPPORT OF MOTION TO DISMISS, ETC.

1    the proceeds in the amount of $1,365,294.58 received on the sale of my real estate in the

2    amount of $1,365,294.58.

3         5.    In or about April and May of 2007, I telephoned Advance on numerous occasions

4    and demanded that my funds be transferred to a title company in order to complete my real

5    estate exchange transaction.  I received no response.

6         6.    On April 30, 2007, I received an electronic-mail from Janet Dashiell, former CEO

7    of Advance, with contact information for Defendant RICHARD SIMRING ("SIMRING"), as

8    new President and Chief Executive Officer of the 1031 Tax Group, LLC ("Tax Group").  A true

9    and correct copy of the electronic-mail is attached hereto as Exhibit 2 and incorporated herein

10   by this reference.

11        7.    On May 1, 2007, I sent a letter to Advance requesting attention to my matter.  I

12   received no response.  A true and correct copy of my letter is attached hereto as Exhibit 3.

13        8.    On or about May 7, 2007, I received a facsimile from Susan Fidler, an escrow

14   officer of First American Title Company, informing me that my money had been transferred to

15   the account of Advance in the Countrywide Bank in Alexandria, Virginia.  I later learned that

16   the money was wired out of that account.  A true and correct copy of the fax is attached hereto

17   as Exhibit 4 and incorporated herein by this reference.

18        9.    Between April 26, 2007, and May 14, 2007,  I spoke with SIMRING, by

19   telephone.  I told SIMRING that I learned from Advance that he was the Chief Executive

20   Officer of Advance, which fact SIMRING did not deny.  During our conversation, SIMRING

21   told me not to worry and that the company held a billion dollars in assets.  SIMRING told me

22   that "we will get you your money next week."  I received electronic-mail from SIMRING

23   evidencing that he was involved in the day to day operations of Advance.  A true and correct

24   copy of the electronic-mail is attached hereto as Exhibit 5 and incorporated herein by this

25   reference.

26        10.    On June 14, 2007 I received an electronic-mail from Michael Norton, an attorney

27   for former employees or agents of Tax Group.  My review of the electronic-mail that I received

28   showed that it was a forwarded electronic-mail, originally sent by Defendant EDWARD H.

OKUN ("OKUN") to all offices of Tax Group.  The electronic-mail stated that SIMRING had

Parr Law Group
150 Almaden Blvd.
Suite 1380
San Jose, CA 95113
Ph 408-267-4500
Fax 408-267-4535

2

1  been appointed interim President and Chief Executive Officer of Tax Group and "its

2  subsidiaries," and that the offices were to act "only on instructions from Mr. Simring." A true

3  and correct copy of the electronic-mail that I received is attached hereto as Exhibit 6 and

4  incorporated herein by this reference. I believe that this electronic mail was originally sent by

5  OKUN. I have no reason to believe otherwise. As a result of these beliefs, it is also my belief

6  that OKUN and SIMRING operated Tax Group and wanted their investors in California to so

7  believe.

8      11.    In May 2007, I spoke with my acquaintance, Candace Graham, a resident of

9  California, whom I know to be an investor and creditor of Tax Group. Ms. Graham informed

10  me that she had spoken with OKUN by telephone and OKUN had proposed an investment

11  opportunity to her and mailed the information to her. I received from Ms. Graham a series of

12  marketing booklets and prospecta from OKUN and Defendant INVESTMENT PROPERTIES

13  OF AMERICA ("IPofA") offering tenancy in common ("TIC") interests in their properties in

14  Houston, Texas, Columbus, Ohio, and other states, including that of California. I believe that

15  IPofA is one of the companies owned by OKUN and his interests. Attached as Exhibit 7 and

16  incorporated herein by this reference is a true and correct copy of said marketing material.

17      12.    I learned from my review of the marketing information available to me, that

18  IPofA maintained a website at www.ipofa.com, which was accessible to California residents. I

19  logged on to their website and discovered that it provided for interactive requests for quotes and

20  other information.

21      13.    I am informed and believe that several brokers are employed by IPofA in

22  California, who market and broker the IPofA's products, such as TIC interests to California

23  residents. I am informed and believe that the names of such brokers are:

24          a)  Jeff Cederberg;

25          b)  Karen Valine;

26          c)  Robert Setzer.

27  ///

28  ///

Parr Law Group
150 Almaden Blvd.
Suite 1380
San Jose, CA 95113
Ph 408-267-4500
Fax 408-267-4535

3

*PLAINTIFF'S DECLARATION IN SUPPORT OF MOTION TO DISMISS, ETC.*

1   I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct. Executed in San Jose, California.

3       DATE:       September 4, 2007

4                                   _____/s/_____

5                                   ANITA HUNTER

6

7                       SIGNATURE ATTESTATION

8       I hereby attest that I have on file all holograph signatures indicated by /s/ signature

9

10  within this e-filed document.

11

12                                  _____/s/_____

13                                  SHAWN R. PARR

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Parr Law Group
150 Almaden Blvd.
Suite 1380
San Jose, CA 95113
Ph 408-267-4500
Fax 408-267-4535

4

*PLAINTIFF'S DECLARATION IN SUPPORT OF MOTION TO DISMISS, ETC.*

# EXHIBIT 1

## REAL PROPERTY EXCHANGE AGREEMENT

THIS REAL PROPERTY EXCHANGE AGREEMENT (Agreement) is made and entered into as of March 12, 2007, by and between Anita Hunter, (Exchanger) and 1031 Advance, Inc., a California corporation as the Qualified Intermediary (QI).

This Agreement is made and entered into with reference to the following facts:

A. Exchanger is the present fee owner of that certain real property located in the County of Santa Clara, State of California, commonly known as 3189 Cadillac Drive, San Jose, California, (Relinquished Property).

B. Exchanger desires to make a qualified tax-deferred exchange of Exchanger's interest in the Relinquished Property for other property or properties of like kind in accordance with Internal Revenue Code §1031, the Treasury Regulations promulgated under that section, and corresponding provisions of state tax legislation.

C. Exchanger has entered into a written Sale Contract with Bhogilal G. Suthar and Premila B. Suthar, Trustees of the Suthar Living Trust dated July 26, 2000, (Buyer) by which Exchanger has agreed to convey and Buyer has agreed to acquire Exchanger's interest in the Relinquished Property on the terms and conditions set forth in the Sale Contract.

D. QI is willing to act as a qualified intermediary, as that term is defined in Regulation §1.1031(k)-1(g)(4), in connection with Exchanger's exchange.

NOW, THEREFORE, in consideration of the mutual covenants, conditions, and agreements set forth in this Agreement, Exchanger and QI each agree as follows:

1. Exchange of Properties. Exchanger agrees to transfer Exchanger's interest in the Relinquished Property to QI in consideration of, and in exchange for, the transfer by QI to Exchanger of other property (or properties) of like kind (Replacement Property) to by identified by Exchanger and transferred to QI under the terms of this Agreement. QI agrees to transfer Exchanger's interest in the Relinquished Property to Buyer in a sale transaction and to acquire the Replacement Property from the Seller of the Replacement Property in a purchase transaction in furtherance of the exchange described in this Agreement.

