# EXHIBIT 1

DREIER LLP
499 Park Avenue
New York, New York 10022
Norman N. Kimel (NK 0474)
Paul Traub (PT 3752)
Steven E. Fox (SF 5432)
Tel. (212) 328-6100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
In re:                                           )
                                                 )       Chapter 11
THE 1031 TAX GROUP, LLC, et al.,1                )       Case No. _____ ( ____ )
                                                 )
           Debtors.                              )       Jointly Administered
-------------------------------------------------------x

### DECLARATION OF JAMES M. LUKENDA, CIRA, AS CHIEF RESTRUCTURING OFFICER (A) IN SUPPORT OF RELIEF REQUESTED IN FIRST DAY MOTIONS AND APPLICATIONS AND (B) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF NEW YORK        )

James M. Lukenda, being duly sworn, deposes and says:

1.    I am the Chief Restructuring Officer of The 1031 Tax Group, LLC (together with its affiliated debtors and debtors in possession herein, the "Debtors"), and since my recent engagement, I have familiarized myself with the business and financial conditions of the Debtors.

2.    I am authorized to submit this affidavit in support of the Debtors' respective

---

1    The Debtors are: The 1031 Tax Group, LLC; 1031 Advance 132 LLC; 1031 Advance, Inc.; 1031 TG Oak Harbor LLC; Atlantic Exchange Company, Inc.; Atlantic Exchange Company LLC; Exchange Management, LLC; Investment Exchange Group, LLC; National Exchange Accommodators, LLC; National Exchange Services QI, Ltd.; National Intermediary, Ltd.; NRC 1031, LLC; Real Estate Exchange Services, Inc.; Rutherford Investment LLC; Security 1031 Services, LLC; and Shamrock Holdings Group, LLC.

{00255916.DOC;}

petitions for relief under chapter 11 of Title 11, United States Code (the "Bankruptcy Code").

3.    Unless otherwise indicated, the financial information contained herein concerning the Debtors has been compiled based upon Debtors' own internal records, has not been subjected to external verification and is unaudited. The financial information is subject to further investigation by the CRO, Treasurer and Temporary Staff from Huron Consulting Services LLC (collectively, "Huron") and is likely to be supplemented and modified.

4.    This Declaration is being submitted in support of the "first day" motions and applications of the Debtors in the above-captioned chapter 11 cases. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition since the engagement of my firm and myself approximately 10 days ago. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.    Part I of this Declaration describes the business of the Debtors and the developments that led to the filing of their chapter 11 petitions. Part II sets forth the relevant facts in support of the various "first day" motions and applications filed by the Debtors concurrently herewith. Part III sets forth, to the extent available, the information required under Local Bankruptcy Rule 1007-2.

6.    As a result of the review of the Debtors' books, records and other information by the CRO, the Treasurer and the Temporary Staff provided by Huron, I believe that the relief sought by the Debtors in their "first day" motions and applications is necessary to enable the Debtors to continue to operate effectively as debtors-in-possession following the filing of their chapter 11 cases, and that the failure to grant such relief would have a deleterious effect upon the

{00255916.DOC;}

Debtors' ability to consummate successfully a comprehensive and effective reorganization so as to provide the greatest potential recovery for its creditors.

## Part I.

## BACKGROUND

**A.    Business Description**

7.    The Debtors act as a "qualified intermediary" (also referred to as a "QI," "exchange accommodator titleholder," "EAT," "accommodator," or "facilitator") for deferred like kind property exchanges consummated by Exchangers pursuant to section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031. A Section 1031 tax deferred exchange, named for the Internal Revenue Code Section to which it refers (also known as a Starker exchange, tax free exchange, or like kind exchange), allows a deferral of the taxes that would otherwise be due.

8.    In a typical 1031 exchange, an exchanger ("Exchanger") sells its business or investment real estate (a 1031 exchange does not apply to one's primary residence). The Exchanger then has forty-five (45) days from the date of sale of the property to identify a like kind replacement property (which usually takes the form of a signed contract) and 180 days from the date of the sale to close on the purchase of the replacement property. In order to preserve the tax deferral, the Exchanger cannot take title to the proceeds of the first sale, but must instead deposit the proceeds with a "qualified intermediary," until such time that the Exchanger is ready to close on the replacement property. Section 1031 does not prohibit the commingling of funds in a single commingled account.

9.    Certain of the Debtors acted as a qualified intermediary for "reverse exchanges." In a reverse exchange, the Exchanger identifies and contracts for the

replacement property prior to selling the old property. The Exchanger lends funds or guarantees a bank loan to the QI. The QI uses the funds to purchase and take title to the replacement property. The replacement property is leased back to the Exchanger at a rent equal to the QI's carrying cost, including debt service. The Exchanger agrees to acquire the property within 180 days. The Exchanger signs a contract to sell the old property and assigns the rights under the contract to the QI. When the sale closes on the old property, the replacement property is conveyed to the Exchanger in exchange for the proceeds of sale of the old property. The funds are used to repay the loan used to purchase the new property and the lease is cancelled. A reverse exchange can also be done where the replacement property is build-to-suit construction or a renovation. Title to the replacement property in a reverse exchange is held in a Single Purpose Entity ("SPE"), usually an LLC (the "Reverse LLC"). Thus, the Debtors have a significant number of Reverse LLCs existing for this purpose. As of the Petition Date, there were over one hundred (100) open reverse exchange contracts, at an undetermined total value. Although the Debtors include entities that hold the member interests in the Reverse LLCs, none of the Reverse LLC entities themselves have filed petitions for relief under chapter 11.

**B.    Business Plan**

10.    Edward H. Okun is the sole member (the "Member") of The 1031 Tax Group, LLC ("1031 Tax Group"). Okun Holdings, Inc. ("Okun Holdings") is a holding company of which Mr. Okun is the sole shareholder. Okun Holdings is intended to be the holding company for all of Mr. Okun's business ventures, although, as of the Petition Date, the actions needed to be taken in connection with 1031 Tax Group and certain other Okun-

affiliated entities formally becoming part of Okun Holdings had not been effected.  Mr.
Okun is also the sole member of Investment Properties of America, LLC ("IPofA" or the
"Borrower").

