# EXHIBIT 1

1  Robert L. Brace, SBN 122240
   Michael P. Denver, SBN199279
2  **HOLLISTER & BRACE**
   P.O. Box 630
3  Santa Barbara, CA  93102
4  Telephone: (805) 963-6711
   Facsimile:  (805) 965-0329
5

   Thomas Foley, SBN 65812
6  **FOLEY, BEZEK, BEHLE & CURTIS, LLP**
7  15 W. Carrillo Street
   Santa Barbara, CA  93101
8  Telephone: (805) 962-9495
   Facsimile:  (805) 962-0722
9  *Attorneys for Plaintiffs, and all others similarly situated*

10              **UNITED STATES DISTRICT COURT**

11          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12

13  ANITA HUNTER, an individual; 409          Case No.: **5:07-CV-02795-JW**
    SHERMAN AVE., LLC, a California limited
    liability company; JOHNNA BOZZA, an       **FIRST AMENDED COMPLAINT**
14  individual; ROBERT J. BUONO, an individual; **FOR:**
    CELLTEX SITE SERVICES, LTD., a Texas
15  limited liability company; GRANDE          1.  **VIOLATIONS OF 18 U.S.C.**
    INVESTMENT, LLC, a Colorado limited liability     **§ 1962(c) & (d) - - CIVIL RICO**
16  company; and all others similarly situated.

17                        Plaintiffs,          2.  **CONVERSION**
18  vs.
                                               3.  **NEGLIGENCE**
19  EDWARD H. OKUN, an individual; RICHARD
    B. SIMRING, an individual; LARA D.         4.  **BREACH OF FIDUCIARY DUTY**
20  COLEMAN; an individual; ROBERT D. FIELD        **AND AIDING AND ABETTING**
    II, an individual; J. PATRICK DOWDALL, an      **BREACH OF FIDUCIARY DUTY**
21  individual; WILLIAM A. HAZEL, an individual;
    CHARLES D. SUBRT, an individual; JAMES F.  5.  **DECLARATORY JUDGMENT**
22  LIVESEY, an individual; TODD R. PAJONAS,
    an individual; MARGA SHEFMAN, an           6.  **NEGLIGENT**
23  individual; DAVID SHEFMAN, an individual;      **MISREPRESENTATION**
    WILLIAM D. BENNETT, an individual;
24  DANIEL MCCABE, an individual; SHIRLEY
    MCCABE, an individual; ANDREW MCCABE,      7.  **INSURANCE FRAUD**
25  an individual; CHAD GREENBERG, an
    individual; PETE MCCAN, an individual; JANET 8. **PROFESSIONAL MALPRACTICE**
26  DASHIELL, an individual;STEVEN ALLRED,
    an individual; Wachovia BANK, N.A., a North 9. **BREACH OF WARRANTY**
    Carolina corporation; CONTINENTAL
27  CASUALTY COMPANY, an  Illinois             10. **LEGAL MALPRACTICE**
    corporation; FEDERAL INSURANCE
28  COMPANY, an Indiana Corporation; SAN       11. **RECEIVING STOLEN  PROPERTY**
    FRANCISCO SERIES OF LOCKTON

                                    1

1  COMPANIES, LLC, a California Limited
   Liability Company; and TWIN CITY FIRE
2  INSURANCE COMPANY, an Indiana
   Corporation.
3
              Defendants.
4

**CLASS ACTION**

**JURY DEMAND**

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

# **TABLE OF CONTENTS**

Page No.

I.    NATURE OF THE ACTION ............................................................. ...........3-4

II.   JURISDICTION AND VENUE ...................................................................5

III.  PARTIES ............................................................................................. 4-37

    A.    Plaintiffs ..................................................................................... 4-5

    B.    Defendants................................................................................. 5-37

        (i)    The Thief Defendants ..................................................... 5-11

        (ii)   The Professional Defendants ...................................... 11-13

        (iii)  The Non-Party Exchange Accommodators ................................. 13-17

        (iv)   The Negligent AEC Employee Defendants ........................... 17-19

        (v)    The Negligent SOS Employee Defendants........................... 19-20

        (vi)   The Negligent REES Employee Defendants ............................... 20-21

        (vii)  The Negligent NES Employee Defendants........................... 21-22

        (viii) The Negligent IXG Employee Defendants ................................. 22-24

        (ix)   The Negligent 1031 Advance Employee Defendants................. 25-26

        (x)    The Banking Defendant ..................................................... 26-31

        (xi)   The Non-Party Non-BFP Transferees........................... 31-33

        (xii)  The Insurance Broker Defendant................................... 34-35

        (xiii) The Insurer Defendants................................................. 35-37

IV.   AGENCY AND CONSPIRACY ALLEGATIONS .................................................38

V.    INFORMATION ALLEGATIONS................................................................38

VI.   THE BUSINESS OF 1031 EXCHANGES .......................................... 39-40

VII.  GENERAL FACTUAL ALLEGATIONS ABOUT OKUN'S PURCHASE OF THE EXCHANGE ENTITIES ........................................................................ 40-43

VIII1 ALLEGATIONS REGARDING THE CONSPIRACY TO LOOT THE EXCHANGE ENTITIES........................................................................ 43-45

IX.   FACTUAL ALLEGATIONS ABOUT THE BONDS COVERING THE THEFT OF CLIENTS' FUNDS BY THE OWNERS OF THE EXCHANGE ENTITIES....45-47

X.    FACTUAL ALLEGATIONS ABOUT THE FIDELITY BOND PROGRAM ADVERTISED AS PROTECTION AGAINST THE EXACT TYPE OF LOSS SUFFERED BY PLAINTIFFS.......................................................................... 47-51

XI.   SPECIFIC FACTUAL ALLEGATIONS ABOUT THE FRAUD COMMITTED BY LOCKTON AND THE INSURER DEFENDANTS ..................................... 51-53

XII.  CLASS ACTION ALLEGATIONS ................................................................. 53-56

XIII. CAUSES OF ACTION..................................................................................... 56-74

XIV.  PRAYER FOR RELIEF .................................................................................. 74-75

TABLE OF CONTENTS
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\FAC - TOC.doc

Plaintiffs for themselves individually and as Class representatives of the Class as defined herein allege with particularity pursuant to Federal Rule of Civil Procedure 9(b) as follows:

## I.

## NATURE OF THE ACTION

1.     This is a Class Action brought by 6 named Plaintiffs with over $9,000,000 in damages on behalf of the class of approximately 330 similarly situated people ("Exchangers") located in Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, New York, Ohio, Oregon, Rhode Island, Texas, Virginia, and Washington, who each lost substantial money (over $130,000,000 combined) entrusted to certain intermediaries ("Exchange Accommodators") to facilitate their respective Internal Revenue Code Section 1031 exchanges ("1031 exchanges").   An organized crime squad headed by career criminal Edward H. Okun ("Okun") discovered that these Exchange Accommodators were unregulated businesses holding large sums of cash that needed ready access to only a small percentage of the money to operate as a going concern.  Pursuant to a conspiracy, Okun and certain other thieves formed a RICO enterprise comprised of themselves and other confederates with the goal of purchasing several Exchange Accommodators to gain access to the funds held in trust for their respective clients ("Exchange Funds") and then steal the majority of those funds for personal gain.  The thieves' goal was reached when Okun purchased six separate Exchange Entities, gained access to their funds held in trust, and stole the majority of those funds. Thereafter Okun hid his theft by using incoming deposits from new Exchangers to fund the escrows of older clients.  In short, Okun ran a Ponzi scheme.  Okun's conspiracy was exposed May 14, 2007 after the real estate market finally cooled, imposing a de facto audit of the looted trust funds and forcing the Exchange Entities to file for Chapter 11 bankruptcy as Okun could no longer cover up the fact that the Exchange Entities' accounts had been "completely depleted."  The RICO enterprise operated from at least August 2005 until late May 2007 and caused over $130,000,000 in damages.

2.     Plaintiffs' First Amended Complaint (the "Complaint") has two components. The first component, the "RICO" portion of the Complaint, is brought against Okun, other thieves and those that wittingly and/or unwittingly helped Okun. The second component of the Complaint, the "Insurance Coverage" portion of the action, is brought against certain insurance carriers which issued coverage that should have covered the Exchangers' damages, as well as against the broker that procured that coverage.

## II.

## JURISDICTION AND VENUE

3.     This Federal District Court may exercise jurisdiction over this Class Action pursuant to 28 U.S.C. §1331, the Class Action Fairness Act of 2005 codified in part at 28 U.S.C. §1332(d) and §1453, and, supplemental jurisdiction pursuant to 28 U.S.C. §1367. The matter is a complex Class Action.

4.     This Court has personal jurisdiction over all of the Defendants named in this Complaint because they either conducted business in California, were fiduciaries or recipients of funds held in trusts created in California, participated in a criminal enterprise which injured Californians, or they are citizens of this state. Venue is proper in this Court because individual 1031 exchange trusts were created in California, conduct at issue took place and had an effect in California, and/or certain Defendants reside in California or have their principal place of business here.

## III.

## PARTIES

A.     **Plaintiffs**

5.     Plaintiff **Anita Hunter** ("Hunter") is an individual living and doing business in Santa Clara County. Hunter owned real property in San Jose, California which was sold to facilitate the purchase of a like kind replacement property. The equity from the sale was then deposited at 1031 Advance, Inc. ("1031 Advance") on March 29, 2007. Hunter lost $1,365,294.58.

6.     Plaintiff **CellTex Site Services, Ltd.** ("CellTex") is a Texas Limited Liability

4

Company doing business in San Antonio, Texas. CellTex owned real property in San Antonio, Texas which was sold to facilitate the purchase of a like kind property. The equity from the sale was then deposited at National Exchange Services QI, Ltd. ("NES") on March 1, 2007. CellTex lost $2,107,900.00.

7.    Plaintiff **Grande Investment, LLC** ("Grande Investment") is a Colorado limited liability company. Grande Investment owned real property in Littleton, Colorado which was sold on December 28, 2006 to facilitate the purchase of a like kind property. The equity from the sale was then deposited at Investment Exchange Group, LLC ("IXG") on January 3, 2007. Grande Investment lost $1,227,341.51.

8.    Plaintiff **Johnna Bozza** ("Bozza") is an individual living and doing business in Nassau County, New York who owned real property in New York, New York that was sold. The equity from the sale was then deposited at Security 1031 Services, LLC ("SOS") on November 27, 2006 to facilitate the purchase of a like kind replacement property. Bozza lost $359,064.65.

9.    Plaintiff **Robert J. Buono** ("Buono") is an individual living and doing business in San Mateo County, California who owned real property in San Carlos, California that was sold. The equity from the sale was then deposited at 1031 Advance on March 30, 2007 to facilitate the purchase of a like kind replacement property. Buono lost $1,002,405.24.

10.    Plaintiff **409 Sherman Ave., LLC** ("409 Sherman") is a California limited liability company doing business in San Mateo, California which owned real property in Portola Valley that was sold. The equity from the sale was then deposited in trust with 1031 Advance on February 14, 2007 to facilitate the purchase of a like kind replacement property. 409 Sherman lost $3,236,560.55.

**B.    Defendants**

    **(i)    The Thief Defendants**

11.    Defendant **Edward H. Okun** ("Okun") is a resident of Miami Dade County, Florida and was the sole owner of Investment Properties of America, LLC ("IPofA"), Okun Holdings, Inc. ("Okun Holdings") and the 1031 Tax Group, LLC ("1031 TG"). IPofA

1   purportedly is a real estate investment and management company headquartered at Richmond,

2   Virginia. IPofA allegedly made its money by legitimately acquiring, developing, and managing

3   real properties, and by leasing real property, primarily to major national and regional retailers

4   under net leases and offering ownership in institutional properties through tenant-in-common

5   ("TIC") ownership structures. In reality, IPofA was used by Okun as a conduit to launder

6   stolen money. The same is true for Okun Holdings, which was Okun's holding company for

7   the myriad of entities Okun used in his criminal ventures and for 1031 TG which was the entity

8   Okun used to hold the following six Qualified Intermediaries ("QIs" or "Exchange Entities")

9   which Okun purchased with over $27,000,000 in stolen money from August 25, 2005 to

10  December, 2006 so that Okun could then loot the trusts of the 6 Exchange Entities:

11       a.     **Atlantic Exchange Company, LLC** ("AEC") purchased August 25, 2005 for

12              $4,250,000;

13       b.     **Security 1031 Services, LLC** ("SOS") purchased November, 2005 for

14              $2,800,000;

15       c.     **Real Estate Exchange Services, Inc.** ("REES") purchased June 9, 2006 for

16              $4,250,000;

17       d.     **National Exchange Services QI, Ltd.** ("NES") purchased June 22, 2006 for

18              $5,000,000;

19       e.     **Investment Exchange Group, LLC** ("IXG") purchased August 4, 2006 for

20              $9,000,000; and

21       f.     **1031 Advance, Inc.** ("1031 Advance") purchased December, 2006 for

22              $2,500,000.

23       12.    Okun used 1031 TG to purchase the first Exchange Entity, AEC, on or about

24  August 25, 2005 for $4,250,000, with $4,000,000 required in cash up-front. To fund the

25  purchase, Okun used money he had siphoned from another of his scams.[1]  Thus, the seed

26

27

---

[1]  Okun's prior scam involved the "sale" of Columbus Works, an office/industrial complex in Columbus, Ohio (which was
28  acquired by IPofA in 2005), to a tenants-in-common fund. Okun allegedly misrepresented the value of the property to
investors claiming it to be $50,000,000 when it was only worth $25,000,000. Okun was sued for fraud and other misconduct
in an adversarial bankruptcy proceeding filed by the allegedly defrauded tenants-in-common fund in the matter styled *In Re:*

1 money for Okun's present scam came from a prior scam, and Okun's 1031 exchange Ponzi

2 scheme began with the purchase of AEC in August 2005 with stolen money.

3      13.   Less than three months after acquiring AEC, in November, 2005, Okun

4 purchased SOS using Exchange Funds Okun misappropriated from AEC.[2]  This occurred

5 when, on November 16, 2005 Okun caused the transfer of $2,800,000 of AEC's clients'

6 Exchange Funds from AEC's Bank of America account #xxx5772 to Okun's personal Union

7 Federal Bank account #xxx6072. The next day, on November 17, 2005 Okun caused the

8 transfer of $1,600,000 (in stolen AEC funds) from Okun's personal Union Federal Bank

9 account #xxx6072 to Todd & Mary Pajonas who owned and/or controlled SOS.  Thus, Okun

10 bought SOS from the Pajonas with money Okun stole from AEC's clients.

11      14.   On or about June 9, 2006 Okun, through 1031 TG, purchased his third Exchange

12 Entity, REES, for $4,250,000, using $3,000,000 in stolen SOS's clients' Exchange Funds.  This

13 occurred when, on June 9, 2006, Okun caused the transfer of $3,200,000 in Exchange Funds

14 from SOS's Commerce Bank account #xxx6734 to IPofA's Wachovia account #xxx2719.

15 Okun then used these stolen SOS Exchange Funds to purchase REES.

16      15.   On or about June 22, 2006, only sixteen days after purchasing REES with stolen

17 money, Okun again looted AEC to buy his fourth exchange company, NES for $5,000,000.

18 Okun funded the NES purchase by misappropriating $5,000,000 from AEC's client trust

19 account at Bank of America, account #xxx5772 and sending it to Frost National Bank account

20 #xxx8924 whereupon the money funded the NES purchase.  The $5,000,000 taken from the

21 AEC bank account included AEC's clients' Exchange Funds and also included a significant

22 amount of REES' clients' Exchange Funds.

23      16.   On or about August 4, 2006, Okun purchased his fifth Exchange Entity, IXG, for

24 $7,000,000 in stolen cash and $2,000,000 in promissory notes.  Okun funded the IXG purchase

25 by misappropriating $6,000,000 of SOS's clients' Exchange Funds which had been transferred

27 *Investment Properties of America, et al.*, Chapter 11 Case No. 07-13621 (MG), filed in the United States Bankruptcy Court for the Southern District of New York.

28 [2] After Okun's purchase of AEC and before Okun's purchase of SOS, AEC and SOS purportedly merged.

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

1  from SOS's Commerce Bank account #xxx6734 to 1031 TG's Wachovia account #xxx3272, to

2  fund the purchase of IXG. Immediately upon purchasing IXG, Okun transferred IXG's clients'

3  Exchange Funds to 1031 TG's Wachovia account #xxx3272, over which Okun had control.

4  Okun then used IXG's Client Exchange Funds to repay SOS the $6,000,000 he had

5  misappropriated to purchase REES.

6        17.    In or about December of 2006, Okun purchased his sixth and last exchange

7  entity, 1031 Advance, for $2,500,000.  Again, this transaction was funded with stolen money.

8        18.    In addition to directly misappropriating Client Exchange Funds to purchase new

9  Exchange Entities Okun used Exchange Funds as collateral for "loans" which funded Okun's

10  lifestyle, and Okun also simply used Exchange Funds to pay for his own wants directly.  With

11  respect to obtaining loans, Okun often listed stolen Exchange Funds as his personal assets to

12  demonstrate collateral for large loans.  An example of such a loan occurred when Okun listed

13  millions in Exchange Funds, among his own assets to that he could qualify for a huge loan

14  pursuant to which Okun borrowed $8,100,000 from Wachovia on March 29, 2006 to buy a

15  yacht.  An example of when Okun used stolen exchange funds to directly purchase luxuries for

16  himself occurred when Okun stole $8,600,000 on November 17, 2005, from AEC's Bank of

17  America account #xxx5772 and deposited it directly into his own personal account at Union

18  Federal Bank account #xxx6072. On that same day, November 17, 2005, Okun transferred

19  $8,350,000 from his personal Union Federal account #xxx6072 to "Morgan Olsen & Olsen

20  LLP," a Florida law firm specializing in yacht sales, for the purchase of a 131 foot luxury

21  motor yacht named after Okun's second wife "Simone" which Okun obtained by trading his

22  106 foot "Las Olas" plus the payment of $11,500,000 in cash.[3]

23        19.    Okun did not only use Exchange Funds to buy additional Exchange Entities, or

24  yachts for that matter. He also used stolen funds to buy real estate.  From 2005 to 2007 Okun,

25  through IPofA, purchased the following properties:

26

27

28
---
[3]  At the time of the transaction in November 2006, the new larger yacht to which Okun upgraded, was named "Princess H".  It was thereafter renamed "Simone" by Okun, after Okun's new and second bride "Simone", a former entertainer from Brazil.

