# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

FILED
IN OPEN COURT

JUL 1 0 2008

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |  |
|---|---|---|
| | ) | Criminal No. 3:08cr *132* |
| | ) | |
| UNITED STATES OF AMERICA | ) | **Count 1** |
| | ) | **Wire & Mail Fraud Conspiracy** |
| v. | ) | **(18 U.S.C. § 1349)** |
| | ) | |
| EDWARD HUGH OKUN | ) | **Count 2** |
| | ) | **Money Laundering Conspiracy** |
| and | ) | **(18 U.S.C. § 1956(h))** |
| | ) | |
| LARA COLEMAN, | ) | **Counts 3 - 15** |
| | ) | **Wire Fraud** |
| Defendants. | ) | **(18 U.S.C. § 1343)** |
| | ) | |
| | ) | **Counts 16 - 18** |
| | ) | **Mail Fraud** |
| | ) | **(18 U.S.C. § 1341)** |
| | ) | |
| | ) | **Counts 19 - 21** |
| | ) | **Money Laundering** |
| | ) | **(18 U.S.C. § 1956(a)(1)(A)(i))** |
| | ) | |
| | ) | **Count 22** |
| | ) | **Money Laundering** |
| | ) | **(18 U.S.C. § 1956(a)(1)(B)(i))** |
| | ) | |
| | ) | **Counts 23 -25** |
| | ) | **Money Laundering** |
| | ) | **(18 U.S.C. § 1957)** |
| | ) | |
| | ) | **Count 26** |
| | ) | **Bulk Cash Smuggling** |
| | ) | **(31 U.S.C. § 5332)** |
| | ) | |
| | ) | **Count 27** |
| | ) | **False Declaration** |
| | ) | **(18 U.S.C. § 1623(a))** |

42

July 2008 Term - At Richmond

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT at all times relevant to this Indictment:

### GENERAL ALLEGATIONS

The Conspirators

1.    EDWARD HUGH OKUN ("OKUN") was the sole owner of Investment Properties of America ("IPofA"), The 1031 Tax Group ("1031TG"), and Okun Holdings, Inc.

2.    LARA COLEMAN ("COLEMAN") was the Chief Operating Officer for IPofA.

3.    Robert D. Field II ("Field") was a Certified Public Accountant who, beginning in or about August 2006, was the Chief Financial Officer ("CFO") for Okun Holdings, Inc. ("Okun Holdings"), which was incorporated to serve as the parent entity for all Okun-owned businesses, though no actual transfers of ownership to Okun Holdings ever occurred.

4.    Richard B. Simring, Esq. ("Simring") was an attorney who, beginning in or about January 2007, was the Chief Legal Officer ("CLO") for Okun Holdings.

5.    Other conspirators, not named herein, included senior executives at IPofA, 1031TG, and Okun Holdings.

Relevant Entities

6.    IPofA was a Virginia limited liability company with its principal place of business in Richmond, Virginia. IPofA was in the commercial real estate investment and management business.

7.    1031TG was a Delaware limited liability company with its principal place of business in Richmond, Virginia. Between August 2005 and December 2006, OKUN acquired

2

six Qualified Intermediary ("QI") companies. These acquisitions ultimately resulted in each of the acquired entities and their affiliated subsidiaries becoming wholly-owned direct or indirect subsidiaries of 1031TG, which was, in turn, wholly owned by OKUN.

The Qualified Intermediary Industry

8.     Section 1031 of the Internal Revenue Code permits owners of investment property to defer the capital gains tax that would otherwise be due and owing upon the sale of the investment property conditioned upon timely application of the sale proceeds to the purchase of an identified replacement investment property. These transactions are commonly known as "like-kind exchanges," "tax-free exchanges," or "1031 exchanges."

9.     In a typical 1031 exchange, an exchanger ("Exchanger" or "Client") sells his or her business or investment real estate. The Exchanger then has 45 days from the date of the sale to identify a like-kind replacement property and 180 days from the date of the sale to close on the purchase of the replacement property. In order to preserve the tax deferral, the Exchanger must deposit the sale proceeds (commonly referred to as "Exchange Funds," "Client Exchange Funds," or "Exchange Proceeds") with a QI until the Exchanger is ready to timely close on the replacement property.

10.     A QI's responsibilities and obligations to the Exchanger regarding the safekeeping and use of Exchange Funds are typically set forth in a contract commonly referred to as an "Exchange Agreement," which is entered into between the Exchanger and the QI.

1031 Tax Group's Exchange Agreements

11.     While 1031TG did not use a uniform Exchange Agreement across its six subsidiary QI companies, the Exchange Agreements entered into by 1031TG's QI companies

3

Case 3:08-cv-00732-REP   Document 42-4   Filed 07/18/2008   Page 4 of 32

made it clear that Client Exchange Funds deposited with the QI were to be held and used to

effectuate 1031 exchanges.  The Exchange Agreements included various promises regarding the

safekeeping and use of Client Exchange Funds.

**COUNT ONE**
(Wire and Mail Fraud Conspiracy)

**THE CONSPIRACY**

12.    The allegations set forth in paragraphs 1 through 11 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

13.    From in or about August 2005 through in or about May 2007, within the Eastern District of Virginia and elsewhere, defendants

**EDWARD HUGH OKUN and**
**LARA COLEMAN**

did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with others, both known and unknown, to commit offenses against the United States, to wit:

a.    To devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343;

b.    To devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and knowingly: (a) placing and causing to be placed in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (b) depositing

5

and causing to be deposited any matter and thing whatever to be sent and delivered by any private and interstate commercial carrier; and (c) causing to be delivered by mail and private and interstate commercial carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

## PURPOSE

14.    A purpose of the conspiracy was to mislead 1031TG clients regarding the safekeeping and use of Client Exchange Funds, as well as the deteriorating financial condition of 1031TG, in order to obtain access to client funds so that the conspirators could: (a) pay for OKUN's lavish lifestyle; (b) pay large salaries and bonuses for the conspirators; (c) purchase additional QI companies; (d) pay operating expenses for OKUN's various companies; and (e) invest in commercial real estate.

## MANNER AND MEANS

15.    On or about August 25, 2005, OKUN purchased a QI named Atlantic Exchange Company, Inc. ("AEC"), which was located in Boston, Massachusetts. The purchase price for AEC was approximately $4.25 million, with $4 million in cash required up-front. At the time of the purchase, AEC's Exchange Agreement required that exchange proceeds be deposited in an interest-bearing escrow account and that exchange proceeds "shall be used solely in accordance with the provisions of Article 3 to enable the Intermediary to perform its obligations as set forth hereunder and to effectuate the exchange. The Exchange Funds shall at no time be considered part of the Intermediary's general assets nor subject to claims by the Intermediary's creditors."

6

16.     Soon after the purchase, OKUN and COLEMAN gained control over AEC's Client Exchange Funds and began wiring millions of dollars of AEC's client funds – in violation of AEC's Exchange Agreements – into OKUN's personal bank account, into IPofA bank accounts, and to a third-party lender, some of which went to repay the $4 million, plus interest, that OKUN had borrowed to purchase AEC.

17.     At the same time that OKUN and COLEMAN were depleting AEC's client funds, OKUN was negotiating to purchase a second QI company named Security 1031 Services, LLC ("SOS"), which was located in Trumbull, Connecticut.  OKUN purchased SOS for approximately $2.8 million on or about November 15, 2005, using misappropriated Client Exchange Funds from AEC.  At the time of the purchase, SOS's Exchange Agreement provided that SOS would establish an exchange escrow account to hold the exchange proceeds and that "[i]t is the intent of the parties that the funds held by SOS are to be used solely by SOS for its obligations under this agreement and shall not be deemed a part of SOS's general assets or subject to the claims of creditors of SOS."

18.     Due to OKUN's and COLEMAN's prior misappropriations of AEC Client Exchange Funds – and in spite of the fact that SOS's exchange agreements required SOS Client Exchange Funds to be used solely to fund SOS client exchanges – OKUN and COLEMAN began using SOS Client Exchange Funds for AEC client exchanges, as well as other purposes unrelated to SOS client exchanges.

19.     In addition to using SOS Client Exchange Funds for AEC client exchanges, on or about June 6, 2006, OKUN and COLEMAN used approximately $3 million of SOS's Client Exchange Funds to purchase another QI company named Real Estate Exchange Services, Inc.

7

("REES"), which was located in Safety Harbor, Florida. At the time of the purchase, REES Exchange Agreement stated: "Cash proceeds to be held in Qualified Intermediary Escrow Account. REES, as escrow holder, shall establish and maintain the term of this Exchange Agreement a segregated account."