2. Assignment and Assumption of Sale Contract.

2.1     Exchanger hereby conditionally assigns all of its right, title and interest in the Sale Contract and certain of its obligations thereunder to Intermediary. More particularly, Exchanger assigns its obligation to sell the Relinquished Property specifically conditioned upon Exchanger's performing all other obligations required of Exchanger to Buyer and any obligations surviving the close and transfer of title to Buyer. Intermediary agrees to assume this obligation and perform said obligation in the manner provided for herein.

01-0701349                                        1

2.2    All representations, covenants, and warranties, express or implied, made by Exchanger or Buyer with respect to the transfer of Exchanger's interest in the Relinquished Property and the transactions contemplated by the Sale Contract and this Agreement shall survive the transfer of Exchanger's interest in the Relinquished Property by Exchanger to QI and by QI to Buyer. All rights, remedies, liabilities, and obligations arising therefrom shall be deemed to be assigned and delegated by QI to Exchanger and assumed by Exchanger effective simultaneously with the closing of the sale of the Relinquished Property to Buyer.

2.3    The assignment and assumption provided in this Agreement shall be null and void if Buyer or its assignee does not acquire title to Exchanger's interest in the Relinquished Property because of the Buyer's or assignee's breach or if either fails to waive any contingencies or if there is a failure of any condition precedent to the obligations of either Exchanger or Buyer to perform the Sale Contract.

3. Relinquished Property Closing.

3.1    Closing Agent. First American Title Company, (Closing Agent) shall handle the processing of the exchange and sale of Exchanger's interest in the Relinquished Property. Exchanger and QI each covenant and agree to execute instructions to Closing Agent consistent with this Agreement for the purpose of effecting the exchange provided for in this Agreement and the subsequent sale of Exchanger's interest in the Relinquished Property to Buyer.

3.2    Prorations; Insurance. All property taxes, insurance premiums, rents, and interest on Exchanger's interest in the Relinquished Property shall be prorated as of the closing.

3.3    Direct Deeding. Without in any way affecting QI's obligation to acquire Exchanger's interest in the Relinquished Property, in order to save transfer taxes, title insurance premiums, and additional closing costs, QI shall direct Exchanger at the closing to execute a deed conveying legal title of Exchanger's interest in the Relinquished Property directly to the Buyer.

3.4    Timely Closing. If QI does not transfer the Relinquished Property to Buyer on or before the date set forth in the Sale Contract, and the parties to this Agreement do not mutually agree to extend the closing date, this Agreement shall be rescinded, and Exchanger's assignment to QI of the Sale Contract shall be deemed null and void.

4. QI's Fee. Exchanger agrees to compensate Intermediary for the performance of the services of such as described herein in the amount of $500.00 which will be collected from the Relinquished Property closing. Exchanger and QI expressly agree that any cash proceeds received from the disposition of the Relinquished Property (Exchange Proceeds) shall be held in the account of QI with a nationally insured bank or savings institution. QI agrees to credit to the account of Exchanger interest on funds held by QI at QI's prevailing rate. Said account shall be in the name of QI and shall require the signature of an authorized officer of QI to permit the withdrawal of any portion thereof.

5. Identification and Acquisition of Replacement Property.

    5.1    Identification of Replacement Property. Before the end of the 45-day period beginning on the date of the transfer of Exchanger's interest in the Relinquished Property to QI, or at QI's direction, to the Buyer, the (Identification Period), Exchanger shall give written notice to QI of all property that may constitute Replacement Property. Any such identification may be revoked and a new Replacement Property identified on Exchanger's written notice to QI before the end of the Identification Period.

    5.2    Contracts To Acquire Replacement Property. Exchanger shall establish the terms of acquisition with the Seller(s) of any identified Replacement Property and shall provide QI with the form of acquisition agreement(s) acceptable to Exchanger. QI shall thereafter accept an assignment of Exchanger's contract rights to purchase any of the identified Replacement Property or, at Exchanger's direction, shall enter into a binding written contract in the form approved by Exchanger with such Seller(s) to acquire any identified Replacement Property.

6. Terms for Acquisition of the Replacement Property.

    6.1    Acquisition and Exchange. All costs of acquiring the Replacement Property, including cash payments toward the purchase price and all other acquisition fees incident thereto shall be borne first from the Exchange Proceeds held by QI from the sale of the Relinquished Property and then, to the extent necessary, from funds of Exchanger. QI shall acquire all Replacement Property specified by Exchanger through escrow/closing procedures specified in the relevant acquisition agreement. Concurrent with acquisition of each Replacement Property, QI shall cause the transfer and conveyance of the same to Exchanger. To facilitate the transfer of Replacement Property to Exchanger and to save additional transfer taxes and escrow fees, QI shall be deemed to have satisfied its obligations under this Agreement if it causes the Seller of any Replacement Property to transfer legal title of the same directly to Exchanger rather than QI first acquiring legal title and then conveying it to exchanger.

    6.2    Effect of Identified Replacement Property Remaining Unacquired. Exchanger expressly acknowledges that if, after the end of the Identification Period, and before the end of the Exchange Period, any identified Replacement Property that has not been acquired by Exchanger within the Exchange Period, for any reason other than for reasons beyond Exchanger's control, then any Exchange Proceeds that are not used during the Exchange Period to acquire any identified Replacement Property, and the interest on the entire Exchange Proceeds, shall not be disbursed to Exchanger until the end of the Exchange Period.

    6.3    Number of Properties To Be Acquired May Be Limited. If Exchanger specifically states in the Identification Form that Exchanger intends to acquire less than all of the identified Replacement Property (e.g., "Exchanger intends to acquire only one [two] of the three properties identified here"), then after Exchanger has, before the end of the Exchange Period, acquired that number of identified Replacement Property, Exchanger shall not be entitled to acquire any other property as Replacement Property, regardless of whether it is identified to QI.

7. Termination of Exchange.

7.1    Exchanger's Right to Cash. Except as expressly provided in this Agreement, Exchanger shall have no right to request or receive anything other than like-kind property before expiration of the Exchange Period. Exchanger shall have no right, except as provided in paragraph 7.2, to receive, pledge, borrow, or otherwise obtain the benefits of the Exchange Proceeds including, without limitation, any interest income earned on the proceeds held in trust by QI under this Agreement, or other property held by Intermediary under this Agreement prior to the end of the Exchange Period.

7.2    Events Giving Right to Cash Before End of Exchange Period. On expiration of the Identification Period, Exchanger shall have the right to require QI to distribute a sum equal to any unexpended portions of the Exchange Proceeds to Exchanger if (i) there remains no identified Replacement Property that has not been acquired; or (ii) QI has acquired all Replacement Property that was identified under Section 5 of this Agreement; (iii) Exchanger has acquired all Replacement Property that it is entitled to acquire under this Agreement; or (iv) it is impossible for QI to acquire any of the remaining identified Replacement Property because of material and substantial circumstances beyond Exchanger's control. The parties to this Agreement intend that these conditions be interpreted and imposed in a manner consistent with the limitations in Regulation §1.1031(k)-1(g)(6).