11.    The Member made six (6) acquisitions between August 2005 and December
2006 under a business strategy of "rolling up" regional QIs into a national firm.  Cash
consideration paid by the Member for these entities totaled approximately $27.5 million. All
of these acquisition entities are wholly-owned direct or indirect subsidiaries of The 1031
Tax Group, LLC, as shown in the organizational chart, attached as Exhibit A.  The
acquisitions in chronological order occurred as follows:  Atlantic Exchange Company, Inc.
and affiliates, Security 1031 Services, LLC, and affiliates, Real Estate Exchange Services,
Inc. and affiliates, National Exchange Services QI, Ltd. and affiliates, Investment Exchange
Group, LLC and affiliates, and 1031 Advance, Inc. and affiliates.  Typically in a strategic
acquisition strategy, the former owner is employed by the acquirer to operator the business,
and cost saving driven from synergies are implemented.  The Member was not involved in
day-to-day operations of the QI businesses.

12.    Revenue is generated in two ways:  (i) fees are earned based on the size and
complexity of each transaction and (ii) the QI earns a spread on interest received from
investing the transaction funds versus interest paid to the Exchanger.

13.    As of the Petition Date, there were in excess of three hundred (300) open
exchange contracts representing an estimated liability of $151 million.  By the nature of the
exchanges, the estimated liability matures within 180 days.  The size of each exchange

ranges from the tens of thousands of dollars to more than $10.5 million and averaged approximately $550,000.

**C.    Events Leading to Bankruptcy**

14.    According to the Member, the acquired companies did not meet revenue expectations in line with historic performance. The Member has asserted that this business decline was the result of the failure of local management. The Member has also asserted that there may be causes of action against the sellers.

15.    While a strategic acquisition strategy was being pursued, it appears that very little effort was focused on integrating the acquisitions either operationally or from a financial accounting and control standpoint. While the open exchange contract records appear to be orderly and in generally good condition, the same cannot be said for the Debtors' accounting and financial reporting records.

16.    Counsel for the Member hired a forensic accounting firm on or about December 15, 2006 to analyze and bring order to the accounting information. However, as of the Petition Date, significant work must still be accomplished for the Debtors to prepare accurate financial statements and provide detailed financial information on their operations and transactions.

17.    IPofA, an entity that is wholly-owned and controlled by Mr. Okun and that has substantial real estate-related interests, borrowed funds from the Debtors in the form of a series of unsecured promissory notes ("Notes"). These Notes are the Debtors' primary asset and source of recovery. Based on the Notes that have been made available for examination, the Notes are in writing, provide for what appears to be market rates of interest, contain

{00255916.DOC;}

maturity dates, and, in the event of non-payment, penalty interest provisions. The maturity of the Notes is one hundred and eighty (180) days. As of the Petition Date, the net balance due to the Debtors of the outstanding Notes was approximately $132 million, which does not appear to include the full amount of accrued interest at contractual rates (including penalty rates for Notes past their Maturity Dates). The Member has advised that the borrowed funds were used to invest in the business and investment activities of entities owned or controlled by the Member. While the Notes are short term in nature, it appears that the Member used the funds borrowed for longer-term purposes with the intention of providing a higher return to the Debtors than would otherwise be available from shorter-term instruments. The Member believed that the anticipated growth of the business would support the level of longer term investment while leaving sufficient reserves in shorter term investments to meet current obligations.

18.     While it appears that some cash payments were made in respect of the Notes, the Note balance grew from approximately $55 million at December 31, 2005 to approximately $113 million at December 31, 2006 and approximately $132 million at May 11, 2007. The levels of new business dropped at the same time the total amount of Notes was growing, creating the beginning of a liquidity crisis.

19.     According to the Member, the liquidity crisis was exacerbated by employees in Denver and in San Jose who allegedly opened local bank accounts without the knowledge of the Member or his treasury management group. Funds were deposited into Colorado Capital Bank and Countrywide Bank and were unilaterally frozen by those institutions (i.e., not the result of any court proceedings), which the Member believes to have been wholly

{00255916.DOC;}

improper. As a result of these actions, the payments to close certain exchange contracts that had expected to fund from a local account were instead made from the main operating account, which quickly depleted available funds and worsened the liquidity crunch. The Debtors have since missed closing dates requested by some of their customers.

20.     Due to the current liquidity crisis, on May 8, 2007, negotiations took place between representatives of Huron and the law firm of Dreier LLP, both on behalf of the 1031 Tax Group, on the one side, and Mr. Okun, the General Counsel for Okun Holdings, and outside counsel to Mr. Okun and Okun Holdings (the law firm Kluger Peretz Kaplan & Berlin, P.L.) on the other side. As a result of those negotiations, Mr. Okun has as of this date executed a personal guarantee of the Notes (in respect of amounts due from IPofA or its subsidiaries) (the "Okun Guaranty"). Mr. Okun has also agreed in principal to collateralize the Okun Guaranty with a collateral package of assets of IPofA and/or other entities controlled by Mr. Okun irrespective of any underlying obligation under the Notes (the "Collateral Pool") in order to facilitate repayment of creditors' claims. Mr. Okun has agreed to provide the Collateral Pool with the express understanding that the Debtors have made no commitment to grant him any release with respect to the Note obligations or any other matter. It is anticipated that the proposed Collateral Pool will include interests in real estate, including malls, warehouses and industrial facilities. In the days that followed, a specific collateral pool was identified and preliminary analysis on these assets was performed. However, in light of the external events that accelerated the timing of the Debtors' bankruptcy filings, final negotiations with Mr. Okun with regard to the Collateral Pool and documentation thereof could not be concluded prior to the Petition Date. In the interim, however, as noted above, Mr. Okun has provided the Okun Guaranty and it is anticipated that the

Collateral Pool will be agreed to and documented within a short period of time.   Mr. Okun has indicated that he has already taken steps to refinance and/or liquidate collateral that will be contributed in part to the Collateral Pool and that the proceeds of such efforts should allow the Debtors to either (i) meet the liquidity needs arising in connection with the completion of Exchanger transactions and/or (ii) create a fund for Exchangers to realize a repayment of amounts that may be due them.  Although Mr. Okun has indicated that such efforts are already underway and funds will become available at various intervals, he estimates that the entire process may take from nine to twelve months.  In addition to providing the Okun Guaranty, Mr. Okun has also indicated his willingness to assist the Debtors in identifying additional recoverable assets and in investigating and pursuing claims against third parties for wrongful acts taken that have damaged the Debtors and their businesses.