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

(i)  West Oaks Mall, a 1.1 million square foot mall in Houston, Texas purchased in September, 2005 for over $102,000,000;

(ii)  West Oaks Mall JC Penney Parcel, purchased in January, 2006 for over 4,000,000;

(iii)  Crossroads Transportation and Logistics, purchased in July, 2006 for over $88,000,000;

(iv)  Salina Central Mall in Salina, Kansas, purchased in August, 2006 for over $36,000,000;

(v)  IPofA Water View, LLC, purchased in August, 2006 for over $6,000,000;

(vi)  IPofA Shreveport Warehouse, purchased in August, 2006 for over $5,000,000; and,

(vii)  IPofA Columbus Works, an industrial complex in Columbus Ohio purchased for over $26,000,000.

20.   IPofA and Okun obtained the financing for these purchases primarily from loans provided by Wachovia Bank, N.A. and other lenders while using Exchange Funds to prop up Okun's net worth so Okun could obtain the loans.   Wachovia and/or other lenders knew or should have known this.

21.   During this time Okun also used stolen funds to purchase several personal residences.  Houses Okun bought include:

(i)   394 South Hibiscus Drive in Miami, Florida purchased in September, 2005 for $6,650,000;

(ii)  39 and 59 Aaron Road in Wolfeboro, New Hampshire purchased in August, 2006 for $10,150,000; and

(iii)  901 Brickell Key Blvd. #1808 and #3404 in Miami, Florida purchased in December, 2005 for $2,800,000 collectively.

22.   In addition to the foregoing real estate purchases, Okun also used Exchange Funds to help himself acquire the following "toys":

(i)   a 2001 Ferrari 550 Barchetta valued at $345,000;

(ii)     a Lamborghini valued at $295,000;

(iii)     a 2003 Bentley Amage valued at $165,000;

(iv)     a 2004 Chevrolet SSR valued at $33,000;

(v)     a 2005 Bentley Continental GT valued at $160,000;

(vi)     a 2004 Lamborghini Murcielago valued at $265,000;

(vii)     a 2006 Land Rover Supercharged valued at $89,000;

(viii)     a 2006 Rolls Royce Phantom valued at $365,000;

(ix)     a 1979 Ferrari 400 valued at $35,000;

(x)     a 2003 Hummer H2 valued at $38,000;

(xi)     a Bell Helicopter valued at $1,010,000;

(xii)     a 78 Lear Jet 25D valued at $850,000;

(xiii)     a 69 Gulf Stream II valued at $5,900,000;

(xiv)     a 26 foot Morin boat valued at $129,000;

(xv)     a Ski Nautique valued at $18,000;

(xvi)     an Aul-craft valued at $18,000;

(xvii)     a Yacht "Simone" purchased for $11,500,000 (plus a "trade-in") and valued at $18,000,000;

(xviii)     a 38 foot cigarette boat valued at $225,000;

(xix)     2 jet skis valued at $16,000; and

(xx)     a 26 foot 1979 Replica Dodge Gold Cup Racer valued at $63,900.

23.     In summary of the foregoing, Okun masterminded the theft of many tens of millions of dollars in Exchange Funds and used the monies (which, in many cases represented plaintiff's life's savings) as he saw fit.

24.     Okun hid his theft by using new Exchanger's deposits of 1031 Exchange Funds and/or monies loaned to him by Wachovia (and/or other banks) to fund the escrows of older Exchange clients. A classic Ponzi scheme.

25.     Toward the end of the Ponzi scheme, Okun knew his theft would be exposed. Okun became desperate and prepared to flee. On or about January 22, 2007, Okun instructed

1    IPofA employees Robert D. Field II and Lara D. Coleman to withdraw $15,000 in cash from

2    IPofA's bank account and smuggle the cash to Okun's personal yacht on Paradise Island in the

3    Bahamas to avoid federal currency reporting requirements. Fortunately, Okun did not get away

4    and he has been indicted and incarcerated.

5        26.    The United States Department of Justice ("DOJ") returned a 27 count

6    superseding indictment charging Okun with: (i) one count of conspiracy to commit mail and

7    wire fraud; (ii) one count of conspiracy to commit money laundering; (iii) 13 counts of wire

8    fraud; (iv) three counts of mail fraud; (v) seven counts of money laundering; and (vi) one count

9    of bulk cash smuggling and forfeiture. Okun was also charged with making false statements.

10   (A copy of the Superseding Indictment, or "SI", which sets forth Okun's alleged criminal

11   activity is attached hereto as Exhibit 1 and incorporated herein by reference).

12       27.    Defendant **Lara D. Coleman** ("Coleman") is a resident of Richmond, Virginia

13   and was the Chief Operating Officer of IPofA at all times relevant to this case. Coleman

14   conspired with Okun and/or otherwise assisted Okun in operating his scam to misappropriate

15   1031 Exchange Funds and thereafter run a Ponzi scheme to hide the theft. Coleman joined

16   IPofA in October, 2004 and served as a Director or officer of various other Okun-controlled

17   entities. Coleman was the sole manager of IPofA Fund Manager, LLC, the Director of Okun

18   Holdings, Inc., and the Manager of IPofA West Oaks Mall and others. Coleman acted, for some

19   period of time, as Secretary for the 1031 TG entities, until February 14, 2007 when she was

20   replaced by Robert D. Field ("Field"). Coleman generally assisted Okun in looting 1031

21   Exchange Funds. Specifically, among other things, Coleman caused the transfer of $5,000,000

22   of Client Exchange Funds on October 13, 2005 into Okun's personal Union Federal Bank

23   account #xxx6072. The DOJ indicted Coleman July 10, 2008 with 27 counts of criminal

24   activity, including Wire and Mail Fraud, Conspiracy, and Money Laundering. (See Exhibit 1).

25       **(ii)    The Professional Defendants**

26       28.    Defendant **Robert D. Field II** ("Field") is a resident of Richmond, Virginia and

27   is a Certified Public Accountant who, beginning in or about August, 2006, was the Chief

28   Financial Officer of Okun Holdings, Inc., which was incorporated to serve as the holding

1  company for all Okun-owned businesses (although the change in ownership never took place).

2  Field was appointed as Secretary of the 1031 TG entities as of February 14, 2007. On or about

3  August 1, 2006, just prior to the purchase of IXG, Field was informed by an IPofA executive

4  that Okun was using clients' Exchange Funds to pay the operating expenses of his companies.

5  Field informed IPofA's in-house counsel that Okun and IPofA were misappropriating 1031

6  TG's clients' Exchange Funds. Thereafter, Field failed to stop Okun from breaching Okun's

7  fiduciary duties to the Exchangers (beneficiaries of the Exchange Entities trusts which Okun

8  oversaw as Trustee), and knowingly aided and abetted Okun's breaches. For example. On or

9  about April 20, 2007, Field caused the transfer of $5,563,162.28 of loan proceeds, secured by

10  collateral that was originally purchased using misappropriated client Exchange Funds, from

11  IPofA's Wachovia account to 1031 TG's Wachovia bank account. On or about January 22,

12  2007, Field caused a package containing $15,000 in cash to be delivered, via Federal Express,

13  from IPofA in Richmond, Virginia to Okun on his yacht, and the "Simone" in Paradise Island

14  in the Bahamas. The DOJ indicted Field June 30, 2008 with Conspiracy to Commit Mail Fraud

15  & Money Laundering. (See Exhibit 2). Field has pled guilty. Field knowingly aided and

16  abetted Okun's breaches of fiduciary duties and acted for his own financial advantage and gain.

17      29.    Defendant **Richard B. Simring** ("Simring") is a resident of Miami Dade

18  County, Florida, and was a partner of Jorden Burt, a national law firm which maintained

19  offices in Connecticut, Florida, and Washington, D.C. While at Jordan Burt, Simring provided

20  legal advice and services to Okun. Thereafter, Simring served as Chief Legal Officer of Okun

21  Holdings, Inc. beginning in January, 2007. By signing on with Okun, Simring received a salary

22  of $850,000, with a signing bonus of $100,000. Simring has also, at times relevant to this case,

23  held himself out to be and signed documents as "General Counsel" for Okun Holdings. Okun

24  consulted with Simring, when both the in-house counsel and CLO of IPofA resigned in

25  November, 2006, and while Simring was employed as a Partner at Miami law firm, Jordan Burt

26  LLP, about issues that had been raised regarding the "borrowing" of client Exchange Funds

27  from client accounts. Simring (who knew Okun was a fiduciary and/or trustee of other peoples'

28  Exchange Funds) advised Okun that this "borrowing" was not allowed, but that Okun would

1  not likely be caught if Okun were to cease such transfers until the exchange agreements were

2  revised to allow transfers and until there was liquidity to ensure sufficient funds. At the time

3  Simring became CLO of Okun Holdings, the exchange agreements had not been revised and

4  the liquidity problem had not been solved. In or about March, 2007, Simring became aware

5  that: (i) Okun was continuing to illicitly transfer millions of dollars of Client Exchange Funds

6  from 1031 TG to IPofA and Okun's personal bank account; (ii) 1031 TG's exchange

7  agreements had not been revised to allow Okun to do so; and, (iii) 1031 TG was on the verge

8  of insolvency. In April, 2007, when Dashiell resigned as 1031 TG's CEO, Okun appointed

9  Simring as President and CEO of 1031 TG and its subsidiaries, giving Simring access to the

10 client Exchange Funds. Upon Okun's instruction, Simring immediately transferred the

11 $8,000,000 in Client Exchange Funds on deposit at 1031 Advance in California to 1031 TG

12 accounts held at Wachovia. Simring resigned 3 days after assuming the role as President and

13 CEO. The DOJ indicted Simring July 9, 2008 with Conspiracy to Commit Mail Fraud &

14 Money Laundering. (See Exhibit 3).  Among the other illegal acts for which Simring was

15 criminally indicted, Simring mailed a Federal Express package containing Client Exchange

16 Funds from Boston, Massachusetts to Richmond, Virginia and also initiated an April 20, 2007

17 wire transfer of $6,177,249 from IPofA's Wachovia account #xxx2719 to 1031 TG's

18 Wachovia account #xxx3272. Simring plead guilty to committing the acts which were criminal

19 offenses on or about July 24, 2008.  Simring's conduct constituted legal malpractice (both

20 while at Jorden Burt and afterward) and Simring knowingly aided and abetted Okun's breaches

21 of fiduciary duty while Simring was acting for his own financial advantage and gain.

22         (iii)    **The Non-Party Exchange Accommodators**[4]

23         30.    **Atlantic Exchange Company, LLC** ("AEC") is a Massachusetts limited

24 liability company, headquartered at 77 Franklin Street, 10th Floor, Boston, Massachusetts. AEC

25 is a 1031 Exchange Accommodator, which is a trustee holdings clients' 1031 exchange funds

26 in trust for the clients' benefit. AEC was, until August 25, 2005, owned by J. Patrick Dowdall

27

28 [4] The Exchange Accommodators are not defendants in this matter.  They are Non-Parties.

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

1  ("Dowdall") (5% direct ownership and 60% indirect ownership through his wholly-owned

2  entity Gold Creek Financial, LLC), William A. Hazel (25%), Charles D. Subrt (5%), and James

3  F. Livesey (5%). On or about August 25, 2005, AEC was purchased by Okun and/or entities

4  owned or controlled by Okun. AEC entered into an "Exchange Agreement" with each of its

5  clients, (including certain of those persons identified above as plaintiffs and/or other Class

6  members) whereby AEC agreed to temporarily hold its clients' funds received from the sale of

7  their "relinquished property" while they located and purchased "replacement property" to defer

8  capital gains taxes. At all times relevant to this case, AEC was obligated by its contracts with

9  its clients to safeguard client funds in a qualified escrow or like account until the client was

10  prepared to close on an appropriate replacement property.   AEC did not comply with its

11  contractual obligations, but instead commingled the clients' trust money in several bank

12  accounts at Bank of America and then transferred this money to the control of 1031 TG without

13  client consent as further alleged, where after the money disappeared.

14         31.    **Security 1031 Services, LLC** ("SOS") is a Connecticut limited liability

15  company, headquartered at 100 Corporate Drive, Suite 201, Trumbull, Connecticut. SOS is a

16  1031 Exchange Accommodator, which is a trustee holdings clients' 1031 exchange funds in

17  trust for the clients' benefit. SOS was, until November, 2005, owned by Todd Pajonas. In or

18  about November, 2005 SOS was purchased by Okun and/or entities owned or controlled by

19  Okun. SOS entered into an "Exchange Agreement" with each of its clients, (including certain

20  of those persons identified above as plaintiffs and/or other Class members) whereby SOS

21  agreed to temporarily hold its clients' funds received from the sale of their "relinquished

22  property" while they located and purchased "replacement property" to defer capital gains taxes.

23  At all times relevant to this case, SOS was obligated by its contracts with its clients to

24  safeguard client funds in a qualified escrow or like account until the client was prepared to

25  close on an appropriate replacement property.   SOS did not comply with its contractual

26  obligations, but instead commingled the clients' trust money in several bank accounts and then

27  transferred this money to the control of 1031 TG without client consent as further alleged

28  where after the money disappeared.

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

1    32.    **Real Estate Exchange Services, Inc.** ("REES") is a Florida corporation,

2   headquartered at 802 2nd Street, Suite A, Safety Harbor, Florida. REES is a 1031 Exchange

3   Accommodator, which is a trustee holdings clients' 1031 exchange funds in trust for the

4   clients' benefit. REES was, until June 9, 2006, owned by Marga Shefman and David Shefman.

5   On or about June 9, 2006, REES was purchased by Okun and/or entities owned or controlled

6   by Okun. REES entered into an "Exchange Agreement" with each of its clients, (including

7   certain of those persons identified above as plaintiffs and/or other Class members) whereby

8   REES agreed to temporarily hold its clients' funds received from the sale of their "relinquished

9   property" while they located and purchased "replacement property" to defer capital gains taxes.

10  At all times relevant to this case, REES was obligated by its contracts with its clients to

11  safeguard client funds in a qualified escrow or like account until the client was prepared to

12  close on an appropriate replacement property.   REES did not comply with its contractual

13  obligations, but instead commingled the clients' trust money in several bank accounts and then

14  transferred this money to the control of 1031 TG without client consent as further alleged

15  whereafter the money disappeared.

16   33.    **National Exchange Services QI, Ltd.** ("NES") is a Texas limited company,

17  headquartered at 16500 San Pedro, Suite 175, San Antonio, Texas. NES is a 1031 Exchange

18  Accommodator, which is a trustee holdings clients' 1031 exchange funds in trust for the

19  clients' benefit. NES was, until June 22, 2006 owned by William Bennett and other

20  shareholders. On or about June 22, 2006, NES was purchased by Okun and/or entities owned or

21  controlled by Okun. NES entered into an "Exchange Agreement" with each of its clients,

22  (including certain of those persons identified above as plaintiffs and/or other Class members)

23  whereby NES agreed to temporarily hold its clients' funds received from the sale of their

24  "relinquished property" while they located and purchased "replacement property" to defer

25  capital gains taxes.  At all times relevant to this case, NES was obligated by its contracts with

26  its clients to safeguard client funds in a qualified escrow or like account until the client was

27  prepared to close on an appropriate replacement property.   NES did not comply with its

28  contractual obligations, but instead commingled the clients' trust money in several bank

1  accounts and then transferred this money to the control of 1031 TG without client consent as

2  further alleged whereafter the money disappeared.

3        34.  **Investment Exchange Group, LLC** ("IXG") is a Colorado limited liability

4  corporation, headquartered at 600 South Cherry Street, Suite 920, Denver, Colorado. IXG is a

5  1031 Exchange Accommodator, which is a trustee holdings clients' 1031 exchange funds in

6  trust for the clients' benefit. IXG was, until August, 2006, owned by Daniel McCabe (76%),

7  Shirley McCabe (8%), Andrew McCabe (4%), Chad Greenberg (3%), and Pete McCann (4%).

8  On or about August 4, 2006, IXG was purchased by Okun and/or entities owned or controlled

9  by Okun. IXG entered into an "Exchange Agreement" with each of its clients, (including

10  certain of those persons identified above as plaintiffs and/or Class members) whereby IXG

11  agreed to temporarily hold its clients' funds received from the sale of their "relinquished

12  property" while they located and purchased "replacement property" to defer capital gains taxes.

13  At all times relevant to this case, IXG was obligated by its contracts with its clients to

14  safeguard client funds in a qualified escrow or like account until the client was prepared to

15  close on an appropriate replacement property.    IXG did not comply with its contractual

16  obligations, but instead commingled the clients' trust money in several bank accounts at

17  Colorado Capital Bank and United Western Bank and then transferred this money to the control

18  of 1031 TG at Wachovia Bank, N.A ("Wachovia") without client consent as further alleged

19  whereafter the money disappeared.

20        35.  **1031 Advance, Inc.** ("1031 Advance") is a California corporation,

21  headquartered at 1884 The Alameda, San Jose, California. 1031 Advance is a 1031 Exchange

22  Accommodator, which is a trustee holdings clients' 1031 exchange funds in trust for the

23  clients' benefit. 1031 Advance was, until December, 2006, owned by Janet Dashiell and Steven

24  Allred. In or about December, 2006, 1031 Advance was purchased by Okun and/or entities

25  owned or controlled by Okun. 1031 Advance entered into an "Exchange Agreement" with each

26  of its clients, (including certain of those persons identified above as plaintiffs and/or Class

27  members) whereby 1031 Advance agreed to temporarily hold its clients' funds received from

28  the sale of their "relinquished property" while they located and purchased "replacement

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

property" to defer capital gains taxes. At all times relevant to this case, 1031 Advance was obligated by its contracts with its clients to safeguard client funds in a qualified escrow or like account until the client was prepared to close on an appropriate replacement property. 1031 Advance did not comply with its contractual obligations, but instead commingled the clients' trust money in several bank accounts at Countrywide Bank and then transferred this money to the control of 1031 TG at Wachovia without client consent as further alleged whereafter the money disappeared.

36.    **1031 Tax Group, LLC** ("1031 TG") is a Delaware limited liability company, headquartered at 10800 Midlothian Turnpike, Suite 152, Richmond, Virginia. 1031 TG was formed by Okun to serve as a holding company to "roll up" the six Exchange Entities he purchased, AEC, SOS, REES, NES, IXG, and 1031 Advance. Upon purchasing the Exchange Entities, Okun caused the trust funds held at each of the Exchange Entities to be unlawfully transferred to accounts controlled by 1031 TG at Wachovia, whereupon 1031 TG became, along with Okun, a trustee of each of the Exchange Entities' clients' trust funds under 1031 TG's control.