20. Almost immediately upon purchasing REES, OKUN and COLEMAN transferred REES Client Exchange Funds to bank accounts that they controlled. OKUN and COLEMAN then used REES Client Exchange Funds to repay SOS the money that they had misappropriated to purchase REES and for other purposes wholly unrelated to funding REES's clients' exchanges.

21. On or about June 22, 2006 – just sixteen days after the purchase of REES – OKUN used approximately $5 million from an AEC bank account to purchase yet another QI, named National Exchange Services QI, Ltd. ("NES"), which was located in San Antonio, Texas. Although the funds to purchase NES came from an AEC bank account, the funds in that bank account consisted primarily of deposits from REES. At the time of purchase, NES Exchange Agreement stated that "all funds and Cash Proceeds received by the Intermediary for the facilitation of this exchange shall be deposited into a segregated account (the "Escrow Account") at an escrow company, financial institution or bank to be selected by Intermediary" and that "the funds in the escrow account shall be invested in money market or other short-term investment funds regularly used by Intermediary in the ordinary course of its business."

22. On or about August 4, 2006, OKUN purchased another QI company named Investment Exchange Group, LLC ("IXG"), which was located in Denver, Colorado, for approximately $7 million. OKUN misappropriated $6 million of SOS's Client Exchange Funds

to fund the purchase of IXG. At the time of purchase, the IXG Exchange Agreement stated: "QI is willing to accept such assignment as a Qualified Intermediary and to hold the proceeds from the sale of the Relinquished Property . . . and to utilize the same in securing, acquiring, and transferring to Exchanger suitable Replacement Property to complete the tax-deferred exchange . . . ." The term "Bank" is defined in the agreement as "the financial institution QI has chosen to hold the exchange funds generated from the sale of any Relinquished Property throughout the Exchange Period."

23.    Almost immediately upon purchasing IXG, OKUN and COLEMAN transferred IXG's Client Exchange Funds to bank accounts that they controlled. OKUN and COLEMAN then used IXG's Client Exchange Funds to repay SOS the $6 million that they had misappropriated to purchase REES and for other purposes wholly unrelated to funding IXG's clients' exchanges.

24.    In an effort to further the conspiracy, OKUN and COLEMAN concealed their misappropriations of 1031TG Client Exchange Funds from various IPofA and 1031TG executives, including IPofA's in-house attorneys.

25.    In or about August 2006, OKUN hired Robert Field to be CFO for Okun Holdings. Initially, all information related to 1031TG was withheld from Field. In or about October 2006, however, Field was informed by an IPofA executive that OKUN was using Client Exchange Funds to pay the operating expenses for his companies. Field subsequently informed IPofA's in-house attorneys that OKUN and IPofA were taking 1031TG's Client Exchange Funds. In addition, Field engaged outside counsel to review the actions of 1031TG. Thereafter, IPofA's in-

9

house counsel began an internal investigation into the unauthorized transfers of QI Client

Exchange Funds.

### Attorneys Warn About Potential Criminal Liability

26.  On or about November 7, 2006, IPofA's in-house counsel issued a memorandum to

OKUN, COLEMAN, and Field entitled "Affiliate Loans from Qualified Intermediary

Companies." In that memorandum, the attorneys documented the following findings from their

internal investigation: (a) the fund transfers from the QI's to OKUN, IPofA, and other parties

began in August 2005; (b) the outstanding balance of the loans could be as low as $80 million

and as high as $135 million; (c) few, if any, of the transactions were documented when

consummated and some remained undocumented; (d) there was no current source of funds to

repay these transactions; and (e) the transactions and course of dealing were specifically

concealed from IPofA in-house counsel (as well as outside counsel) and material misstatements

had been made to in-house counsel during recent months concerning these transactions. The

memorandum further contained interim conclusions stating that the prior conduct surrounding

the loans: (a) violated existing exchange agreements with QI entity customers; (b) violated any

fiduciary standard that might apply; (c) "could potentially subject one or more involved parties to

criminal prosecution in multiple states and/or at the federal level (under theories ranging from

theft, embezzlement, and or conversion to racketeering and laundering statutes);" (d) could

potentially violate the terms of one or more existing loans to which IPofA, OKUN, and/or

affiliates were parties; and (e) the loans could render outstanding financial statements provided to

lenders of IPofA or OKUN materially inaccurate. In the recommendations section of the

memorandum, IPofA's in-house counsel stated that "[a]ll outstanding Loans should be repaid immediately."

27.     On or about November 13, 2006, IPofA's in-house counsel became aware that OKUN was in negotiations to purchase another QI company named 1031 Advance, Inc. ("1031 Advance"). The attorneys became concerned that this was a continued effort to acquire new QI entities as a temporary fix to 1031TG's current financial problems and that it suggested an intent to continue the previously outlined improper course of conduct.

28.     On or about November 21, 2006, IPofA's Chief Legal Officer ("CLO") wrote another memorandum, which was sent via electronic mail to OKUN, COLEMAN, and Field as a follow-up to the November 7, 2006 Memorandum, entitled "Affiliate Transfers from QI Entities." In the November 21st Memorandum, the CLO wrote: (a) "[t]he prior course of conduct described in the November 7 memorandum likely constitutes violation of both federal and state criminal law;" (b) IPofA and 1031TG's outside counsel had confirmed the conclusion regarding the violation of both federal and state criminal law; (c) "[t]his prior course of conduct also constitutes a breach of the underlying exchange agreements (with respect to the QI entities) and likely a violation of state statutory and common law under a variety of theories;" (d) "[u]nder the Virginia Rules of Professional Conduct, [the CLO was] obligated to advise the company that continuing this course of conduct will likely result in both civil and criminal liability (in multiple jurisdictions) to the entities and individuals involved with such conduct;" and (e) "[t]his course of conduct should cease and desist immediately and all outstanding funds owed to the QI entities should be repaid immediately." IPofA's CLO resigned on or about November 21, 2006.

11

29.     On or about November 21, 2006, IPofA and 1031TG's outside counsel resigned
from further representation of IPofA and 1031TG.  In its resignation letter, the outside law firm
stated: (a) the letter confirmed discussions between the law firm and OKUN that the law firm
ceased to render legal services to IPofA and 1031TG; (b) the resignation decision was based on
concerns about both entities' continuing course of conduct and potential conflicts of interest
between IPofA and 1031TG; (c) under the Virginia Rules of Professional Conduct, the outside
law firm was obligated to advise IPofA and 1031TG that continuing the prior course of conduct
with respect to the transfer or investment of funds received by the 1031TG could result in civil
and criminal liability to the entities and individuals involved with that conduct; (d) the outside
law firm had counseled OKUN that the conduct must cease and all outstanding funds owed to the
QI entities should be repaid immediately; and (e) although OKUN had assured the outside law
firm that all the entities involved were taking steps to cease and cure the improper course of
conduct, the outside law firm could not continue to represent IPofA and 1031TG due to possibly
divergent interests.

30.     In or about November 2006, OKUN consulted Richard Simring, who at the time
was a partner at a law firm in Miami, Florida, about the issues raised by IPofA's CLO and IPofA
and 1031TG's outside counsel regarding the transfers of Client Exchange Funds.  Simring
subsequently reviewed specific 1031TG Exchange Agreements, conducted independent legal
research, and spoke to the in-house and outside counsel that had raised the concerns.  Simring
concluded that Okun's prior course of conduct of obtaining money under false pretenses risked
criminal liability.

31.    Simring informed OKUN of his conclusions and advised OKUN that the transfers

of Client Exchange Funds must cease until: (1) the exchange agreements were changed to allow

for the transfer of Client Exchange Funds; and (2) there was adequate liquidity at 1031TG to

ensure that there were sufficient funds to cover client exchanges as they became due. Simring

further informed OKUN that following this prospective advice would not rectify what OKUN

had done in the past, but by ensuring that no clients lost money, OKUN would minimize the

likelihood that law enforcement authorities would learn about what OKUN had done, which

would minimize the prospect of OKUN being criminally prosecuted. In response, OKUN told

Simring that the exchange agreements would be changed and that OKUN would pay back the

majority of the Client Exchange Funds that he and IPofA had taken from 1031TG. Simring

warned OKUN that failing to follow his advice would likely result in OKUN going to jail.

### The Theft of 1031TG's Client Funds Continues

32.    In or about late November 2006, due to OKUN's and COLEMAN's prior

misappropriations of 1031TG's Client Exchange Funds, the financial condition of the 1031TG

companies had so deteriorated that it was becoming increasingly difficult to fund the exchanges

of 1031TG clients.