7.3    At End of Exchange Period. The period within which the Exchanger must receive the Replacement Property (Exchange Period) begins on the date on which the Relinquished Property is transferred to Buyer and ends on the earlier of 180 days or the due date (including extensions) for the Exchanger's tax return for the taxable year in which the transfer of the Relinquished Property occurs. At the expiration of the Exchange Period, QI shall distribute to Exchanger a sum equal to any balance of the Exchange Proceeds and interest that QI has not already used to acquire Replacement Property for conveyance to Exchanger. The payment of such amounts shall be made in cash; provided, however, that to the extent that QI holds any Purchase Note, payment shall be made by QI's assignment, without recourse, of such Purchase Note to Exchanger (and the assignment of all security given with respect to such Purchase Note), plus the delivery to Exchanger of all payments of interest or principal on the Purchase Note that have been actually received by QI.

8. Indemnity by Exchanger.

8.1    General Indemnity. Exchanger shall, and agrees to, hold QI harmless and indemnify QI, its directors, officers, employees, attorneys, and agents from any claim, liability, demand, expense, tax, or assessment of any nature or kind, expressed or implied, whether sounding in tort or in contract that may be asserted against QI, its directors, officers, employees, and agents, by any person (other than Exchanger), firm, corporation, governmental agency, or taxing authority, including but not limited to any and all supplemental tax bills issued by the tax collector in any county in which any transaction contemplated by this Agreement is consummated, that may arise from any acts or omissions, active or passive, related to carrying out the terms of this Agreement or from participation in this transaction, except any that arise from the gross negligence or willful misconduct of QI or any other person to be indemnified. Exchanger's obligations shall include, without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, cleanup, or detoxification or decontamination of any of the Relinquished Property or

Replacement Property or any improvements on these Properties, and the preparation and implementation of any closure, remedial action, or other required plans in connection with these Properties. These obligations to indemnify QI shall survive the transfer of any such Property or improvements to QI's successor in interest. For purposes of these indemnity provisions, any acts or omissions of, or by employees, agents, assignees, or representatives of Exchanger or others acting for or on behalf of Exchanger (whether or not they are negligent, intentional, willful, or unlawful) shall be strictly attributable to Exchanger.

9. Conflict With Prior Agreements. If and to the extent that this Agreement conflicts with any prior written or oral agreement or understanding between the parties to this Agreement, the terms of this Agreement shall prevail. No modification or waiver of the terms of this Agreement shall be valid unless made in a writing signed by both parties.

10. Attorney Fees. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover as an element of its costs and not as damages, reasonable attorneys fees to be fixed by the court.

11. Survival. The terms of this Agreement shall survive the closing and the delivery of Exchanger's interest in the Relinquished Property to QI and of the Replacement Property to Exchanger.

12. Time. Time is of the essence of this Agreement.

13. Assignment. This Agreement shall inure to the benefit of, and shall be binding on, the parties to this Agreement, their estates, heirs, representatives, successors in interest, and assigns; provided, however, that neither party shall have any right to assign this Agreement or any of that party's rights under it without the prior written consent of the other party, which such party may withhold in its sole discretion.

14. Notices. Any notice to be given hereunder shall be given by personal delivery or by depositing such notice in the United States Mail postage prepaid, and addressed to the respective party at the following address:

To Exchanger:

> Anita Hunter
> 14107 Taos Drive
> Saratoga, CA 95070

To QI:

> 1031 Advance, Inc.
> 1884 The Alameda
> San Jose, CA 95126

Either party may change its address for notice by giving notice to the other party in accordance with this section.

01-0701349                                                5

15. <u>No Agency</u>. Exchanger acknowledges QI is acting as a principal in all the transactions contemplated by this Agreement and in no way shall be deemed an agent of Exchanger and to such extent, QI shall not have any obligations to Exchanger as an agent of Exchanger nor shall Exchanger have any obligations to QI as a principal of QI.

16. <u>Counterparts</u>. This Agreement may be executed in counterpart and shall be of the same force and effect as if one document had been signed by all parties.

17. <u>No Warranty on Tax Consequences</u>. QI makes no representation or warranty, nor shall QI bear any responsibility or liability concerning the federal or state tax consequences to Exchanger of the transaction contemplated in this Agreement, including, without limitation, the status of any Replacement Property as like-kind property or the qualification of this transaction as a like-kind exchange under Internal Revenue Code §1031 or applicable state tax laws.

18. <u>Force Majeure</u>. Intermediary shall not be liable to Exchanger for any failure or delay in performance including, but not limited to power failure, rolling blackouts, earthquake, fire, flood, war, insurrection, Acts of God, accident, strike or other labor disturbance, or interruption of or delay in transportation. Accordingly, Exchanger is strongly urged to take steps to schedule the acquisition of all Replacement Property sufficiently before the expiration of the Exchange Period so that any unforeseen delay will not result in a violation of the time constraints imposed.

19. <u>Governing Law</u>. This Agreement shall be interpreted under and governed by the laws of the State of California.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**EXCHANGER**

Date: 3-27-07

Anita Hunter

**QI**

1031 ADVANCE, INC.,
a California corporation

Date: 3-12-07

By: _____
Steven Allred, Vice President

01-0701349

6

## ASSIGNMENT OF PURCHASE AND SALE AGREEMENT

### (Relinquished Property)

This Assignment is entered into by and between Anita Hunter, (Exchanger) and 1031 Advance, Inc. as qualified intermediary (QI).

Exchanger, as Seller, entered into that certain Real Estate Purchase and Sale Agreement with Bhogilal G. Suthar and Premila B. Suthar, Trustees of the Suthar Living Trust dated July 26, 2000, (Buyer) for the property commonly known as 3189 Cadillac Drive, San Jose, California, (Relinquished Property). The Purchase and Sale Agreement, together with any and all amendments thereof collectively the Sale Agreement (Sale Agreement), is incorporated herein by this reference.

Exchanger and QI have executed an Exchange Agreement in which Exchanger has agreed to transfer the Relinquished Property to QI, in consideration of QI's acquisition of suitable replacement property and the transfer of the replacement property to Exchanger.

NOW, THEREFORE, the parties agree:

1. Exchanger hereby conditionally assigns all of its right, title and interest in the Sale Agreement and certain of its obligations thereunder to QI. More particularly, Exchanger assigns its obligations to sell the Relinquished Property specifically conditioned upon Exchanger's performing all other obligations required of Exchanger to Buyer and any obligations surviving the close and transfer of title to Buyer. QI agrees to assume this obligation and perform said obligation in the manner provided for herein.

All representations, covenants, and warranties, express or implied, made by Exchanger or Buyer with respect to the transfer of Exchanger's interest in the Relinquished Property and the transactions contemplated by the Sale Agreement shall survive the transfer of Exchanger's interest in the Relinquished Property by Exchanger to QI and by QI to Buyer.

2. QI hereby requests and directs Exchanger to deed the Relinquished Property directly to Buyer.

IN WITNESS WHEREOF, the parties have executed this agreement as their free and voluntary act and deed, on the date indicated by each signature.