21.    During the last several weeks, the Debtors have commenced a contraction of their operations.  The Debtors began the process of closing sales offices and consolidating processing. The Debtors have reduced the number of employees from over fifty (50) to five (5).  The Debtors expect to use their best efforts to complete reverse exchanges in the normal course over the next several months.  The Debtors hope to fund the closing of open exchanges to the extent that funding becomes available and to the extent allowable under chapter 11.

22.    According to the Member, the Debtors' liquidity crisis in the period leading up to the Petition Date was the result of management of the various regional offices engaging in a practice of opening new localized bank accounts for the deposit of Exchanger funds, rather than utilizing the Debtors' main operating accounts, but which accounts were unknown to the Member or his treasury management group.  These amounts include

{00255916.DOC;}

$572,000 held by Countrywide Bank, a California institution, and between $10.5 million to $19.3 million held by Colorado Capital Bank, in Denver.  The Countrywide accounts are segregated for specific customer transactions and the bank is unwilling to make the funds generally available to the estates.  The cash held in Colorado Capital Bank is likewise frozen.  With respect to the funds on deposit in Colorado Capital Bank, there is presently pending an action in the Colorado District Court (styled Colorado Capital Bank v. Investment Exchange Group, LLC, The 1031 Tax Group, LLC, et al.) seeking to determine the proper disposition of the funds held at the bank.2  In the days leading up to the commencement of these chapter 11 cases, the Debtors have been defending the allegations in the referenced action.  In addition to the disputed funds on deposit with Colorado Capital Bank, the Debtors' main operating account at Wachovia Bank was frozen as a result of a Temporary Restraining Order received on May 11, 2007.  Bank statements as of May 11, 2007 reflect a balance in that account of $76,000; however, $38,000 is believed to have been disbursed for payroll, resulting in a $38,000 balance which is now unavailable to the Debtors.  The Debtors believe that the automatic stay imposed as a result of the filing of their chapter 11 cases requires the banks to immediately release the funds which they have improperly restrained.  In the event the banks at issue refuse to do so, the Debtors intend to seek immediate relief from this Court in order to obtain access to all such funds.

23.      In the absence of access to the disputed funds, the Debtors appear to have little available cash; however, Mr. Okun has provided a personal guarantee to provide up to $100,000 of immediate liquidity to the Debtors in order to meet their obligations through the first thirty

---

2      The range of funds in the account varies from $10.5 million, the last bank balance prior to the funds being frozen and an amount of $19.3 million mentioned in state court by counsel for Colorado Capital Bank.

{00255916.DOC;}

(30) days post petition (to be offset by any funds that may become available to the Debtors during that time from other sources). It is his intention to wire funds as soon as a Debtor-in-Possession Account has been opened. Mr. Okun has also indicated his willingness to assist the Debtors in identifying additional recoverable assets and in investigating and pursuing claims against third parties for wrongful acts taken that have damaged the Debtors and their businesses.

24.    A preliminary investigation by the U.S. Attorney's Office, Richmond, Virginia has begun concerning the activities of the Debtors. A Federal search warrant was executed on Friday, April 27, 2007 by the U.S. Postal Inspector for documents in connection with this investigation. The affidavit in support of the search warrant is sealed. Counsel to the Member has represented that the Member is cooperating fully with the Federal investigation and is complying fully with all requests, including a standstill on all new business until the investigation is resolved.

25.    The Debtors determined and believed that it was absolutely necessary to file immediately for relief under chapter 11 to address the pending court actions, resolve claims and proceed with an orderly restructuring of their businesses and obligations due to third parties. Given the achievements obtained to date, including (a) negotiating and obtaining the Okun Guarantee; (b) working with Mr. Okun and his counsel and financial advisors to identify available collateral for the Collateral Pool, (c) assisting the Debtors in identifying additional recoverable assets and in investigating and pursuing claims against third parties for wrongful acts taken that have damaged the Debtors and their businesses, and (d) formulating the outline of a plan for the ultimate liquidation of the Collateral Pool to the extent necessary to satisfy claims,

the Debtors believe that the highest potential recovery for creditors of the Debtors' estates can be achieved through a Chapter 11 proceeding.

## Part II.

## FIRST DAY MOTIONS AND APPLICATIONS

26.     As noted above, I believe that the relief sought by the Debtors in their "first day" motions and applications is necessary to enable the Debtors to operate effectively as a debtor-in-possession following the commencement of the chapter 11 cases, and that the failure to grant such relief would have a deleterious effect on the Debtors' ability to administer their affairs under chapter 11. The factual background and support for each of these first day pleadings is provided below. This case is likely to be complex and will require counsel to the Debtors with a national reputation and with extensive experience in insolvency and bankruptcy cases. The Debtors have chosen Dreier LLP (New York, NY) ("Dreier") as their bankruptcy counsel for these cases and desire to employ and retain Dreier as their attorneys. Dreier is a law firm with a national and international restructuring expertise.