### (iv)    The Negligent AEC Employee Defendants

37.    Defendant **J. Patrick Dowdall** ("Dowdall") is a resident of Wellesley, Massachusetts and until August, 2005 was an employee, representative, and agent of AEC exercising control over the trust funds held on deposit at AEC, which were held by AEC as trustee for its clients as beneficiaries of each respective trust created by each client for the purpose of accomplishing a 1031 exchange. Dowdall co-founded AEC in 1998. On or about August 25, 2005, without proper due diligence, Dowdall sold his 65% interest in AEC (5% owned by Dowdall himself, 60% owned by Gold Creek Financial, LLC, which is in turn 100% owned by Dowdall) for a share of the $4,250,000 total sale price to 1031 TG, a Delaware corporation controlled by Okun and other members of the RICO enterprise. Dowdall did not remain as an officer or employee of AEC after his sale of AEC to Okun. Had Dowdall conducted proper due diligence, he would have learned the money Okun offered to pay for the Exchange Entity was stolen, that Okun was not trustworthy and that the Exchange Entity

1  should not be sold to Okun because he was not a proper candidate for trusteeship. Dowdall

2  was negligent, breached fiduciary duties to the client Exchangers and knowingly aided and

3  abetted Okun's breaches of fiduciary duties while acting for his own financial advantage and

4  gain.

5      38.    Defendant **William A. Hazel** ("Hazel") is a resident of Eaton, Massachusetts

6  and until August, 2005 was an employee, representative, and agent of AEC exercising control

7  over the trust funds held on deposit at AEC, which were held by AEC as trustee for its clients

8  as beneficiaries of each respective trust created by each client for the purpose of accomplishing

9  a 1031 exchange. Hazel co-founded AEC in 1998. On or about August 25, 2005, without

10 proper due diligence, Dowdall sold his 25% interest in AEC for a share of the $4,250,000 total

11 sale price to 1031 TG, a Delaware corporation controlled by Okun and other members of the

12 RICO enterprise. Hazel did not remain as an officer or employee of AEC after his sale of AEC

13 to Okun. Had Hazel conducted proper due diligence, he would have learned the money Okun

14 offered to pay for the Exchange Entity was stolen, that Okun was not trustworthy and that the

15 Exchange Entity should not be sold to Okun because he was not a proper candidate for

16 trusteeship. Hazel was negligent, breached fiduciary duties to the client Exchangers and

17 knowingly aided and abetted Okun's breaches of fiduciary duties while acting for his own

18 financial advantage and gain.

19     39.    Defendant **Charles D. Subrt** ("Subrt") is a resident of Ashland, Massachusetts

20 and was an employee, representative, and agent of AEC exercising control over the trust funds

21 held on deposit at AEC, which were held by AEC as trustee for its clients as beneficiaries of

22 each respective trust created by each client for the purpose of accomplishing a 1031 exchange.

23 Subrt was an employee of AEC since its inception and served as the Senior Vice President of

24 AEC. On or about August 25, 2005, without proper due diligence, Subrt sold his 5% interest in

25 AEC for a share of the $4,250,000 total sale price to 1031 TG, a Delaware corporation

26 controlled by Okun and other members of the RICO enterprise. Subrt remained as Vice

27 President of New England Operations and retained control over AEC and SOS's trust funds

28 after AEC and SOS merged in or about September, 2005. Had Subrt conducted proper due

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

1   diligence, he would have learned the money Okun offered to pay for the Exchange Entity was

2   stolen, that Okun was not trustworthy and that the Exchange Entity should not be sold to Okun

3   because he was not a proper candidate for trusteeship. Subrt was negligent, breached fiduciary

4   duties to the client Exchangers and knowingly aided and abetted Okun's breaches of fiduciary

5   duties while acting for his own financial advantage and gain.

6       40.    Defendant **James F. Livesey** ("Livesey") is a resident of Massachusetts and

7   until August, 2005 was an employee, representative, and agent of AEC exercising control over

8   the trust funds held on deposit at AEC, which were held by AEC as trustee for its clients as

9   beneficiaries of each respective trust created by each client for the purpose of accomplishing a

10  1031 exchange. On or about August 25, 2005, without proper due diligence, Livesey sold his

11  5% interest in AEC for a share of the $4,250,000 total sale price to 1031 TG, a Delaware

12  corporation controlled by Okun and other members of the RICO enterprise. Had Livesey

13  conducted proper due diligence, he would have learned the money Okun offered to pay for the

14  Exchange Entity was stolen, that Okun was not trustworthy and that the Exchange Entity

15  should not be sold to Okun because he was not a proper candidate for trusteeship. Livesey was

16  negligent, breached fiduciary duties to the client Exchangers and knowingly aided and abetted

17  Okun's breaches of fiduciary duties while acting his own financial advantage and gain.

18      **(v)    The Negligent SOS Employee Defendants**

19      41.    Defendant **Todd R. Pajonas** ("Pajonas") is a resident of Trumbull, Connecticut

20  and was an employee, representative, and agent of SOS exercising control over the trust funds

21  held on deposit at SOS, which were held by SOS as trustee for its clients as beneficiaries of

22  each respective trust created by each client for the purpose of accomplishing a 1031 exchange.

23  On or about November, 2005, without proper due diligence, Pajonas sold his interest in SOS

24  for $2,800,000 to 1031 TG, a Delaware corporation controlled by Okun and other members of

25  the RICO enterprise. Pursuant to this transaction, Pajonas remained as an employee and agent

26  of SOS and retained control over SOS's trust funds. On November 16, 2005, just one day

27  before Okun purchased SOS from Pajonas for $2,800,000, Okun caused the transfer of

28  $2,800,000 in client trust funds from AEC's Bank of America account #xxx5772 to Okun's

1  personal Union Federal Bank account #xxx6072. Pajonas was paid by the wire transfer of

2  $1,600,000 on November 17, 2005 from Okun's personal account at Union Federal Bank

3  account #xxx6072 to Todd & Mary Pajonas. A news article dated September 27, 2005 and

4  posted on SOS's website www.sos1031.com announced the merger of AEC and SOS, (two

5  months prior to the actual date of SOS's sale to Okun). The article stated that Pajonas would

6  continue as President of the newly merged companies. As President of both AEC and SOS,

7  Pajonas was or should have been aware that he was being paid by Okun in AEC clients' funds

8  for his ownership interests in SOS.  Had Pajonas conducted proper due diligence, he would

9  have learned the money Okun offered to pay was stolen, that for the Exchange Entity Okun was

10 not trustworthy and that the Exchange Entity should not be sold to Okun because he was not a

11 proper candidate for trusteeship.  Pajonas was negligent, breached fiduciary duties to the client

12 Exchangers and knowingly aided and abetted Okun's breaches of fiduciary duties while acting

13 for his own financial advantage and gain.

14             **(vi)    The Negligent REES Employee Defendants**

15             42.    Defendant **Marga Shefman** is a resident of Safety Harbor, Florida and was an

16 employee, representative, and agent of REES exercising control over the trust funds held on

17 deposit at REES, which were held by REES as trustee for its clients as beneficiaries of each

18 respective trust created by each client for the purpose of accomplishing a 1031 exchange.  On

19 or about June 9, 2006, without proper due diligence, Shefman sold her 51% interest in REES

20 for a share of the $4,250,000 total purchase price to 1031 TG, a Delaware corporation

21 controlled by Okun and other members of the RICO enterprise and was paid $3,000,000 in cash

22 up front for the sale, with another $1,250,000 promised over the next two years on June 9, 2007

23 and June 9, 2008, provided that the Gross Income ("GI") of the Company for the immediate

24 past calendar year did not drop below the GI of the calendar year immediately preceding the

25 closing. Pursuant to this transaction, Shefman remained as an employee and agent of REES and

26 retained control over REES's trust funds.  Had Shefman conducted proper due diligence, she

27 would have learned the money Okun offered to pay for the Exchange Entity was stolen, that

28 Okun was not trustworthy and that the Exchange Entity should not be sold to Okun because he

1  was not a proper candidate for trusteeship. Shefman was negligent, breached fiduciary duties

2  to the client Exchangers and knowingly aided and abetted Okun's breaches of fiduciary duties

3  while acting for her own financial advantage and gain.

4         43.    Defendant **David Shefman** is a resident of Safety Harbor, Florida and was an

5  employee, representative, and agent of REES exercising control over the trust funds held on

6  deposit at REES, which were held by REES as trustee for its clients as beneficiaries of each

7  respective trust created by each client for the purpose of accomplishing a 1031 exchange. On

8  or about June 9, 2006, without proper due diligence, Shefman sold his 49% interest in REES

9  for a share of the $4,250,000 total purchase price to 1031 TG, a Delaware corporation

10  controlled by Okun and other members of the RICO enterprise and was paid $3,000,000 in cash

11  up front for the sale, with another $1,250,000 promised over the next two years on June 9, 2007

12  and June 9, 2008, provided that the Gross Income ("GI") of the Company for the immediate

13  past calendar year did not drop below the GI of the calendar year immediately preceding the

14  closing. Pursuant to this transaction, Shefman remained as an employee and agent of REES and

15  retained control over REES's trust funds. Had Shefman conducted proper due diligence, he

16  would have learned the money Okun offered to pay for the Exchange Entity was stolen, that

17  Okun was not trustworthy and that the Exchange Entity should not be sold to Okun because he

18  was not a proper candidate for trusteeship. Shefman was negligent, breached fiduciary duties

19  to the client Exchangers and knowingly aided and abetted Okun's breaches of fiduciary duties

20  while acting for his own financial advantage and gain.

21        **(vii)**    **The Negligent NES Employee Defendants**

22         44.    Defendant **William D. Bennett** ("Bennett") is a resident of San Antonio, Texas

23  and was an employee, representative, and agent of NES exercising control over the trust funds

24  held on deposit at NES, which were held by NES as trustee for its clients as beneficiaries of

25  each respective trust created by each client for the purpose of accomplishing a 1031 exchange.

26  On or about June 22, 2006, without proper due diligence, Bennett sold his 30.25% interest in

27  NES for a share of the $5,000,000 total purchase price to 1031 TG, a Delaware corporation

28  controlled by Okun and other members of the RICO enterprise. Pursuant to this transaction,

1   Bennett remained as an employee and agent of NES and retained control over NES's trust

2   funds.   Had Bennett conducted proper due diligence, he would have learned the money Okun

3   offered to pay for the Exchange Entity was stolen, that Okun was not trustworthy and that the

4   Exchange Entity should not be sold to Okun because he was not a proper candidate for

5   trusteeship.   Bennett was negligent, breached fiduciary duties to the client Exchangers and

6   knowingly aided and abetted Okun's breaches of fiduciary duties while acting for his own

7   financial advantage and gain.

8           **(viii)    The Negligent IXG Employee Defendants**

9           45.       **Daniel McCabe** is a Colorado resident and was an employee, representative,

10  and agent of IXG exercising control over the trust funds held on deposit at IXG, which were

11  held by IXG as trustee for its clients as beneficiaries of each respective trust created by each

12  client for the purpose of accomplishing a 1031 exchange.   On or about August, 2006, without

13  proper due diligence, Daniel McCabe sold his 76% interest in IXG for the pro rata percentage

14  of the $9,000,000 total purchase price to 1031 TG, a Delaware corporation controlled by Okun

15  and other members of the RICO enterprise. $7,000,000 was paid in cash up front, and the other

16  $2,000,000 was to be paid over the next two years on the anniversary of the sale. Pursuant to

17  this transaction, Daniel McCabe remained as an employee and agent of IXG and retained

18  control over IXG's trust funds.  Had McCabe conducted proper due diligence, he would have

19  learned the money Okun offered to pay for the Exchange Entity was stolen, that Okun was not

20  trustworthy and that the Exchange Entity should not be sold to Okun because he was not a

21  proper candidate for trusteeship.  McCabe was negligent, breached fiduciary duties to the client

22  Exchangers and knowingly aided and abetted Okun's breaches of fiduciary duties while acting

23  for his own financial advantage and gain.

24          46.       Defendant **Shirley McCabe** is a Colorado resident and was an employee,

25  representative, and agent of IXG exercising control over the trust funds held on deposit at IXG,

26  which were held by IXG as trustee for its clients as beneficiaries of each respective trust created

27  by each client for the purpose of accomplishing a 1031 exchange.   On or about August, 2006,

28  without proper due diligence, Shirley McCabe sold her 8% interest in IXG for the pro rata

percentage of the $9,000,000 total purchase price to 1031 TG, a Delaware corporation controlled by Okun and other members of the RICO enterprise. $7,000,000 was paid in cash up front, and the other $2,000,000 was to be paid over the next two years on the anniversary of the sale. Pursuant to this transaction, Shirley McCabe remained as an employee and agent of IXG and retained control over IXG's trust funds. Had McCabe conducted proper due diligence, she would have learned the money Okun offered to pay for the Exchange Entity was stolen, that Okun was not trustworthy and that the Exchange Entity should not be sold to Okun because he was not a proper candidate for trusteeship. McCabe was negligent, breached fiduciary duties to the client Exchangers and knowingly aided and abetted Okun's breaches of fiduciary duties while acting for her own financial advantage and gain.

47. Defendant **Andrew McCabe** is a Colorado resident and was an employee, representative, and agent of IXG exercising control over the trust funds held on deposit at IXG, which were held by IXG as trustee for its clients as beneficiaries of each respective trust created by each client for the purpose of accomplishing a 1031 exchange. On or about August, 2006, without proper due diligence, Andrew McCabe sold his 4% interest in IXG for the pro rata percentage of the $9,000,000 total purchase price to the 1031 TG, a Delaware corporation controlled by Okun and other members of the RICO enterprise. $7,000,000 was paid in cash up front, and the other $2,000,000 was to be paid over the next two years on the anniversary of the sale. Pursuant to this transaction, Andrew McCabe remained as an employee and agent of IXG and retained control over IXG's trust funds. Had McCabe conducted proper due diligence, he would have learned the money Okun offered to pay for the Exchange Entity was stolen, that Okun was not trustworthy and that the Exchange Entity should not be sold to Okun because he was not a proper candidate for trusteeship. McCabe was negligent, breached fiduciary duties to the client Exchangers and knowingly aided and abetted Okun's breaches of fiduciary duties while acting for his own financial advantage and gain.

48. Defendant **Chad Greenberg** ("Greenberg") is a Colorado resident and was an employee, representative, and agent of IXG exercising control over the trust funds held on deposit at IXG, which were held by IXG as trustee for its clients as beneficiaries of each

1  respective trust created by each client for the purpose of accomplishing a 1031 exchange.  On

2  or about August, 2006, without proper due diligence, Greenberg sold his 3% interest in IXG for

3  the pro rata percentage of the $9,000,000 total purchase price to 1031 TG, a Delaware

4  corporation controlled by Okun and other members of the RICO enterprise. $7,000,000 was

5  paid in cash up front, and the other $2,000,000 was to be paid over the next two years on the

6  anniversary of the sale. Pursuant to this transaction, Greenberg remained as an employee and

7  agent of IXG and retained control over IXG's trust funds.  Had Greenberg conducted proper

8  due diligence, he would have learned the money Okun offered to pay for the Exchange Entity

9  was stolen, that Okun was not trustworthy and that the Exchange Entity should not be sold to

10  Okun because he was not a proper candidate for trusteeship.   Greenberg was negligent,

11  breached fiduciary duties to the client Exchangers and knowingly aided and abetted Okun's

12  breaches of fiduciary duties while acting for his own financial advantage and gain.

13      49.    Defendant **Pete McCann** ("McCann") is a Colorado resident and was an

14  employee, representative, and agent of IXG exercising control over the trust funds held on

15  deposit at IXG, which were held by IXG as trustee for its clients as beneficiaries of each

16  respective trust created by each client for the purpose of accomplishing a 1031 exchange.  On

17  or about August, 2006, without proper due diligence, McCann sold his 4% interest in IXG for

18  the pro rata percentage of the $9,000,000 total purchase price to 1031 TG, a Delaware

19  corporation controlled by Okun and other members of the RICO enterprise. $7,000,000 was

20  paid in cash up front, and the other $2,000,000 was to be paid over the next two years on the

21  anniversary of the sale. Pursuant to this transaction, Greenberg remained as an employee and

22  agent of IXG and retained control over IXG's trust funds.  Had McCann conducted proper due

23  diligence, he would have learned the money Okun offered to pay for the Exchange Entity was

24  stolen, that Okun was not trustworthy and that the Exchange Entity should not be sold to Okun

25  because he was not a proper candidate for trusteeship.   McCann was negligent, breached

26  fiduciary duties to the client Exchangers and knowingly aided and abetted Okun's breaches of

27  fiduciary duties while acting for his own financial advantage and gain.

28  ///

1      (ix)   **The Negligent 1031 Advance Employee Defendants**

2      50.    Defendant **Janet Dashiell** ("Dashiell") is a resident of San Jose, California and

3  was a President, employee, representative, and agent of 1031 Advance exercising control over

4  the trust funds held on deposit at 1031 Advance, which were held by 1031 Advance as trustee

5  for its clients as beneficiaries of each respective trust created by each client for the purpose of

6  accomplishing a 1031 exchange. On or about December, 2006, without proper due diligence,

7  Dashiell sold her interest in 1031 Advance for a share of the $2,500,000 total purchase price to

8  the 1031 TG, a Delaware corporation controlled by Okun and other members of the RICO

9  enterprise. Pursuant to this transaction, Dashiell remained as an employee and agent of 1031

10  Advance and retained control over 1031 Advance's trust funds, including the trust funds of the

11  other Exchange Accommodators when she replaced Okun as President and CEO of 1031 TG

12  on February 14, 2007. Dashiell breached her fiduciary duties to the trust and acted for her own

13  personal advantage and gain. Had Dashiell conducted proper due diligence, she would have

14  learned the money Okun offered to pay for the Exchange Entity was stolen, that Okun was not

15  trustworthy and that the Exchange Entity should not be sold to Okun because he was not a

16  proper candidate for trusteeship. Dashiell was negligent, breached fiduciary duties to the client

17  Exchangers and knowingly aided and abetted Okun's breaches of fiduciary duties while acting

18  for her own financial advantage and gain.

19      51.    Defendant **Steven Allred** ("Allred") is a resident of San Jose, California and

20  was an employee, representative, and agent of 1031 Advance exercising control over the trust

21  funds held on deposit at 1031 Advance, which were held by 1031 Advance as trustee for its

22  clients as beneficiaries of each respective trust created by each client for the purpose of

23  accomplishing a 1031 exchange. On or about December, 2006, without proper due diligence,

24  Allred sold his interest in 1031 Advance for a share of the $2,500,000 total purchase price to

25  1031 TG, a Delaware corporation controlled by Okun and other members of the RICO

26  enterprise. Pursuant to this transaction, Allred remained as an employee and agent of 1031

27  Advance and retained control over 1031 Advance's trust funds. Had Allred conducted proper

28  due diligence, he would have learned the money Okun offered to pay for the Exchange Entity

1   was stolen, that Okun was not trustworthy and that the Exchange Entity should not be sold to

2   Okun because he was not a proper candidate for trusteeship.  Allred was negligent, breached

3   fiduciary duties to the client Exchangers and knowingly aided and abetted Okun's breaches of

4   fiduciary duties while acting for his own financial advantage and gain.