33.    On December 19, 2006, OKUN purchased 1031 Advance for approximately $2.5

million, which was located in San Jose, California. At the time of the time of the purchase, 1031

Advance's Exchange Agreement stated: "Exchanger and QI expressly agree that any cash

proceeds received from the disposition of the Relinquished Property (Exchange Proceeds) shall

be held in the account of QI with a nationally insured bank or savings institution."

13

34.    To fund the acquisition of 1031 Advance, OKUN obtained a loan from a third-party lender that was secured, in part, by real estate that he had previously purchased using misappropriated Client Exchange Funds from AEC. Consistent with OKUN's and COLEMAN's prior course of conduct, 1031 Advance's Client Exchange Funds were transferred almost immediately upon 1031 Advance's acquisition to bank accounts controlled by OKUN and COLEMAN. Just one day after the purchase of 1031 Advance, on or about December 20, 2006, OKUN and COLEMAN misappropriated approximately $5 million of 1031TG's Client Exchange Funds and used those funds for purposes wholly unrelated to funding the exchanges of 1031TG's clients.

35.    In or about January 2007, OKUN hired Simring to be the Chief Legal Officer for Okun Holdings.

36.    In or about March 2007, Simring became aware that: (1) OKUN was continuing to illicitly transfer millions of dollars of Client Exchange Funds from 1031TG to IPofA and OKUN's personal bank account; (2) 1031TG's exchange agreements had not been changed; and (3) 1031TG was on the verge of insolvency. When Simring confronted OKUN about the continued illicit transfer of Client Exchange Funds, OKUN stated that it was only in the short term, and that OKUN was in the process of repaying 1031TG to ensure that it had adequate liquidity. Despite these assurances, the financial condition of 1031TG continued to deteriorate.

37.    In or about April 2007, the financial condition of 1031TG had worsened to the point that 1031TG was unable to fund certain client exchanges when due. In response to inquiries from 1031TG clients regarding delays in funding their exchanges, and in order to conceal the prior misappropriations, the conspirators, including Field and Simring, lied to 1031TG clients by

14

informing them that their funds were secure and that the delay was a short-term liquidity issue resulting from mistimed investments. But in truth and fact, 1031TG was insolvent as a result of the prior misappropriations by OKUN and the other conspirators.

38.    To conceal the misappropriations and the deteriorating financial condition of 1031TG it was part of the conspiracy that OKUN, COLEMAN, Field, Simring and other conspirators continued to misappropriate Client Exchange Funds to make "lulling" payments to earlier unwitting 1031TG clients from deposits that were supposed to be held for later unwitting 1031TG clients. Each and every one of these lulling payments represented a separate misappropriation of Client Exchange Funds.

39.    By in or about late April 2007, 1031TG's financial condition was so dire that it became increasingly difficult to misappropriate Client Exchange Funds from later clients to fund earlier clients' exchanges and certain clients began to threaten to complain to the authorities. To fund a client exchange in order to avoid detection, OKUN obtained a loan – using collateral originally purchased with stolen 1031TG Client Exchange Funds – from a third-party lender and the loan proceeds were deposited into OKUN's personal bank account. To conceal from the client that the funds were proceeds from a personal loan rather than from Client Exchange Funds held by 1031TG, OKUN, COLEMAN, Field, Simring and other conspirators agreed that the proceeds would be forwarded from OKUN's personal bank account to 1031TG's bank account and then to the client.

40.    In or about late April 2007, 1031TG's CEO resigned due to concerns regarding the illicit transfers of Client Exchange Funds. The CEO was one of the authorized signatories for approximately $8 million of 1031TG Client Exchange Funds held in bank accounts in California.

15

Upon 1031TG's CEO's resignation, OKUN appointed Simring as interim CEO of 1031TG. To enable the conspirators to make "lulling" payments and thereby avoid detection by law enforcement authorities, OKUN directed COLEMAN and Simring to transfer approximately $8 million of Client Exchange Funds to bank accounts controlled by the conspirators. COLEMAN and Simring did as OKUN directed.

<u>1031 Tax Group Declares Bankruptcy</u>

41.    On or about May 13, 2007, 1031TG filed for protection under Chapter 11 of the United States Bankruptcy Code. As of the date of the bankruptcy filing, 1031TG estimated that it was owed approximately $132 million from IPofA as a result of OKUN's transfers of Client Exchange Funds.

(All in violation of Title 18, United States Code, Section 1349.)

16

## COUNT TWO
(Money Laundering Conspiracy)

42.    The allegations contained in paragraphs 1 through 11 and 15 through 41 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

43.    From in or about August 2005 through in or about April 2007, within the Eastern District of Virginia and elsewhere, defendants

**EDWARD HUGH OKUN and
LARA COLEMAN**

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

a.    To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is the transfer of millions of dollars in misappropriated 1031TG Client Exchange Funds for the purchase of new QI companies, with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud and wire fraud, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b.    To knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, mail fraud and wire fraud,

17

knowing that the transactions were designed in whole or in part to conceal and

disguise the nature, location, source, ownership, and control of the proceeds of

specified unlawful activity, and that while conducting and attempting to conduct

such financial transactions, knew that the property involved in the financial

transactions represented the proceeds of some form of unlawful activity, in

violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c.      To knowingly engage and attempt to engage, in monetary transactions by, through

or to a financial institution, affecting interstate and foreign commerce, in

criminally derived property of a value greater than $10,000, that is the transfer of

millions of dollars in misappropriated 1031TG Client Exchange Funds, such

property having been derived from a specified unlawful activity, that is, mail fraud

and wire fraud, in violation of Title 18, United States Code, Section 1957.

(All in violation of Title 18, United States Code, Section 1956(h).)

### COUNTS THREE THROUGH FIFTEEN
(Wire Fraud)

44.    The allegations contained in paragraphs 1 through 11 and 15 through 41 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

45.    On or about the respective dates shown below, each such date constituting a separate count of this Superseding Indictment, within the Eastern District of Virginia and elsewhere, defendants

### EDWARD HUGH OKUN and
### LARA COLEMAN

and others, for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

| Count | Date | Type | Amount | Origin | Destination |
|---|---|---|---|---|---|
| 3 | 9/1/05 | Funds Transfer | $4,100,000 | AEC Bank of America Acct. # XXXX9732 | OKUN's Personal Union Federal Bank Acct. # XXXX6072 |
| 4 | 9/7/05 | Funds Transfer | $4,400,000 | AEC Bank of America Acct. # XXXX9732 | Cambridge Trust Company Acct. # XXXX0601 |
| 5 | 11/16/05 | Funds Transfer | $2,800,000 | AEC Bank of America Account # XXXX5772 | OKUN's Personal Union Federal Bank Acct. # XXXX6072 |
| 6 | 11/17/05 | Funds Transfer | $8,600,000 | AEC Bank of America Account # XXXX5772 | OKUN's Personal Union Federal Bank Acct. # XXXX6072 |

19

| 7 | 6/9/06 | Funds Transfer | $3,200,000 | SOS Commerce Bank Account # XXXX6734 | IPofA Wachovia Account # XXXX2719 |
|---|--------|----------------|------------|--------------------------------------|----------------------------------|
| 8 | 6/22/06 | Funds Transfer | $5,000,000 | AEC Bank of America Account # XXXX5772 | Frost National Bank Account # XXXX8924 |
| 9 | 8/3/06 | Funds Transfer | $6,000,000 | SOS Commerce Bank Account # XXXX6734 | 1031TG Wachovia Bank Account #XXXX3272 |
| 10 | 8/14/06 | Funds Transfer | $800,500 | 1031TG Wachovia Bank Account # XXXX3272 | IPofA Wachovia Account # XXXX2719 |
| 11 | 12/20/06 | Funds Transfer | $5,000,000 | 1031TG Wachovia Bank Account # XXXX3272 | IPofA Wachovia Account # XXXX2719 |
| 12 | 1/17/07 | Funds Transfer | $2,000,000 | 1031TG Wachovia Bank Account # XXXX3272 | IPofA Wachovia Account # XXXX2719 |
| 13 | 3/15/07 | Funds Transfer | $4,000,000 | Okun Holdings Bank Account # XXXX2400 | OKUN's Personal Wachovia Bank Account # XXXX0662 |
| 14 | 4/20/07 | Funds Transfer | $6,177,248 | OKUN's Personal Wachovia Bank Account # XXXX0662 | IPofA Wachovia Account # XXXX2719 |
| 15 | 4/26/07 | Funds Transfer | $5,559,795 | 1031 Advance, Inc. Countrywide Bank Account # XXXX3210 | 1031TG Wachovia Bank Account # XXXX3272 |

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

20

## COUNTS SIXTEEN THROUGH EIGHTEEN
(Mail Fraud)

46.     The allegations contained in paragraphs 1 through 11 and 15 through 41 of this

Superseding Indictment are realleged and incorporated as though set forth in full herein.