### EXCHANGER:

Date: 3-27-07      By: _____

Anita Hunter

*Signatures continued on next page*

01-0701349                          1

**QI:**

1031 ADVANCE, INC.,
a California corporation

Date: 3·12·07          By: _____

Steven Allred, President

Acknowledged:

**BUYER:**

The Suthar Living Trust dated July 26, 2000

Date: 3/26/07          By: _____

Bhogilal G. Suthar, Trustee

Date: 3/26/07          By: _____

Premila B. Suthar, Trustee

01-0701349                              2

# EXHIBIT 2

⚠ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Anita  Hunter**

| From: | Janet Dashiell [jldash@hotmail.com] | | Sent: | Mon 4/30/2007 6:41 PM |
|---|---|---|---|---|
| To: | Anita Hunter; achaturvedi@nixonpeabody.com | | | |
| Cc: | | | | |
| Subject: | Fw: FEA Member Update | | | |
| Attachments: | 📄 pic04693.jpg(13KB)  📄 FINALPRESSRELEASE.pdf(78KB) | | | |

Anita,

I am sorry I am not able to provide you detailed information on what has
occurred since I resigned as CEO last Wednesday.  Please feel welcome to
call my attorney, Anjali Chaturvedi, with any questions.  Her number is
202-585-8270.  I have also copied her on this email.

Per our conversation, here is the other information you requested:

Richard Simring, President & CEO
The 1031 Tax Group
777 Brickell Avenue, Ste. 500
Miami, FL  33131-2803

305-371-2600
305-347-6814
786-202-6891

His email addresses:
casalago@bellsouth.com
rbs@jordenusa.com
richard.simring@ipofa.com

Lara Coleman
Okun Holdings/IPofA
10800 Midlothian Turnpike, Ste. 309
Richmond, VA 23235

804-594-3550
804-938-2085

lara.coleman@ipofa.com

David Field, COO
Okun Holdings
10800 Midlothian Turnpike, Ste. 300
Richmond, VA 23235

804-594-3550
804-419-2391
804-347-0740

david.field@ipofa.com

If you think of anyone else you would like to contact, please let me know.

Thank you,

Janet Dashiell

```
<FEA@fernley.com>
>To
>          04/30/2007 03:18        undisclosed-recipients:;
>          PM                                        cc
>
>                                          Subject
>                            FEA Member Update
>
>
>
>
>
>
>
>
>
>
>          (Embedded image moved to file: pic04693.jpg)
>
>To All FEA Members,
>
>I am writing to inform you that The 1031 Tax Group has been temporarily
>suspended as a member of the Federation of Exchange Accommodators. The
>1031 Tax Group includes the following companies:  1031 Advance (CA);
>Atlantic Exchange Company (MA); Investment Exchange Group (CO); National
>Exchange Services (TX);  Real Estate Exchange Services (FL) and Security
>1031 Services (CT).
>
>The Board of Directors took this action based on credible allegations that
>transactions had not been funded in a timely manner.  At this point we have
>no knowledge of any customer losses.  We are investigating the situation
>and will keep you apprised of any significant changes.
>
>We have attached a press release that was prepared by an attorney for
>employees of one of the affected companies.  It is being provided to you as
>a matter of information only.  The FEA has no independent knowledge of the
>events set forth in the press release, but since it has been released to
>the public we believe that it is better for you to be aware of it as soon
>as possible.
>
>These are trying times for our industry.  I again urge you to present our
>industry in a positive light.  Some companies may be tempted to use events
>such as this as a marketing tool.  Such a short sighted approach only
>serves to hurt us all.  Any company that must rely on the misfortune of
>others to promote itself needs to reevaluate its own business practices.
>You will never be sorry that you took the high road.
>
>We just completed a very successful Mid-Year Conference.  I had the
>opportunity to see many of you and be reminded of what a great group of
>people you are.  I am confident that if we stand together we can withstand
>anything.
>
>If you have any questions or have any information on this matter please do
>not hesitate to contact the FEA.
>
>Regards,
>Hugh Pollard
```

# EXHIBIT 3

May 1, 2007


To:  Audrey, David Field, or  To Whom it May Concern, at 1031Advance,


RE: Your #01-0701349

You are holding my proceeds from my last sale of a relinquished property.   I am under
contract for a property and this need immediate attention.

I authorize you to wire my deposit money for the purchase of 2857 Sugarpine Ct.   San
Jose, CA .

Escrow is open with First American Title and I am late in getting my deposit money to
the escrow.   This is extremely urgent as I will loose this property if I do not perform.   I
have been trying to find someone to answer the phone at the San Jose location for days.
Please rush the wire over to First American Title company immediately:

First American Title Company:
12772 Saratoga-Sunnyvale Rd.
Saratoga, CA 95070
Attn:   Sue Fiddler
Escrow number:   22759982
Their phone number:   408-867-9915

Sincerely,

Anita Hunter
408-930-1265

# EXHIBIT 4



# Wiring Instructions

**Date:**   March 26, 2007

**To:**     Susan Fiddler

**From:**   Yolanda Barrueta-Digesti

**RE:**     Escrow #4307-2524321 Hunter

---

Please wire funds to the following account for the above referenced escrow.

Countrywide Bank, N.A.
Federal Reserve Wire Short Name: COUNTRYWIDE BK ALEX VA
Alexandria, Virginia
Account Name: 1031 Advance, Inc.
ABA Number - 056-009-110
Attn: Alma Ramirez
Account Number: 423210
Further Reference: Hunter 01- 0701349

Should you have any questions, feel welcome to call or email me at
ydigesti@1031advance.com

Thank you.

## 1031 Advance, Inc.
### Qualified Intermediary
1884 The Alameda, San Jose, CA  95126
Toll Free:  866-977-1031    Fax 408-241-3191

# Wire Transfer Order
*First American Title Company*

Number:    3401

| File No.: | 4307-2524321 | | Issued By: | Jenny Ann Hamilton |
|---|---|---|---|---|
| PR: | 06243 - California Region | | Issued Date/Time: | 03/29/2007 02:07:54 PM |
| Office: | 4307 - Saratoga (North) (489) | | Transmission Date/Time: | |
| Officer: | Susan Fiddler | | Amount: | $1,365,294.58 |

## ORIGINATOR

| Account Number | Bank Name |
|---|---|
| 2000012201 | First American Trust, FSB - |

Information
2524321

## RECEIVING BANK

| ABA Number | Bank Name |
|---|---|
| 056009110 | Countrywide Bank, N.A. |

Bank Address

## BENEFICIARY

| Account Number | Beneficiary Name |
|---|---|
| 423210 | 1031 Advance, Inc. |

Beneficiary Address
3189 Cadillac Drive;San Jose, CA 95117

Additional Information
Attn: Alma Ramirez Further Credit to Anita Hunter 01-0701349;Sender: Jenny First American 408-867-9915

Advice

## CUSTOMER AUTHORIZATION

_____          _____
Signature                                        Signature

_____          _____
Printed Name and Title                      Printed Name and Title

## BANK USE ONLY

| Fund Held/Credit | Credit Code | CALLBACK |
|---|---|---|
| Available Funds | | Name |
| | | Time                    Initials |

Fees
- [ ] Analysis
- [ ] Waived
- [ ] Other

- [ ] Charge To Account
- [ ] Included in Check

Method of Payment
- [ ] Debit Account Number
- [ ] Incoming Wire

- [ ] Check Received
- [ ] Other

SPECIAL INSTRUCTIONS/NOTES

# EXHIBIT 5

```
From: Richard Simring [mailto:richard.simring@okunholdings.com]
Sent: Tue 5/1/2007 10:14 AM
To: Anita Hunter; richardsimring-blackberry; casalago@bellsouth.com; Richard B. Simring;
Audrey Crumpton
Cc: Lara Coleman; David Field
Subject: RE: I would like my money wired to another exchange today.
```

Anita,

With all respect, nobody is using your money.  All files from San Jose have been shipped
to Denver and we have processors opening the boxes as we speak.
If you will please allow us two days to get organized, that would be appreciated.   There
are many customers and we are trying to deal with emergency issues these next two days.
As I told you, this issue was created by the abrupt departure of all senior management and
we are trying to regroup and restaff.