### A.    Debtors' Motion For Joint Administration

27.     By this Motion, the Debtors are seeking the entry of an Order, authorizing the joint administration of the Debtors' Cases for procedural purposes only and related relief. Joint administration of these cases is warranted because each of the other Debtors are all directly or indirectly wholly owned by The 1031 Tax Group, LLC, and the Debtors have many common creditors and overlapping business operations.

{00255916.DOC;}

## B.    Retention of Professionals

### (i)    Dreier LLP

28.    Since approximately May 1, 2007, Dreier has been advising the Debtor with respect to restructuring and insolvency issues, as well as certain related issues and with respect to factors pertaining to the commencement of these cases. In so doing, Dreier has become familiar with the Debtors and their affairs. I have been informed that the partners and associates of Dreier who will advise the Debtors in these cases have wide-ranging experience in insolvency and bankruptcy law, as well as in such additional disciplines as may be required in these chapter 11 cases. I believe that Dreier is well-qualified to represent the Debtors as debtors-in-possession in these chapter 11 cases.

### (ii)    Huron Consulting Services, LLC

29.    By this Motion, the Debtors seek the entry of an Order authorizing the Debtors' employment of Huron Consulting Services LLC ("Huron") to provide certain officers and temporary staff to the Debtors in these cases to assist them in their restructuring. Huron has agreed to provide James M. Lukenda to serve as the Debtors' Chief Restructuring Officer (the "CRO") and Richard R. Vanderbeek, Jr. to serve as Treasurer. In these capacities, the CRO and Treasurer will assist the Debtors in their operations and will manage the Debtors' restructuring efforts, including negotiating with parties in interest and coordinating the Debtors' employees and professionals who are assisting the Debtors in the restructuring process.

30.    The CRO is well-suited to provide the restructuring services required by the Debtors. The CRO has an extensive background in providing services to financially distressed and/or Chapter 11 debtors in the past.

{00255916.DOC;}

31.    In addition, the Debtors seek to employ and to provide certain temporary employees (the "Temporary Staff"). The Temporary Staff will assist the CRO and Treasurer on numerous fronts during these cases, including, but not limited to, the negotiation of the collateral package from Edward Okun, liquidity management, the preparation of a forensic analysis of cash transactions, and the preparation of the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities.

32.    The Debtors are familiar with the professional standing and reputation of Huron. The Debtors pre-petition sought the assistance and advice of Huron in its capacity as experienced turnaround consultants. During this process, the Debtors were exposed to, and benefited from, Huron's wealth of experience in providing advisory services in restructurings, reorganizations, and forensic investigations. In addition, the Debtors are aware that Huron enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

33.    Moreover, prior to the Petition Date, Huron employees have devoted substantial amounts of time and effort researching options relative to maximizing the recovery to creditors and assisting the Debtors in their contingency planning efforts, among other activities. Throughout this process, Huron professionals were invaluable to the Debtors and have played an instrumental role in their restructuring efforts to date.

34.    The Debtors believe that the employment of Huron, the CRO, the Treasurer, and the Temporary Staff would greatly benefit the Debtors' estates and creditors. Each is clearly qualified for the position for which they are being employed. The Debtors have determined that the compensation terms of the Engagement Agreement are within the range for senior executive

{00255916.DOC;}

officers employed with companies of comparable size, value and reputation. Accordingly, the

Debtors' decision to enter into the Engagement Agreement reflects an exercise of the Debtors'

sound business judgment.

### C. Motion for Authority for Debtor to Mail Initial Notices and to File a Consolidated List of Creditors (Without Claim Amounts) in Lieu of a Matrix

35. The Debtors have identified more than five hundred (500) entities to which notice

of the Debtors' Chapter 11 proceedings must be given. The Debtors maintain lists of the names

and addresses of all such entities on various computer programs or have access to such lists,

which permits the Debtors (or its agents) to produce mailing labels for each creditor.

36. Transferring this information to the form of a mailing label matrix described by

the Local Bankruptcy Rules would be a monumental and expensive task. Moreover, in light of

the size of the mailings, I am informed by counsel that this Court is likely to direct the Debtors to

complete such mailings in any event. Consequently, I believe it is in the best interest of the

Debtors' estates and creditors to avoid the costs and risks associated with preparing and filing the

mailing label matrix and to permit the Debtors instead to file a list of creditors, not in matrix

form, without claim amounts. The Debtors also propose to undertake (or have an agent

undertake) all other mailings directed by the Court, the United States Trustee or required by the

Bankruptcy Code or the Local Rules of this district.

### D. Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals

37. The Debtors request the establishment of procedures for compensating and

reimbursing Court-approved retained professionals on a monthly basis consistent with General

Order M-219. I believe that such an order will streamline the professional compensation process

and enable the Court and all other parties to more effectively monitor the professional fees incurred in this chapter 11 case.

38.    The requested procedures would permit each retained professional subject to these procedures to present to the Debtors, the Debtors' counsel, the Office of the United States Trustee, and counsel to any official committee of creditors (a "Committee") appointed by the United States Trustee to serve in these chapter 11 cases, a monthly statement of services rendered and expenses incurred by each retained professional during the immediately preceding month, subject in all respects to the submission of interim and/or final applications in accordance with sections 330 and 331 of the Bankruptcy Code.

39.    The Debtors further request that each member of the Committee (if one is appointed) be permitted to submit statements of expenses and supporting vouchers to counsel for the Committee (if appointed), who will collect and file such requests for reimbursement in accordance with the foregoing procedure for monthly and interim compensation and reimbursement of retained professionals.

40.    The Debtors further request that the Court limit the notice of hearings to consider interim and final compensation applications to: (i) the Office of the United States Trustee; (ii) the Debtors; (iii) counsel for the Debtors; (iv) counsel for any Committee; and (v) all parties requiring notice pursuant to Bankruptcy Rule 2002.  I believe that such notice should reach the parties most active in this case and will save this estate the expense of undue duplication and mailing.