5         **(x)**    **The Banking Defendant**

6       52.    Defendant **Wachovia Bank, N.A.** ("Wachovia") is a national bank licensed to

7   do business throughout the United States, with its headquarters located in Charlotte, North

8   Carolina.  Wachovia knowingly engaged in conduct which facilitated Okun's misuse of trust

9   funds by Okun, a valued Wachovia client.  As described herein, Wachovia knowingly aided

10  and abetted breaches of fiduciary duties by Okun (and/or others) while  Wachovia acted for

11  Wachovia's own financial advantage and gain.

12      53.    In 2005, when Okun moved from Carmel, Indiana to Florida, and prior to

13  Okun's purchase of the six Exchange Entities, Okun established a banking relationship with

14  Wachovia Relationship Manager Steve Cooney and the Fort Lauderdale Wachovia Wealth

15  Management Team. Wachovia's dealings with Okun increased and Wachovia developed a

16  strong relationship with Okun and his entities through its Real Estate Financial Services

17  Division, Wealth Management Division, and personal as well as business banking divisions.

18  Wachovia's relationship with Okun included, among other things, making loans to Okun

19  personally and to the entities Okun owned and controlled, and Wachovia also acted as wealth

20  management and cash management advisors to Okun. As a result of this relationship, Wachovia

21  prepared detailed loan underwriting analyses which establish that Wachovia had intimate

22  knowledge of Okun, Okun's fiduciary duties, Okun's business and the manner in which Okun

23  operated those businesses.

24      54.    Wachovia was aware of the fiduciary duties owed by Exchange Entities to

25  clients who entered into Exchange Agreements with the Exchange Entities based upon, among

26  other things, Wachovia's knowledge and understanding of Okun's businesses and also the fact

27  that Wachovia itself acted as an exchange accommodator and provided services to its own

28  client Exchangers' for purposes of IRS §1031 tax deferred exchanges.  Wachovia knew that

1  Exchangers funds were to be held in trust by each Exchange Entity for the benefit of the client,

2  that the Exchanger's funds were to be deposited into escrow or trust accounts, and that the trust

3  and escrow relationships were fiduciary in nature such that each Exchange Entity owed

4  fiduciary duties to the clients whose funds were entrusted to the Exchange Entity.  Wachovia

5  knew that if the owner of an Exchange Entity purported to "borrow" client Exchange Funds for

6  the owner's personal use and benefit, such conduct would be an improper misappropriation of

7  the client Exchange Funds, and, among other things, a breach of fiduciary duties.

8       55.    Sometime prior to March 23, 2006 Wachovia obtained actual knowledge that

9  Defendant Okun acquired AEC in August, 2005, and SOS in November, 2005, and that Okun

10  had improperly "borrowed" Exchangers' funds from "escrow accounts" into which the

11  Exchangers' funds had been deposited.

12      56.    Attached hereto as Exhibit "4" is a true and correct copy of a Real Estate Risk

13  Assessment Summary ("Risk Assessment") dated September 12, 2005 prepared by Wachovia

14  related to an application by Okun for an $80 Million loan to purchase West Oaks Mall in

15  Houston, Texas.  Included in that Risk Assessment was a personal financial statement supplied

16  by Okun that listed his personal net worth at $69,620,036.  Eleven months later, Defendant

17  Wachovia prepared a Deal Concept Memo #1 dated August 31, 2006, a true and correct copy

18  of which is attached hereto as Exhibit "5."  In Deal Concept Memo #1, Defendant Wachovia

19  confirmed its knowledge that Defendant Okun had acquired AEC and SOS in 2005, and NES

20  and IXG in 2006.  The loan supervisors analyzing Okun's request in Deal Concept Memo #1,

21  for a $6 Million additional loan, specifically asked the loan officer preparing that loan

22  application the following question:  **"Has Ed permanently ceased the practice of borrowing**

23  **from the QI escrow accounts?"** (Emphasis added.)  In that same Deal Memo #1, the question

24  was posed: **"Does Ed anticipate any regulation of Exchange Entities in the near future due**

25  **to the risk of escrow money disappearing?"**  References to Okun's improper borrowing from

26  the escrow accounts also appear in the internal memorandum dated March 23, 2006, proving

27  that Wachovia acquired knowledge of Okun's misconduct and breach of trust sometime prior

28  to March 23, 2006.

57.    After Wachovia was aware by, at the very latest, March 23, 2006 that Okun was mishandling trust funds, Wachovia did not take steps to terminate its business relationship with Okun, but instead Wachovia actively rewarded Okun for continuing to mishandle trust funds by, among other things, loaning millions of dollars to Okun based upon Okun "personal wealth" which Wachovia knew was propped up by exchange funds he had deposited into his own personal accounts.

58.    Wachovia learned in October, 2006 that Defendant Okun intended to purchase 1031 Advance to provide Okun an entry into the California Exchange Entity business.

59.    In an internal written memo entitled "Deal Concept #2" dated October 17, 2006, Wachovia noted that the "current float" of Exchangers' escrows funds at the five Exchange Entities (aside from 1031 Advance) available to Okun at that time was $180 Million dollars; a true and correct copy of Deal Concept Memo #2 is attached hereto as Exhibit "6." The term "float" refers to the surplus Exchangers' funds held by an Exchange Entity not immediately needed to close Exchangers' replacement escrows, which surplus funds were available to be invested by the Exchange Entity.  Deal Concept #2 reconfirmed that Wachovia knew that Okun was utilizing Exchangers' funds he misappropriated from Exchange Entities to make long-term investments for his own personal benefit.

60.    Wachovia's knowledge that Okun was converting Exchangers' funds from trust accounts maintained by Exchange Entities and transferring Exchanger funds to 1031 TG's Wachovia accounts and/or other of Okun's Wachovia accounts meant that Wachovia knew it was holding Exchangers' funds for the benefit of the Exchange Entities' clients.

61.    Wachovia's knowledge that Okun was converting Exchangers' funds from trust accounts maintained by Exchange Entities and utilizing those trust funds for Okun's own personal long-term investments meant that Wachovia also knew that when clients (whose funds had been misappropriated) were prepared to complete their exchanges, the only way that the Exchange Entities could timely close the clients' replacement escrows was to utilize (or, more accurately, convert) newly deposited trust funds belonging to new Exchangers to close the original Exchangers' replacement escrows, which conduct was a classic Ponzi scheme.

28

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

62.    Okun's transfers or conversions of Exchange funds under Wachovia's control include the following:

| No. | Date | Amount | From | To |
|---|---|---|---|---|
| 1 | 6/9/06 | $3,200,000 | SOS Commerce Bank Acct # xxx6734 | IPofA Wachovia Bank Acct #xxx2719 |
| 2 | 8/14/06 | $800,500 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 3 | 12/20/06 | $5,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 4 | 1/17/07 | $2,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 5 | 3/1/07 | $1,400,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 6 | 3/2/07 | $2,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 7 | 3/8/07 | $1,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 8 | 3/15/07 | $700,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 9 | 3/23/07 | $1,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 10 | 4/20/07 | $6,177,248 | Okun's Personal Wachovia Bank Acct # xxx0662 [Funds originally received from IXG] | IPofA Wachovia Acct #2719 |
|  | **Total Transfers to IPofA:** | **$23,277,748** |  |  |

63.    Examples of Exchange Funds transfers from Wachovia accounts to Okun disguised as "loans" include the following:

a.    On January 17, 2007 Okun Holdings "borrowed" $2,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

b.    On January 24, 2007 Okun Holdings "borrowed" $1,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

c.    On January 31, 2007 Okun Holdings "borrowed" $3,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

d. On February 15, 2007 Okun Holdings "borrowed" $2,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

e. On February 22, 2007 Okun Holdings "borrowed" $8,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

f. On March 1, 2007 Okun Holdings "borrowed" $1,400,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

g. On March 2, 2007 Okun Holdings "borrowed" $2,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

h. On March 8, 2007 Okun Holdings "borrowed" $1,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

i. On March 15, 2007 Okun Holdings "borrowed" $4,700,000 from 1031 TG; $4,000,000 of this money was wired from 1031 TG's Wachovia account #xxx3272 to Okun Holdings and $700,000 was wired to IPofA.

j. On March 23, 2007 Okun Holdings "borrowed" $1,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

64. With the knowledge that Okun was operating a Ponzi scheme and converting Exchangers' funds deposited in trust with the Exchange Entities to fund Okun's own personal business activities and lavish lifestyle, including, inter alia, purchasing real estate, cars, yachts, other "toys", etc. and acquiring additional qualified intermediary businesses, or purchasing other assets which conduct was a breach of the fiduciary duties that Okun and/or 1031 TG (as Trustee for exchange funds held by 1031 TG, AEC, SOS, REES, NES, IXG, and/or 1031 Advance) owed to the Exchanger clients, Wachovia provided Okun and/or 1031 TG with substantial assistance in breaching those fiduciary duties by, among other things, loaning Okun money, allowing Okun to hold/hide misappropriated Exchange Funds in Wachovia accounts, facilitating wire transfers used by Okun to misappropriate tens of millions of dollars worth of Exchange Funds and by otherwise enabling Okun and his related entities to purchase additional Exchange Entities, use Exchange Funds to conduct those personal business activities and to otherwise continue the Ponzi scheme.

65.    In assisting Okun, Wachovia acted for its own financial advantage and gain by, among other things, engaging in unusual banking procedures to make larger than normal profits off of Okun and his Ponzi scheme. For example, Wachovia's unusual loans to Okun which perpetuated the scheme had abnormally high Loan to Value ("LTV") ratios, often-times above 90%, and, Wachovia charged abnormally high interest rates, often around 9% which was well above normal market rates for the time period when in question rates were at or near historic lows.

66.    By engaging in the conduct described herein which substantially assisted Okun's Ponzi scheme, Wachovia acted for its own financial advantage and gain while knowingly aiding and abetting Okun's breaches of fiduciary duties to the Exchangers.

67.    Plaintiffs and the class members who entered into exchange agreements with 1031 TG and/or its subsidiaries or affiliates AEC, SOS, REES, NES, IXG, and 1031 Advance have each been damaged in an amount to be established at trial by the actions of Wachovia described herein

(xi)    **The Non-Party Non-BFP Transferees**[5]

68.    **The 1031 Tax Group, LLC** ("1031 TG") is a Delaware limited liability company created December 12, 2005 which was owned and controlled by Okun. 1031 TG, under Okun's direction and control, was used as a tool in Okun's Ponzi scheme. After Okun bought the Exchange Entities with stolen money, 1031 TG acted as a holding company for the Exchange Entities. Upon purchasing each of the Exchange Entity, Okun immediately transferred some or all of the Exchange Entity's clients' funds to 1031 TG controlled accounts, whereupon Okun and/or 1031 TG served as the trustee for the clients' funds. After causing the transfer of the clients' funds to 1031 TG, Okun then moved the funds to either his own personal bank accounts, or to accounts controlled by IPofA, Okun Holdings and/or other Okun controlled entities. Okun "borrowed" approximately $26,000,000 in trust assets between January 2007 and March 2007 through a series of ten "Promissory Notes" between Okun

---

[5] The Non-BFP Transferees are not defendants in this case. They are Non-Parties.

1  Holdings (100% owned by Okun) and the 1031 Tax Group (100% owned by Okun), and signed

2  by Okun. These "loans" were misappropriations of clients' trust funds.  It is estimated that

3  Okun and IPofA "borrowed" approximately $138,000,000 from 1031 TG from 2005 to May,

4  2007.

5          69.    **Okun Holdings, Inc.** ("Okun Holdings") is a Virginia corporation created

6  December 28, 2006 to serve as a holding company for all of Okun's entities. Okun Holdings,

7  under Okun's direction and control served as a conduit to launder stolen trust money and/or to

8  transfer it across state lines and otherwise acted as a tool in Okun's Ponzi scheme.  Okun, on

9  behalf of Okun Holdings, executed at least 10 "Promissory Notes" whereby Okun "borrowed"

10 over $26,000,000 from 1031 TG (stolen trust funds) between January and March 2007 in the

11 following transactions:

12         a.     On January 17, 2007 Okun Holdings "borrowed" $2,000,000 from 1031 TG;

13                this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

14         b.     On January 24, 2007 Okun Holdings "borrowed" $1,000,000 from 1031 TG;

15                this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

16         c.     On January 31, 2007 Okun Holdings "borrowed" $3,000,000 from 1031 TG;

17                this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

18         d.     On February 15, 2007 Okun Holdings "borrowed" $2,000,000 from 1031 TG;

19                this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

20         e.     On February 22, 2007 Okun Holdings "borrowed" $8,000,000 from 1031 TG;

21                this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

22         f.     On March 1, 2007 Okun Holdings "borrowed" $1,400,000 from 1031 TG; this

23                money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

24         g.     On March 2, 2007 Okun Holdings "borrowed" $2,000,000 from 1031 TG; this

25                money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

26         h.     On March 8, 2007 Okun Holdings "borrowed" $1,000,000 from 1031 TG; this

27                money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

28         i.     On March 15, 2007 Okun Holdings "borrowed" $4,700,000 from 1031 TG;

$4,000,000 of this money was wired from 1031 TG's Wachovia account #xxx3272 to Okun Holdings and $700,000 was wired to IPofA.

     j.     On March 23, 2007 Okun Holdings "borrowed" $1,000,000 from 1031 TG; this money was wired from 1031 TG's Wachovia account #xxx3272 to IPofA.

Although the promissory notes were executed by Okun on behalf of Okun Holdings, only $4,000,000 of the $26,000,000 was actually transferred into accounts held by Okun Holdings. The rest ($22,000,000) went directly to IPofA and then to Okun personally.

     70.     **Investment Properties of America, LLC** ("IPofA") is a Virginia limited liability company with its principal offices in Richmond, Virginia. At all relevant times, IPofA was wholly owned and operated by Okun. IPofA, under Okun's direction and control, was used as a conduit to launder money across state lines and otherwise was used as a tool in Okun's Ponzi scheme. IPofA unlawfully received the following known transfers (some of which were interstate transfers)of stolen exchange funds from June 2006 to April 2007:

| No. | Date | Amount | From | To |
|---|---|---|---|---|
| 1 | 6/9/06 | $3,200,000 | SOS Commerce Bank Acct # xxx6734 | IPofA Wachovia Bank Acct #xxx2719 |
| 2 | 8/14/06 | $800,500 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 3 | 12/20/06 | $5,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 4 | 1/17/07 | $2,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 5 | 3/1/07 | $1,400,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 6 | 3/2/07 | $2,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 7 | 3/8/07 | $1,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 8 | 3/15/07 | $700,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 9 | 3/23/07 | $1,000,000 | 1031 TG Wachovia Acct #3272 | IPofA Wachovia Acct #2719 |
| 10 | 4/20/07 | $6,177,248 | Okun's Personal Wachovia Bank Acct # xxx0662 [Funds originally received from IXG] | IPofA Wachovia Acct #2719 |
| | **Total Transfers to IPofA:** | **$23,277,748** | | |

(xii)    **The Insurance Broker Defendant**

71.    Defendant **San Francisco Series of Lockton Companies, LLC** ("Lockton") is a California Corporation with its principal place of business in San Francisco, CA. Lockton acted as the insurance producer for 1031 TG and/or its subsidiaries (including AEC, SOS, REES, NES, IXG and 1031 Advance, collectively the "Exchange Entities") and procured Crime Policies for the Exchange Entities. Lockton misrepresented to the public that the Crime Policies were "Fidelity Bonds" to pass them off to the clients of the Exchange Entities as Surety Bonds. Examples of the Lockton Evidence of Insurance ('EOI") promoting the "Fidelity Bond Program", which are representative of the numerous EOIs executed by Lockton and advertised on the Exchange Entities' web-sites are attached hereto as Exhibit 7. The inexpensive Crime Policies which were passed off as expensive Surety Bonds in the manner exemplified by Exhibit 7 included:

(a)    an August 15, 2005 to August 15, 2006 $5,000,000 Crime Policy (which was called a "Bond") issued to ATL, LKE Solutions, LLC ("LKE"), Easton Exchange Services, LLC ("EES"), Wellesley Exchange Services, LLC ("WES") and AEC Exchange Company, LLC ("AEC") and underwritten by Continental Casualty Company ("Continental") (Policy No. 268026103);

(b)    an August 15, 2005 to August 15, 2006 $5,000,000 Crime Policy (which was called a "Bond") issued to National Intermediary, Ltd. ("NI"), National Exchange Accommodators, LLC ("NEA"), and NES and underwritten by Continental (Policy No. 268024531);

(c)    an August 15, 2005 to August 15, 2006 $1,000,000 Crime Policy (which was called a "Bond") issued to REES and underwritten by Continental (Policy No. 268024335);

(d)    an August 15, 2005 to August 15, 2006 $10,000,000 Crime Policy (which was called a "Bond") issued to SOS and underwritten by Continental (Policy No. 268117856) and Federal Insurance Company ("Chubb") (Policy No. 6801-8602);

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

(e)    an August 15, 2006 to August 15, 2007 $10,000,000 Crime Policy (which was called a "Bond") issued to 1031 Advance and underwritten by Continental (Policy No. 287014434) and Chubb (Policy No. 8207-2761);

(f)    an August 15, 2006 to August 15, 2007 $10,000,000 Crime Policy (which was called a "Bond") issued to SOS, SOS Holdings, LLC ("SOS Holdings"), Atlantic Exchange Mutual ("ATLM"), NES and NEA and underwritten by Continental (Policy No. 268117856) and Chubb (Policy No. 6801-8602);

(g)    an August 15, 2006 to August 15, 2007 $10,000,000 Crime Policy (which was called a "Bond") issued to IXG and underwritten by Continental (Policy No. 268024755) and Chubb (Policy No. 6802-1824);

(h)    an August 15, 2006 to August 15, 2007 $1,000,000 Crime Policy (which was called a "Bond") issued to REES and underwritten by Continental (Policy No. 268024335);

(i)    a November 11, 2006 to August 15, 2007 $10,000,000 Crime Policy (which was called a "Bond") issued to 1031 Tax Group ("1031TG"), ATL, IXG, NES, REES, SOS, and SOS Holdings and underwritten by Continental (Policy No. 268117856) and Chubb (Policy No. 6801-8602); and

(j)    a February 21, 2007 to August 15, 2007 $20,000,000 Crime Policy (which was called a "Bond") issued to 1031 Advance and underwritten by Continental (Policy No. 287014434) and Chubb (Policy No. 8207-2761) and Twin City Fire Insurance ("Twin City") (Policy No. 57FA024108807).

**(xiii)   The Insurer Defendants**

72.    Defendant **Continental Casualty Company** ("Continental") is an Illinois corporation doing business throughout the United States. Continental issued Crime Policies to the Exchange Entities in 2003, 2004, 2005, 2006, and 2007, and then authorized Lockton to misrepresent (or ratified the misrepresentation) the terms of the illusory two-party Crime Policies to be three-party "Fidelity Bonds" which protected the clients of the Exchange Entities.