47.     On or about the respective dates shown below, each such date constituting a

separate count of this Superseding Indictment, within the Eastern District of Virginia and

elsewhere, defendants

**EDWARD HUGH OKUN and
LARA COLEMAN**

and others, for the purposes of executing the scheme and artifice to defraud described above and

to obtain money and property by means of material false and fraudulent pretenses,

representations, and promises, did knowingly: (a) place and cause to be placed in any post office

and authorized depository for mail matter, any matter and thing whatever to be sent and delivered

by the Postal Service; (b) deposit and cause to be deposited any matter and thing whatever to be

sent and delivered by any private and interstate commercial carrier; and (c) cause to be delivered

by mail and private and interstate commercial carrier any matter and thing whatever according to

the direction thereon, the following:

| Count | Date | Mailing |
|-------|------|---------|
| 16 | 12/4/2006 | Package containing due diligence binder for 1031 Advance to be delivered via Federal Express, from San Jose, California, to IPofA's headquarters in Richmond, Virginia |
| 17 | 1/22/2007 | Package containing $15,000 in cash to be delivered, via Federal Express, from IPofA's headquarters in Richmond, Virginia, to Okun on his yacht, "The Simone," located at The Atlantic Marina, slip # 4041 on Paradise Island in the Bahamas |

21

| 18 | 4/26/2007 | Package containing two checks totaling $733,099.45 of Client Exchange Funds to be delivered via Federal Express, from 1031TG in Boston, Massachusetts, to IPofA's headquarters in Richmond, Virginia |

(All in violation of Title 18, United States Code, Sections 1341 and 2.)

## COUNTS NINETEEN THROUGH TWENTY-ONE
### (Money Laundering – Promotion)

48.    The allegations contained in paragraphs 1 through 11 and 15 through 41 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

49.    On or about the respective dates shown below, each such date constituting a separate count of this Superseding Indictment, within the Eastern District of Virginia and elsewhere, defendants

### EDWARD HUGH OKUN and
### LARA COLEMAN

and others, did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is the transfer of millions of dollars in misappropriated 1031TG Client Exchange Funds for the purchase of new QI companies with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud and wire fraud, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 19 | 11/17/05 | $1,600,000 | Wire transfer from OKUN's Personal Union Federal Bank Acct. # XXXX6072 to Citibank Account # XXXX6548 for the purchase of SOS |
| 20 | 6/9/06 | $1,530,000 | Wire transfer from IPofA Wachovia Account # XXXX2719 to Bankers Bank Account # XXXX1574 for the purchase of REES |

23

| 21 | 8/3/06 | $7,000,000 | Wire transfer from 1031TG Wachovia Bank Account #XXXX3272 to Matrix Capital Bank Account # XXXX0074 for the purchase of IXG |
|----|--------|------------|---|

(All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.)

## COUNT TWENTY-TWO
(Money Laundering – Concealment)

50.    The allegations contained in paragraphs 1 through 11 and 15 through 41 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

51.    On or about April 20, 2007, within the Eastern District of Virginia and elsewhere, defendants

### EDWARD HUGH OKUN and
### LARA COLEMAN

and others, did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce and foreign commerce, that is transferred and caused the transfer of $6,177,248 from IPofA's Wachovia Bank Account # XXXX2719 to 1031TG's Wachovia Bank Account # XXXX3272, which transaction involved the proceeds of specified unlawful activity, that is, mail fraud and wire fraud, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

(All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

25

## COUNTS TWENTY-THREE THROUGH TWENTY-FIVE
(Money Laundering)

52.     The allegations contained in paragraphs 1 through 11 and 15 through 41 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

53.     On or about the respective dates shown below, each such date constituting a separate count of this Superseding Indictment, within the Eastern District of Virginia and elsewhere, defendants

### EDWARD HUGH OKUN and
### LARA COLEMAN

and others, did knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the transfer of millions of dollars in misappropriated 1031TG Client Exchange Funds, such property having been derived from a specified unlawful activity, that is mail fraud and wire fraud.

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 23 | 11/17/05 | $8,350,000 | Wire transfer from OKUN's Personal Union Federal Bank Acct. # XXXX6072 to Mellon United National Bank Acct. # XXXX1686 for the purchase of the M/Y Simone Yacht |
| 24 | 8/14/06 | $800,500 | Wire transfer from IPofA Wachovia Bank Account # XXXX2719 to International Bank of Commerce Bank Acct. # XXXX3717 for the purchase of Bell helicopter |
| 25 | 1/17/2007 | $400,000 | Wire transfer from IPofA Wachovia Account # XXXX2719 to OKUN's Personal Wachovia Bank Account #XXXX0662 for the payment of personal expenses |

(All in violation of Title 18, United States Code, Section 1957.)

26

## COUNT TWENTY-SIX
(Bulk Cash Smuggling)

54.   The allegations contained in paragraphs 1 through 11 and 15 through 41 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

55.   On or about January 22, 2007, in the Eastern District of Virginia, and elsewhere, defendants,

## EDWARD HUGH OKUN and
## LARA COLEMAN

and others, with the intent to evade a currency reporting requirement under Title 31, United States Code, Section 5316, knowingly caused the concealment of more than $10,000 in currency and other monetary instruments in a conveyance or other container, and caused the transport and transfer or the attempted transport and transfer of such currency and monetary instruments from a place within the United States to a place outside of the United States.

56.   On or about January 22, 2007, OKUN sent the following instructions, via electronic mail, to an IPofA employee: "[C]ould you fed ex $15,000 cash (large bills and pad the package with paper on both sides so it looks like a thick document, you may want to put it in several envelopes so they can't tell what it is) to me here in nassau people don't like credit cards here. I would suggest cashing two checks one for 5,200 and one for 9,800 so you stay under the 10,000 cash reporting with the irs or better yet take someone else with you, you cash one and they cash the other. I need it sent priority next day to: Atlantis Marina, Paradise Island, Nassau Bahamas, c/o motor Yacht Simone slip #4041, Telephone number 954-XXX-XXXX. Thanks, Ed."

57.   On or about January 22, 2007, an IPofA employee withdrew $15,000 in cash from one of IPofA's bank accounts in Richmond, Virginia. On that same day, Federal Express picked

27

up a package at IPofA's headquarters in Richmond, Virginia and delivered the package the following day to OKUN on his yacht, "The Simone," located at The Atlantic Marina, slip #4041 on Paradise Island in the Bahamas.

(All in violation of Title 31, United States Code, Section 5332, and Title 18, United States Code, Section 2.)

## COUNT TWENTY-SEVEN
(False Declaration)

58.   The allegations contained in paragraphs 1 through 11 and 15 through 41 of this Superseding Indictment are realleged and incorporated as though set forth in full herein.

59.   Prior to November 7, 2007, a federal grand jury sitting in the Eastern District of Virginia issued a grand jury subpoena to the above mentioned Chief Legal Officer ("CLO") for IPofA for information related to the grand jury's investigation of the misappropriation of Client Exchange Funds held at 1031TG.  OKUN, through counsel, filed a Motion to Quash the grand jury subpoena based on his claim that he had a personal attorney-client relationship with the CLO.

60.   On or about November 7, 2007, the United States District Court for the Eastern District of Virginia, considering OKUN's Motion to Quash, held an evidentiary hearing to determine whether a personal attorney-client relationship existed between OKUN and the CLO.

61.   On or about November 7, 2007, in the Eastern District of Virginia, the defendant

**EDWARD HUGH OKUN,**

having taken an oath to testify truthfully in a proceeding before a United States District Court sitting in the Eastern District of Virginia, unlawfully, willfully, knowingly, and contrary to such oath, did make false material declarations, that is, he gave the following false testimony:

Question:   Did you have a discussion with him about whether or not he was your lawyer or the companies' lawyer?

Answer:   Yes.

Question:   Did you ever discuss with him [the CLO] your view as to whether or not

29

he was your lawyer?

Answer:    Yes.

Question:    Without telling us the details of the conversation, what was the nature of

your assertion to [the CLO]?

Answer:    That he personally was my lawyer.

Question:    As it relates to what?

Answer:    To the memorandums and this matter regarding borrowings from the QI.

62.    In truth and in fact, as OKUN well knew, OKUN never had a discussion with the

CLO in which OKUN told the CLO that OKUN believed the CLO to be his personal attorney.

(All in violation of Title 18, United States Code, Section 1623(a)).