Richard

```
-----Original Message-----
From: Anita Hunter [mailto:ahunter@apr.com]
Sent: Tuesday, May 01, 2007 11:56 AM
To: richardsimring-blackberry; casalago@bellsouth.com; Richard B. Simring; Richard
Simring; Audrey Crumpton
Cc: Lara Coleman; David Field
Subject: RE: I would like my money wired to another exchange today.
```

I am under contract now on a property and I will loose the property if I
don't perform.    I have no contingencies on it and our market is hot out
here.    THIS IS PRESSING AND I DEMAND THAT ALL MONEY IS WIRED TODAY.    I
am the customer, not you.    That's my money you're holding and using.


```
From: rsimring@mycingular.blackberry.net
[mailto:rsimring@mycingular.blackberry.net]
Sent: Tue 5/1/2007 8:04 AM
To: Anita Hunter; casalago@bellsouth.com; Richard B. Simring; richard.simring@ipofa.com
Cc: Lara D. Coleman; David Field
Subject: Re: I would like my money wired to another exchange tomorrow.
```

Anita,

We are helping clients with more pressing issues today.  Your request will be handled next
week.

Richard
Sent via BlackBerry from Cingular Wireless

1

-----Original Message-----
From: "Anita  Hunter" <ahunter@apr.com>
Date: Mon, 30 Apr 2007 20:20:26
To:<casalago@bellsouth.com>, <rbs@jordenusa.com>, <richard.simring@ipofa.com>
Cc:<lara.coleman@ipofa.com>, <david.field@ipofa.com>
Subject: I would like my money wired to another exchange tomorrow.


My name is Anita Hunter and I have $1.375M sitting with your company. Given the
circumstances, I would like the funds including interest wired
to another exchange company immediately.    My exchange was under my
name.    In addition I recommended your company to my clients, Miguel and
Anamaria Litvin.    I would also like you to prepare to wire their $60K
to them.


Please let me know who will facilitate this request.    Call me
immediately.

Anita Hunter
Alain Pinel Realtors
408-930-1265




Richard Simring, President & CEO
The 1031 Tax Group
777 Brickell Avenue, Ste. 500
Miami, FL  33131-2803

305-371-2600
305-347-6814
786-202-6891

His email addresses:
casalago@bellsouth.com
rbs@jordenusa.com
richard.simring@ipofa.com

Lara Coleman
Okun Holdings/IPofA
10800 Midlothian Turnpike, Ste. 309
Richmond, VA 23235

804-594-3550
804-938-2085

lara.coleman@ipofa.com

David Field, COO
Okun Holdings
10800 Midlothian Turnpike, Ste. 300
Richmond, VA 23235

804-594-3550
804-419-2391
804-347-0740

david.field@ipofa.com

# EXHIBIT 6

## D. Sean Velarde

| | |
|---|---|
| **From:** | Dan McCabe [dan.mccabe@ixg1031.com] |
| **Sent:** | Wednesday, April 25, 2007 11:12 AM |
| **To:** | D. Sean Velarde; Michael Norton |
| **Subject:** | FW: Janet Dashiell |
| **Importance:** | High |

-----Original Message-----
**From:** Ed Okun [mailto:ed.okun@okunholdings.com]
**Sent:** Wednesday, April 25, 2007 10:21 AM
**To:** Nicole Elder; Kelly Smith; Carol Absher; Asher Azim; Chad Greenberg; Cheri Dosh; Dan McCabe; Idania Ochoa; JaVonne McCoy; Jennifer Simpson; Jessica Pelker; kimbicket@ixg1031.com; Narissa Sanders; Pete McCann; Scott Rodli; Shirley McCabe; wbennett@nes1031.com; knickel@nes1031.com; jtownsend@nes1031.com; brose@1031advance.com; bsitka@1031advance.com; davidk@1031advance.com; krostom@1031advance.com; kvaline@1031advance.com; sallred@1031advance.com; tle@aec1031.com; kostiguy@aec1031.com; rjsmith@sos1031.com; dana@1031taxsavers.com; amanda@1031taxsavers.com; cherie@sos1031.com; csheehan@aec1031.com; wcullivan@aec1031.com; meagan@sos1031.com; quentin@sos1031.com; csburt@aec1031.com; hsosa@aec1031.com
**Cc:** JDashiell@1031advance.com
**Subject:** Janet Dashiell
**Importance:** High

Ladies and Gentlemen:

Please be advised that effective immediately, Janet Dashiell has been relieved of her duties as President and CEO of The 1031 Tax Group, LLC and all of its subsidiaries including, but not limited to:

1031 Advance, Inc.
Investment Exchange Group, LLC
National Exchage Accomodators, LLC
National Exchange Service QI, Ltd.
Atlantic Exchange Company, Inc.
Atlantic Exchange Company, LLC
Security 1031 Services, Inc.
Real Estate Exchange Services, Inc.

Accordingly, Ms. Dashiell is no longer authorized to act in any capacity for The 1031 Tax Group, LLC and its subsidiaries and you are not to take any instructions from her.

Richard B. Simring has been appointed Interim President and CEO of The 1031 Tax Group, LLC and its subsidiaries. You are to act only on instructions from Mr. Simring.

Very truly yours,


Edward H. Okun


5/10/2007

# EXHIBIT 7

SEP-04-2007  06:21PM  FROM-ALAIN PINEL REALTY            408-000-0000        T-355  P.002/002  F-070



May 11, 2007

**VIA FEDERAL EXPRESS**

Candace Graham
1 Applewood Lane
Portola Valley, CA 94028

Re: IPofA WOM Master LeaseCo LP offering of West Oaks Mall

Dear Ms. Graham:

Pursuant to a request by Ken Bolton and Ed Okun, enclosed please find a copy of the Private Placement Memorandum for the IPofA WOM Master LeaseCo offering of parcel leasehold interests in the West Oaks Mall in Houston, Texas. Also enclosed is a First Supplement to the Confidential Private Placement Memorandum.

To the extent that you have any questions, please contact our Investor Services department at 1-877-MY-IPofA (877-694-7632) or at Investor.Services@IPofA.com.

Best regards,

Kim S. Watts
Director, Investor Services

Enclosures

10800 Mid'othian Turnpike, Suite 309    Richmond, VA 23235      804.594.3550      fax 804.594.3556      1.877.MY.IPofA      IPofA.com
Richmond, VA                                              Indianapolis, IN                              Decatur, GA

RECEIVED   SEP-04-07   06:18PM      FROM-650 851 8329              TO-Alain Pinel Realtors      PAGE  001



Who

we

ARE

# BUYING. REPOSITIONING. INVESTING.

Investment Properties of America (IPofA) is a full-service real estate investment company actively acquiring retail, industrial and office properties. We specialize in turning under-performing properties into stable, income-producing assets.