**E.    Motion for Order Extending Time to
        File Schedules, Lists and Statements of Affairs**

41.    The voluntary chapter 11 petitions filed by each of the Debtors were accompanied

{00255916.DOC;}

by a consolidated list of the Debtors' twenty (20) largest unsecured creditors. Due to the exigencies surrounding the Debtors' commencement of these Chapter 11 cases, the schedules of assets and liabilities, statements of financial affairs, lists of equity security holders and lists of executory contracts and leases (collectively the "Schedules") required by Bankruptcy Rule 1007(b) were not filed with the Debtors' chapter 11 petitions.

42.    Due to the complexity of the Debtors' business, the nature of its operations and assets and the recent termination or resignation of the majority of the Debtors' employees, I believe that the fifteen (15) day automatic extension of time to file the Schedules provided by Bankruptcy Rule 1007(c) will not be sufficient to permit completion of the Schedules. Accordingly, the Debtors require additional time to bring its books and records up to date and to collect the data needed for the preparation and filing of the Schedules.

43.    At this juncture, I estimate that an extension of forty-five (45) additional days (for a total of 60 days), pursuant to Bankruptcy Rule 1007(c), will provide sufficient time to prepare and file the Schedules.

### F.    Motion for Order Authorizing Temporary Maintenance of Debtor's Cash Management System and Bank Accounts

44.    Before the Petition Date, the Debtors maintained over one hundred bank accounts (each an "Existing Account," and collectively, the "Existing Accounts"), in several financial institutions across the United States, including various payroll, tax, local depository, concentration and disbursement bank accounts (the "Existing Cash Management System").

45.    The Debtors intend to comply fully with the United States Trustee's guidelines by opening new debtor-in-possession bank accounts (the "Debtor-in-Possession Bank Accounts") with JPMorgan Bankruptcy Deposit & Investment Services as soon as is practical.

{00255916.DOC;}

46.     The Debtors are seeking authority to maintain the Existing Bank Accounts and the Existing Cash Management System temporarily, in conjunction with the new Debtor-in-Possession Bank Accounts.  It is the Debtors' intention to write checks and make disbursements only from the Debtor-in-Possession Bank Accounts so as to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and avoid the inadvertent payment of pre-petition claims.

47.     In addition, the Debtors cannot currently access the funds in several of the Existing Accounts as the funds have been blocked by the respective financial institutions. Several of the Existing Accounts are the subject of litigation and other legal action, as described more fully herein.

48.     Temporary maintenance of the Existing Bank Accounts would greatly facilitate as smooth and orderly a transition into chapter 11 as possible under the circumstances, thereby creating a minimum amount of disruption and cost to the estate.  Therefore, the Debtors should be permitted to continue maintenance of the Debtors' Existing Cash Management System and the Existing Bank Accounts until such time as the Existing Bank Accounts can be closed and/or transferred in an orderly manner.

**G.     Motion for Order Authorizing (i) Payment of
Pre-Petition Wages, Salaries and Employee Benefits,
(ii) Reimbursement of Employee Business Expenses, and
(iii) Payment of Other Employee-Related Amounts**

49.     As of the Petition Date, the Debtors employed five (5) employees.  Due to the nature of its business activities, the Debtors are a participant in or are obligated under various salary and wage policies, savings plans, insurance plans and other programs designed to provide benefits for its employees.

{00255916.DOC;}

50.     I believe that continued payment when due of pre-petition wages and salaries and the continuation, without interruption, of all savings plans, insurance plans and compensation policies is necessary to ensure the ongoing services of the Debtors' employees.  These employees are vital to the Debtors' effectuation of an orderly restructuring of their affairs and to the ultimate ability of the Debtors to complete successfully their chapter 11 proceedings.

51.     As of the Petition Date, employees of the Debtor had incurred or had accrued in their favor various sums for (i) wages and salaries (including wage garnishments owing to third parties), (ii) employee business expenses, including, without limitation, travel, meals and lodging, and (iii) other employee benefits, including, without limitation, those due to or for the benefit of the employees under various health, life and savings plans or vacation policies (collectively, "Compensation").  Compensation is due and owing to the Debtor's employees as of the Petition Date by reason of, inter alia:

(a)     the failure of payroll and expense reimbursement checks issued to employees prior to the commencement of these chapter 11 cases to have been presented or to have cleared the banking systems;

(b)     the fact that employees have not yet been paid all their salaries and wages earned for services previously rendered to the Debtors or been reimbursed for business expenses previously paid by such employees on behalf of the Debtors; and

(c)     the fact that certain employee benefits related to pre-petition services have not yet been paid to or for the benefit of the employees.

52.     I believe that any delay in paying the Compensation could severely disrupt the Debtors' relationship with its employees and irreparably impair the employees' morale at the very time when their dedication, confidence and cooperation are most critical.  The Debtors must also continue their corporate policy of permitting certain of its employees to incur business-

{00255916.DOC;}

related expenses and thereupon seek repayment thereof by submitting appropriate invoices or vouchers evidencing these out-of-pocket disbursements.  If the relief requested in that motion is not granted, the employees would suffer great hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their own personal obligations.  Overall, I believe that the relief requested in this motion is critical to the Debtors' business operations.

### H.    Motion to Enforce Automatic Stay

53.    Prior to the Petition Date, at least one financial institution, Colorado Capital Bank ("CCB"), located in Denver Colorado, improperly placed an administrative "freeze" or "hold" on bank accounts maintained by certain of the Debtors at CCB, and other financial institutions are believed to have similarly frozen certain of the Debtors' bank accounts.  CCB also thereafter commenced an action (the "Colorado Action") against Debtors Investment Exchange Group, LLC and The 1031 Tax Group, LLC, in the District Court, City and County of Denver, Colorado (the "Colorado Court"), Case No. 07CV4352, seeking, among other relief, an order directing that funds maintained by the Debtors at CCB be placed in the registry of the Colorado Court.