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

73.    Defendant **Federal Insurance Company** ("Chubb") is an Indiana corporation doing business throughout the United States. Chubb issued excess policies to the Exchange Entities in 2004, 2005, 2006, and 2007. Chubb authorized Lockton to misrepresent (or ratified the misrepresentation) the terms of the illusory two-party Crime Policies to be three-party "Fidelity Bonds" which protected the clients of the Exchange Entities.

74.    Defendant **Twin City Fire Insurance Company** ("Twin City") is a subsidiary of The Hartford Casualty Insurance Company ("The Hartford"), a Connecticut corporation. Twin City does business throughout the United States. Twin City issued excess policies to the Exchange Entities in 2007. Twin City authorized Lockton to misrepresent (or ratified the misrepresentation) the terms of the illusory two-party Crime Policies to be three-party "Fidelity Bonds" which protected the clients of the Exchange Entities.

75.    Plaintiffs did not receive copies of the applicable Crime Policies until after the failure of the Exchange Entities. Plaintiffs only received copies of the Evidences of Insurance (in the form exemplified by Exhibit 7) which they (or their agents or subrogors) relied upon and which form the basis of plaintiffs' fraud and breach of contract claims. Plaintiffs were promised protection by bonds, not Crime Policies, and the existence of these illusory Crime Policies is not a defense to the prosecution of claims based upon the Evidence of Fiduciary Bond Program typified by Exhibit 7.

76.    A summary of the Crime Policies procured by the Insurance Producer Defendants Lockton and issued by the Insurer Defendants introduced above is as follows:

### Crime Policies Issued to the Tax Group Entities

| Period | Coverage | Producer | Insurer | Entity |
|---|---|---|---|---|
| August 15, 2005 to August 15, 2006 **\*ATL purchased 8/25/05** | Primary $5,000,000 | Lockton | Continental | **ATL**, LKE, EES, WES, AEC |
| August 15, 2005 to August 15, 2006 **\*NES purchased 6/22/06** | Primary $5,000,000 | Lockton | Continental | NI, NEA, **NES** |

36

| | | | | |
|---|---|---|---|---|
| August 15, 2005 to August 15, 2006 **\*REES purchased 6/9/06** | Primary $1,000,000 | Lockton | Continental | **REES** |
| August 15, 2005 to August 15, 2006 **\*SOS purchased 11/05** | Primary  $5,000,000<br>Excess    $5,000,000<br><br>Total:    $10,000,000 | Lockton | Continental Chubb | **SOS** |
| August 15, 2006 to August 15, 2007 **\*1031 Advance purchased 12/06** | Primary  $5,000,000<br>Excess    $2,500,000<br>Excess    $2,500,000<br><br>Total:    $10,000,000 | Lockton | Continental Chubb Twin City | **1031 Advance** |
| August 15, 2006 to August 15, 2007 | Primary  $5,000,000<br>Excess    $5,000,000<br><br>Total:    $10,000,000 | Lockton | Continental Chubb | **SOS**, SOS Holdings, ATLM, **NES,** NEA |
| August 15, 2006 to August 15, 2007 **\*IXG purchased 8/1/06** | Primary  $5,000,000<br>Excess    $5,000,000<br><br>Total:    $10,000,000 | Lockton | Continental Chubb | **IXG** |
| August 15, 2006 to August 15, 2007 | Primary  $1,000,000 | Lockton | Continental | **REES** |
| Nov.  11, 2006 to August 15, 2007 | Primary  $5,000,000<br>Excess    $5,000,000<br><br>Total:    $10,000,000 | Lockton | Continental Chubb | 1031 TG, **ATL, IXG, NES, REES, SOS,** SOS Holdings |
| Feb. 21, 2006 to August 15, 2007 | Primary  $10,000,000<br>Excess    $5,000,000<br>Excess    $5,000,000<br><br>Total:    $20,000,000 | Lockton | Continental Chubb Twin City | **1031 Advance** |

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

## IV.

## AGENCY AND CONSPIRACY ALLEGATIONS

77.    Plaintiffs allege that the acts and events alleged against each Thief Defendant were in collaboration, collusion, and conspiracy with each other Thief Defendant and each Thief Defendant authorized or ratified the acts of each other in furtherance of the scheme to steal the money and knowingly breach the trust.

78.    Plaintiffs allege that the acts and events alleged against the Insurance Producer Defendant Lockton were in collaboration with the Insurer Defendants and were performed within the course and scope of Lockton's real, apparent or ostensible agency. The conduct of Lockton as alleged herein occurred substantially within the time and space limits authorized by Lockton's agency relationship with the Insurer Defendants, was motivated in part by a purpose to serve Lockton's principals, was of a kind that Lockton was hired to perform, was in part beneficial to the Insurer Defendants, and was ratified and affirmed by the Insurer Defendants. In the alternative, in the event the Insurer Defendants deny they authorized Lockton to execute the "Evidence of Insurance" of "Fidelity Bond Program" and these representations were made without any real, apparent or ostensible authority, then Lockton is liable for breach of warranty of authority as an agent or liable for breach of contracts entered into by an agent for an undisclosed principal.

## V.

## INFORMATION ALLEGATIONS

79.    Allegations made in this First Amended Complaint have been based on information and belief, except those allegations that pertain directly to Plaintiffs, which are based on their personal knowledge. Plaintiffs' information and belief is based on, *inter alia*, the investigation conducted by Plaintiffs and Plaintiffs' attorneys after their retention. Each and every allegation and factual contention contained in this Complaint has evidentiary support or, alternatively, is likely to have evidentiary support after reasonable opportunity for further investigation or discovery by Plaintiffs or their counsel.

///

# VI.

## THE BUSINESS OF 1031 EXCHANGES

80.    The business of 1031 exchanges refers to the IRS code section that allows for like kind transfers of property that defer capital gains tax as graphically depicted below:

### 1031 EXCHANGE



81.    IRS Code §1031 prohibits the seller of property from taking possession of the proceeds at any time during the 1031 transaction.  Thus, Exchange Accommodators (also called "Qualified Intermediaries") were established in order to take possession and hold the funds in trust while substitute property was designated by the client and then transfer those funds directly to the escrow established to complete the purchase of the replacement property or properties.

82.    The deferral of capital gains is the incentive for property owners to utilize tax deferred exchanges.  As a result, Exchange Accommodators often handle large sums of money that they hold in trust for periods of up to 180 days.  Exchange Accommodators are largely unregulated, unlike banks and insurance companies which also provide this same service. Exchange Accommodators charge a fee in order to hold the funds in trust and to accommodate their clients' exchange.  Generally, the fee includes the interest earned on the funds held in trust which are to be invested in safe fiduciary accounts.  Because, generally, the clients of the Exchange Accommodators do not receive the interest on the funds invested, they do not

1  receive an accounting of their investment at the close of escrow of their replacement property.

2  This lack of an accounting process creates the perfect scenario for the theft of these funds by

3  unscrupulous fiduciaries and thieves working in collusion with them.

4       83.    Although the legal title to the funds of the clients of the Exchange Entities was

5  transferred to the intermediaries, the clients retained all rights in the proceeds of the transaction

6  except for the use and benefit of the money during the exchange period. The proceeds are held

7  in trust by the intermediary acting in the capacity of a trustee for the client (the beneficiary of

8  the trust).

9  ## VII.

10 ## GENERAL FACTUAL ALLEGATIONS ABOUT OKUN'S

11 ## PURCHASE OF THE EXCHANGE ENTITIES

12      84.    Plaintiffs owned investment real property which was sold and the proceeds of

13 which were transferred to the Exchange Entities pursuant to the terms of Exchange Agreements

14 entered into with each client. An example of an Exchange Agreement is attached hereto as

15 Exhibit 8. Each Exchange Agreement was mailed in the U.S. mail to each client and it

16 contained the representation that each client's funds would be retained and used exclusively for

17 the client's subsequent purchase of replacement property. Thereafter, Plaintiffs entered into

18 contracts to purchase like kind replacement property and deposited earnest money in escrow to

19 purchase the replacement property by the 180 day requirement for a 1031 exchange.

20      85.    In or about May 2007, Plaintiffs were informed that their money held in trust

21 was no longer available. As a result of the loss of the access to these funds, the Plaintiffs may

22 also: (i) lose their tax deferred status and be subjected to a capital gains tax on the profits from

23 the sale of the relinquished property without access to the stolen funds to pay the tax; (ii) be in

24 breach of contracts to purchase replacement property and be subjected to damages including

25 the loss of their deposit unless they come up with alternative funds to close escrow;  (iii) be

26 required to hire attorneys to attempt to recover their funds and defend actions, if any, brought

27 by the seller of the replacement property and tax advisors to deal with the IRS; and (iv) have to

28 share in the cost associated with the retention of a successor trustee hired to administer the

1  trust. Similar consequential damages are currently being suffered by each member of the

2  Class.

3      86.    Since late May 2007, Plaintiffs have been advised that: (i) the Exchange Entities

4  have closed their doors and are out of business; (ii) 1031 TG, 1031 Advance, AEC, IXG, NES,

5  REES, SOS, and other Okun-controlled entities are in Bankruptcy; (ii) Okun, Coleman,

6  Simring and Field have been indicted for their roles in the lost Exchange Funds; (iv) lawsuits

7  have been filed against IXG and the Negligent IXG Employee Defendants, among others; and

8  (vii) there is over $130,000,000 in trust funds owned by over 330 clients that has been stolen

9  by employees of the Exchange Entities acting in collusion with others.

10      87.    On or about August 25, 2005, AEC was purchased by 1031 TG for $4,250,000

11  (stolen money) based upon wire fraud and mail fraud, in a transaction executed by Okun as

12  CEO of 1031 TG which resulted in: (i) cash payments to Dowdall, Hazel, Subrt, and Livesey in

13  exchange for their abdication of control over and the protection of the AEC client trust funds;

14  (ii) the control over AEC client trust funds by Okun and employees of the later-purchased 1031

15  TG subsidiaries; and (iii) the assumption by 1031 TG of the obligations AEC owed its clients

16  pursuant to the terms of the Exchange Agreements entered into between AEC and each of its

17  clients. Immediately after the sale, Okun and his co-conspirator(s) looted the trust assets held at

18  AEC.

19      88.    In or about November, 2005, SOS was purchased by 1031 TG, using

20  $2,800,000 in stolen AEC clients' trust funds to fund the purchase in a transaction executed by

21  Okun as CEO of 1031 TG which resulted in: (i) cash payments to Pajonas in exchange for his

22  abdication of control over and the protection of the SOS client trust funds; (iii) the affiliation

23  between AEC and SOS; (iii) the control over SOS client trust funds by Okun and employees of

24  the later-purchased 1031 TG subsidiaries; and (iv) the assumption by 1031 TG of the

25  obligations SOS owed its clients pursuant to the terms of the Exchange Agreements entered

26  into between SOS and each of its clients. Immediately after the sale, Okun and his co-

27  conspirator(s) looted the trust assets held at SOS.

28      89.    On or about June 6, 2006, REES was purchased by 1031 TG, using SOS clients'

1    stolen trust funds, for $4,250,000 in a transaction executed by Okun as CEO of 1031 TG which

2    resulted in: (i) cash payments to Marga and David Shefman in exchange for their abdication of

3    control over and the protection of the REES client trust funds; (iii) the affiliation between

4    AEC, SOS, and REES; (iii) the control over REES client trust funds by Okun and employees of

5    the later-purchased 1031 TG subsidiaries; and (iv) the assumption by 1031 TG of the

6    obligations REES owed its clients pursuant to the terms of the Exchange Agreements entered

7    into between REES and each of its clients. Immediately after the sale, Okun and his co-

8    conspirator(s) looted the trust assets held at REES.

9        90.    On or about June 22, 2006, NES was purchased by 1031 TG, using stolen REES

10   clients' trust funds, for $2,800,000 in a transaction executed by Okun as CEO of 1031 TG

11   which resulted in: (i) cash payments to Bennett and NES' other owners in exchange for their

12   abdication of control over and the protection of the NES client trust funds; (iii) the affiliation

13   between AEC, SOS, REES, and NES; (iii) the control over NES client trust funds by Okun and

14   employees of the later-purchased 1031 TG subsidiaries; and (iv) the assumption by 1031 TG of

15   the obligations NES owed its clients pursuant to the terms of the Exchange Agreements entered

16   into between NES and each of its clients. Immediately after the sale, Okun and his co-

17   conspirator(s) looted the trust assets held at NES.

18       91.    On or about August 4, 2006, IXG was purchased by 1031 TG for $9,000,000,

19   using client funds looted from the previously purchased Exchange Entities, in a transaction

20   executed by Okun as CEO of 1031 TG which resulted in: (i) cash payments to the Negligent

21   IXG Employee Defendants in exchange for their abdication of control over and the protection

22   of the IXG client trust funds; (iii) the affiliation between AEC, SOS, REES, NES, and IXG;

23   (iii) the control over IXG client trust funds by Okun and employees of the previously and later-

24   purchased 1031 TG subsidiaries; and (iv) the assumption by 1031 TG of the obligations IXG

25   owed its clients pursuant to the terms of the Exchange Agreements entered into between IXG

26   and each of its clients. Immediately after the sale, Okun and his co-conspirators looted the trust

27   assets held at IXG.

28       92.    In or about December, 2006, 1031 Advance was purchased by 1031 TG for

42

1    $2,500,000 using stolen funds belonging to previously purchased Exchange Entities' clients in

2    a transaction executed by Okun as CEO of 1031 TG which resulted in: (i) cash payments to

3    Dashiell and Allred in exchange for their abdication of control over and the protection of the

4    1031 Advance client trust funds; (iii) the affiliation between AEC, SOS, REES, NES, IXG, and

5    1031 Advance; (iii) the control over 1031 Advance client trust funds by Okun and employees

6    of the previously-purchased 1031 TG subsidiaries; and (iv) the assumption by 1031 TG of the

7    obligations 1031 Advance owed its clients pursuant to the terms of the Exchange Agreements

8    entered into between 1031 Advance and each of its clients. Immediately after the sale, Okun

9    and his co-conspirator(s) looted the trust assets held at 1031 Advance as one of the final thefts

10   in the 2 year-long criminal enterprise (from August 2005 to May 2007).

11                                              **VIII.**

12                      **ALLEGATIONS REGARDING THE CONSPIRACY**

13                         **TO LOOT THE EXCHANGE ENTITIES**

14          93.    Prior to August 2005, Okun discovered the existence of the unregulated

15   business of 1031 Exchange Accommodators whereby large sums of money were held in trust

16   for 180 days with the interest on the deposits going to the 1031 intermediary as fee income

17   which meant that no accounting was required for the clients regarding the disposition of their

18   assets pending the close of escrow.  Okun also discovered that with rising real estate prices,

19   new clients' escrows would be opened on relinquished properties which would be sufficient to

20   pay for the close of escrows on older clients' replacement properties, so the majority of the

21   funds held in trust could be used, indefinitely, for Okun's own individual advantage and gain.

22   A Ponzi scheme.

23          94.    Okun and Coleman conspired and agreed that Okun should purchase the six

24   Exchange Entities with stolen money and thereafter use clients' 1031 Exchange Funds as Okun

25   saw fit.  After purchasing each of the six Exchange Entities, Okun used the Exchange Entities'

26   clients' funds to inflate his on-paper net worth in order to obtain loans and financing from

27   Wachovia for the purchase of luxury homes, yachts, automobiles, other "toys" and commercial

28   real estate. Okun transferred Exchange Entities' clients' funds into his own personal bank

1   account at Union Federal Bank, (now Huntington National Bank) to inflate his cash assets for

2   the purpose of his loan applications. In Okun's financial statements prepared and sent to

3   Wachovia by Coleman, Okun also listed the Exchange Entities' escrow accounts and the book

4   value of each Exchange Entity, which was in fact, money stolen from other Exchange Entities'

5   clients' trusts, as assets in order to obtain better credit terms and larger loans.  The bank(s)

6   knew or should have known this.

7         95.    From August 2005 through to May/June 2007, when the Exchange Entities

8   closed their doors, Okun and the members of the RICO enterprise stole over $130,000,000 in

9   trust assets.  The Trustee in Bankruptcy has issued a preliminary accounting for the Exchange

10  Entities which shows over $150,000,000 in missing money, which amount includes the stolen

11  Exchange Funds as well as trade debts.

12        96.    The methodology employed by the RICO enterprise to steal the trust money and

13  conceal the theft involved the use of multiple accounts for multiple bogus entities at Wachovia

14  (including 1031 TG, IPofA and Okun Holdings) and bogus promissory notes issued by Okun

15  and/or Okun's entities to 1031 TG.   At first, the money was stolen out of the Exchange

16  Entities' accounts by wire transfers to the 1031 TG account at Wachovia.  This money was

17  then wired to either Okun's personal account at Union Federal Bank or to IPofA's account at

18  Wachovia to be used for Okun's personal expenses and to fund IPofA's operations and

19  acquisitions.

20        97.    Immediately upon the purchase of AEC in August, 2005, Okun caused the

21  transfer of over $18,000,000 of AEC clients' Exchange Funds out of AEC's Bank of America

22  account(s) and into Okun's personal Union Federal Bank account #xxx6072. This money was

23  then used to, among other things, pay or partially pay for the following:  a luxury $6.1 million

24  private residence on Miami's exclusive Hibiscus Island in September, 2005; large cash

25  payments to Okun himself; nearly $6,000,000 in divorce settlement payments to Okun's ex-

26  wife Dorothy Okun; a $270,000 luxury automobile; an $18,000,000 yacht "Simone," named

27  after Okun's new wife; and the purchase of SOS from Todd Pajonas in November, 2005.

28        98.    Okun operated a similar scheme with his purchase of IXG. From January, 2007

to April, 2007, Okun caused the transfer of $49,837,357.78 from IXG exchange accounts held at Colorado Capital Bank to 1031 TG's Wachovia account #xxx3272.  This money immediately left 1031 TG's accounts and was transferred to IPofA and/or Okun Holdings, both 100% controlled and owned by Okun.  In March 2007 alone, Okun transferred over $10,000,000 of IXG clients' trust funds into unrelated and/or bogus entities under his sole control so that the money could then be used as Okun saw fit.  This was Okun's effort at money laundering.  A specific example of Okun's effort at money laundering is as follows: on March 15, 2007 Okun directed that $4,000,000 be transferred from IXG to Okun Holdings; the money was immediately retransferred that same day (March 15, 2007) from the Okun Holdings into Okun's personal bank account #xxx0662 at Wachovia whereafter it was consumed by Okun.  Okun's activity after purchasing AEC and IXG is representative of what Okun did with the four other Exchange Entities after he purchased them.