## Forfeiture Allegation

Pursuant to Federal Rule of Criminal Procedure 32.2, the defendant is advised that upon conviction of the offense charged in Count One of this indictment, he shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violation charged in Count One, and upon conviction of the offense charged in Count Twenty-Six of this indictment, he shall forfeit to the United States, any property, real or personal, involved in the offense, and any property traceable to such property.

Property subject to forfeiture consists of, but it not limited to, the following:

The sum of not less than $132 million which represents the proceeds of client funds fraudulently transferred by the defendant to IpofA as charged in Count One.

The sum of $15,000 which represents property involved in the offense charged in Count Twenty-Six.

If property subject to forfeiture meets the requirements of 21 U.S.C. § 853(p), the government will seek an order forfeiting substitute assets.

(In accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and 31 U.S.C. § 5332(b)(2)).

A TRUE BILL  Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

FOREPERSON

31

CHUCK ROSENBERG
UNITED STATES ATTORNEY

STEVEN R. TYRRELL
CHIEF, FRAUD SECTION

By: _____

Michael S. Dry
Assistant United States Attorney
Eastern District of Virginia

By: _____

for Brigham Cannon
Trial Attorney, Fraud Section
U.S. Department of Justice

# EXHIBIT 2

FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

2009 JUN 30  A 10: 52

Richmond Division

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 3:08cr 307 |
| v. | ) | |
| | ) | Count 1 - 18 U.S.C. § 371 |
| ROBERT D. FIELD II, | ) | Conspiracy to Commit Mail Fraud |
| | ) | & Money Laundering |
| Defendant. | ) | |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Criminal Information:

#### The Conspirators

1.    Edward Hugh Okun ("Okun") was the sole owner of Investment Properties of America ("IPofA"), The 1031 Tax Group ("1031TG"), and Okun Holding's Inc.

2.    ROBERT D. FIELD II ("FIELD") was a Certified Public Accountant and was the Chief Financial Officer ("CFO") for Okun Holdings Inc. ("Okun Holdings"), which was incorporated to serve as the parent entity for all Okun owned businesses, though no actual transfers of ownership to Okun Holdings ever occurred.

3.    Other conspirators, not named herein, included senior executives at IPofA, 1031TG, and Okun Holdings.

Relevant Entities

4.    IPofA was a Delaware limited liability company with its principal place of business in Richmond, Virginia.  IPofA was in the commercial real estate investment and management business.

5.    1031TG was a Delaware limited liability company with its principal place of business in Richmond, Virginia.  Between August 2005 and December 2006, Okun acquired six Qualified Intermediary ("QI") companies.  These acquisitions ultimately resulted in each of the acquired entities and their affiliated subsidiaries becoming wholly-owned direct or indirect subsidiaries of 1031TG, which was, in turn, wholly owned by Okun. These acquisitions included:

    a.    Atlantic Exchange Company, Inc. ("AEC") in Boston, Massachusetts in or about August 2005;

    b.    Security 1031 Services, LLC ("SOS") in Trumbull, Connecticut in or about November 2005;

    c.    Real Estate Exchange Services, Inc. ("REES") in Safety Harbor, Florida in or about June 2006;

    d.    National Exchange Services QI, Ltd. ("NES") in San Antonio, Texas in or about June 2006;

    e.    Investment Exchange Group, LLC ("IXG") in Denver, Colorado in or about August 2006; and

    f.    1031 Advance, Inc. ("1031 Advance") in San Jose, California in or about December 2006.

2

## The Qualified Intermediary Industry

6.    Section 1031 of the Internal Revenue Code permits owners of investment property to defer the capital gains tax that would otherwise be due and owing upon the sale of the investment property conditioned upon timely application of the sale proceeds to the purchase of an identified replacement investment property.  These transactions are commonly known as "like-kind exchanges," "tax-free exchanges," or "1031 exchanges."

7.    In a typical 1031 exchange, an exchanger ("Exchanger" or "Client") sells his or her business or investment real estate.  The Exchanger then has 45 days from the date of the sale to identify a like-kind replacement property and 180 days from the date of the sale to close on the purchase of the replacement property.  In order to preserve the tax deferral, the Exchanger must deposit the sale proceeds (commonly referred to as "Exchange Funds," "Client Exchange Funds," or "Exchange Proceeds") with a QI until the Exchanger is ready to timely close on the replacement property.

8.    A QI's responsibilities and obligations to the Exchanger regarding the safekeeping and use of Exchange Funds are typically set forth in a contract commonly referred to as an "Exchange Agreement," which is entered into between the Exchanger and the QI.

## 1031 Tax Group's Exchange Agreements

9.    While 1031TG did not use a uniform Exchange Agreement across its six subsidiary QI companies, the Exchange Agreements entered into by 1031TG's QI companies made it clear that Client Exchange Funds deposited with the QI were to be held and used to effectuate 1031

3

exchanges.  The Exchange Agreements included various promises regarding the safekeeping and use of Exchange Funds, which limited the permissible uses of Client Exchange Funds to effectuating client exchanges.

### COUNT ONE
(Conspiracy to Commit Mail Fraud and Money Laundering)

### THE CONSPIRACY

10.    The allegations set forth in paragraphs 1 through 9 of this Criminal Information are realleged and incorporated as though set forth in full herein.

11.    From in or about November 2006 through in or about May 2007, within the Eastern District of Virginia and elsewhere, defendant

### ROBERT D. FIELD II

did unlawfully and knowingly combine, conspire, confederate, and agree with others, both known and unknown, to commit offenses against the United States, namely:

a.    Having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, did knowingly: (a) place and cause to be placed in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (b) deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and interstate commercial carrier; and (c) cause to be delivered by mail and private and interstate commercial carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341; and

b.    Did knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the

5

proceeds of specified unlawful activity, that is mail fraud, knowing that the

transactions were designed in whole or in part to conceal and disguise the nature,

location, source, ownership, and control of the proceeds of specified unlawful

activity, and that while conducting and attempting to conduct such financial

transactions, knew that the property involved in the financial transactions

represented the proceeds of some form of unlawful activity, in violation of Title

18, United States Code, Section 1956(a)(1)(B)(i).

### PURPOSE

12.    A purpose of the conspiracy was to mislead 1031TG Clients regarding the

safekeeping and use of Client Exchange Funds, as well as the ever worsening financial condition

of 1031TG, in order to obtain access to client funds so that the conspirators could: (a) pay for

Okun's lavish lifestyle; (b) pay large salaries and bonuses for the conspirators; (c) purchase

additional QI companies; (d) pay operating expenses for Okun's various companies; and (e)

invest in commercial real estate.

### MANNER AND MEANS

13.    Despite the limitations contained in the Exchange Agreements restricting the QI's

use of Client Exchange Funds and the promises contained in the Exchange Agreements regarding

the safekeeping of those funds, Okun began misappropriating client funds soon after his first

acquisition of a QI company, AEC, in or about August of 2005.

14.    Typically upon acquiring a QI company and in order to effectuate and conceal his

misappropriations, Okun transferred, or caused the transfer of, the Client Exchange Funds held

by the newly acquired QI company to personal and business bank accounts controlled by Okun

6

and a select group of IPofA and/or 1031TG executives. Okun would then transfer, or cause the transfer, of Client Exchange Funds to: (a) his own personal bank accounts; (b) the bank accounts of other companies Okun owned, which were unrelated to the QI companies; and (c) the bank accounts of third-party lenders.

15.    Okun used misappropriated Client Exchange Funds to: (a) fund his lavish lifestyle; (b) pay large salaries and bonuses for the conspirators; (c) pay operating expenses for his various companies; and (d) invest in commercial real estate. Other than his salary, there is no evidence known to the Government that Field received or profited from any portion of the 1031TG Client Exchange Funds.

16.    At various times, Okun's misappropriations resulted in the depletion of Client Exchange Funds at 1031TG companies to the extent they were in danger of being unable to fund the 1031 exchanges of their clients. In order to continue the scheme and conceal the misappropriation of Client Exchange Funds, Okun would use the remaining Client Exchange Funds under his control to finance the purchase of additional QI's. In doing so, Okun was able to access the Client Exchange Funds of the newly acquired QI, use these funds to conceal the amounts he had previously misappropriated, and continue to use Client Exchange Funds for his personal benefit.

17.    On or about August 1, 2006, Okun hired FIELD to be CFO for Okun Holdings. Initially, all information related to 1031TG was withheld from FIELD. In or about October of 2006, however, FIELD was informed by an IPofA executive that Okun was utilizing Client Exchange Funds to pay the operating expenses for his companies. FIELD subsequently informed IPofA's in-house counsel that Okun and IPofA were taking 1031TG's Client Exchange Funds. In

7

addition, FIELD engaged outside counsel to review the actions of 1031TG. Thereafter, IPofA's in-house counsel began an internal investigation into the unauthorized transfers of QI Client Exchange Funds.