In the Midwest alone, we have closed over $100 million in §1031 tenant in common transactions.

If you're selling property. Contact us.

If you're looking for investment opportunities. Contact us.

If you want to learn more about Investment Properties of America. Contact us.



CORPORATE OFFICE
1.877.MY.IPofA (1.877.694.7632)
10800 Midlothian Turnpike, Suite 309
Richmond, VA 23235
IPofA.com



**Lara D. Coleman**
chief operating officer

10800 Midlothian Turnpike
Suite 309
Richmond, VA 23235

804.694.3550
fax 804.694.3556
cell 804.938.2085
1.877.MY.IPofA
lara.coleman@ipofa.com
IPofA.com



**Kim S. Watts**
director
investor relations

10800 Midlothian Turnpike
Suite 309
Richmond, VA 23235

804.694.3550
fax 804.694.3556
1.877.MY.IPofA
kim.watts@ipofa.com
IPofA.com

## Our Mission Statement

It is the mission of Investment Properties of America (IPofA) to be an innovative, full service real estate company dedicated to ownership and management of quality real estate in major and middle markets throughout the United States and to protect these assets through intense management.    We will accomplish these goals through creativity, diversity, consistency and integrity.

## Who We Are

IPofA is a full-service real estate investment and management company, which acquires, owns and operates properties, primarily leased to major national and regional retail tenants under net leases.  We focus on value added real estate, including retail, industrial and office space.   We own and manage properties throughout the United States with corporate offices located in Richmond, Virginia, Miami, Florida, Decatur, Georgia  and Indianapolis, Indiana. We are committed to managing and operating our nationwide assets in a manner consistent with our core values to protect and improve the market values of these properties.

## Our Company Values

IPofA's core values define our beliefs and management philosophy. These core values are shared throughout all levels of our company and are a critical component of our foundation. We pledge that we will:

* provide the highest level of service and execution in the real estate industry
* operate our business in such a manner that our employees, tenants and vendors can have confidence in our ability to perform with competence and integrity
* continually reinforce our reputation for superior personal service by providing respect, training, involvement, recognition, reward, security and advancement opportunities to our employees

## Our Employee Values

IPofA employees also adhere to a set of values that compliments our management's philosophy so that our company can conduct business in accordance with its core values. Each of our employees will aspire to do the following:

* act with integrity
* value our fellow employees, investors and vendors
* learn and continuously improve
* focus on sustainable success

## How We Do It

Our management professionals work to assure the long-term productivity of our properties. On-site center management teams, intensely focused on the needs and opportunities of each market, are supported by our corporate resources in the areas of marketing, communications, leasing and operations.

# INVESTMENT PROPERTIES OF AMERICA

# Management

**Edward H. Okun,** *President and Chief Executive Officer.* Mr. Okun is the founder, sole member, and a manager on the Board of Managers, of IPofA. He has been active in real estate development and property management for more than 30 years. Although he remains active in the day to day operations of IPofA, he has assembled a management team so he can spend more time reviewing potential real estate transactions for investors. Originally from Toronto, Mr. Okun became a U.S. citizen in the summer of 2004. Mr. Okun holds a MBA from York University in Ontario, Canada. He is a member of the International Council of Shopping Centers (ICSC).

**Lara D. Coleman,** *Chief Operating Officer.* Mrs. Coleman joined IPofA in October 2004 as the Vice President, Operations. Mrs. Coleman serves as a member of the Board of Managers of IPofA and as Chief Operating Officer, Mrs. Coleman manages the company's day-to-day operations, including investor services, marketing, facilities and human resources. Mrs. Coleman has experience in public and private real estate related securities offerings (both REITs and tenant in common syndications), securities regulation compliance (state, federal, NASD and NYSE), corporate governance and compliance and 1031 Like Kind Exchanges. Immediately prior to joining IPofA, Mrs. Coleman was a Senior Securities Paralegal for Genworth Financial, Inc. From 1998 to 2004, Mrs. Coleman was a Senior Paralegal in the Real Estate Securities Practice Group at Hirschler Fleischer, A Professional Corporation, where she participated in tenant in common syndications and several public offerings of REITs. She received her education at Virginia Commonwealth University and the University of Richmond, in Richmond, Virginia. She is a member of ICSC.

**B. Fisher Paty,** *Vice President, Managing Director, Acquisitions.* Mr. Paty joined IPofA in early 2006 and oversees its acquisitions department. He is responsible for identifying potential acquisitions, analyzing the market and preparation of all information necessary for IPofA to make investment decisions with regards to the acquisition or disposition of real estate. In addition, he is a member of the IPofA's acquisition committee. Mr. Paty brings 8 years of real estate acquisition experience to IPofA. Prior to joining IPofA, Mr. Paty was an associate with Eastdil Secured in Atlanta, Georgia, where he was directly involved in more than $1.5 billion in retail and office transactions. He was previously a Manager for Ernst & Young in their Transaction Advisory and Capital Markets Group. Mr. Paty received his education at the University of Florida in Gainesville, Florida. He is a Certified Commercial Investment Member, a Registered Real Property Appraiser in the State of Georgia and a member of ICSC.

**Tracy Tingen,** *Controller.* Mrs. Tingen joined IPofA in the summer of 2006. As Controller of Finance, she oversees the financial reporting of IPofA's various divisions, and is responsible for the day-to-day accounting functions. Mrs. Tingen is a Certified Public Accountant and brings over 5 years of experience in the areas of taxation and financial reporting. She received her education at Radford University. Mrs. Tingen is a member of the Virginia Society of Certified Public Accountants (VSCPA).

**Kimberly Watts,** *Director of Investor Services.* Mrs. Watts joined IPofA in 2004. As its Director of Investor Services, she oversees the company's investor services division. Her responsibilities include acting as a liaison between the investors, their representatives and IPofA. She oversees investor reporting. Mrs. Watts brings more than twenty years of real estate experience to IPofA through her experience as a real estate agent, title examiner and underwriter, and loan originator. She received her education at the University of Phoenix. Mrs. Watts is a member of the Tenant in Common Association (TICA), the Federation of Exchange Accommodators (FEA) and the International Council of Shopping Centers (ICSC).

**Katie Duff,** *Director, Corporate Communications.* Ms. Duff joined IPofA in 2005. As its Director of Corporation Communications, she directs the corporate marketing and advertising efforts of IPofA. Her department supports acquisition, leasing, property development and investor services. Ms. Duff's responsibilities also include networking the satellite offices through direction of technical support and IT concerns. Ms. Duff plans all corporate conferences and events locally, regionally and nationally. She received her education at Virginia Commonwealth University in Richmond, Virginia. She is a member of the International Council of Shopping Centers (CSC) and the Tenant in Common Association (TICA).

AUG-31-2007  06:34PM    FROM-ALAIN PINEL REALTY        408-000-0000        T-325  P.006/051  F-041



# Richmond Square Mall







Property Profile



# Richmond Square Mall

This 385,364 square foot regional shopping mall is located along US 40 (National Road) in Richmond, Indiana about 2 miles south of I-70. The property serves a trade area of approximately 100,000 persons and is the dominant retail-shopping destination in Richmond and several surrounding counties, extending into western Ohio.