54.    Access to the funds in and transactional information concerning all of the Debtors' bank accounts are essential in order for the Debtors to continue to operate their businesses.  Accordingly, because the Debtors are concerned that at least CCB, if not other financial institutions, may not immediately release such funds to the Debtors absent a court order, the Debtors will be filing a motion seeking enforcement of the automatic stay under 11 U.S.C. § 362 against all administrative "freezes" or "holds" applied to all bank accounts maintained by the Debtors at any financial institution, including CCB.

{00255916.DOC;}

55.    The Motion to Enforce Automatic Stay will also seek entry of an order staying the continued prosecution of the Colorado action so as to remove any uncertainty by the Colorado Court regarding the Debtors' entitlement to move all funds maintained at CCB into debtor-in-possession bank accounts under the supervision of this Court.

## Part III.

### LOCAL BANKRUPTCY RULE 1007-2

56.    Attached hereto and incorporated herein by this reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-2. Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meanings ascribed to *them* in preceding paragraphs of this Declaration.

Dated: May 13, 2007

Respectfully Submitted,

James M. Lukenda,
As Chief Restructuring Officer

Sworn to before me this
13th day of May 2007:

*/s/ Steven E. Fox*
Notary Public
Qualified In New York County
No. 02-4892129
My Commission Expires May 13, 2009

## Exhibit A

## DEBTORS' ORGANIZATION CHART



# RULE 1007-2 AFFIDAVIT

# LIST OF SUPPORTING SCHEDULES

| Schedule | Description |
|----------|-------------|
| 1 | List of the names and addresses of the members of, and attorneys for, any Creditors' committee organized prior to the Petition Date |
| 2 | Consolidated list of the names, addresses, and telephone numbers of the Debtors' twenty (20) largest unsecured creditors |
| 3 | Consolidated list of the names and addresses of the holders of the five (5) largest secured claims |
| 4 | Preliminary consolidated summary of the Debtors' assets and liabilities |
| 5 | The number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held |
| 6 | A list of all of the Debtors' property in the possession or custody of any custodian |
| 7 | A list of the premises owned or leased by the Debtors |
| 8 | The location of the Debtors' substantial assets and the location of its books and records |
| 9 | List of actions or proceedings pending or threatened against the Debtors or their property |
| 10 | The names of the individuals who comprise the Debtors' existing senior management |
| 11 | The estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders, and partners) for the thirty (30) day period following Petition Date |
| 12 | The amount paid and proposed to be paid for services for the thirty (30) day period following Petition Date to (a) officers, stockholders and directors and (b) consultants |
| 13 | Summary estimating cash receipts and disbursements for the thirty (30) day period following the Petition Date |

{00255916.DOC;}

## SCHEDULE 1

## LIST OF THE MEMBERS OF, AND ATTORNEYS FOR, ANY CREDITORS' COMMITTEE ORGANIZED PRIOR TO THE PETITION DATE

The Debtors are not aware of any Creditors' committee organized prior to the Petition Date.

{00255916.DOC;}

**SCHEDULE 2**

**CONSOLIDATED LIST OF THE DEBTORS'
TWENTY (20) LARGEST UNSECURED CREDITORS**

Following is the list of the debtors' creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112: Fed. R. Bankr. P. 1007(m).

| Name of creditor and complete mailing address including zip code | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|
| Dr. and Mrs. Bordoni<br>478 Sequoia Way<br>Los Altos, CA 94024 | Trade Debt | | $ 10,645,330.31 |
| Capitol Aggregates, Ltd.<br>Gaydos, J.<br>P.O. Box 33240<br>San Antonio, TX 78265 | Trade Debt | | $ 8,115,800.55 |
| Newton Bayard Limited Partnership<br>75 Second Ave<br>Needham, MA 02494 | Trade Debt | | $ 4,358,265.58 |
| Siox Realty Corp<br>212-07 33rd Road<br>Bayside, NY 11361 | Trade Debt | | $ 3,945,904.51 |
| William Newton<br>405 Country Lane<br>San Antonio, TX 78209 | Trade Debt | | $ 3,362,954.89 |
| Red Bird Ranch, Ltd; Reeves Hollimon<br>Hollimon, R.<br>300 Austin Hwy. Suite 200<br>San Antonio, TX 78209 | Trade Debt | | $ 3,354,493.99 |

{00255916.DOC;}

| Name of creditor and complete mailing address including zip code | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|
| 409 Sherman Way, LLC<br>Ms. Candace Graham<br>1 Applewood Lane<br>Portolo Valley, CA 94028 | Trade Debt | | $3,325,777.96 |
| LJ Ambassador, Ltd.<br>Mr. Andy Hull<br>P.O. Box 6051<br>San Antonio, TX 78209 | Trade Debt | | $ 3,175,439.52 |
| LJ 904 West Ave, Ltd., LJ Castle Hill Ventures, Ltd., and LJ Villa Marquis, Ltd.<br>Hull, Andy<br>P.O. Box 6051<br>San Antonio, TX 78209 | Trade Debt | | $ 3,052,462.70 |
| Joyce Green<br>86 Beach Lane<br>Westhampton Beach, NY 11979 | Trade Debt | | $2,842,423.57 |
| Mr. and Mrs. Don Konics<br>926 Deer Creek Rd<br>Martinez, CA 94553 | Trade Debt | | $ 2,817,123.03 |
| NP 1300, LLC<br>76 South Orange Ave<br>South Orange, NJ 07079 | Trade Debt | | $ 2,481,026.56 |
| Vista Enclave Ltd.<br>1117 Eldridge Parkway<br>Houston, TX 77077 | Trade Debt | | $ 2,365,496.47 |
| Huber, G./CellTex<br>Huber, Greg<br>2230 Pipestone Drive<br>San Antonio, TX 78232 | Trade Debt | | $ 2,139,316.37 |
| Quirk Infiniti, Inc.<br>442 Quincy Avenue<br>Braintree, MA 02184 | Trade Debt | | $ 2,077,437.99 |
| Charles & Maria Sourmaidas<br>P.O. Box 351<br>Adamsville, RI 02801 | Trade Debt | | $ 1,970,200.11 |