## IX.

## FACTUAL ALLEGATIONS ABOUT THE BONDS COVERING THE THEFT OF CLIENTS' FUNDS BY THE OWNERS OF THE EXCHANGE ENTITIES

99.    The Exchange Agreements entered into with each client and the 1031 transaction each client began created a trust relationship between each client and their respective Exchange Entity.  Procuring and/or issuing insurance for a trustee of a trust for the benefit of the beneficiaries of the trust creates legal duties owed by the insurance producer (Lockton) and the insurer(s) (the Insurer Defendants) to the beneficiaries of the trust as the beneficiaries must be the intended recipients of the benefits of the bonds and/or insurance.

100.    In or about May 2007, Plaintiffs were informed that their money deposited in trust at the Exchange Entities (over $130,000,000) was stolen by Okun, the owner of the 1031 Tax Group, which is the holding company for the Exchange Entities, with the help of certain employees of the Exchange Entities pursuant to a RICO enterprise. Thereafter, the Plaintiffs discovered that Okun bought the Exchange Entities between August 25, 2005 and December, 2006 for over $27,000,000, collectively, and that Okun and others looted tens of millions in trust assets.

45

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

101.   During the period of time while Okun was buying and looting Exchange Entities, the Exchange Entities were insured under (at least) the earlier identified Commercial Crime Insurance Policies issued by Continental, Chubb and Twin City.   The clients of the Exchange Entities were led to believe their respective funds were protected by Fidelity bonds in amounts between $1,000,000 and $20,000,000 (See Exhibit 7 which exemplifies the form in which the "bonds" were promoted).

102.   While the "bonds" were in place, Okun and others looted the Exchange Entities. Okun used the majority of the stolen money to purchase luxury items such as 4 Indy racecars, 2 mansions in Miami and New Hampshire, 20 automobiles, 3 planes, a helicopter, 8 boats including a yacht worth approximately $18,000,000 to  purchase other exchange entities, and/or to fund the Ponzi scheme.

103.   No claim was made to Continental or any other carriers on any of the policies by Okun, 1031 TG, the Exchange Entities, or anyone else because Okun was involved in the theft and was adversely dominating the entities under his control in order to conceal the theft. No claim was made by the clients of the Exchange Entities on the "Fidelity Bonds" because they were unaware of the theft. Okun's embezzlement of trust assets from 2005 through 2007 amounts to a total loss of over $130,000,000, which covers losses during each of the policy periods of the applicable bonds.

104.   In April, 2007, 1031 Tax Group's inside counsel and interim President Richard Simring demanded that Dan and Shirley McCabe, former owners and operators of IXG, transfer IXG's exchange proceeds to help fund exchanges to the 1031 Tax Group's accounts which, according to Simring, had become "completely depleted." When the McCabes refused to do so, they and other IXG employees were fired by Simring, and the 1031 Tax Group filed for Chapter 11 bankruptcy just a few weeks later. Plaintiffs are equitably subrogated to the rights of prior clients of the Tax Group Entities to the extent plaintiffs' funds were used to close the older escrows, while the trust was in a deficit. From 2005 to 2007, Okun with the help of certain other defendants adversely dominated the Tax Group Entities and concealed the theft so that claims on the applicable bonds for looting in 2005, 2006 and 2007 were not made.

1  Adverse domination of the corporate trustees and concealing the theft of trust assets from the

2  beneficiaries of the trust equitably tolls applicable requirements for timely notice to the Insurer

3  Defendants of the crimes committed by Okun.

<div align="center">

**X.**

**FACTUAL ALLEGATIONS ABOUT THE FIDELITY BOND PROGRAM**

**ADVERTISED AS PROTECTION AGAINST THE EXACT TYPE OF LOSS**

**SUFFERED BY PLAINTIFFS**

</div>

8  105.    Lockton and the Insurer Defendants each participated in an insurance fraud by

9  issuing inexpensive standard Commercial Crime Policies ("Crime Policies") to the Exchange

10  Entities and then agreeing amongst themselves to call them "Fidelity Bonds" (which they were

11  not) so that the two-party insurance could be passed off to the public by the Exchange Entities

12  as expensive three-party "Surety Bonds" to convince potential clients that their money would

13  be safe during the 180 day exchange period.  The Insurer Defendants, and each of them,

14  represented in the Evidences of Insurance to the public or allowed their agent to represent to

15  the public that the Exchange Entities were "bonded" by "Fidelity Bonds" that would provide

16  cover for the theft of clients' funds by the employees and owners of the Exchange Entities for

17  the express benefit of the plaintiffs. Lockton and the Insurer Defendants' representations were

18  false. Okun did steal over $130,000,000 of the clients' trust funds and the insurers are now

19  claiming to the Plaintiffs, after the fact, that they issued illusory two-party Commercial Crime

20  Policies (which Plaintiffs never saw and which do not cover any losses) and not Fidelity Bonds

21  or three-party Surety Bonds. Plaintiffs would not have deposited or kept their funds in trust at

22  the Exchange Entities but for the certification that the Exchange Entities were "bonded" which

23  written representations were relied upon by the clients and/or their subrogors and agents.

24  Defendants' tortious misrepresentations in the Evidences of Insurance caused plaintiffs' losses

25  or defendants are contractually bound to pay for plaintiffs' losses.  One or the other.

26  106.    Prior to agreeing to deposit or consenting to retain their 1031 exchange funds

27  with the Exchange Entities, Plaintiffs and each member of the Class (or their subrogors or

28  agents, which would include the honest employees of the Exchange Entities) were informed by

<div align="center">47</div>

1  interstate mail, email, and/or by written and electronic advertisements that the Exchange

2  Entities had purchased Fidelity Bonds to protect the clients' funds against theft or

3  embezzlement by the employees and/or owners of the Exchange Entities. (See Exhibit 7 which

4  contains examples of the advertisements). An example is set forth below:

**Example of the "Evidence of Insurance" of "Fidelity Bond Program":**



| EVIDENCE OF INSURANCE |
|---|

| FIDELITY BOND PROGRAM |
|---|

This document certifies that:

**1031 ADVANCE INC.**

is insured under a Fidelity Bond underwritten by Continental Casualty Company,
a member of the CNA Insurance Companies, for the effective period of:

**February 21, 2007 – August 15, 2007**

Description of Coverage:  The Fidelity Bond insures against losses resulting from dishonest acts, such as embezzlement, conversion, fraud, theft, etc., of the insured's employees against the insured, as well as the insured's employees, partners and owners against the insured's clients.

Policy Number:  287014434          Continental Casualty Company
8207-2761          Federal Insurance Company
57FA0241088 07          Twin City Fire Insurance Company

Amount of Coverage:  $20,000,000   Per Occurrence

Insurance Broker:  Claudia Porras
Lockton Insurance Brokers, Inc.
Two Embarcadero Center, Suite 1700
San Francisco, CA 94111
Tel: (415) 568-4037 / Fax: (415) 992-4000

LOCKTON INSURANCE BROKERS, INC.

*Claudia Porras*
Authorized Representative

107.    Plaintiffs (or their subrogors) would not have deposited or retained their funds at

the Exchange Entities but for the certification that the Exchange Entities were "bonded" based

on the existence of the alleged Fidelity Bonds as depicted in the Evidences of Insurance

executed by Lockton, which were placed on the Exchange Entities' websites, and disseminated

as broadly as possible by the Exchange Entities with the consent of the Insurer Defendants or

their agent Lockton.

///

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

108.    Plaintiffs (or their agents and/or subrogors) were informed of the existence of the Fidelity Bonds by the multiple "Evidences of Insurance" executed by Lockton which were posted on websites and published in promotional advertisements at or about the time they were issued.  The Evidences of Insurance are unqualified. The Evidences of Insurance do not limit themselves to the terms, conditions and exclusions contained in any policy of insurance or the underlying Crime Policies issued by the Defendant Insurers as required by California Insurance Code § 384. The Evidences of Insurance unambiguously state without disclaimer, reservation or hesitation that the clients of the Exchange Entities were protected by a:

> **"Fidelity Bond [which] insures against losses resulting from**
> **dishonest acts, such as embezzlement, conversion, fraud, theft,**
> **etc., by. . . the Insured's employees and owners against**
> **the Insured's clients."**

109.    Lockton contends that the Plaintiffs are not protected by Exhibit 7 because (i) they could not reasonably believe they or their assets were covered by a "bond" or any policy of insurance when they read and relied upon the Evidences of Insurance; and/or (ii) Defendants' representations to the Plaintiffs were not false or misleading in any way, notwithstanding the fact there are thousands of words contained in a Commercial Crime Policy (See the exemplar attached as Exhibit 9), none of which include the term, phrase, or words "Fidelity Bond." The Insurer Defendants, contend that Plaintiffs are not protected by insurance or a bond because: (i) they are specifically excluded as beneficiaries under the Tax-Deferred Exchange Endorsements contained in the Crime Policies (See Exhibit 9); (ii) internal protocols at the Exchange Entities, which had to be complied with as conditions precedent to coverage, were not satisfied; and/or (iii) the applicants lied on the insurance applications for coverage by not disclosing Okun's prior looting. According to the insurers, the insurance covers "theft" by the employees and/or owners of the Exchange Entities but coverage is vitiated if the owners "lie" about the "theft" which we can all assume they will do.

110.    The "Evidences of Insurance" of the "Fidelity Bond Program" state in non-ambiguous language that the "bonds" insure against losses incurred by the clients of Exchange

Entities caused by the theft of their funds by the owners of the Exchange Entities. The only reasonable interpretation of the Evidences of Insurance interpreted by the Plaintiffs or their agents was that clients funds were secured by a bond issued for their direct benefit. There is no other reasonable interpretation and the fact that the Evidences of Insurance were issued by Lockton to be disseminated to the Plaintiffs and other prospective clients of the Exchange Entities as an inducement to deposit funds with the knowledge, consent, or ratification of the Insurer Defendants supports that reasonable interpretation. In other words, the Plaintiffs must be covered by the policies because there could be no other conceivable purpose for the transmission of this insurance information to the prospective clients of the Exchange Entities.

111.    If Lockton and/or the Insurer Defendants did not want Plaintiffs (or their agents or subrogors) to believe they were protected as insureds by a "bond," they should not have executed the "Evidences of Insurance" of "Fidelity Bond Program" knowing they would be distributed to the very same people their lawyers would later contend were not covered. Endorsing the mass solicitation of Exchange Entity clients using the Evidences of Insurance must have been intended by Defendants to confer some insurance rights on the persons receiving and relying on the advertisements. If the Evidences of Insurance were intended by these Defendants to fail to confer any rights, they were worse than useless as they would be worthless as actual insurance and misleading as pretend insurance.

112.    The issuance of $1,000,000 to $20,000,000 "bonds" by the Defendant Insurers must, by their very nature, involve serious study of the rewards as compared to all of the risks which may play a role in losing $1,000,000 to $20,000,000. The shear size of the bonds as represented in the "Evidences of Insurance" of "Fidelity Bond Program" implied underwriting the assessment of all risks, and the logical endorsement of the Exchange Entities as worthy of doing business with. The shear size of the alleged bonds also implies that they must have been intended to be for the benefit of the clients of the Exchange Entities as they were the only people with this amount of money to lose. The Exchange Entities, acting as trustees of other peoples' money, had no money of their own to protect, so there would be no logical reason for them to purchase $1,000,000 to $20,000,000 in coverage unless the coverage was intended for

1   the benefit of someone other than the Exchange Entities themselves.

2       113.   Technically, all bonds are surety bonds and "he that is surety for a stranger shall

3   smart for it." Proverbs, 11:14-15. Suretyship differs from insurance in that a surety bond is a

4   three-party contract involving a surety, principal and obligee while an insurance policy is a

5   two-party contract between the insured and the insurer. A bond is issued by a surety for the

6   benefit of the obligee only after the character, ability and financial worth of the principal is

7   confirmed by the surety.   The fee paid for a surety bond is primarily a payment for the

8   investigation of the principal and the subsequent certification by the surety that the principal is

9   "bonded."

10                                  **XI.**

11          **SPECIFIC FACTUAL ALLEGATIONS ABOUT THE FRAUD**

12          **COMMITTED BY LOCKTON AND THE INSURER DEFENDANTS**

13       114.   Lockton, Continental, Chubb, and Twin City are now being sued in this First

14   Amended Complaint.

15       115.   The Ponzi scheme finally collapsed in May of 2007, with numerous clients of

16   the Exchange Entities sending claims to the carriers seeking to recover their funds as proof of

17   reliance based on the various false "Evidences of Insurance" of "Fidelity Bond Program."

18       116.   The Evidences of Insurance which describe the "Fidelity Bond Program" as

19   protecting clients' funds from theft by the owners of the Exchange Entities are misleading

20   because:

21       (a)    the standard ISO Commercial Crime Policy with the Tax-

22              Deferred Exchange Endorsements (See Exhibit 9) contains

23              thousands of words which do not include the term "Fidelity

24              Bond" and it specifically excludes plaintiffs as third-party

25              beneficiaries or loss payees.   Notwithstanding,   the entire

26              marketing program promoting the insurance protection as

27              "security" was specifically directed at Plaintiffs (and other

28              potential clients of the Exchange Entities) which must logically

1    imply that the insurance purchased by the Exchange Entities and

2    issued by the Defendant Insurers was for the direct benefit of

3    Plaintiffs (or the marketing made no sense);

4    (b)    the Evidences of Insurance and advertisements do not refer

5    Plaintiffs to any language in the standard ISO Commercial Crime

6    Policy (which Plaintiffs never saw) which would give Plaintiffs

7    notice that the policy had exclusions and conditions which

8    jeopardized Plaintiffs' coverage described in the "bonds" as

9    advertised;

10    (c)    the Evidence of Insurance violated California Insurance Code §

11    384 and was not the Standard Accord Certificate of Insurance

12    issued by insurance producers or insurers as proof of insurance;

13    (d)    the use of the term "Fidelity Bond" and the word "bond" is

14    inherently misleading to ordinary citizens because Plaintiffs

15    would naturally interpret the phrase to mean that the Exchange

16    Entities were "bonded" for the Plaintiffs' benefit as creditors of

17    the Exchange Entities (the principals) by a surety. A surety is one

18    who promises to answer for the debt, default, or miscarriage of

19    another and a surety who has assumed liability for payment or

20    performance is liable to the creditor immediately upon default by

21    the principal.    It is common knowledge that suretyship is

22    distinguished from insurance by the risk assumed and the

23    calculation of the premiums charged.    Actuarial science is the

24    basis of insurance rates while the fee for a surety bond is

25    primarily a payment for the investigation and certification of the

26    principal, with only a small element to cover inevitable losses.

27    *See Emmett Vaughan,* Fundamentals of Risk and Insurance (6th

28    Ed.), Chapter 32, *Surety Bonds and Credit Insurance*; and

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

(e)    The shear size of the bonds ($1 million to $20 million) implied

they were for the direct benefit of Plaintiffs as creditors of the

Exchange Entities because it was the Plaintiffs who had $20

million to lose, not the Exchange Entities, which had no money of

their own for anybody to steal or for any insurer to insure.

## XII.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this action on their own behalf and as Class representatives

pursuant to Federal Rule of Civil Procedure 23.  The Class is defined, for now, as follows:

All Persons whose 1031 exchange funds were deposited with the

Exchange Entities owned or controlled by Edward Okun (1031 Advance,

AEC, IXG, NES, REES, and/or SOS), and who have been deprived of the

access to those funds (the "Class").

118.    Upon completion of discovery with respect to the scope of the Class Plaintiffs

reserve the right to amend the class definition and to define sub-classes if needed.

119.    Excluded from the definition of the Class are the Defendants and any person,

corporation, or other entity related to, controlled by or affiliated with any defendant.  Also

excluded from the Class are the Court, the Court's spouse, all persons within the third degree

of relationship to the Court, and the spouses of such persons.  Included in the term "Persons" in

the definition of the Class are entities and representatives of these entities.

120.    The members of the Class are so numerous that joinder of all of them is

impracticable.  There are at least 330 victims of the Defendants' conduct residing in numerous

states, including Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho,

Illinois, Indiana, Kansas, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey,

New York, Ohio, Oregon, Rhode Island, Texas, Virginia, and Washington, among others.

121.    There are questions of law and fact which are common to the Class which

predominate over questions affecting any individual Class member.  The common questions

include, *inter alia*, the following:

a.  whether the Thief Defendants misappropriated, stole, embezzled and/or converted the trust res of each client;

b.  whether the certain Defendants aided and abetted the Thief Defendants' misappropriation of the trust res of each client;

c.  whether the Thief Defendants (and/or others) were participants in a RICO enterprise which damaged the clients' business or property;

d.  whether Okun, the Negligent Employee Defendants, and/or others breached fiduciary duties owed to the Exchangers;

e.  whether Wachovia aided and abetted others' breaches of fiduciary duties by, among other things, helping Okun wire stolen trust funds, allowing Okun to use Wachovia's accounts to misappropriate and/or hid stolen trust monies, and/or loaning against Okun's "personal" wealth which Wachovia knew to include the clients' stolen exchange funds;

f.  whether the Negligent Employee Defendants were negligent, or breached fiduciary duties or other obligations owed to the Class Members when, for their own personal gain, they handed the clients' funds over to Okun and/or failed to protect entrusted funds;

g.  whether the Negligent Employee Defendants aided and abetted breaches of fiduciary duties by Okun or others by, among other things, failing to protect clients' trust monies from Okun's looting;

h.  whether the Lockton executed the Evidences of Insurance within the course and scope of its authority (either actual or ostensible) as the agent of the Defendant Insurers;

i.  whether "Evidences of Insurance" of "Fidelity Bond Program," on their own, bind Lockton and/or the Insurer Defendants to contractual obligations owed to the Plaintiffs or their subrogors;

j.  whether the "Evidences of "Insurance" of "Fidelity Bond Program" are false statements of fact;

k.       whether Plaintiffs or their subrogors (or their agents) reasonably relied upon the uniform misrepresentations contained in the "Evidences of Insurance" of "Fidelity Bond Program" and, as a result, suffered damages;

l.       whether the Negligent Employee Defendants or others received stolen trust funds which must be returned; and

m.      whether Simring committed legal malpractice.

122.   The claims of Plaintiffs are typical of the claims of the Class as a whole. Plaintiffs are members of the Class and have suffered harm and are likely to continue to suffer harm due to the loss of entrusted funds.

123.   Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs are consistent with and not antagonistic to the interests of the Class. Combined, the representative Plaintiffs have lost over $9,000,000 and have sought out and retained counsel experienced in complex Class Actions in an effort to get their money back. Plaintiffs have agreed to act for the benefit of all of the victims similarly situated and not to put their individual interest ahead of any member of the Class.

124.   The prosecution of a multitude of separate actions by individual Class members may establish incompatible standards of conduct for the parties opposing the Class, may substantially impair or impede the interests of other members of the Class to protect their interests, and will result in waste.

125.   The actions of Defendants applicable to the Plaintiffs apply generally to the Class thereby making the final relief granted by the Court to the Plaintiffs applicable to the Class and as a whole.