<u>Attorneys Warn About Potential Criminal Liability</u>

18.    On or about November 7, 2006, IPofA's in-house counsel issued a memorandum to Okun, FIELD, and other IPofA executives entitled "Affiliate Loans from Qualified Intermediary Companies." In that memorandum, the attorneys documented the following findings from their internal investigation: (a) the fund transfers from the QI's to Okun, IPofA, and other parties began in August of 2005; (b) the outstanding balance of the loans could be as low as $80 million and as high as $135 million; (c) few, if any, of the transactions were documented when consummated and some remained undocumented; (d) there was no current source of funds to repay these transactions; and (e) the transactions and course of dealing were specifically concealed from IPofA in-house counsel (as well as outside counsel) and material misstatements had been made to in-house counsel during recent months concerning these transactions. The memorandum further contained interim conclusions stating that the prior conduct surrounding the loans: (a) violated existing exchange agreements with QI entity customers; (b) violated any fiduciary standard that might apply; (c) "could potentially subject one or more involved parties to criminal prosecution in multiple states and/or at the federal level (under theories ranging from theft, embezzlement, and or conversion to racketeering and laundering statutes);" (d) could potentially violate the terms of one or more existing loans to which IPofA, Okun, and/or affiliates are parties; and (e) the loans could result in material inaccuracies on outstanding financial

8

statements provided to lenders of IPofA or Okun. In the memorandum, IPofA's in-house counsel recommended that "[a]ll outstanding Loans should be repaid immediately."

19.    On or about November 13, 2006, IPofA's in-house counsel became aware that Okun was in negotiations to purchase another QI company named 1031 Advance, Inc. ("1031 Advance"). The attorneys became concerned that this purchase represented part of a continuing effort to acquire new QI entities as a temporary fix to 1031TG's current financial problems and that it suggested an intent to continue the previously outlined improper course of conduct.

20.    On or about November 21, 2006, IPofA's Chief Legal Officer ("CLO") wrote another memorandum, which was sent via electronic mail to Okun, FIELD, and other IPofA executives, as a follow-up to the November 7, 2006 Memorandum, entitled "Affiliate Transfers from QI Entities." In the November 21st Memorandum, the CLO wrote: (a) "[t]he prior course of conduct described in the November 7 memorandum likely constitutes violation of both federal and state criminal law;" (b) IPofA and 1031TG's outside counsel had confirmed the conclusion regarding the violation of both federal and state criminal law; (c) "[t]his prior course of conduct also constitutes a breach of the underlying exchange agreements (with respect to the QI entities) and likely a violation of state statutory and common law under a variety of theories;" (d) "[u]nder the Virginia Rules of Professional Conduct, [the CLO was] obligated to advise the company that continuing this course of conduct will likely result in both civil and criminal liability (in multiple jurisdictions) to the entities and individuals involved with such conduct;" and (e) "[t]his course of conduct should cease and desist immediately and all outstanding funds owed to the QI entities should be repaid immediately." IPofA's CLO resigned on or about November 21, 2006.

9

21.    On or about November 21, 2006, IPofA and 1031TG's outside counsel also resigned from further representation of IPofA and 1031TG. In its resignation letter, the outside law firm stated: (a) the letter confirmed discussions between the law firm and Okun that the law firm ceased to render legal services to IPofA and 1031TG; (b) the resignation decision was based on concerns about both entities' continuing course of conduct and potential conflicts of interest between IPofA and 1031TG; (c) under the Virginia Rules of Professional Conduct, the outside law firm was obligated to advise IPofA and 1031TG that continuing the prior course of conduct with respect to the transfer or investment of funds received by the 1031TG could result in civil and criminal liability to the entities and individuals involved with that conduct; (d) the outside law firm had counseled Okun that the conduct must cease and all outstanding funds owed to the QI entities should be repaid immediately; and (e) while Okun had assured the outside law firm that all the entities involved were taking steps to cease and cure the improper course of conduct, the outside law firm could not continue to represent IPofA and 1031TG due to possibly divergent interests.

## The Ongoing Theft of 1031TG's Client Funds

22.    In or about late November of 2006, due to Okun's prior misappropriations of 1031TG's Client Exchange Funds, the financial condition of the 1031TG companies was deteriorating to the point that it was becoming increasingly difficult to fund the exchanges of 1031TG clients.

23.    On December 19, 2006, Okun purchased 1031 Advance for approximately $2.5 million. At the time of the purchase, 1031 Advance's Exchange Agreement stated: "Exchanger and QI expressly agree that any cash proceeds received from the disposition of the Relinquished

10

Property (Exchange Proceeds) shall be held in the account of QI with a nationally insured bank or savings institution."

24.    In order to fund the acquisition of 1031 Advance, Okun obtained a loan from a third-party lender that was secured, in part, by real estate that he had previously purchased utilizing misappropriated Client Exchange Funds from AEC. Consistent with the conspirators' prior course of conduct, 1031 Advance's Client Exchange Funds were transferred almost immediately upon 1031 Advance's acquisition to bank accounts controlled by Okun. Just one day after the purchase of 1031 Advance, on or about December 20, 2006, Okun and other conspirators misappropriated approximately $5 million of 1031TG's Client Exchange Funds and used those funds in violation of the Exchange Agreements and for purposes wholly unrelated to funding the exchanges of 1031TG's clients.

25.    From in or about December of 2006 through in or about April of 2007, despite the advice provided by IPofA's former in-house counsel and former outside counsel regarding their conclusions that the transfers of 1031TG's Client Exchange Funds were likely criminal, Okun, FIELD, and other conspirators continued the illicit transfer of Client Exchange Funds and misappropriated millions of dollars of additional client funds. Throughout this period, Okun, FIELD, and other conspirators concealed the misappropriation of Client Exchange Funds from various 1031TG senior executives.

26.    In order to conceal the misappropriations and the ever worsening financial condition of 1031TG – and wholly consistent with a typical "Ponzi" scheme – it was part of the conspiracy that Okun, FIELD, and other conspirators misappropriated Client Exchange Funds to make "lulling" payments to earlier unwitting 1031TG clients from deposits belonging to later

11

unwitting 1031TG clients. Each and every one of these lulling payments represented a separate misappropriation of Client Exchange Funds.

27.    In or about late April of 2007, the financial condition of 1031TG had worsened to the point that 1031TG was unable to fund certain client exchanges when due. On or about April 20, 2007, in order to fund one of these client exchanges, Okun obtained a loan – utilizing collateral originally purchased with misappropriated 1031TG Client Exchange Funds – from a third party lender that were deposited into Okun's personal bank account. In order to conceal from the client the fact that the funds were proceeds from a personal loan to Okun rather than from Client Exchange Funds held by 1031TG, Okun, FIELD, and other conspirators agreed that the proceeds would be forwarded from Okun's personal bank account through 1031TG's bank account and then to the client.

28.    Also in or about late April of 2007, in response to inquiries from 1031TG clients regarding delays in funding their exchanges and in order to conceal the prior misappropriations, FIELD and other conspirators lied to 1031TG clients by informing them that their funds were secure and that the delay was a short-term liquidity issue resulting from mistimed investments, when in truth and fact, 1031TG was insolvent as a result of the prior misappropriations by Okun, FIELD, and the other conspirators.

## 1031 Tax Group Declares Bankruptcy

29.    On or about May 13, 2007, 1031TG filed for protection under Chapter 11 of the United States Bankruptcy Code. As of the date of the bankruptcy filing, 1031TG estimated that it was owed approximately $132 million from IPofA as a result of Okun, FIELD, and the other conspirators' illicit transfers of Client Exchange Funds.

12

## OVERT ACTS

30.    In furtherance of the conspiracy and to effect the objects thereof, within the Eastern

District of Virginia and elsewhere, defendant FIELD, conspirator Okun, and others did commit

and cause to be committed the following overt acts, among others:

a.    On or about January 22, 2007, cause a package containing $15,000 in cash to

be delivered, via Federal Express, from IPofA's headquarters in Richmond, Virginia, to Okun on

his yacht, "The Simone," located at The Atlantic Marina, slip #4041 on Paradise Island in the

Bahamas.

b.    On or about April 20, 2007, cause a wire transfer of $5,563,162.28 of loan

proceeds – secured by collateral that was originally purchased with misappropriated Client

Exchange Funds – from IPofA's Wachovia account to 1031TG's Wachovia bank account located

in Richmond, Virginia.