Richmond Square was owned and operated by two different national firms prior to its purchase in 2004 by Investment Properties of America (IPofA). In spite of the center's strong national tenant mix and complete renovation in 1997, the property never realized its full potential.

IPofA recognized this potential and acquired the property with the expectation of creating substantial returns for the owners over the next five to seven years. This will be achieved through the application of IPofA's property management experience and ability to address several specific issues including:

- **Successful leasing program** - When purchased, the center was 97% occupied at below market rents and leasing was managed without local market knowledge or presence.

- **Cost-effective contract services and hands-on management** - Prior owners were not actively involved in the day-to-day operation of the center and used inefficient contract services that have been re-evaluated and improved. These services include maintenance, housekeeping, trash removal, security, etc.

- **Effective marketing program** - Historically, little focus had been placed on the mall's marketing and the program lacked sufficient funding, direction, category or tenant-specific promotion. It was not structured to positively impact the property's gross sales and net operating income. In addition to instituting an aggressive marketing program, IPofA's plans include hosting income-producing events in the common area of the mall and rolling out a new gift certificate program.

- **New leasing opportunities** - IPofA has identified and is already engaged in the pursuit of new leasing opportunities with national tenants, including the development of two outparcels along US 40.

By successfully dealing with these issues, IPofA believes that increasing cash flows and an eventual TIC owner profit may be achieved.



The mall is now approximately 99% leased, with 95% of the mall tenants being national chains with household names, including Victoria's Secret, Radio Shack, Aeropostale, Sears, JCPenney, Dillard's, PacSun, Finish Line, American Eagle Outfitters, Chili's Bar & Grill and many more. IPofA has recently filled vacancies with national and local tenants including Hot Topic, Christopher & Banks and Hibbetts Sporting Goods and is in contact with other credit-worthy tenants to fill the new outparcel buildings.

Richmond, VA  |  Indianapolis, IN  |  1.877.MY.IPofA

Parkway Complex







Property Profile



# Parkway Complex

Acquired by Investment Properties of America in 2001, this office and industrial warehouse complex includes three buildings with total square footage of 134,060 on 8.78 acres in northeastern Indianapolis, Indiana.

The property was constructed in various phases beginning in the nineteenth century and continuing between 1921 and 1964. The Parkway Complex has been renovated and improved over the years and most recently has undergone extensive renovations inside and out, including updated HVAC, telecommunications and data system wiring.

The Parkway Complex has been designated as an Urban Enterprise Zone, offering significant tax advantages to the owners and businesses operating in the Zone. Located at 4201 Millersville Road, the Parkway Complex has easy access to local, regional and national thoroughfares.





**The Opportunity:** IPofA is offering for sale a 34 year and 1 month individual Parcel Lease Interest ("PLI") in the West Oaks Mall in Houston, Texas. The PLI aims to provide owners with predictable, growing income from the rental of space within the mall. The leases feature two scheduled rental increases in years 3 and 5. Monthly income will be paid on the 25th of each month from date of investment on the original equity investment. Owners may expect to deduct mortgage interest and are able to amortize their full investment over the term of the lease. An affiliate of IPofA will retain an option to purchase the PLI from owners in year 7 at fair market value plus a lease termination payment, subject to terms and other conditions as fully described in the Memorandum.

**About the Provider:** Investment Properties of America, LLC is an exciting and diversified real estate investment and management company, which acquires, develops and manages properties, primarily leased to major national and regional retail companies under net leases. The company has a portfolio of retail and industrial properties throughout the United States, containing an aggregate of approximately 4 million square feet of gross leasable area and is continuing to expand its presence in the real estate market.

In addition, IPofA has offered to qualified investors ownership in commercial properties through tenant in common and LLC ownership structures. We specialize in repositioning under-performing properties with the intent of turning them into stable, income-producing assets for investors of all sizes.

**Market Description:** The City of Houston is the 5th largest metropolitan service area in the US with a population of 5.2 million. Growth between 2002 - 2005 is 19.3% and is forecasted to be 7.6% thru 2010. The property enjoys frontage on Westheimer Road and Highway 6 with daily car counts of 100,000 per day. The average household income within a 10-mile radius of the property is $100,000 annually. Houston's diverse economy includes Oil and Gas, Banking, Insurance, Medical, and Manufacturing. The area's largest employers include Houston Independent School District with 23,768, The University of Texas MD Anderson Cancer Center with 13,400, Harris County with 12,503, Shell Oil with 12,200, and Halliburton with 12,168. Area recreation and cultural activities include 60 colleges and universities, 8 Museums, 4 professional sports teams, and over 18,000 Acres of public parks.

## Demographics Overview

| | 5-mile | 10-mile | 15-mile |
|---|---|---|---|
| **Population** | | | |
| 2010 Projection | 303,211 | 1,185,255 | 2,125,915 |
| 2005 Estimate | 273,070 | 1,064,191 | 1,906,309 |
| Growth Projected (2005-2010) | 11.00% | 11.40% | 11.50% |
| **Households by Income** | | | |
| $100,000 + | 21.20% | 21.50% | 23.70% |
| $75,000-$99,999 | 12.30% | 11.50% | 11.90% |
| $50,000-$74,999 | 20.40% | 18.20% | 18.20% |

\* Demographic information obtained through Claritas

RICHMOND, VA   •   INDIANAPOLIS, IN   •   ATLANTA, GA   •   1.877.MY.IPOFA   •   WWW.IPOFA.COM



# INVESTMENT PROPERTIES OF AMERICA

## Acquisition Opportunity Highlights

| | |
|---|---|
| Property Type: | Class A Super-Regional Mall |
| Location: | Houston, Texas |
| Property Size: | 496,796 Square Foot |
| Occupancy: | 87% |
| Number of Tenants: | 80 (approximately) |
| Purchase Price: | $170,000,000 |
| Equity: | $84,000,000 |
| Debt: | $86,000,000 |
| Debt to Equity Ratio: | 50.58% |
| Co-ownership Structure: | Parcel Lease |
| Parcel Lease Term: | 34 Years and 1 month (Plus a 10 yr. extension option) |
| Initial Yield: | 7% |

## Property Description:

West Oaks Mall is a Class A super-regional mall located at the corner of Highway 6 and Westheimer Road in Houston, Texas where 150,000 cars pass daily. The mall was built in 1984 and significantly remodeled with more than $10 Million invested in capital improvements between 2004 - 2005. The property enjoys a 87% occupancy from over 80 tenants, the majority of which are considered national credit tenants. Sales are currently $275 per square foot and are projected to rise above $300 per square foot in 2007. West Oaks Mall had approximately 8.5 million visitors in the 12 month period ending May 2006.