{00255916.DOC;}

| Name of creditor and complete mailing address including zip code | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|
| James Collins<br>5602 Grape Street<br>Houston, TX 77096 | Trade Debt | | $ 1,919,652.65 |
| Ward Enterprises, LLC<br>c/o Peter Gosch<br>32 Dawn Heath Drive<br>Littleton, CO80127 | Trade Debt | | $ 1,900,028.81 |
| Cody Dutton, Trustee<br>Cody Dutton Testamentary<br>Trust<br>1499 S. Main Street<br>Boerne, TX 78006 | Trade Debt | | $ 1,772,384.44 |
| Myane, G.<br>Myane, Geoffrey<br>PO Box 1876<br>Uvalde, TX 78820 | Trade Debt | | $ 1,649,822.22 |
| Garson<br>Nona A Garson<br>51 Bissell Rd<br>Lebanon, NJ 08833 | Trade Debt | | $ 1,647,544.66 |

**SCHEDULE 3**

**LIST OF THE HOLDERS OF THE FIVE (5) LARGEST SECURED CLAIMS**

The Debtors do not have any secured debt and are not aware of any secured claims at this time.

{00255916.DOC;}

**SCHEDULE 4**

**PRELIMINARY CONSOLIDATED ESTIMATED**
**STATEMENT OF ASSETS AND LIABILITIES**
[UNAUDITED AND SUBJECT TO ADJUSTMENT]

As of May 11, 2007

Identified Assets:

| | |
|---|---:|
| [1] Cash | $11,109,000 |
| [2] Note Interest Receivable | 11,126,100 |
| [3] Notes Receivable | 132,400,000 |
| [4] Equity Interest in Reverse Exchange LLCs | - |
| [5] Property, Plant & Equipment | - |
| [6] Intangibles | - |
| | |
| Total Identified Assets | $154,635,100 |

Identified Liabilities:

| | |
|---|---:|
| [7] Accounts Payable | $466,800 |
| [8] Exchange Agreement Liabilities | 151,642,415 |
| | |
| Total Identified Liabilities | $152,109,215 |
| | |
| Identified Net Assets | $2,525,885 |

As noted in the Declaration, the condition of the Debtors' books and records is such that this schedule represents the best information currently available. Accordingly, it is subject to supplement and revision.

Notes:

1.    The Debtors do not have visibility into all of their cash accounts. The Debtors had confirmed approximately $10.5 million in Colorado Capital on April 30, 2007. (It has been represented in the Colorado State Court action that there may be an additional $9 million in the Colorado Capital accounts.) The Debtors believe the balances to be

$572,000 at Countrywide and $38,000 at Wachovia. The Debtors do not currently have access to any of these funds due to legal actions and restraining orders.

2.    The Debtors do not record contractual interest accrued or paid on Notes Receivable from IPofA. The estimate of Note Interest Receivable is calculated as follows:

    i.    2005 interest of $1,051,540 is based on calculation made by a former employee

    ii.    2006 interest is calculated by multiplying the average of the beginning and ending balance by 8%

    iii.    2007 interest is calculated by multiplying the average of the beginning and ending balance for 4 months by an 8% annualized rate.

The actual interest rate on the Notes that have been provided for examination is, in most cases, higher than 8%.

3.    The Debtors have not provided sufficient support to establish the Notes Receivable balance. The estimated balance is the sum of the 2005 balance calculated by a former employee ($55 million), plus tracing of all transactions between Debtors and IPofA and affiliates (prepared by a forensic accounting firm hired on behalf of the Debtors) during 2006 ($59 million), and Notes Receivable recorded during 2007, net of repayments ($18 million). Not all of the Note documentation has been available for review nor can the Debtors confirm the total dollar amount of the Notes Receivable.

4.    The Debtors intend to investigate whether there is any equity interest in the Reverse Exchange LLCs as title to property held generally is offset by a loan against such property.

{00255916.DOC;}

5.     The Debtors do not have estimates of Property Plant & Equipment.

6.     The Debtors made two acquisitions in 2005 and four acquisitions in 2006. The Debtors have not recorded purchase accounting entries for these transactions.

7.     Accounts payable as of May 11, 2007 is estimated to be $467,000. The estimate includes approximately $217,000 accounts payable in Richmond (consolidated for all offices except Denver and San Jose), $100,000 fees for forensic accounting work not yet invoiced and an estimated $150,000 of accounts payable for Denver and San Jose, the accounting records of which are missing. This estimate does not include invoices taken by the Postal Inspectors in Richmond prior to being recorded.

8.     The latest estimate of Exchange Agreement liabilities was derived from work product provided by forensic accountants hired on the Debtors' behalf. It is preliminary and may be missing some contracts and may be missing earned interest.

{00255916.DOC;}

## SCHEDULE 5

## LIST OF STOCK, DEBENTURES, OR OTHER SECURITIES
## OF THE DEBTORS THAT ARE PUBLICLY HELD

There are no shares of stock, debentures or other securities of the Debtors that are publicly held.

## SCHEDULE 6

## LIST OF PROPERTY OF THE DEBTORS
## IN THE POSSESSION OF THIRD PARTIES

Upon information and belief, there is no property of the Debtors that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.  However, as of the Petition Date there are pending actions against the Debtors as further described in Schedule 9.