126.   This Class Action would be superior to other available methods for the fair and efficient adjudication of the controversy between the parties. The interest of most members of the Class in individually controlling the prosecution of separate actions appears low, due to the complexity of the case. Most members would be unable or unwilling to individually prosecute an action without joining their claims with other claimants which is generally difficult. The amount of damages at stake for each victim varies radically from $300 to $10,500,000.

1  Claimants with excessively large claims will most likely opt out and prosecute their own cases.
2  Separate suits on the smaller claims would be impractical yet settlements with insurers and the
3  banking type Defendants will require complete closure of all claims by all claimants favoring
4  the use of the Class mechanism.    Concentrating litigation in this forum will also promote
5  judicial efficiency.

6      127.    This proposed Class Action is manageable.    There are approximately 330
7  victims with relatively large claims compared to most Class Actions involving a multitude of
8  claimants with minimal claims.  Participation in the case by Class members who do not opt out
9  will be assured by the size of the loss sustained by each member.

<center>XIII.</center>

<center>CAUSES OF ACTION</center>

<center>**FIRST CAUSE OF ACTION**</center>

<center>**Violations of 18 U.S.C. § 1962 (c) and (d); Civil RICO**</center>

<center>**and Conspiracy to Commit Civil RICO**</center>

<center>(Against Defendants Okun and Coleman for RICO violations</center>

<center>and Wachovia for Aiding and Abetting RICO violations)</center>

17      128.    Plaintiffs incorporate paragraphs 1 through 127 above as if fully set forth herein.
18      129.    Defendants Okun and Coleman are collectively referred to in this First Cause of
19  Action (and elsewhere) as the "RICO Defendants."  The RICO Defendants are all persons
20  within the meaning of 18 U.S.C. § 1961 (3), and are the persons involved in the creation and
21  maintenance of a racketeering enterprise as defined in §1961(4).  The RICO Defendants, and
22  each of them, have been employed by and/or associated with the enterprise, and while so
23  employed and/or associated, have conducted, directed, managed or participated in, either
24  directly or indirectly, the conduct of the affairs and business of the enterprise affecting
25  interstate commerce through the described pattern of racketeering activity. Defendant
26  Wachovia aided and abetted the conduct of the RICO Defendants as alleged herein-after.
27  ///
28  ///

<center>56</center>

1

**The Scheme**

2    130.    The scheme was to purchase Exchange Entities, gain access to the Exchange

3 Entities' clients' Exchange Funds held in trust, steal the trust assets, conceal the theft through

4 corporate machinations and related entity transfers so that clients' funds could be used as Okun

5 saw fit before the real estate market cooled, the trust assets had to be replaced, and the theft

6 would be discovered. Okun and Coleman agreed and conspired to carry out the scheme.

7    131.    Typically, upon acquiring an Exchange Entity, and in order to effectuate and

8 conceal his scheme, Okun transferred, or caused the transfer of the clients' Exchange Funds to

9 personal and business bank accounts controlled by Okun and a select group of IPofA and/or

10 1031 TG executives. Okun would then transfer, or cause the transfer of clients' Exchange

11 Funds to: (a) his own personal bank accounts; (b) the bank accounts of other companies Okun

12 owned which were unrelated to the Exchange Entity; and/or (c) the bank accounts of third

13 party lenders.

14    132.    Okun used misappropriated clients' Exchange Funds for among other things, the

15 following purposes: (a) to buy additional Exchange Entities to loot; (b) to fund Okun's lavish

16 personal lifestyle; (c) to pay large salaries and bonuses to Okun, Coleman and others; (d) to

17 pay operating expenses of Okun's various companies; and (e) to invest in commercial real

18 estate owned by Okun and Okun related companies so that Okun could reap the benefits

19 thereof.

20    133.    The success of the scheme was dependent upon Okun's ability to mislead clients

21 of 1031 TG and its Subsidiaries regarding the safekeeping and use of clients' Exchange Funds

22 (or clients would not do business with the Exchange Entities) and to hide the ever worsening

23 financial condition of 1031 TG and its Subsidiaries.

24    134.    The scheme began to fail in late 2006 when the real estate market began to cool.

25 In April of 2007, 1031 TG and the Exchange Entities experienced a liquidity crisis resulting

26 from the cooling real estate market and the lack of profitability of the businesses and real estate

27 investments in which the enterprise invested the stolen Exchange Funds. Notwithstanding the

28 imminent collapse of the scheme, Defendant Okun caused 1031 TG to purchase 1031 Advance

1  in December 2006, utilizing wire and mail fraud, so that 1031 Advance could be looted to

2  prolong the Ponzi scheme.

### The RICO Enterprise

4  135.  The enterprise is a group of persons and entities associated together for a

5  common purpose of engaging in a course of conduct. The enterprise consisted of the RICO

6  Defendants identified above, the Non-Party Non-BFP Transferees, the Negligent Professionals,

7  the Exchange Entities and Negligent Employees. Each person employed by or associated with

8  the enterprise had separate identities from the enterprise itself. Each person associated with the

9  enterprise managed and directed specific components of the enterprise, each component being

10 critical to the success of the enterprise.  However, if one member of the enterprise left the

11 enterprise, it would continue as an ongoing criminal enterprise until stopped by law

12 enforcement.

13 136.  The enterprise operated out of, among other places, a suite of offices located in

14 Richmond, Virginia, but conducted its affairs in various locations in the United States by using,

15 and effecting, interstate commerce.  At all times herein mentioned, the RICO Defendants

16 operated as an "enterprise" as defined in 18 U.S.C. § 1961 (4).

### The Pattern of Racketeering

18 137.  In furtherance of the ongoing scheme, the RICO Defendants, and each of them,

19 committed hundreds of predicate acts, and Defendant Wachovia, with knowledge of the theft

20 of the clients' Exchange Funds knowingly aided and abetted and provided substantial

21 assistance in the commission of predicate acts proscribed by 18. U.S.C. § 1961(1)(b) between

22 August 2005 and May 2007, including mail fraud, wire fraud, and money laundering as alleged

23 in the Superceding Indictment ("SI") attached hereto as Exhibit 1, which is incorporated into

24 this First Amended Complaint by reference thereto.

### Injury to Business or Property

26 138.  As the actual and proximate cause of the operation of the enterprise, the RICO

27 Defendants' association with the enterprise, and the RICO Defendants' conducting the affairs

28 of the enterprise through the pattern of racketeering activity and commission of predicate acts,

1  Plaintiffs and the Class have been damaged in amounts to be shown at trial, including but not

2  limited to, the loss of their trust res which was a business asset for each of them.

3  **Aiding and Abetting**

4      139.    Defendant Wachovia aided and abetted Defendants Okun and Coleman in the

5  commission of the RICO violations by, among other things, engaging in the following actions

6  which are described in detail elsewhere in this Complaint:

7      a.    Defendant Wachovia had knowledge of the enterprise and, with the knowledge

8  that the RICO Defendants were taking the actions alleged herein, provided substantial

9  assistance to the RICO Defendants, by assisting in carrying out certain of the predicate acts and

10  otherwise perpetuating the scheme.

11      b.    Defendant Wachovia substantially assisted the RICO Defendants Okun and

12  Coleman by wiring funds, as alleged in the SI (Exhibit 1 and incorporated by reference; *see*

13  Counts 1-25) and by providing loans to Okun (and/or Okun related entities involved in the

14  enterprise) the proceeds of which were utilized by the RICO Defendants, along with the

15  misappropriated client Exchange Funds, to purchase additional Exchange Entities and/or

16  yachts, jets, luxury homes, and real estate assets.

17      c.    Defendant Wachovia substantially assisted the RICO Defendants in the

18  perpetuation of the scheme by making the aforementioned wires and loans with the knowledge

19  that the RICO Defendants were committing the acts alleged herein.  But for that assistance, the

20  scheme would have collapsed.

21      140.    As the actual and proximate cause of the operation of the enterprise entered into

22  by the RICO Defendants and with Defendant Wachovia's substantial assistance thereof,

23  Plaintiffs and the Class have been damaged in amounts to be shown at trial including, but not

24  limited to, the loss of their trust exceeding $130,000,000.  Plaintiffs are entitled to treble

25  damages against the RICO Defendants and also against Wachovia for Wachovia's actions in

26  aiding and abetting the RICO Defendants in carrying out the enterprise.

27  ///

28  ///

## SECOND CAUSE OF ACTION

### Conversion

(Against Defendants Okun and Coleman and

Against Wachovia for Aiding and Abetting Conversion)

141.    Plaintiffs incorporate paragraphs 1 through 140 above as if fully set forth herein.

142.    Plaintiffs and each class member had trust funds on deposit with their respective Exchange Entity. Plaintiffs and each class member retained a superior possessory interest in their respective trust funds and retained the right to possession of those trust funds at the time of the close of their respective escrows to purchase replacement properties pursuant to the terms of the exchange agreements executed by each Plaintiff and class member with their respective Exchange Entity.

143.    Defendants Okun and Coleman, with help from others, misappropriated and converted the trust funds held by the Exchange Entities to the detriment of Plaintiffs and each member of the Class in an amount to be proven at trial.

144.    Neither Plaintiffs nor any member of the Class consented to the misappropriation and conversion of their trust funds and such conduct was a substantial factor in causing damages and harm to Plaintiffs and the Class, including the loss of the trust res, the tax liability for failing to accomplish a 1031 exchange, the liability to the seller of the replacement property for breach, damage to credit ratings, and the need to hire and retain professionals to mitigate losses caused by the theft.

145.    The herein described misappropriation and conversion was done with wrongful intent, and the Thief Defendants are guilty of oppression, fraud and malice toward the Plaintiffs and the Class whereby the Court should impose a penalty on said Thief Defendants to make an example of them to deter others from such behavior in the future.

146.    Wachovia aided and abetted the Thief Defendants in their conversion of Plaintiffs' property as follows:

a.    Defendant Wachovia had knowledge that 1031 TG and/or its Subsidiaries were acting as Exchange Accommodators, and that the funds held on deposit by those

60

1   entities were trust funds to be utilized only as permitted by the terms of the

2   Exchange Agreements.   Wachovia had specific knowledge   that Okun was

3   converting Exchange Funds as alleged   herein and utilizing those converted

4   funds improperly.   With full knowledge that Defendant Okun was converting

5   client Exchange Funds, including those belonging to Plaintiffs and the Class,

6   Wachovia aided and abetted the RICO Defendants' conversion by providing

7   substantial assistance in (i) providing banking services including bank accounts

8   for Okun personally and/or his related entities into which the converted

9   Exchange Funds were wired or deposited and hidden, (ii) facilitating wire

10  transfers utilized to transfer converted Exchange Funds from the Exchange

11  Entities' escrow accounts and/or 1031 TG's account(s) to Okun's personal bank

12  accounts and/or the bank accounts of his related entitles, (iii)  granting loans to

13  Okun and/or his related entities for real estate projects which Wachovia was

14  aware involved converted Exchange Funds, and (iv) otherwise enabling and

15  facilitating the Thief Defendants' commission of the predicate acts referenced in

16  Counts 1-25 of the SI (Exhibit 1 attached hereto), the Thief Defendants'

17  conversion of  the Client Exchange Funds, and their perpetuation of the Ponzi

18  scheme.

19      b.      Wachovia knew that Plaintiffs had not consented to the Thief Defendants'

20              wrongful dominion of Plaintiffs' property, but assisted Okun anyway.

21      147.    As the actual and proximate cause of the conversion, which was substantially

22  aided and abetted by Wachovia, Plaintiffs and the members of the Class have lost their

23  exchange funds totaling over $130,000,000 and have otherwise had their properties and

24  businesses damaged in amounts to be established at trial.

25      148.    The conduct of the Thief Defendants, and the conduct of Wachovia in aiding

26  and abetting the Thief Defendants was malicious, oppressive and done with a conscious

27  disregard for the rights of Plaintiffs and members of the Class, and an award of punitive

28  damages is warranted.

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

## THIRD CAUSE OF ACTION

### Negligence

(Against The Negligent Employee Defendants)

149.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 148 as though fully set forth herein.

150.    By virtue of the Negligent Employee Defendants'(Dowdell, Hazel, Subrt, Livesey, Pajonas, Marge Shefman, David Shefman, Bennett, Daniel McCabe, Shirley McCabe, Andrew McCabe, Greenberg, McCann, Dashiell, and Allred) respective ownership of and/or positions of control at ACE, SOS, REES, NES, IXG, and/or 1031 Advance, each Negligent Employee Defendant assumed the role of Exchange Accommodator in Plaintiffs' and the class members' exchange transactions. Each respective Employee Defendant owed a duty to the Plaintiffs and class members who contracted with that Exchange Entity to exercise due care to ensure that Plaintiffs and the Class Members' Exchange Funds were available for the timely completion of their exchange transactions and to safeguard Exchange Funds in the interim.

151.    The Negligent Employee Defendants breached their respective duties to exercise due care to the Plaintiffs and the class members by selling their respective interests in the Exchange Entities to Defendant Okun (who was not suitable for trusteeship) without completing sufficient due diligence with respect to Okun, Okun's business practices and/or into the manner in which 1031 TG and/or Okun would hold the Client Exchange Funds on deposit with the Exchange Entities when they were handed over to Okun.  Had the Negligent Employee Defendants conducted proper due diligence, they would have learned that Okun was not suitable for trusteeship.

152.    After the Negligent Employee Defendants sold their respective Exchange Entity interests to Okun, certain of them, as described herein, continued to work for, with, or at their respective Exchange Entity under Okun's direct or indirect ownership for the benefit of the Exchange Entity and its clients.

153.    In continuing to work for, with, or at the Exchange Entities after they were sold, Negligent Employee Defendants owed a duty to the Exchange Entities' clients, including

1    Plaintiffs and Class Members to make sure that Client Exchange Funds were not

2    misappropriated by Okun or anyone else.

3        154.    The Negligent Employee Defendants breached their duties of care to the

4    Exchange Entities' clients including Plaintiffs and Class Members by selling their Exchange

5    Entity interests to Okun who was not suitable for trusteeship and by allowing Okun and others

6    to misappropriate the Clients' Exchange Funds on deposit with the Exchange Entities.

7        155.    As a direct and proximate result of the Negligent Employee Defendants breach

8    of their duties of care and/or negligent acts, Plaintiffs and Class Members have been harmed in

9    that they have suffered the loss of their Exchange Funds and have incurred additional damages

10   as a proximate and foreseeable result of losing their Exchange Funds including, but not limited

11   to, adverse tax consequences, all in an amount to be shown at trial.

12                           **FOURTH CAUSE OF ACTION**

13       **Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty**

14             (Against the Thief Defendants, the Professional Defendants, and the Negligent

15                 Employee Defendants, for Breach of Fiduciary Duty and Against the Negligent

16         Employee Defendants and Wachovia for Aiding and Abetting Breaches of Fiduciary Duty)

17       156.    Plaintiffs incorporate the allegations of paragraphs 1 through 155 as though fully

18   set forth herein.

19       157.    The Exchange Entities (and 1031 TG as the holding company) owed fiduciary

20   duties to the trust(s) and to Plaintiffs and Class Members, as trust beneficiaries, to safeguard

21   Exchange Funds and to maintain Exchange Funds in trust and invest those funds in a manner

22   that would enable each Exchange Entity to have each Exchanger's funds available when

23   needed to timely fund each Exchanger's replacement escrow.

24       158.    The Thief Defendants, the Negligent Employee Defendants, Simring and Field,

25   as owners and/or officers of the Exchange Entities and/or 1031 TG, owed fiduciary duties to

26   the trusts and to the Exchange Entities' beneficiary clients to ensure that the Exchange Entities

27   implemented security and investment policies and procedures to cause the Exchange Entities to

28   safeguard Exchange Funds and to properly effectuate 1031 exchanges.

1    159.    The Thief Defendants breached their fiduciary duties when they looted the

2  Exchange Entities and acted for their own financial advantage and gain.

3    160.    In selling the Exchange Entities to Okun and/or to entities owned and controlled

4  by Okun without proper due diligence, the Exchange Entities and Negligent Employee

5  Defendants (and the Exchange Entities themselves) each breached their fiduciary duties to the

6  trust(s) and to the Exchange Entities' beneficiary clients when, among other things, they failed

7  to discover that Okun was not a suitable candidate for trusteeship and they failed to require

8  Okun to maintain proper Exchange Entity investment policies to guarantee the Exchangers'

9  funds would be available to timely close on the Exchangers' replacement escrows.

10    161.    The Exchange Entities and the Negligent Employee Defendants each also

11  breached their respective fiduciary duty to notify Exchanger clients that control over the

12  Exchange Entity trust had been sold (meaning a new person controlled Exchange Funds) to

13  1031 TG and/or Okun, and that no restrictions had been placed on the manner in which Okun

14  and his related entities could hold and invest the clients' Exchange Funds.   While breaching

15  their fiduciary duties, the Negligent Employee Defendants acted for their own financial

16  advantage and gain.

17    162.    Simring and Field breached their respective fiduciary duties to the trust(s) and/or

18  to the Exchange Entities' beneficiary clients when, among other things: (i) they allowed Okun,

19  who was not suitable for trusteeship, to control exchange funds; (ii) they allowed Okun to

20  convert Exchange Funds and use them as he saw fit; and (iii) they failed to implement proper

21  investment policies for exchange funds.   While breaching their fiduciary duties, Simring and

22  Field acted for their own financial advantage and gain.

23    163.    In addition to breaching their own fiduciary duties, the Negligent Employee

24  Defendants knowingly aided and abetted the aforementioned breaches of fiduciary duties by

25  the Thief Defendants, 1031 TG and/or the Exchange Entities as follows:

26    a.    By selling the Exchange Entities and transferring control of Exchange Funds to

27  Okun (without proper due diligence) who was not suitable for trusteeship;

28  ///

1       b.      By failing to require, as a condition of sale, that Okun and/or his entities

2  properly handle Exchange Funds post sale;

3       c.      With respect to those Negligent Employee Defendants who stayed on post-sale

4  as an Exchange Entity officer, director, or other role with duties to oversee exchange funds, by

5  failing to ensure that exchange funds were not mishandled post sale and/or by helping Okun

6  mishandle trust funds post sale.

7       164.    In doing so, the Negligent Employee Defendants knowingly aided and abetted

8  1031 TG, Okun and/or the Exchange Entities in breaching their fiduciary duties to the trust(s)

9  and the beneficiaries by providing substantial assistance to Okun and/or 1031 TG as

10 $130,000,000 Exchange Funds were misappropriated.