(All in violation of Title 18, United States Code, Section 371.)

13

## Forfeiture Allegation

Pursuant to Federal Rule of Criminal Procedure 32.2, the defendant is advised that upon conviction of the offense charged in Count One of this information, he shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violation charged in Count One.

If property subject to forfeiture meets the requirements of 21 U.S.C. §853(p), the government will seek an order forfeiting substitute assets.

(In accordance with 18 U.S.C. §981(a)(1)(C) and 28 U.S.C. §2461(c) and 31 U.S.C. §5332(b)(2)).

CHUCK ROSENBERG
UNITED STATES ATTORNEY

STEVEN R. TYRRELL
CHIEF, FRAUD SECTION

By: _____
Michael Dry
Assistant United States Attorney
Eastern District of Virginia

By: _____
    for    Brigham Cannon
Trial Attorney, Fraud Section
U.S. Department of Justice

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 3:08cr 321 |
| v. | ) | |
| | ) | Count 1 - 18 U.S.C. § 371 |
| RICHARD B. SIMRING, | ) | Conspiracy to Commit Mail Fraud |
| | ) | & Money Laundering |
| Defendant. | ) | |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Criminal Information:

### The Conspirators

1.    Edward Hugh Okun ("Okun") was the sole owner of Investment Properties of America ("IPofA"), The 1031 Tax Group ("1031TG"), and Okun Holdings, Inc.

2.    RICHARD B. SIMRING ("SIMRING") was an attorney who, beginning in January of 2007, served as the Chief Legal Officer ("CLO") for Okun Holdings, Inc. ("Okun Holdings)", which was incorporated to serve as the parent entity for all Okun owned businesses, though no actual transfers of ownership to Okun Holdings ever occurred.

3.    Other conspirators, not named herein, included senior executives at IPofA, 1031TG, and Okun Holdings.

Case 3:08-cr-00321-REP   Document 1   Filed 07/09/2008   Page 2 of 13

<u>Relevant Entities</u>

4.      IPofA was a Delaware limited liability company with its principal place of business in Richmond, Virginia.  IPofA was in the commercial real estate investment and management business.

5.      1031TG was a Delaware limited liability company with its principal place of business in Richmond, Virginia.  Between August 2005 and December 2006, Okun acquired six Qualified Intermediary ("QI") companies.  These acquisitions ultimately resulted in each of the acquired entities and their affiliated subsidiaries becoming wholly-owned direct or indirect subsidiaries of 1031TG, which was, in turn, wholly owned by Okun. These acquisitions included:

    a.      Atlantic Exchange Company, Inc. ("AEC") in Boston, Massachusetts in or about August 2005;

    b.      Security 1031 Services, LLC ("SOS") in Trumbull, Connecticut in or about November 2005;

    c.      Real Estate Exchange Services, Inc. ("REES") in Safety Harbor, Florida in or about June 2006;

    d.      National Exchange Services QI, Ltd. ("NES") in San Antonio, Texas in or about June 2006;

    e.      Investment Exchange Group, LLC ("IXG") in Denver, Colorado in or about August 2006; and

    f.      1031 Advance, Inc. ("1031 Advance") in San Jose, California in or about December 2006.

2

## The Qualified Intermediary Industry

6.    Section 1031 of the Internal Revenue Code permits owners of investment property to defer the capital gains tax that would otherwise be due and owing upon the sale of the investment property conditioned upon timely application of the sale proceeds to the purchase of an identified replacement investment property. These transactions are commonly known as "like-kind exchanges," "tax-free exchanges," or "1031 exchanges."

7.    In a typical 1031 exchange, an exchanger ("Exchanger" or "Client") sells his or her business or investment real estate. The Exchanger then has 45 days from the date of the sale to identify a like-kind replacement property and 180 days from the date of the sale to close on the purchase of the replacement property. In order to preserve the tax deferral, the Exchanger must deposit the sale proceeds (commonly referred to as "Exchange Funds," "Client Exchange Funds," or "Exchange Proceeds") with a QI until the Exchanger is ready to timely close on the replacement property.

8.    A QI's responsibilities and obligations to the Exchanger regarding the safekeeping and use of Exchange Funds are typically set forth in a contract commonly referred to as an "Exchange Agreement," which is entered into between the Exchanger and the QI.

## 1031 Tax Group's Exchange Agreements

9.    While 1031TG did not use a uniform Exchange Agreement across its six subsidiary QI companies, the Exchange Agreements entered into by 1031TG's QI companies made it clear that Client Exchange Funds deposited with the QI were to be held and used to effectuate 1031 exchanges. The Exchange Agreements included various promises regarding the safekeeping and

3

use of Exchange Funds, which limited the permissible uses of Client Exchange Funds to

effectuating client exchanges.

4

## COUNT ONE
(Conspiracy to Commit Mail Fraud and Money Laundering)

### THE CONSPIRACY

10. The allegations set forth in paragraphs 1 through 9 of this Criminal Information are realleged and incorporated as though set forth in full herein.

11. From in or about March 2007 through in or about May 2007, within the Eastern District of Virginia and elsewhere, defendant

### RICHARD B. SIMRING

did unlawfully and knowingly combine, conspire, confederate, and agree with others, both known and unknown, to commit offenses against the United States, namely:

a. Having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, did knowingly: (a) place and cause to be placed in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (b) deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and interstate commercial carrier; and (c) cause to be delivered by mail and private and interstate commercial carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341; and

b. Did knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the

5

proceeds of specified unlawful activity, that is mail fraud, knowing that the

transactions were designed in whole or in part to conceal and disguise the nature,

location, source, ownership, and control of the proceeds of specified unlawful

activity, and that while conducting and attempting to conduct such financial

transactions, knew that the property involved in the financial transactions

represented the proceeds of some form of unlawful activity, in violation of Title

18, United States Code, Section 1956(a)(1)(B)(i).

### PURPOSE

12.   A purpose of the conspiracy was to mislead 1031TG Clients regarding the

safekeeping and use of Client Exchange Funds, as well as the ever worsening financial condition

of 1031TG, in order to obtain access to client funds so that the conspirators could: (a) pay for

Okun's lavish lifestyle; (b) pay large salaries and bonuses for the conspirators; (c) purchase

additional QI companies; (d) pay operating expenses for Okun's various companies; and (e)

invest in commercial real estate.

### MANNER AND MEANS

13.   Despite the limitations contained in the Exchange Agreements restricting the QI's

use of Client Exchange Funds and the promises contained in the Exchange Agreements regarding

the safekeeping of those funds, Okun began misappropriating client funds soon after his first

acquisition of a QI company, AEC, in or about August 2005.

14.   Typically upon acquiring a QI company and in order to effectuate and conceal his

misappropriations, Okun transferred, or caused the transfer of, the Client Exchange Funds held

by the newly acquired QI company to personal and business bank accounts controlled by Okun

and a select group of IPofA and/or 1031TG executives. Okun would then transfer, or cause the

transfer, of Client Exchange Funds to: (a) his own personal bank accounts; (b) the bank accounts

of other companies Okun owned, which were unrelated to the QI companies; and (c) the bank

accounts of third-party lenders.

15.    Okun used misappropriated Client Exchange Funds to: (a) fund his lavish lifestyle;

(b) pay large salaries and bonuses for the conspirators; (c) pay operating expenses for his various

companies; and (d) invest in commercial real estate.

16.    At various times, Okun's misappropriations resulted in the depletion of Client

Exchange Funds at 1031TG companies to the extent they were in danger of being unable to fund

the 1031 exchanges of their clients. In order to continue the scheme and conceal the

misappropriation of Client Exchange Funds, Okun would use the remaining Client Exchange

Funds under his control to finance the purchase of additional QI's. In doing so, Okun was able to

access the Client Exchange Funds of the newly acquired QI, use these funds to conceal the

amounts he had previously misappropriated, and continue to use Client Exchange Funds for his

personal benefit.

17.    In or about September of 2006, IPofA's in-house counsel became aware that Okun

and IPofA were taking Client Exchange Funds from the QI's. Thereafter, IPofA's in-house

counsel began an internal investigation into the unauthorized transfers of QI Client Exchange

Funds.