## West Oaks Mall Representative Tenants

| Tenant | Square Footage | Lease Expiration |
|---|---|---|
| Sears | 102,036 | 2010 |
| Steve & Barry's | 75,000 | 2013 |
| Linen N' Things | 28,185 | 2014 |
| Victoria's Secret | 6,294 | 2016 |
| Hollister | 7,000 | 2016 |
| Bath and Body Works | 3,259 | 2016 |
| Alamo Drafthouse | 25,771 | 2015 |
| Dillard's** | 227,600 | 2012 |
| Foley's** | 250,000 | |

**Shadow Anchor -- Not included in overall square footage



| Fiscal Year Ending | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Exercise of Call Right |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Rental Revenue | 7,000 | 7,000 | 8,000 | 8,000 | 9,000 | 9,000 | 9,000 | |
| Debt Service | 6,636 | 7,984 | 7,966 | 7,968 | 7,966 | 7,984 | 7,966 | |
| Lease Termination Fee | | | | | | | | |
| Gain | | | | | | | | 30,000 / 29,665 |
| **Total Income** | 13,636 | 14,984 | 15,966 | 15,966 | 15,966 | 16,984 | 16,966 | 69,665 |
| **Deductions** | | | | | | | | |
| Debt Interest | 6,427 | 7,719 | 7,678 | 7,655 | 7,631 | 7,826 | 7,577 | |
| Amortization | 5,938 | 5,938 | 5,938 | 5,938 | 5,938 | 5,938 | 5,938 | |
| **Total Deductions** | 12,365 | 13,657 | 13,616 | 13,593 | 13,569 | 13,564 | 13,515 | |
| **Net Taxable Income** | 1,271 | 1,327 | 2,350 | 2,373 | 3,397 | 3,420 | 3,451 | 69,665 |
| **Total Before Tax Cash Flows** | 7,000 | 7,000 | 8,000 | 8,000 | 9,000 | 9,000 | 9,000 | 130,256 |
| **Total After Tax Cash Flows** | 5,504 | 6,483 | 7,083 | 7,074 | 7,675 | 7,666 | 7,664 | 116,233 |
| Before Tax Cash Flows IRR | 11.06% | | | | | | | |
| After Tax Cash Flows IRR | 8.87% | | | | | | | |

...not an offer to sell or a solicitation of an offer to buy securities. Such offers can only be made by the Confidential Private Placement Memorandum (the "Memorandum"). The information herein is qualified in its entirety by the medium. All potential investors must read the Memorandum in its entirety and no person may invest in Tenant In Common Interests without acknowledging receipt and complete review of the Memorandum. The Investment various degrees of risk, including speculative market and financing risks associated with fluctuations in the real estate market. Please refer to the "Risk Factors" section of the Memorandum.

AUG-31-2007  06:37PM  FROM-ALAIN PINEL REALTY        408-000-0000      T-325  P.012/051  F-041





# West Oaks Mall
## Property Profile





INVESTMENT
PROPERTIES
OF AMERICA



# West Oaks

A 1.1 million square foot shopping complex located on the booming west side of Houston, West Oaks was built in 1984 and offers three anchor stores – Dillard's, Foley's and Sears – and over 110 inline stores and services. The mall recently underwent an extensive renovation and added a magnificent food court, featuring a two-story, open-hearth fireplace.

| Quick Facts – Primary Trade Area | |
|---|---|
| Population | 550,481 |
| Total Households | 196,030 |
| Avg. Household Income | $81,871 |
| Median Age | 33.4 yrs. |
| Vehicular Traffic | 207,220/day |

The multi-million dollar renovation is complete and has transformed West Oaks into a modern, ranch-style shopping experience. Using Texas-inspired design and authentic materials, the personality, hospitality and pride of Houston itself has been captured. From the Great Room food court to the new soft play area for kids, West Oaks is stylish, sophisticated and welcoming – a whole new brand of shopping in the city's fastest growing area.

West Oaks continues to attract key national and regional tenants. Sales at the center have risen dramatically as customers discover West Oaks' new ambience and stores including:



Alamo Drafthouse Cinema
American Eagle
Applebee's*
Bombay Company
Forever 21
Gap
Gap Kids/Baby Gap
Hollister Co.
Kirkland's
Lenscrafters
Lids
Limited
Linens 'n Things
Steve & Barry's*
Victoria's Secret
*Coming soon





1000 West Oaks Mall
Houston, Texas 77082
281.531.1332
Fax 281.531.1579

Richmond, VA  |  Indianapolis, IN  |  1.877.MY.IPofA
Owned and managed by Investment Properties of America

AUG-31-2007  06:38PM  FROM-ALAIN PINEL REALTY        408-000-0000        T-325  P.014/051  F-041



Property Profile









## Parkway Complex

Acquired by Investment Properties of America (IPofA) in 2001, this office/industrial complex includes three buildings with total square footage of 134,060 on 8.78 acres located at 4201 Millersville Road in eastern Indianapolis, Indiana. The property was constructed in various phases between 1921 and 1964. The property has been renovated and improved over the years and most recently has undergone extensive renovations. The location of the property has been designated as an Urban Enterprise Zone, offering significant tax advantages to the owners and businesses operating in the Zone. The property was sold to tenant in common investors in 2005.

## 5201 West 86th Street

Acquired by IPofA in 2001, this 459,000 square foot office/industrial complex on 16.5 acres in Park 100 Industrial Park, is located in Indianapolis, Indiana. The property has been leased to Point to Point Express, a provider of transportation and logistical services to Hewlett Packard and other national companies. However, with its versatility, it could be easily subdivided for up to four different tenants. The building operates profitably and was sold to tenant in common investors in 2004.

## Richmond Square Mall

Acquired by IPofA in early 2004, this 385,000 square foot regional mall is located in Richmond, Indiana and draws shoppers from a broad area of eastern Indiana and western Ohio. It is anchored by JCPenney, Sears and Dillard's. The property is now approximately 99% leased, with 95% of the mall tenants being national chains and household names, including Victoria's Secret, Radio Shack, Aeropostale, PacSun, Finish Line, American Eagle and Chili's Bar & Grill. IPofA filled the vacancies with Hot Topic, Christopher & Banks and Hibbetts Sporting Goods and is currently in contact with other credit-worthy tenants to fill the new outparcel buildings. The mall is operating profitably and was sold to tenant in common investors in 2004.

## Crooked Creek Centre

Acquired by IPofA in 1994, this 51,000 square foot retail strip center is situated on 6 acres in northwest Indianapolis, Indiana. The property has been renovated and seasoned into a stable neighborhood shopping center. In addition, the center is anchored by one of the top-performing Tuesday Morning stores, a national retail chain of over 600 stores specializing in selling deeply discounted, upscale home accessories and gifts. The center was sold to tenants in common in 2004.

## Canyon Heights Estates

Located in Palm Springs, California, this residential, hotel and golf course project was developed between 1989 and 1991. Edward Okun, President and CEO of Investment Properties of America, was an equity partner in the project and was responsible for assembling 500 acres contiguous to the bankrupt Canyon Hotel and golf course. During the course of development, Okun negotiated the purchase of the hotel and golf course on Native American leasehold land with a short-term lease over an 18-month period and purchased the fee simple estate from all beneficiaries to make the project viable. In addition, he obtained zoning approvals for total redesign of the golf course, the demolition and rebuilding of the hotel and spa, and surveying and plotting land for estate home sites on the property. Okun sold his interest in the venture to an equity partner in 1991.



## Village on Canon

In 1985 Okun purchased a 45,000 square foot site at the corner of Canon and Dayton Way in Beverly Hills, California. Existing structures were demolished and replaced with a 109,000 square foot mixed-use, retail and office project that included a 900-car, 4.5 level parking structure below grade. He selected Gensler & Associates to design the project, which received several architectural awards. The project was completed on time and within budget in 1988.