**SCHEDULE 7**

**PREMISES OWNED OR LEASED BY THE DEBTORS**

Management was not able provide all purchase agreements and leases related to premises occupied by the Debtors.  One location is believed to be owned by The 1031 Tax Group, LLC or by Okun Holdings or an affiliate of Okun Holdings:

- 100 Corporate Drive, Suite 201, Trumbull, CT 06611

Premises Leased by the Debtors:

- 805 Third Avenue, 10th Floor, New York, NY 10022
- 3390 Peach Tree Rd. NE, Suite 100, Atlanta, GA 30326
- 6410 Heronwalk Drive, Gulf Breeze, FL 32653
- 3001 N. Rocky Point Drive, Suite 225, Tampa, FL 33607
- 14815 Summer Song Lane, Del Ray Beach, Fl 33484
- 4251 Old Route 22, Suite 5, Brewster, NY 10509
- 1286 N. Milwaukee Ave, No. 202, Chicago, IL 60622
- 17304 Preston Rd., Suite 800, Dallas, TX 75252
- 633 N. Easton Rd., Glenside, PA 10938
- 1 Barker Ave., 2nd Floor, White Plains, NY 10601
- 1225 Franklin Ave., Suite 325, Garden City, NY 11530
- 77 Franklin St., 10th Floor, Boston, MA 02110
- 32 Court St., Plymouth, MA 02360
- 100 Midway Place, Suite 100, Cranston, RI 02920
- 1884 The Alameda, San Jose, CA 95126
- 600 South Cherry St., Suite 920, Denver, CO 80246
- 16500 San Pedro, Suite 220, San Antonia, TX 78232
- Washington, DC (Address Unknown)

## SCHEDULE 8

## THE LOCATION OF THE DEBTORS' SUBSTANTIAL
## ASSETS AND THE LOCATION OF ITS BOOKS AND RECORDS

The majority of the Debtors' assets are deposits held at banks and Notes Receivable. To the best of my knowledge, formed after reasonable inquiry and following reasonable diligence, there are no assets held by the Debtors outside the territorial limits of the United States.

**SCHEDULE 9**

**ACTIONS PENDING OR THREATENED AGAINST
THE DEBTORS OR THEIR PROPERTY**

1.      <u>Colorado Capital Bank v. Investment Exchange Group, LLC, The 1031 Tax Group, LLC, et al.</u>, District Court, City & County of Denver, State of Colorado, Case No. 07CV4352. The action is in the nature of an interpleader action commenced by Colorado Capital Bank seeking to determine the proper disposition of certain funds held on account at said institution.

2.      On May 11, 2007, the Debtors learned that there is a pending action in United States District Court for the Southern District of New York, Case No. 1:07-cv-03714-MGC, styled <u>Magnomin Corp. v. Security 1031 Services, LLC and 1031 Tax Group, LLC</u>.  The action seeks injunctive relief and to restrain certain funds of the Debtors in connection with an exchange transaction.

3.      The Debtor has learned that an individual under the name of Christopher Emery (or an entity affiliated therewith) claims to have commenced an action in the Superior Court of Massachusetts seeking an *ex parte* order of attachment on certain funds of Atlantic Exchange Group, LLC, one of the Debtors.  The Debtors do not have any direct knowledge of any such action or the status of any such *ex parte* order of attachment.

{00255916.DOC;}

## SCHEDULE 10

### LIST OF THE DEBTORS' EXISTING SENIOR MANAGEMENT

On or around April 27, 2007, all of the then members of senior management resigned, as did many employees. As an interim measure, Mr. Okun utilized management and staff from Okun Holdings and affiliates to fill empty positions. Mr. Okun appointed Mr. R. David Field as the President of The 1031 Tax Group, LLC. Mr. Field is also the Chief Operating Officer of Okun Holdings. Mr. Lukenda, Mr. Vanderbeek and the Temporary Staff will fill the remaining open positions.

{00255916.DOC;}

## SCHEDULE 11

### THE ESTIMATED AMOUNT OF THE WEEKLY PAYROLL TO EMPLOYEES (EXCLUSIVE OF OFFICERS, DIRECTORS, STOCKHOLDERS, AND PARTNERS) FOR THE THIRTY (30) DAY PERIOD FOLLOWING PETITION DATE

The estimated amount of the monthly payroll to employees of the Debtors (exclusive of officers, directors, stockholders, and partners) for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions is approximately $20,000.

{00255916.DOC;}

## SCHEDULE 12

## THE AMOUNT PAID AND PROPOSED TO BE PAID FOR SERVICES FOR THE THIRTY (30) DAY PERIOD FOLLOWING PETITION DATE TO (A) OFFICERS, STOCKHOLDERS AND DIRECTORS AND (B) CONSULTANTS

There are no amounts proposed to be paid to the Debtors' officers, stockholders, and directors for services for the thirty day (30) period following the Petition Date.  However, it is currently anticipated that an independent sole Manager will be chosen shortly to assume the duties of the Member to act as, in effect, the board of directors of the Debtors. It is likely that Manager will require compensation for performing such duties.  The amount of such compensation cannot be estimated at this time.

Consulting fees are not anticipated to be paid within the thirty day (30) period following the Petition Date.

{00255916.DOC;}

## SCHEDULE 13

## DEBTORS' ESTIMATED CASH RECEIPTS AND DISBURSEMENTS, FOR THE 30-DAY PERIOD FOLOWING THE PETITION DATE

| | |
|---|---|
| *Cash Receipts:* | $0 |
| | |
| *Cash Disbursements:* | |
| Operating Expenses | (97,000) |
| **Net Projected Cash Flow** | **($97,000)** |

Receivables expected to accrue but remain unpaid are primarily Note Interest Receivable.  The amount cannot be determined until the Notes are reconciled.

Obligations expected to accrue but remain unpaid during the period are primarily exchange agreement funding requests, if such obligations cannot be met.

No cash receipts are anticipated in the 30 day period following the Petition Date.  No new exchange agreements will be made.  Income from properties held for Reverse Exchanges may continue to flow into bank accounts.  However, those amounts have not been quantified and currently the bank accounts are frozen and therefore are not accepting new deposits.

Cash disbursements estimated for operating expenses within the 30 day projection period include the following:

| | |
|---|---|
| Employee Wages | $20,000 |
| Unpaid Medical and Dental Benefits | 50,000 |
| Operating expenses | 12,000 |
| Contingency | 15,000 |
| | $97,000 |

{00255916.DOC;}