11      165.    Wachovia aided and abetted the breaches of fiduciary duties by the Thief

12 Defendants, 1031 TG and the Exchange Entities as follows:

13      a.      At all relevant times, Wachovia knew and understood that an exchange entity is

14 a fiduciary.   Wachovia knew that Okun purchased the Exchange Entities, and that the

15 Exchange Entities accepted deposits of Client's Exchange Funds in trust.   Wachovia knew

16 Exchange Funds were deposited into escrow accounts at Wachovia and other banks, to be held

17 until such time as the client identified a replacement property to complete their exchange, at

18 which time the client's trust funds were to be withdrawn from the escrow account and utilized

19 to fund the purchase of the replacement property. Wachovia had actual knowledge in early

20 2006 that Okun was converting client Exchange Funds from AEC and SOS (and the holding

21 company 1031 TG) by withdrawing the clients' Exchange Funds from escrow accounts and

22 utilizing those funds, not to fund the clients' replacement escrows, but instead to, among other

23 things, purchase additional Exchange Entities, operate Okun's other business entities, to make

24 real estate investments for Okun's personal benefit, and/or for improper purposes not related to

25 the clients' tax deferred exchanges.

26      b.      Wachovia's knowledge that Okun was converting client Exchange Funds from

27 escrow accounts and utilizing those trust funds for improper purposes as alleged herein  meant

28 that Wachovia knew Okun, 1031 TG and the Exchange Entities were breaching fiduciary duties

1  by converting clients' Exchange Funds from escrow accounts and utilizing those converted

2  funds in such a manner that they would not be available to timely close the clients' tax deferred

3  exchanges. Wachovia knew that converted client Exchange Funds would not be available to

4  timely close the client's replacement escrows, and that the Exchange Entities were using new

5  clients' deposits to timely close earlier depositors' replacement escrows, which conduct was a

6  classic Ponzi scheme.

7      c.    With that knowledge that Okun was converting client Exchange Funds from the

8  escrow accounts maintained by the Exchange Entities, Wachovia knowingly provided

9  substantial assistance to Okun and otherwise knowingly aided and abetted the breaches of

10  fiduciary duties owed by Okun and the Exchange Entities and perpetuated the ongoing Ponzi

11  scheme by, among other things, (i) providing bank accounts for Okun and/or his related entities

12  into which the converted Client Exchange Funds were deposited and hidden, (ii)  facilitating

13  wire transfers used by Okun and/or his related entities to convert  Exchange Funds from the

14  escrow accounts maintained by the Exchange Entities, or to move funds between Okun's

15  accounts post-conversion, (iii) by assisting Okun in disguising the source of the converted

16  Exchange Funds by structuring lending transactions for Okun (and/or his related entities) which

17  enabled Okun to use converted funds together with "loan proceeds" obtained from Wachovia to

18  purchase and operate unrelated businesses, (iv) loaning millions to Okun while recognizing

19  stolen Exchange Funds as Okun's collateral which enabled Okun to use stolen exchange funds

20  as Okun saw fit and to continue the Ponzi scheme.  If Wachovia in its underwriting of the

21  creditworthiness of Okun (and/or his related entities) to qualify for loans had excluded from

22  Wachovia's consideration the converted client Exchange Funds or assets purchased therewith,

23  Wachovia would not have been able to make most if not all of the loans it made to Okun and/or

24  his related entities.

25      d.    Wachovia, with specific knowledge that the Thief Defendants were converting

26  client Exchange Funds pursuant to an ongoing Ponzi scheme, aided and abetted Okun's

27  breaches of fiduciary duties and furthered the Ponzi scheme for Wachovia's own financial gain

28  and advantage, including abnormally high origination fees and exorbitant interest payments on

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

1  loans which Okun used to perpetuate the Ponzi scheme as described herein.

2      e.     Plaintiffs and members of the Class were damaged by the conduct of Wachovia

3  in aiding and abetting the breaches of fiduciary duty by Okun, and the Exchange Entities in an

4  amount to be established at trial.

5      166.    As the direct, proximate result of the aforementioned breaches of fiduciary

6  duties, the Plaintiffs and Class Members have been harmed in that they have suffered the loss

7  of their Exchange Funds (over $130,000,000) and have incurred additional damages as a

8  proximate and foreseeable result of losing their Exchange Funds, including but not limited to

9  adverse tax consequences, all in an amount to be shown at trial.  The conduct of the Thief

10 Defendants, the Professional Defendants, and the Negligent Employee Defendants in breaching

11 fiduciary duties, and of the Negligent Employee Defendants and Wachovia in aiding and

12 abetting breaches of fiduciary duties owed to the Plaintiffs and to the Class members, as trust

13 beneficiaries, was malicious, oppressive and warrants the imposition of punitive damages.

14                    **FIFTH CAUSE OF ACTION**

15                      **Declaratory Judgment**

16                    (Against the Insurer Defendants)

17      167.    Plaintiffs incorporate paragraphs 1 through 166 above as if fully set forth herein.

18      168.    Defendant Lockton at all times alleged in this FAC was a licensed insurance

19 broker in the State of California. An "Evidence of Insurance" of "Fidelity Bond Program"

20 issued by a California insurance producer must accurately describe the coverage and contain

21 the disclaimer language mandated by California Insurance Code § 384.  If it is misleading or

22 fails to refer to the limitations in the policy, the certificate or Evidence of Insurance will bind

23 coverage as described in the certificate to those persons identified as beneficiaries,

24 notwithstanding the limitations, conditions or exclusions to the contrary contained in the

25 policy.  See *Ainsworth v. Combined Ins. of Am.*, 104 Nev. 587 (1988) where "good news

26 letters" describing the coverage bound the insurer to the coverage described.

27      169.    The Defendant Insurers, (Continental, Chubb, and Twin City), entered into

28 contracts whereby they agreed to provide coverage against losses incurred by the clients of the

1  Exchange Entities from dishonest acts (including embezzlement, conversion, fraud and theft)

2  by the owners the Exchange Entities as described in the "Evidences of Insurance", or

3  certificates of the "Fidelity Bond Program."

4        170.   Pursuant to the terms of the "Evidences of Insurance" and the certificates of the

5  "Fidelity Bond Program," the  Defendant Insurers have wrongfully failed to pay for the losses

6  caused to the clients of the Exchange Entities by the dishonest acts of the owners of the

7  Exchange Entities and a dispute has arisen between the parties as to whether there is coverage

8  for the losses sustained.

9        171.   Plaintiffs request that the Court enter a Judgment against the Defendant Insurers

10  declaring that under the proper construction and application of the law to the claims alleged by

11  the Class that:  (i) there is coverage for the claims alleged; and (ii) the Defendant Insurers have

12  a duty to pay for the losses sustained by the Class pursuant to the terms of coverage as defined

13  by the Court when interpreting the Evidences of Insurance.

14  <div align="center">**SIXTH CAUSE OF ACTION**</div>

15  <div align="center">**Negligent Misrepresentation**</div>

16  <div align="center">(Against Lockton and the Insurer Defendants)</div>

17        172.   Plaintiffs incorporate paragraphs 1 through 171 above as if fully set forth herein.

18        173.   All of the Insurer Defendants or their authorized agent(s) executed the

19  "Evidences or certificates of the Insurance" of "Fidelity Bond Program" which were uniform

20  written representations made to members of the general public. All of the Insurer Defendants

21  agreed to represent in writing to the general public that the Exchange Entities were "bonded"

22  with $1,000,000 to $20,000,000 in coverage, "per occurrence."  All of the Insurer Defendants

23  knew that these written representations would be relied upon by the clients of the Exchange

24  Entities (or their subrogors or agents) and impliedly constituted a certification by the Insurer

25  Defendants that the Exchange Entities were legitimate and responsible fiduciaries.

26        174.   The Insurer Defendants did not know at the time they made the uniform written

27  representations if the Exchange Entities were legitimate and responsible because they did not

28  audit the books and records of the Exchange Entities before executing the $1,000,000 to

1   $20,000,000 "Evidences of Insurance" or certificates of the "Fidelity Bond Program." The

2   Insurer Defendants did not audit the books and records of the Exchange Entities before issuing

3   the policies because they believed there was no risk as the policies were illusory and were

4   intended to be used by the Exchange Entities solely as a marketing device to lure clients to

5   deposit their funds in trust at the Exchange Entities.

6        175.   The Insurer Defendants' representations contained in the "Evidences of

7   Insurance" or certificates of the "Fidelity Bond Program" were material and false, were made

8   without adequate regard to their accuracy, were believed to be true by the plaintiffs or their

9   subrogors or agents, were relied upon by Plaintiffs and Class members (or by their subrogors or

10  agents) to their detriment, and such negligent misrepresentations (and subsequent omissions)

11  were a direct, proximate and legal cause of Plaintiffs' losses in an amount to be proven at trial.

12                         **SEVENTH CAUSE OF ACTION**

13                                **Insurance Fraud**

14                       (Against Lockton and the Insurer Defendants)

15       176.   Plaintiffs incorporate paragraphs 1 through 175 above as if fully set forth herein.

16       177.   The Insurer Defendants' uniform written representations alleged above were

17  false, and known to be false by the Defendants. The Insurer Defendants made the uniform

18  written misrepresentations to the plaintiffs (or their subrogors or agents) for the sole purpose of

19  inducing the public to deposit their trust funds at the Exchange Entities, because there can be

20  no other reason. The Plaintiffs (or their subrogors or agents) relied upon the Insurer

21  Defendants' material misstatements to their detriment and deposited or retained their trust

22  funds on deposit at the Exchange Entities. The Insurer Defendants made no effort to educate

23  plaintiffs with accurate information, knowing that the plaintiffs were acting upon a false set of

24  facts set forth by the Defendants. As a direct, legal and proximate cause of the Insurer

25  Defendants' false statements and material omissions, the plaintiffs have been damaged in

26  amounts to be proven at trial. Defendants' conduct was improper, reprehensible and should not

27  be tolerated in a civil society. As such, plaintiffs request the imposition of a penalty against

28  Defendants.

## EIGHTH CAUSE OF ACTION

### Professional Malpractice

(Against Lockton)

178.    Plaintiffs incorporate paragraphs 1 through 177 above as if fully set forth herein.

179.    In performing professional services for a client, an insurance producer has the duty to have that degree of learning and skill ordinarily possessed by reputable insurance producers practicing in the same or a similar locality and under similar circumstances, and to use reasonable diligence and best judgment in the exercise of professional skill and in the application of learning, in an effort to accomplish the purpose for which the professional was employed. An insurance agent has an obligation to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured. An agents' failure to deliver the agreed-upon coverage may constitute actionable negligence and the proximate cause of an injury.

180.    In performing professional services for Plaintiffs, the only possible intended beneficiaries of the insurance (because the Exchange Entities did not have any of their own money to steal and were acting as corporate trustees for the benefit of Plaintiffs) Lockton breached its duty to use the care and skill ordinarily used by reputable insurance producers all to the detriment of Plaintiffs in the following particulars:

a.    the Plaintiffs and the Class as defined herein have suffered property damage in an amount exceeding $130,000,000; and

b.    the Plaintiffs and the Class as defined herein have suffered losses in excess of $130,000,000 in claims payable pursuant to the promised insurance policies which claims have not been paid. The claims would have been paid had Lockton procured the bond for the Plaintiffs as was represented in the Evidences of Insurance.

///

///

///

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

## NINTH CAUSE OF ACTION

### Breach of Warranty of Authority

(Against Lockton)

181.   Plaintiffs incorporate paragraphs 1 through 180 above as if fully set forth herein.

182.   When an agent acts without authority or in excess of his authority granted by the principal, he or she is liable for breach of an implied warranty that the agent is authorized to speak on behalf of and bind the principal.  The detriment caused by the breach of the warranty authority of an agent is deemed to be the amount that could have been recovered from the principal on the contract if the warranty had been complied with, together with reasonable expenses of legal proceedings taken in good faith to enforce the promised obligation of the alleged principal against the agent. Lockton knew that the Evidences of Insurance would be utilized by the Exchange Entities for marketing purposes to cause members of the general public to enter into contracts and deposit trust funds with the Exchange Entities.

183.   Lockton expressly and impliedly warranted in writing to the plaintiffs by causing the Evidences of Insurance to be issued that it was authorized by the insurers and could bind coverage for the plaintiffs and the Class with $1,000,000 to $20,000,000 in bonds, "per occurrence."  The insurers as principals may not have authorized Lockton to execute the false "Evidences of Insurance" of "Fidelity Bond Program."  Therefore, Lockton may have breached its warranty of authority by representing to the Plaintiffs that such coverage had in fact been bound.  If there was no actual or ostensible authority granted to Lockton by the Insurer Defendants, then Lockton must pay.

184.   As the actual and proximate cause of the possible breach of the warranty of authority by Lockton, the Plaintiffs have been damaged as follows:

   a.    the Plaintiffs and the Class as defined herein have suffered damage by losing entrusted assets in an amount exceeding $130,000,000; and

   b.    the Plaintiffs and the Class as defined herein have suffered damage by the occurrence of approximately $130,000,000 in claims payable under the promised insurance policy which claims have not been paid.

## TENTH CAUSE OF ACTION

### Legal Malpractice

(Against Defendant Simring)

185.    Plaintiffs incorporate paragraphs 1 through 184 above as if fully set forth herein.

186.    In November of 2006, Defendant Simring was a partner at Jorden Burt, a national law firm which maintained offices in Connecticut, Florida and Washington, D.C.

187.    The exchange transactions which were the subject of the exchange agreements between Plaintiffs (and all Class members) and the Exchange Entities were intended to benefit the clients by including provisions whereby the Exchange Entities agreed to hold the Client Exchange Funds in trust for the benefit of the client until a replacement property had been identified.

188.    1031 TG retained Simring and Jorden Burt in November 2006 to advise and its Exchange Entity Subsidiaries regarding their business operations.  Simring and Jorden Burt had a duty to the clients of 1031 TG because they knew that 1031 TG intended, as one of the primary objectives of the representation, that their legal services would benefit the clients of the Exchange Entities.  Imposing a duty by Simring and Jorden Burt to the clients would not significantly impair the performance of obligations of Simring and Jorden Burt to provide legal advice to 1031 TG and its Exchange Entity Subsidiaries because the legitimate business interests of 1031 Tax Group and its Exchange Entity Subsidiaries were to comply with the provisions of the exchange agreements and to otherwise protect the clients' trust funds.

189.    It was foreseeable to Simring and Jorden Burt at the inception of the representation that if 1031 TG and its Exchange Entity Subsidiaries did not comply with the terms of the exchange agreements and safeguard the clients' trust funds, that the clients would be harmed.

190.    Simring and Jorden Burt learned during their representation in November of 2006 that Okun was operating a Ponzi scheme by looting Exchange Funds and utilizing deposits from new clients to close replacement escrows of the older clients whose own funds had been looted.  Simring and Jorden Burt's clients in the representation was 1031 TG and its

Exchange Entity Subsidiaries and not Okun individually. Simring and Jorden Burt negligently failed in November of 2006 to advise their clients to immediately adopt policies to prevent Okun from continuing to convert Exchange Funds, to immediately seek to recover from Okun and/or his related entities the converted Exchange Funds and/or to warn thrust beneficiaries that Okun was stealing trust funds. Instead, Simring and Jorden Burt provided advice to Okun, who was not their client, as to how Okun could continue to operate 1031 TG and the Exchange Entities in furtherance of the Ponzi scheme without being criminally prosecuted.

191.     Thereafter, Simring was hired by Okun and went to work for 1031 TG and the Exchange Entities as "General Counsel." As Okun continued his Ponzi scheme, Simring continued to fail to warn the trust beneficiaries and enabled Okun to steal further trust funds.

192.     Simring's negligent failure to warn trust beneficiaries and/or to counsel the clients to immediately adopt policies to prevent Okun from continuing to steal Exchange Funds, and Simring's concurrent advice to Okun as to how Okun could best avoid detection for mishandling trust funds harmed the clients of the Exchange Entities, the beneficiaries of the trust who deposited Client Exchange Funds between November 2006 until May of 2007 when the Exchange Entities collapsed. The harm to the Exchange Entity clients, the trust beneficiaries, was both foreseeable and certain based on Simring's and Jorden Burt's negligent failure to advise 1031 TG to immediately adopt policies to prevent Okun from stealing Exchange Funds.

193.     As a direct and proximate result of the Simring and Jorden Burch's breaches of their duties of care and/or negligent acts, Plaintiffs and Class Members have been harmed in that they have suffered the loss of their Exchange Funds )over $130,000,000) and have incurred additional damages as a proximate and foreseeable result of losing their Exchange Funds including, but not limited to, adverse tax consequences, all in an amount to be established at trial.

///

///

///

73

1

**ELEVENTH CAUSE OF ACTION**

2

**Receiving Stolen Property**

3

(Against the Thief Defendants, the Professional Defendants,

4

the Negligent Employee Defendants, and Wachovia)

5

194.    Plaintiffs incorporate paragraphs 1 through 193 above as if fully set forth herein.

6

195.    For their own financial advantage and gain, Defendants received and/or

7

concealed stolen trust funds knowing the funds had been misappropriated or stolen.

8

196.    The Defendants' conduct was a substantial factor in causing damages and harm

9

to plaintiffs and the Class, including the loss of over $130,000,000 trust res, tax liability for

10

failing to accomplish a 1031 Exchange, the liability to the seller of replacement property for

11

breach, and the need to hire and retain professionals to mitigate losses. The Court should

12

impose punitive damages on Defendants to make an example of them to deter others from such

13

behavior in the future.

14

**XIV.**

15

**PRAYER FOR RELIEF**

16

WHEREFORE, Plaintiffs pray for Judgment against the Defendants as follows:

17

1.      For certification of the Class as defined;

18

2.      For the appointment of Plaintiffs as Class Representatives and Plaintiffs' counsel

19

        as counsel for the Class;

20

3.      For damages to Plaintiffs and Class members measured by the loss of their

21

        property held in trust including consequential damages and the disgorgement of

22

        unjust profits;

23

4.      for damages to plaintiffs as Class members measured by the amount payable

24

        under the "Evidences of Insurance" of "Fidelity Bond Program";

25

5.      for tort damages to Plaintiffs and Class members measured by the loss of their

26

        property held in trust including consequential damages as alleged;

27

6.      For treble, exemplary and/or punitive damages, as applicable;

28

7.      For pre-judgment interest;

FIRST AMENDED COMPLAINT
F:\MATTER\WK3\7316.001 - (OKUN HOLDINGS)\Pleadings\First Amended Complaint\First Amended Complaint 09-11-08.doc

8.    For costs of this action, including reasonable attorneys' fees as afforded by any applicable law;

9.    For the imposition of a constructive trusts and the avoidance of fraudulent conveyances; and

10.    For all other relief the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by Jury for all issues which may be so resolved.

DATED this 11th day of September, 2008

Robert L. Brace, Esq., SBN. 122240
Michael P. Denver, Esq., SBN. 199279
**HOLLISTER & BRACE**
1126 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 963-6711

Thomas Foley, Ca. Bar No. 65812
**FOLEY, BEZEK, BEHLE & CURTIS, LLP**
15 W. Carrillo Street
Santa Barbara, CA 93101
Telephone: (805) 962-9495
Facsimile: (805) 962-0722

*Attorneys for Plaintiffs and the Class*