<u>Attorneys Warn About Potential Criminal Liability</u>

18.    On or about November 7, 2006, IPofA's in-house counsel issued a memorandum to

Okun and other IPofA executives entitled "Affiliate Loans from Qualified Intermediary

7

Companies." In that memorandum, the attorneys documented the following findings from their internal investigation: (a) the fund transfers from the QI's to Okun, IPofA, and other parties began in August of 2005; (b) the outstanding balance of the loans could be as low as $80 million and as high as $135 million; (c) few, if any, of the transactions were documented when consummated and some remained undocumented; (d) there was no current source of funds to repay these transactions; and (e) the transactions and course of dealing were specifically concealed from IPofA in-house counsel (as well as outside counsel) and material misstatements had been made to in-house counsel during recent months concerning these transactions. The memorandum further contained interim conclusions stating that the prior conduct surrounding the loans: (a) violated existing exchange agreements with QI entity customers; (b) violated any fiduciary standard that might apply; (c) "could potentially subject one or more involved parties to criminal prosecution in multiple states and/or at the federal level (under theories ranging from theft, embezzlement, and or conversion to racketeering and laundering statutes);" (d) could potentially violate the terms of one or more existing loans to which IPofA, Okun, and/or affiliates are parties; and (e) the loans could result in material inaccuracies on outstanding financial statements provided to lenders of IPofA or Okun. In the memorandum, IPofA's in-house counsel recommended that "[a]ll outstanding Loans should be repaid immediately."

19.    On or about November 13, 2006, IPofA's in-house counsel became aware that Okun was in negotiations to purchase another QI company named 1031 Advance, Inc. ("1031 Advance"). The attorneys became concerned that this purchase represented part of a continuing effort to acquire new QI entities as a temporary fix to 1031TG's current financial problems and that it suggested an intent to continue the previously outlined improper course of conduct.

20.    On or about November 21, 2006, IPofA's Chief Legal Officer ("CLO") wrote

another memorandum, which was sent via electronic mail to Okun and other IPofA executives,

as a follow-up to the November 7th Memorandum, entitled "Affiliate Transfers from QI Entities."

In the November 21st Memorandum, the CLO wrote: (a) "[t]he prior course of conduct described

in the November 7 memorandum likely constitutes violation of both federal and state criminal

law;" (b) IPofA and 1031TG's outside counsel had confirmed the conclusion regarding the

violation of both federal and state criminal law; (c) "[t]his prior course of conduct also

constitutes a breach of the underlying exchange agreements (with respect to the QI entities) and

likely a violation of state statutory and common law under a variety of theories;" (d) "[u]nder the

Virginia Rules of Professional Conduct, [the CLO was] obligated to advise the company that

continuing this course of conduct will likely result in both civil and criminal liability (in multiple

jurisdictions) to the entities and individuals involved with such conduct;" and (e) "[t]his course

of conduct should cease and desist immediately and all outstanding funds owed to the QI entities

should be repaid immediately." IPofA's CLO resigned on or about November 21, 2006.

21.    On or about November 21, 2006, IPofA and 1031TG's outside counsel also

resigned from further representation of IPofA and 1031TG. In its resignation letter, the outside

law firm stated: (a) the letter confirmed discussions between the law firm and Okun that the law

firm ceased to render legal services to IPofA and 1031TG; (b) the resignation decision was based

on concerns about both entities' continuing course of conduct and potential conflicts of interest

between IPofA and 1031TG; (c) under the Virginia Rules of Professional Conduct, the outside

law firm was obligated to advise IPofA and 1031TG that continuing the prior course of conduct

with respect to the transfer or investment of funds received by the 1031TG could result in civil

9

and criminal liability to the entities and individuals involved with that conduct; (d) the outside

law firm had counseled Okun that the conduct must cease and all outstanding funds owed to the

QI entities should be repaid immediately; and (e) while Okun had assured the outside law firm

that all the entities involved were taking steps to cease and cure the improper course of conduct,

the outside law firm could not continue to represent IPofA and 1031TG due to possibly divergent

interests.

### Okun Hires SIMRING

22.     In or about November 2006, Okun consulted with SIMRING, who at the time was

a partner at a Miami law firm, about the issues raised by IPofA's CLO and IPofA and 1031TG's

outside counsel regarding the transfers of Client Exchange Funds.  SIMRING subsequently

reviewed specific 1031TG Exchange Agreements, conducted independent legal research, and

spoke to the in-house and outside counsel that had raised the concerns.  SIMRING concluded

that Okun's prior course of conduct of obtaining money under false pretenses risked criminal

liability.

23.     SIMRING informed Okun of his conclusions and advised Okun that the transfers

of Client Exchange Funds must cease until: (1) the exchange agreements were changed to allow

for the transfer of Client Exchange Funds; and (2) there was adequate liquidity at 1031TG to

ensure that there were sufficient funds to cover client exchanges as they became due.  SIMRING

further informed Okun that following this prospective advice would not rectify what Okun had

done in the past, but by ensuring that no clients lost money, Okun would minimize the likelihood

that law enforcement authorities would learn about what Okun had done, which would minimize

the prospect of Okun being criminally prosecuted.  In response, Okun told SIMRING that the

exchange agreements would be changed and that Okun would pay back the majority of the Client

Exchange Funds that he and IPofA had taken from 1031TG.  SIMRING told Okun that failing to

follow his advice would likely result in Okun going to jail.

24.    In or about January 2007, Okun hired SIMRING to be the Chief Legal Officer for

Okun Holdings at an annual salary of $850,000, with a signing bonus of $100,000.

25.    In or about March 2007, SIMRING became aware that: (1) Okun was continuing to

illicitly transfer millions of dollars of Client Exchange Funds from 1031TG to IPofA and Okun's

personal bank account; (2) 1031TG's exchange agreements had not been changed; and, (3)

1031TG was on the verge of insolvency.  When SIMRING confronted Okun about the continued

illicit transfer of Client Exchange Funds, Okun stated that it was only in the short term and that

Okun was in the process of paying 1031TG back to ensure that it had adequate liquidity.  Despite

these assurances, the financial condition of 1031TG continued to deteriorate.

26.    In or about April 2007, the financial condition of 1031TG had worsened to the point

that 1031TG was unable to fund certain client exchanges when due.  In response to inquiries

from 1031TG clients regarding delays in funding their exchanges and in order to conceal the

prior misappropriations, SIMRING and other conspirators lied to 1031TG clients by informing

them that their funds were secure and that the delay was a short-term liquidity issue resulting

from mistimed investments.  But in truth and fact, 1031TG was insolvent as a result of the prior

misappropriations by Okun and the other conspirators.

27.    In order to conceal the misappropriations and the ever worsening financial

condition of 1031TG – and wholly consistent with a typical "Ponzi" scheme – it was part of the

conspiracy that Okun, SIMRING, and other conspirators continue to misappropriate Client

11

Exchange Funds to make "lulling" payments to earlier unwitting 1031TG clients from deposits belonging to later unwitting 1031TG clients. Each and every one of these lulling payments represented a separate misappropriation of Client Exchange Funds.

28.    In or about late April 2007, 1031TG's CEO resigned due to concerns regarding the illicit transfers of Client Exchange Funds. The CEO was one of the authorized signatories for approximately $8 million of 1031TG Client Exchange Funds held in bank accounts in California. Upon 1031TG's CEO's resignation, Okun appointed SIMRING as interim CEO of 1031TG. So the conspirators could continue to make "lulling" payments, and thereby avoid detection by law enforcement authorities, Okun directed SIMRING to transfer the approximately $8 million of Client Exchange Funds to bank accounts controlled by Okun and other conspirators. In response, SIMRING willingly complied with Okun's directive. SIMRING resigned three days after assuming the role of interim CEO of 1031TG.

### 1031 Tax Group Declares Bankruptcy

29.    On or about May 13, 2007, 1031TG filed for protection under Chapter 11 of the United States Bankruptcy Code. As of the date of the bankruptcy filing, 1031TG estimated that it was owed approximately $132 million from IPofA as a result of the illicit transfers of Client Exchange Funds.

### OVERT ACTS

30.    In furtherance of the conspiracy and to affect the objects thereof, within the Eastern District of Virginia and elsewhere, defendant SIMRING, conspirator Okun, and other conspirators did commit and cause to be committed the following overt acts, among others:

12

a. On or about April 26, 2007, cause a package containing two checks of Client Exchange Funds to be delivered, via Federal Express, from Boston, Massachusetts to Richmond, Virginia.

b. On or about April 20, 2007, cause the wire transfer of $6,177,249 from IPofA's Wachovia Bank Account # XXXX2719 to 1031TG's Wachovia Bank Account # XXXX3272.

(All in violation of Title 18, United States Code, Section 371.)

CHUCK ROSENBERG
UNITED STATES ATTORNEY

STEVEN R. TYRRELL
CHIEF, FRAUD SECTION

By: _____
Michael Dry
Assistant United States Attorney
Eastern District of Virginia

By: _____
Brigham Cannon
Trial Attorney, Fraud Section
U.S. Department of Justice

13