# EXHIBIT 4

REAL ESTATE
RISK ASSESSMENT SUMMARY

**Relationship Name:**
Investment Properties of America (IPA – Ed Okun)

**Date:**
9/12/05

**Borrower Name:**
West Oaks Indiana Trust, a single asset entity established to lend to an affiliate entity, IPofA West Oaks Mall, LP, the Fee Owner of the subject West Oaks Mall, Houston, TX collateral property being acquired. The Fee Loan and all first priority title and rights documentation will be collaterally assigned to the Bank. Mr. Edward H. Okun (100% unconditional loan guarantor), President and CEO of Investment Properties of America (IPA), will control 100% of the Borrower and will be providing $26.875MM of equity towards the property acquisition. Mr. Okun will contribute $8.875MM of cash equity and is obtaining an $18MM subordinated mezzanine loan for the remaining equity requirement from Boulder West Oaks, LLC, Roy Mc Dowell III, a President a Tier 1 prospect of Boston REFS Group.

The loan will be secured with a first priority collateral assignment of a $80,625,000 note and assignment of all title and lease rent collection rights pertaining to the 499,880SF West Oaks Mall property, Houston, TX that is being acquired. The loan guarantor (Edward H. Okun 100% & unconditional) is a Tenant-In-Common (TIC) issuer. A TIC closing will occur subsequent to this loan closing in exchange for a payment of $135,000,000. The TIC investors will invest up to $35,000,000 in the TIC and the Borrower will execute and assign a replacement loan in the amount of $100,000,000 to the TIC, which TIC loan note and related priority lien property documents will be collaterally assigned to the bank as replacement collateral upon repayment of the initial fee loan.

**PURPOSE:**
The loan will provide the lesser of: $80,625,000; 75% stabilized LTV; and 75% of the total related costs to acquire and stabilize the West Oaks Mall, Houston, TX (the "Property"). The remaining equity of $26.875MM is being provided from IPofA West Oaks Mall LP, LLC /Okun (via cash of $8.875MM and subordinated mezzanine debt of $18MM obtained from Boulder West Oaks/McDowell).

The West Oaks Mall is a 1,078,829 SF regional mall in Houston, Texas. The Borrower will be acquiring 499,880 SF of the existing mall space ($161/sf) as three of the mall anchors (Dillard's, Foley's and JC Penney) each own their respective pad parcels. The 499,880SF being purchased is 87% occupied with pending leases that will bring the overall leasing to 89%. The Property recently underwent a $10MM renovation that was completed in 2004. IPA, is a Tenant In Common ("TIC") sponsor and intends to purchase the Property, continue to lease-up the vacant space, and then sell the Property to TIC investors within 12-months. As such, the subject loan will be secured with a first priority collateral assignment of a note receivable in the amount of the subject loan that will be secured by assignments of a first priority recorded mortgage on the Property, all assets of the Borrower, all tenant leases, reciprocal easement agreements, and all tangible and intangible property and fixtures pertaining to the ownership and operation of the Property. As IPA establishes the Tenant In Common (TIC) replacement ownership entity, Wachovia will allow for the change in ownership (subject to provisions outlined herein) and acceptance of an approximate $100MM replacement note payable, secured with assignment of the same first priority recorded mortgage collateral noted above. Subsequent to the Borrower raising the intended $35MM in TIC equity and improving the mall operations and resulting NOI, the subject loan will be repaid in full via refinance with an approximate $90-100MM permanent loan (which note payable represents the Banks primary collateral for the loan).

The sources and uses are detailed as follows:

499,880 SF Purchased

| Source | $ | $/SF | % | Use | $ | $/SF | % |
|---|---|---|---|---|---|---|---|
| Initial Loan Amount | $77,625,000 | $155.29 | 72% | Purchase Price | $102,000,000 | $204.05 | 95% |
| Capital Reserve | $3,000,000 | $6.00 | 3% | Closing Costs | $2,500,000 | $5.00 | 2% |
| Total Loan | $80,625,000 | $161.29 | 75% | Capital Reserves | $3,000,000 | $6.00 | 3% |
| Upfront Cash Equity | $26,875,000 | $53.76 | 25% | | | | |
| TOTAL | $107,500,000 | $215.05 | 100% | | $107,500,000 | $215.05 | 100% |

Up to $77,625,000 will be funded at closing to acquire the property (72% of total cost, 76% of the As-Is LTV) with $3,000,000 held back to fund tenant improvements, tenant moving expenses, and leasing commissions to stabilize the Property. The aggregate loan of $80,625,000 will represent 72% of the stabilized LTV. The loan term will be 12-months, with no extension option. The facility will earn interest at 30, 60, or 90 day Libor+200bps, or Prime + 50 bps. The Borrower will pay an upfront fee of 0.75% ($604,687.50). Based upon this pricing, the facility's RAROC is 66.16%. The loan is subject to a maximum LTV of 75% based upon a REVS approved appraisal. The loan will be 100% unconditionally guaranteed by Edward H. Okun (inclusive of all principal, interest, operating carry, leasing commissions, and tenant improvements). Mr. Okun will also provide a full and unconditional environmental indemnification. Guarantor covenants will require Mr. Okun to maintain minimum net worth of $30MM and minimum liquidity of $7MM.

The going-in NOI of $7.2MM based on leasing in place for the period ending 12/31/05, satisfies Market Debt Service 1.22x with Sensitized Debt Service of 1.11x (Actual DS at Libor + 200bps = 1.24x). The Bank adjusted year 2 stabilized NOI (12/31/06 – first full year of operation under new IPA ownership with a projected loan balance of $79,125M outstanding) is sufficient to cover Market Debt Service (10-yr UST + 150bps, 5.87% all-in, 25-yr amort.) 1.33X and Sensitized Debt Service 1.21X (market plus 100bps = 6.87% all-in, 25-yr amort.). The fully advanced $80,625M loan would be supported with tenants in occupancy generating projected NOI of $8.5MM (12/31/07 – one-year beyond the proposed loan term). This stabilized NOI is adequate to cover market DS 1.39x with Sensitized DS of 1.26x.

Principal payments will be made based from a quarterly cash flow sweep of net cash flow payments the Borrower will be required to have deposited into a Wachovia controlled lock box account. The Borrower will be required provide supporting back-up calculations of all monthly net cash flow deposits (Net Cash Flow defined as all revenues received by the Borrower minus operating expenses, including reasonable management fees not to exceed 4% of gross revenue, and interest expense associated with the Facility).

Additional principal payments may be made as proceeds are raised from IPA marketing the Property to TIC investors (the "Offering"). Specifically, provided there are no events of default, the proceeds raised from the Offering will be distributed:

First, to the payment of all fees and expenses associated with the Offering;

Second, to the repayment of the Mezzanine Debt Provider (Boulder Capital/McDowell) inclusive of all accrued interest and fees;

Third, to the Common Equity holder of the Limited Partner (IPA) for distribution to the owner of the Common Equity holder of the Limited Partner, in an amount not exceeding $24,000,000. This

WACH-MCHALE    000008010

distribution shall by no means be retained by the owner of the Common Equity holder of the Limited Partner and shall solely be used for the purpose of funding West Oaks Indiana Trust to accommodate the increased loan amount from West Oaks Indiana Trust to the TIC (representing a paper transaction with a replacement note receivable to Edward Okun once the TIC closes).

Fourth, on a 50%/50% pro-rata basis, to the repayment of principal outstanding under the Facility (50%) and to the Common Equity holder of the Limited Partner (50%). However, in no event shall the aggregate distribution to the Common Equity holder of the Limited Partner (IPA) exceed $4,500,000 (i.e., any proceeds after the point the Common Equity holder of the Limited Partner has received $4,500,000 shall go 100% to the repayment of the subject loan).

The RAS recommends a full underwrite for the $80,625,000 loan. Wachovia's Capital markets will however seek to syndicate approximately $35,000,000 to $50,625,000 of the loan within 45-days of closing (preserving syndication accounting) and reducing Wachovia's hold to approximately $30,000,000 to $45,625,000, and eliminating the $32,025M House Lending Limit Exception that will initially be created upon closing the full $80,625,000 loan at the 5.8 FDG level.

SPONSORSHIP:
The loan sponsor is Mr. Edward H. Okun, President of Investment Properties of America (IPA) and secondarily by Mr. Roy S. McDowell, Jr., President of The McDowell Companies and Boulder Capital, LLC. Mr. Okun is an existing Wachovia Wealth Management customer whose primary relationship is managed by Steve Cooney. This opportunity was initially presented to the Boston REFS group by Mr. Roy McDowell of Boulder Capital, a Tier 1 prospect and Mezzanine Lender to the acquisition.

Investment Properties of America
IPA was formed in November 2003 as a Virginia limited liability company wholly owned by Edward H. Okun. Mr. Okun has 30 years of experience in real estate development, finance, management, leasing and sales. Mr. Okun has been involved in real estate projects having an aggregate value in excess of $500,000,000. A partial listing of IPA's more recent projects is presented below:

Richmond Square Mall
Acquired in early 2004, this 385,000 SF regional mall located in Richmond, VA is anchored by JC Penney, Sears, and Dillards. The Property is currently 99% leased with 95% of the tenants being national chains and household names. Subsequent to the acquisition, IPA filled vacancies within the mall with Hot Topics, Christopher & Banks, and Hibbitts Sporting Goods. The mall was sold to TIC investors in 2004.

Crooked Creek Retail Centre
Acquired in 1994, this 51,000 SF retail strip center is located in northwest Columbus, Ohio. The property has been recently renovated and seasoned into a stable neighborhood shopping center and is currently 95% occupied. The center is anchored by one of the top performing Tuesday Morning stores, a national retail chain of over 600 stores specializing in selling deeply discounted, upscale home accessories and gifts. The center was sold to TIC investors in 2004.

5201 West 86th Street
Acquired in 2001, this 459,000 SF office/industrial complex is located in Park 100 Industrial Park in Columbus, OH. The property was leased to Point to Point Express, a provider of transportation and logistical services to HP and other national companies. The property is in the process of being syndicated to TIC investors and is expected to be completed within the next three weeks.

WACH-MCHALE    000008011

Other key employees at IPA include:

<u>Lara Coleman, Vice President of Operations</u>
Mrs. Coleman joined IPA in October of 2004 and serves as a member of the Board of Managers of IPA. As VP of Operations, Mrs. Coleman is directly responsible for human resource management for the company and its affiliates, managing the syndication process for each property, coordinating corporate and regulatory compliance of the firm, and directing activities of outside counsel and managing investor relations. Immediately prior to joining IPA, Mrs. Coleman was a Senior Paralegal for Genworth Financial. From 1998-2004, she was a Senior Paralegal in the Real Estate Securities Practice group at Hirshler Fleischer, where she participated in TIC syndications and several public REIT offerings.

<u>Robert O'Grady, Vice President of Acquisitions</u>
Mr. O'Grady also joined IPA in 2004. Mr. O'Grady primarily oversees the management of IPA's retail properties. He brings over 15-years of direct retail property management to IPA. Prior to joining IPA, Mr. O'Grady served as the General Manager of the Scottsdale Mall inn South Bend, OH.

The subject facility represents Mr. Okun's second loan with Wachovia. Mr. Okun has a $1.4MM 1st ships preferred first mortgage loan with Wachovia Wealth Management. The subject facility will increase Mr. Okun's exposure to $82.025MM. The subject loan will also create a House Lending Limit Exception at the 5.5 FDG grade level. Wachovia Capital markets is expected to syndicate approximately one-half of the loan which would reduce the HLE exposure to $41.7MM within 45-days of closing.

The secondary loan sponsor is Roy S. McDowell, Jr., President of McDowell Companies and Boulder Capital. Roy McDowell is a tier I prospect of the Boston REFS Group, which has bid on other McDowell sponsored projects which for various reasons did not develop into loan opportunities.

<u>The MacDowell Company/Boulder Capital</u>
The company was founded approximately 30-years ago by Roy S. MacDowell, Jr. as primarily a landscape design and construction firm. The company enjoyed considerable success and became known as a preeminent landscaping firm. Leveraging on this success, Mr. MacDowell formed The Boulder Company, a real estate development firm, to focus on value added real estate investments. MacDowell's most notable real estate investments include the following:

**Cronin's Landing:** A 281-unit luxury apartment project constructed in 1998 located in Waltham, MA. MacDowell subsequently sold Cronin's Landing to Charles E. Smith.

**Sterling Medical Center:** A 400,000+ SF medical center located in Waltham, MA. MacDowell purchased the hospital from Waltham Hospital in May 2002 for $8.5MM and completed a $10MM+ capital improvement campaign which included a complete rehab of the hospital interior and the construction of a 600-space parking garage. MacDowell recently sold the hospital to Children's Hospital for $53MM, netting approximately $33MM in net proceeds.

**Longview Place:** A 348-unit luxury apartment project located on 19-acres of land adjacent to the Sterling Medical Center. The land was included in MacDowell's purchase of the Waltham Hospital; he successfully rezoned the parcel for apartments and started construction in 2002-03. MacDowell has

WACH-MCHALE  000008012

entered into an agreement with Archstone Smith to purchase Longview Place upon construction at a reported cap rate of 5.75% on proforma NOI, an estimated $100MM sale.

In addition to The Boulder Company, MacDowell is also President and founder of Boulder Capital, a venture capital company that provides equity and mezzanine financing for under capitalized real estate developers.

<u>PROPERTY ANALYSIS:</u>

<u>Property Description:</u>
The subject property is the West Oaks Mall, a single story regional mall having an aggregate 1,078,829 SF of GLA on 96.23 acres. The mall also includes seven outparcels. The mall is located in Houston, TX (Harris County) at the intersection of Westheimer (FM 1093) and State Highway 6. The mall has excellent visibility with approximately 3,200 linear foot frontage along Westheimer Road; 1,400 linear foot frontage along Highway 6; and 3,100 foot frontage along Richmond Avenue. The mall was constructed in 1984 and underwent a $10MM renovation that was completed in 2004. The renovation included new floors, ceiling, exterior signage, food court area, construction of a soft-play area and some exterior renovation to the building and parking areas.

The entire mall is comprised of 1,078,829 SF; however, the Borrower is purchasing only 499,880 SF (encompassing 57.84 acres) plus seven outparcels (encompassing 11.51 acres), as three of the existing anchor stores (Dillard's, Foley's and JC Penney - encompassing 38.39 acres) each own their respective parcels and are therefore not included in the transaction. Two additional anchor stores (Sears and Steve & Barry's University Sportswear – formerly Mervyn's) are included in the acquisition. The department stores are ideally positioned for this trade area, as Dillard's is one of the most popular department stores in Texas, and Sears, and Foley's have a loyal following in the marketplace. Mervyn's was closed (as part of their broader Texas strategy), and the current owners acquired the Mervyn's site/box and leased the space to Steve & Barry's University Sportswear under a new 7Year lease commencing within 120 days of delivery of the space (anticipated start 11/05). The projected opening of Steve & Barry's University Sportswear will greatly enhance a currently underutilized space and further consolidate and strengthen the competitive position of West Oaks Mall.

WACH-MCHALE   000008013

**Transaction Components**

| Mall Components | Transaction Component | Area (SF) | Site Acres | % of Total Mall SF | % of Transaction SF |
|---|---|---|---|---|---|
| Anchor - Foley's | No | 250,000 | 18.35 | 23.15% | 0.00% |
| Anchor - Dillard's | No | 230,000 | 14.02 | 21.30% | 0.00% |
| Anchor - JC Penney | No | 100,000 | 6.02 | 9.26% | 0.00% |
| **Anchor - Sears** | **YES** | **102,036** | **6.04** | **9.45%** | **20.41%** |
| **Anchor - Steve & Barry's** | **YES** | **75,000** | **7.11** | **6.95%** | **15.00%** |
| *Sub-Total Anchors* | | *757,036* | *51.54* | *70.10%* | *35.41%* |
| **Mall Shop GLA** | **YES** | **322,863** | **33.18** | **29.90%** | **64.59%** |
| **Outparcel 1** | **YES** | **0** | **2.83** | **n/a** | **n/a** |
| **Outparcel 2** | **YES** | **0** | **2.28** | **n/a** | **n/a** |
| **Outparcel 3** | **YES** | **0** | **3.03** | **n/a** | **n/a** |
| **Outparcel 4** | **YES** | **0** | **0.74** | **n/a** | **n/a** |
| **Outparcel 5 & 6** | **YES** | **0** | **2.19** | **n/a** | **n/a** |
| **Outparcel 7** | **YES** | **0** | **0.45** | **n/a** | **n/a** |
| *Sub-Total Outparcels* | | *0* | *11.52* | *n/a* | *n/a* |
| Total Mall | | 1,079,899 | 96.24 | 100.00% | |
| **TOTAL TRANSACTION** | | **499,899** | **57.85** | | **100.00%** |

Site Plan:



WACH-MCHALE   000008014

Ingress/egress to the Property is adequately provided with one main entrance/exit along Highway 6 at the front of the property; two entrances along Westheimer road; two additional entrances along Richmond Avenue, and a third being completed at Outparcel 2 (New Applebee's Restaurant). The outparcel entrance will also provide adequate access to two additional buildings (6,000 SF and 7,500 SF) to be constructed on two additional pads currently being built. Parking at the mall is adequate with 5,499 spaces (5.1 spaces / 1,000 SF of rentable GLA) plus 113 handicap parking spaces).

WACH-MCHALE    000008015

A complete rent roll for West Oaks Mall is presented as follows:

**WEST OAKS MALL - Rent Roll**

| | TENANT | Lease Start | First Expiration | SF | $/SF | Annual Rent |
|---|---|---|---|---|---|---|
| | **Current Leasing** | | | | | |
| 1 | AGACI TOO | 4/01 | 4/11 | 4,380 | 18.00 | $78,840 |
| | ALAMO DRAFTHOUSE | 4/03 | 3/12 | 25,771 | 5.82 | $150,000 |
| 2 | AMERICAN EAGLE | 8/99 | 9/09 | 4,801 | 0.00 | $0 |
| | APPLEBEE'S - PAD | 9/05 | 8/25 | 0 | 0.00 | $75,000 |
| | ARBY'S | 5/92 | 4/09 | 741 | 53.98 | $40,000 |
| | ASHLEY AVERY | 11/93 | 9/05 | 584 | 21.70 | $12,673 |
| | BATH & BODY WORKS | 11/96 | 1/07 | 3,016 | 25.00 | $75,400 |
| | BETTER VISION CENTER | 5/05 | 3/10 | 2,461 | 29.50 | $72,600 |
| | BODY SHOP | 11/98 | 12/08 | 3,633 | 27.53 | $100,000 |
| | BOMBAY COMPANY | 5/94 | 1/06 | 4,376 | 24.00 | $105,024 |
| | CASUAL CORNER | 7/98 | 7/08 | 4,922 | 23.00 | $113,206 |
| | CHAMPS | 3/94 | 2/06 | 4,711 | 22.00 | $103,642 |
| | CHARLOTTE RUSSE | 11/04 | 1/15 | 7,001 | 14.00 | $98,014 |
| | CINGULAR WIRELESS | 5/04 | 4/07 | 150 | 293.33 | $44,000 |
| | CLAIRE'S BOUTIQUE | 6/92 | 5/12 | 930 | 50.00 | $46,500 |
| | DAIRY QUEEN/Orange Julius | 6/05 | 6/15 | 703 | 35.00 | $24,605 |
| | DISNEY STORE | 5/94 | 1/06 | 4,908 | 28.00 | $137,424 |
| | ELECTRONIC'S BOUTIQUE | 10/88 | 8/08 | 841 | 54.70 | $46,003 |
| | EXPRESS | 11/91 | 1/15 | 7,421 | 21.50 | $159,552 |
| | EYE MASTERS | 12/89 | 10/09 | 4,392 | 24.00 | $105,408 |
| | FINESSE SKINCARE | 7/05 | 6/10 | 1,393 | 15.00 | $20,895 |
| | FINISH LINE | 10/01 | 2/12 | 4,108 | 21.00 | $86,268 |
| | FOOTACTION USA | 12/94 | 1/15 | 9,700 | 16.00 | $155,200 |
| | FOOTLOCKER | 11/96 | 12/06 | 1,743 | 36.00 | $62,748 |
| | FOREVER 21 | 8/96 | 7/06 | 4,197 | 23.00 | $96,531 |
| | FRANKLIN COVEY | 2/05 | 1/06 | 2,152 | 35.00 | $75,320 |
| | GAP | 2/93 | 3/06 | 8,616 | 15.00 | $129,240 |
| | GAP KIDS | 8/94 | 3/06 | 4,034 | 27.00 | $108,918 |
| 3 | GNC (percentage rent) | 3/94 | 2/06 | 1,698 | 0.00 | $0 |
| | GINGISS FORMALWEAR | 9/98 | 9/05 | 1,577 | 19.02 | $30,000 |
| | GORDON'S JEWELERS | 6/04 | 5/14 | 1,904 | 60.69 | $115,560 |
| | GREAT AMERICAN COOKIES | 7/97 | 8/07 | 547 | 58.50 | $32,000 |
| 4 | HALLMARK | 5/04 | 3/09 | 3,424 | 0.00 | $0 |
| | HEAKIN RESEARCH | 6/98 | 6/08 | 1,826 | 15.00 | $27,390 |
| | HELLO JOSEPHINE | 6/98 | 6/08 | 707 | 63.65 | $45,000 |
| | HELZBERG DIAMONDS | 9/92 | 1/07 | 1,642 | 65.00 | $106,730 |
| | HOLLISTER | 12/04 | 1/16 | 7,001 | 22.00 | $154,022 |
| | HOT TOPIC | 8/04 | 1/15 | 1,311 | 28.00 | $36,708 |
| 5 | HOUSE OF TOBACCO | 10/99 | 12/05 | 465 | 86.75 | $40,343 |
| | ICING | 11/97 | 1/08 | 1,170 | 35.90 | $42,000 |
| | IMAGE NAILS | 12/04 | 11/14 | 1,789 | 28.00 | $50,092 |
| | IMAGE SHOTS | 11/99 | 1/10 | 2,057 | 17.75 | $36,512 |
| | JEWELRY CENTER | 9/04 | 8/07 | 160 | 262.50 | $42,000 |
| | JOURNEY'S | 5/00 | 4/10 | 1,840 | 45.00 | $82,800 |
| | KAY JEWELERS | 10/04 | 1/15 | 1,723 | 57.52 | $99,110 |
| | KIRKLAND'S OF WEST OAKS | 9/02 | 1/06 | 4,200 | 0.00 | $0 |
| | LA CHOCOLATIER | 1/03 | 1/13 | 714 | 44.00 | $31,416 |
| | LANE BRYANT | 12/94 | 1/06 | 6,400 | 0.00 | $0 |
| | LENSCRAFTERS | 8/97 | 8/07 | 4,313 | 18.50 | $79,791 |
| | LERNER NEW YORK | 2/04 | 1/09 | 6,049 | 20.00 | $120,980 |
| | LIDS | 7/05 | 7/15 | 531 | 45.00 | $23,895 |
| | LIMITED | 10/92 | 1/08 | 8,148 | 20.00 | $162,960 |
| | LIMITED TOO | 2/95 | 2/07 | 3,800 | 22.00 | $83,600 |
| | LINENS N THINGS | 8/03 | 1/14 | 26,185 | 13.00 | $340,405 |
| | MANDARIN EXPRESS | 2/98 | 12/15 | 687 | 58.22 | $40,000 |
| | MC DONALD'S | 11/00 | 11/10 | 1,203 | 24.94 | $30,000 |
| | MOTHERHOOD MATERNITY | 3/65 | 2/06 | 835 | 41.92 | $35,003 |
| | PACIFIC SUNWEAR | 10/98 | 12/08 | 2,771 | 27.00 | $74,817 |
| | PERFUME OUTLET | 1/03 | 12/07 | 531 | 67.80 | $36,000 |
| | PICTURE PEOPLE | 8/01 | 1/12 | 2,073 | 28.00 | $58,044 |
| | POPCORN KINGDOM | 3/05 | 2/10 | 440 | 38.50 | $16,940 |
| | RAVE | 8/99 | 9/09 | 2,536 | 33.00 | $83,688 |
| | REGIS SALON | 5/02 | 6/12 | 1,019 | 38.00 | $38,722 |
| | ROCKPORT | 3/98 | 3/08 | 1,561 | 30.00 | $46,830 |
| | SEARS | 7/96 | 8/10 | 102,036 | 2.89 | $294,600 |
| | SPENCER GIFTS | 7/95 | 1/06 | 1,820 | 21.00 | $38,220 |
| | STEVE & BARRYS | 11/05 | 1/13 | 75,000 | 8.00 | $600,000 |
| | STRUCTURE | 9/91 | 1/07 | 4,277 | 18.25 | $78,055 |
| | Suite 441 FC - Kelly's Cajun Grill | 9/05 | 1/16 | 621 | 56.36 | $35,000 |
| | Suite K-02 - Sprint - | 6/05 | 6/08 | 100 | 700.00 | $70,000 |

WACH–MCHALE    000008016

| Tenant | | | | | |
|---|---|---|---|---|---|
| SUNGLASS HUT | 4/90 | 2/07 | 314 | 127.39 | $40,000 |
| T MOBILE | 7/98 | 7/08 | 624 | 73.72 | $46,000 |
| THINGS REMEMBERED | 7/99 | 6/09 | 1,671 | 34.00 | $56,814 |
| TRADE SECRET | 11/96 | 10/06 | 1,322 | 27.99 | $37,000 |
| UNDERGROUND STATION | 8/05 | 8/15 | 1,584 | 31.57 | $50,000 |
| VERIZON | 7/04 | 6/07 | 150 | 333.33 | $50,000 |
| VICTORIA'S SECRET | 11/92 | 1/07 | 6,294 | 21.00 | $132,174 |
| VILLA PIZZA | 5/97 | 7/09 | 786 | 82.70 | $65,000 |
| VISIBLE CHANGES | 3/98 | 6/09 | 4,865 | 23.74 | $115,495 |
| WETZELS PRETZELS | 12/04 | 12/14 | 313 | 55.00 | $17,215 |
| WHITEHALL JEWELERS | 6/98 | 12/08 | 885 | 84.75 | $75,000 |
| WINDSOR JEWELERS | 11/99 | 12/14 | 735 | 61.22 | $45,000 |
| WIRELESS WORLD | 1/04 | 12/06 | 150 | 266.67 | $40,000 |
| ZALES JEWELERS | 9/95 | 8/15 | 1,814 | 63.00 | $114,282 |
| 5-7-9 | 3/85 | 1/13 | 1,896 | 30.00 | $56,880 |
| **Subtotal** | | | 433,779 | 15.27 | $6,623,103 |
| **Pending Leasing** | | | | | |
| 6   AEROPOSTALE | 12/05 | 11/15 | 3,652 | 18.00 | $65,736 |
| 7   Suite 425 - Johnny Roc | 1/05 | 12/15 | 3,915 | 20.00 | $78,300 |
| 8   Suite 437 FC - Subway | 12/05 | 11/15 | 1,808 | 20.61 | $37,260 |
| **Subtotal** | | | 9,375 | 19.34 | $181,296 |
| **TOTALS** | | | 443,154 | 15.35 | 6,804,399 |
| **VACANT** | | | 56,726 | 20.00 | $1,134,520 |
| **VACANT OUTPARCELS** | | | | | |
| 9   SPEC OP2B | | | | $ | 125,000 |
| SPEC OP2C | | | | $ | 100,000 |
| **TOTAL POTENTIAL REVENUE** | | | 499,880 | | $8,163,919 |

1)   Agaci Too in Suite 204 executed a new lease and expansion for 4,914 SF @ $18 per square foot, plus CAM & Real Estate Tax charges. The anticipated commencement date is November 1, 2005 expiring 7/31/15, with a rental bump occurring August 1, 2010.

2)   American Eagle rent commences 4/1/06 @$28.00/SF = $134,428/YR.

3)   GNC percentage rent payments

4)   Hallmark rent commences 3/1/06 @$16.00/SF = $54,784/YR.

5)   House of Tobacco executed an early termination, effective 12/31/05, as modeled in the analysis.       T-Mobile is very close to executing its lease amendment to expand into that space and extend its lease through February 28, 2011, as modeled in the analysis.

6)   Aeropostale has completed final site visits and a deal is being negotiated for space 321 (3,652 SF) with a base rent ranging from $18-$20 PSF, plus ancillary charges.

7)   Johnny Rockets is very interested in space 425 (3,915 SF), located just outside the food court near the Alamo theater. They have completed their initial site visits and are currently negotiating terms with the leasing department.

8)   Subway has also approved a deal for space 437 in the food court that is expected to be fully executed by end of August 2005.

9)   Out Parcel #2 is currently under construction. Three pad sites are being developed, one of which is for a new Applebee's restaurant. There are two additional pads being developed to facilitate a 6,000 SF building and a 7,500 SF building. With the infrastructure in place and a new mall entrance also under construction along side the pads, the other two pads are expected to move quickly.

The following table highlights the key tenants at the West Oaks Mall. The mall space being acquired is 89% leased to a total of 88 tenants, many of which comprise a regional and national tenant base:

| Tenant Description | RSF |
|---|---|
| Sears    (Moody Ba1, S&P BB+/Negative as of 3/28/05) | 102,036 |
| Steve & Barry's (executed – not rated) | 75,000 |
| Linens'N Things (not rated) | 26,185 |
| Alamo Drafthouse Cinema (not rated) | 25,771 |
| TOTAL ANCHORS | 228,992 |
| In Line mall (Includes Food Court & Kiosks) | 270,907 |

WACH-MCHALE   000008017

| | |
|---|---|
| TOTAL OWNED | 499,899 |
| Dillards (Moody's Senior Implied B1 / stable - non-owned anchor) | 230,000 |
| Foleys (May subsidiary Moody Baa1 - non-owned anchor) | 250,000 |
| JC Penney (Moody Ba1 / stable - non-owned anchor) | 100,000 |
| **TOTAL** | **1,078,829** |

Sale Statistics:

The mall continues to enjoy significant increases in tenant sales performance. The $10MM renovation completed in 2004 has bolstered both leasing activity and shopper traffic. What follows are a few highlights from the May 2005 sales report:

- Total mall sales for the month increased 6.0%. Several key retailers achieved sales increases including Body Shop (36.1%), Limited (7.7%), Victoria Secret (54.8% - trending toward $3 million in annual sales), Sunglass Hut (7.9%), Agaci Too (51.5%), Lerner New York (4.6%), Journey's (28.6%), Limited Too (16.2%) and American Eagle (33.2%).

- Food Court comparable sales increased 26%.

- Total in-line sales increased 5.6% in May trending to $281 PSF. Cumulative comparable in-line sales for April and May 2005 increased 11.0% over the same period from prior year.

In additional to leasing the vacant space to a stabilized level, the Borrower had identified other leasing and development opportunities to improve the NOI of the Property. These include the following:

- New retail merchandising units (RMU's) have been purchased for the Property to complement the recent renovation project. At present, only a small number of these RMU's (or kiosks) have been leased, at rents ranging from $30,000 to $76,000. Several additional units could easily be accommodated and the NOI could realistically be impacted by an additional $750,000 or more.

- Additionally, JC Penney intends on moving its store to a new free-standing facility in November of 2005. The sponsor is negotiating the purchase of the JC Penney box and parking area for approximately $4MM in a deal expected to close Q1:06 (funded via a separate transaction). The opportunity to recapture the JC Penney pad affords the Borrower several options. To simply split the 100,000 SF box and re-lease the space to two or three mini-box users could generate as much as $1MM in base rent plus CAM and Real Estate Tax reimbursement income. With the inclusion of a parking structure or conversion of some of the undeveloped out parcels into parking areas, the developer could also conceivably create a new mall wing adding an estimated 200,000 SF of in-line retail space and a new 100,000 SF anchor pad.

WACH-MCHALE    000008018

Tenant Turnover:

The following table presents the turnover at West Oaks mall:

| WEST OAKS TENANT ROLLOVER TENANT | Lease Start | First Expiration | SF | $/SF | Annual Rent |
|---|---|---|---|---|---|
| **Expiring 2005** | | | | | |
| ASHLEY AVERY | 11/93 | 9/05 | 584 | 21.70 | $12,673 |
| GINGISS FORMALWEAR | 9/98 | 9/05 | 1,577 | 19.02 | $30,000 |
| HOUSE OF TOBACCO | 10/99 | 12/05 | 465 | 86.76 | $40,343 |
| sub-total | 3 | 1% | 2,626 | 1% | $83,016 |
| cumulative | 3 | | 2,626 | | $83,016 |
| | | | | | |
| **Expiring 2006** | | | | | |
| BOMBAY COMPANY | 5/94 | 1/06 | 4,376 | 24.00 | $105,024 |
| CHAMPS | 3/94 | 2/06 | 4,711 | 22.00 | $103,642 |
| DISNEY STORE | 5/94 | 1/06 | 4,908 | 28.00 | $137,424 |
| FOOTLOCKER | 11/96 | 12/06 | 1,743 | 36.00 | $62,748 |
| FOREVER 21 | 8/96 | 7/06 | 4,197 | 23.00 | $96,531 |
| FRANKLIN COVEY | 2/05 | 1/06 | 2,152 | 35.00 | $75,320 |
| GAP | 2/93 | 3/06 | 8,616 | 15.00 | $129,240 |
| GAP KIDS | 8/94 | 3/06 | 4,034 | 27.00 | $108,918 |
| GNC (percentage rent) | 3/94 | 2/06 | 1,698 | 0.00 | $0 |
| KIRKLAND'S OF WEST OAKS | 9/92 | 1/06 | 4,200 | 0.00 | $0 |
| LANE BRYANT | 12/94 | 1/06 | 6,400 | 0.00 | $0 |
| MOTHERHOOD MATERNITY | 3/85 | 2/06 | 835 | 41.92 | $35,003 |
| SPENCER GIFTS | 7/95 | 1/06 | 1,820 | 21.00 | $38,220 |
| TRADE SECRET | 11/96 | 10/06 | 1,322 | 27.99 | $37,000 |
| WIRELESS WORLD | 1/04 | 12/06 | 150 | 266.67 | $40,000 |
| sub-total | 15 | 10% | 51,162 | 12% | $969,070 |
| cumulative | 18 | 11% | 53,788 | 13% | $1,052,086 |
| | | | | | |
| **Expiring 2007** | | | | | |
| BATH & BODY WORKS | 11/96 | 1/07 | 3,016 | 25.00 | $75,400 |
| CINGULAR WIRELESS | 5/04 | 4/07 | 150 | 293.33 | $44,000 |
| GREAT AMERICAN COOKIES | 7/97 | 8/07 | 547 | 58.50 | $32,000 |
| HELZBERG DIAMONDS | 9/92 | 1/07 | 1,642 | 65.00 | $106,730 |
| JEWELRY CENTER | 9/04 | 8/07 | 160 | 262.50 | $42,000 |
| LENSCRAFTERS | 8/97 | 8/07 | 4,313 | 18.50 | $79,791 |
| LIMITED TOO | 2/95 | 2/07 | 3,800 | 22.00 | $83,600 |
| PERFUME OUTLET | 1/03 | 12/07 | 531 | 67.80 | $36,000 |
| STRUCTURE | 9/91 | 1/07 | 4,277 | 18.25 | $78,055 |
| SUNGLASS HUT | 4/90 | 2/07 | 314 | 127.39 | $40,000 |
| VERIZON | 7/04 | 6/07 | 150 | 333.33 | $50,000 |
| VICTORIA'S SECRET | 11/92 | 1/07 | 6,294 | 21.00 | $132,174 |
| sub-total | 12 | 5% | 25,194 | 10% | $799,750 |
| cumulative | 30 | 16% | 78,982 | 23% | $1,851,836 |
| | | | | | |
| **Expiring 2008** | | | | | |
| BODY SHOP | 11/98 | 12/08 | 3,633 | 27.53 | $100,000 |
| CASUAL CORNER | 7/98 | 7/08 | 4,922 | 23.00 | $113,206 |
| ELECTRONICS BOUTIQUE | 10/88 | 8/08 | 841 | 54.70 | $46,003 |
| HEAKIN RESEARCH | 6/98 | 6/08 | 1,826 | 15.00 | $27,390 |
| HELLO JOSEPHINE | 8/98 | 6/08 | 707 | 63.65 | $45,000 |
| ICING | 11/97 | 1/08 | 1,170 | 35.90 | $42,000 |
| LIMITED | 10/92 | 1/08 | 8,148 | 20.00 | $162,960 |
| PACIFIC SUNWEAR | 10/98 | 12/08 | 2,771 | 27.00 | $74,817 |
| ROCKPORT | 3/98 | 3/08 | 1,561 | 30.00 | $46,830 |
| Suite K-02 - Sprint | 6/05 | 6/08 | 100 | 700.00 | $70,000 |
| T MOBILE | 7/98 | 7/08 | 624 | 73.72 | $46,000 |
| WHITEHALL JEWELERS | 6/98 | 12/08 | 885 | 84.75 | $75,000 |
| sub-total | 12 | 5% | 27,188 | 10% | $849,206 |
| cumulative | 42 | 21% | 106,170 | 33% | $2,701,041 |
| | | | | | |
| **Thereafter** | | | | | |
| 46 Tenants | 46 | 67% | 336,984 | 49% | $4,024,518 |

WACH–MCHALE   000008019

The Mall does have a 33% tenant turnover on a $/SF basis scheduled over the next three years (21% by number of tenants. This is understandable given the fact that the mall tenants in place are primarily older tenants that are now beginning to realize the sales volume increases resulting from the 2004 mall renovation. Both store sales and occupancy are increasing and the mall is expected to retain the majority of the current tenant base as the mall realizes continued benefits from the 2004 renovation, the draw attracted from the new Steve & Barry's anchor as well as from positive leasing and management brought by the new IPA ownership.

Anchors / Majors:

The line-up of anchor / major retailers at West Oaks Mall include Foley's, Dillard's, JC Penney, Sears, Steve & Barry's (opening January 2006), Linen's & Things and the Alamo Draft House Cinema. This list of anchor tenants mirrors those of the neighboring shopping centers, however, the inclusion of Steve & Barry's is expected to bring a unique flavor to the western suburbs of Houston.

The known sales volumes of the center's present anchor tenants range from around $16 million up to approximately $38.5 million, (with the exception of Linens & Things. The combination of low average occupancy costs and respectable sales volumes, leaves little (if any) concern over anchor tenancy turn-over.

One of the outstanding upsides for the property is the closure of JC Penney in late November 2005. The current ownership has secured a commitment from JC Penney to purchase the pad. This presents an infinite amount of options to further differentiate West Oaks Mall within the market and to further improve the shopping center's market share, increase shopper traffic and enhance the property's attraction to both area residents and prospective tenants. The Boston REFS team anticipates Mr. Okun will present this acquisition financing opportunity to Wachovia over the next calendar quarter.

## CURRENT LEASING UPDATES

- **Books-A-Million** has completed site visits and is interested in spaces 530 & 526 for a store that will have both exterior and common area entrances.

- **Steve & Barry's University Sportswear** has executed a lease for the former 75,000 SF former Mervyn's space @ $8 per square foot with an opening date currently projected to be November 1, 2005.

- **Agaci Too** in Suite 204 executed a new lease and expansion for 4,914 SF @ $18 per square foot, plus CAM & Real Estate Tax charges. The anticipated commencement date is November 1, 2005 expiring at 7/31/15 with a rental bump occurring August 1, 2010.

- **House of Tobacco** did execute an early termination effective 12/31/05 as modeled in the analysis and T-Mobile is very close to executing its lease amendment to expand into this space and extend its lease through February 28, 2011, as modeled in the analysis.

- **Kelly's Cajun Grill** has executed a lease for 621 SF in Suite 441. The lease will commence September 1, 2005 and expire January 31, 2016 with an initial rent of $35,000 (or $56.36 PSF) increasing to $40,000 ($64.41 PSF) on September 1, 2010. The tenant will also pay 10% percentage rent over a natural breakpoint and reimburse its pro rata share of CAM and Real

WACH-MCHALE   000008020

Estate Taxes based on Occupied SF with a 75% floor plus a pro rata share of expenses related to the food court.

- **Sprint PCS** has executed a 3-year lease for Kiosk KO-2 (100 SF). The lease will commence June 24, 2005 and has an annual gross rent of $70,000 and an additional $6,000 for electricity reimbursement.

- **Coffee Kiosk** – A national coffee operator is executing a 3-year lease for Kiosk KO-4 for a gross rent equal to the greater of $30,000 or 10% of sales per annum. The kiosk is very attractive and will be a tremendous asset to this area of the mall providing a needed product to mall shoppers.

- **Underground Station** executed its lease for 1,584 SF and recently opened in Suite 344 with an initial rent of $50,000 (or $31.57) with rent increasing to $55,000 (or $34.72) in 2007 and up to $60,000 (or $37.88) in July 2013.

- **Victoria's Secret** executed an early renewal extending their lease through January 31, 2016 for 6,284 SF for Suite 229. The new rental rate of $24 PSF will commence when the remodeling is completed that began July 2005. The commencement date of the new rent is expected to be October 1, 2005 and it will bump to $26 PSF on February 1, 2011.

- **Charlie's Steak** is executing an anticipated 10-year lease agreement for space 417 in the food court. The base year fixed minimum rent will be $45,000 plus the tenant will pay full pass through charges in addition to food court CAM charges. The Lease is currently tenant executed.

- **Subway** has also approved a deal for space 437 in the food court. The base rent will be $45,000 plus full pass through charges in addition to food court CAM charges. The lease is tenant executed and is expected to be fully executed in the near future.

- **Aeropostale** has completed their final site visits and a deal is being negotiated for space 321 (3,652 SF) with a base rent ranging from $18-$20 PSF plus ancillary charges. Initial terms have been forwarded to the tenant and Leasing is presently waiting for the retailer's response.

- **Sheik Shoes** has signed a lease for space 325 (3,047) for a gross rent of $127,974 (or $42.00 PSF).

- **Motherhood Maternity** is relocating and expanding from space 533 (835 SF) into space 237 (1,681 SF). The new economics are not yet available.

- **Johnny Rockets** is very interested in space 425 (3,915 SF) just outside the food court located across the hall from the Alamo theater. They have completed their initial site visits and the leasing department is currently negotiating terms with the tenant.

- **Abercrombie & Fitch** is also on the horizon for a future leasing deal. Following the recent opening of Hollister in late 2004, a deal with A&F is expected if the store performs as anticipated.

WACH–MCHALE    000008021

- **Champs** has agreed to renew their present lease agreement and the lease extension is now tenant executed. The actual economics are not yet available.

- **Express** will be expanding their present location and incorporating unisex apparel in 2006. The base rent will be changing to $27 per square foot, however, the actual expanded square footage is not yet known.

- **Footlocker** is expanding into an adjacent space, the new square footage yet unknown, and the lease amendment has been tenant executed.

- **Dairy Queen** has recently executed and opened a new store in the food court. The new deal is for $47,881 in base rent plus full pass through charges in addition to food court CAM charges.

## ADDITONAL COMMON AREA LEASING OPPORTUNITIES

In addition to the above referenced leasing deals already sited, there are several other opportunities. The first, (and most obvious) will be leasing the center's remaining vacant spaces. The current leasing momentum and the steadily increasing sales presently near $280 per square foot (well within the benchmarks for most national retailers) has substantially broadened the scope of retailers that will be attracted to the center.

Additionally, new retail merchandising units (RMU's) have been purchased to complement the recent renovation project. At present, several of these RMU's are available for lease and there is adequate space of additional kiosks capable of netting annual rents over $30,000.

## SALES UPDATE

The mall continues to enjoy dramatic sales increases in tenant sales performance. The multi-million dollar renovation has not only bolstered leasing activity but shopper traffic as well. The following are a few highlights from the May 2005 sales report:

- Total mall sales for the month increased 6.0%. Several key retailers achieved sales increases including Body Shop (36.1%), Limited (7.7%), Victoria Secret (54.8% - trending toward $3 million in annual sales), Sunglass Hut (7.9%), Agaci Too (51.5%), Lerner New York (4.6%), Journey's (28.6%), Limited Too (16.2%) and American Eagle (33.2%).

- Food Court comparable sales increased 24%.

- Total in-line sales increased 5.6% in May trending to $281 PSF. Cumulative comparable in-line sales for April and May 2005 increased 11.0% over the same period from prior year.

## OUT PARCEL DEVELOPMENT

There are currently five out parcels available for development or conversion into additional parking to accommodate new development and/or expansions to the mall's gross leaseable area. One such site is already under development. The following is a summary of the aforementioned parcels.

**Out Parcel #1** is a 2.8-acre pad currently undeveloped adjacent to the primary mall entrance on Westheimer Road.

**Out Parcel #2** is currently under construction. Three pad sites are being developed, one of which is the future site for a new Applebee's restaurant. There are two additional pads being developed to

WACH–MCHALE   000008022

facilitate a 6,000 SF building and a 7,500 SF building. With the infrastructure in place and a new mall entrance also under construction alongside the pads, the other two pads are expected to lease quickly.

Out Parcel #3 is a 3-acre pad currently undeveloped and the corner of Westheimer Road and Richmond Avenue.

Out Parcel #4 is a .75-acre pad currently undeveloped and positioned near a mall entrance along Richmond Avenue.

Out Parcel #5 is a 2.6-acre pad currently undeveloped along Westheimer Rd near the mall entrance leading to Dillards.

## NEW & REDEVELOPEMENT OPPORTUNITIES

There are two additional development opportunities at West Oaks Mall. The following is a summary of each:

- JC Penny's latest plan to move forward toward a new format with free-standing stores will create tremendous opportunity. They plan to close the West Oaks mall location in October or November 2005. The current ownership has already initiated negotiations to purchase and recapture the anchor pad.

  This opportunity to recapture the JC Penney pad opens an infinite number of options. To simply split the 100,000 SF box and re-lease the space to two or three mini-box users could generate as much as $1 million in base rent plus CAM and Real Estate Tax reimbursement income. With the inclusion of a parking structure or conversion of some of the undeveloped out parcels into parking areas, the developer could also conceivably create a new mall wing expanding the mall's in-line retail space capped by a new potential anchor tenant.

- One other very prominent opportunity would be to enhance the entertainment draw of the property with the development of an additional movie theater. The Alamo Theater, presently operating at the center is unique in that the customer can order food and alcoholic beverages while viewing movies in any one of the six stadium seating theaters. Each of the theaters at the Alamo are currently generating $600,000 annually and the operator is expecting over $4 million in sales over 2005 to 2006.

  Several major theater chains have recognized the value of this particular site for a traditional theater, likely in the 50,000 SF size range. Major theaters operators have both expressed interest in the property. This too clearly adds a substantial increase in potential revenue and traffic for the property.

- Another option for the developer stems from the present owner's previous acquisition of the former Mervyn's box. While marketing the space intended for Steve & Barry's, several big box users expressed interest in the property. In fact, three common area spaces (spaces 529, 531, 533) have intentionally been left available to facilitate a common area entrance for a new department store deal.

WACH-MCHALE   000008023

Market:

The following market information is compiled from the following resources: REVAC Houston/Harris County Retail Market Survey, Real Estate Center Houston Retail market Overview, Claritas, and Cushman & Wakefield.

The subject Property is located in the West Side of the Greater Houston TX market. Greater Houston has a population of over 4.5 million and a workforce of 3 million. Houston's population grew at a rate over 2.6% per year in the 1990's and is projected to be among the national leaders in population growth over the next 30 years with 10% growth over the next five years. The most explosive area of growth in the Houston area appears to be on the west side where West Oaks Mall is located with population on the west side market area increasing by over 9,000 people annually.

The greater Houston economy has traditionally been based on energy and shipping with the southwest hosting the majority of the U.S. oil deposits. Greater Houston is the energy headquarters of the county and said to be the world center for virtually every segment of the petroleum industry. Houston is home to approximately 5,000 energy-related establishments, over 400 exploration and production firms, more than 30 pipeline operators and hundreds of manufacturers of energy sector products. Additionally, Houston is home also to over 40 of the nation's largest publicly traded oil and gas firms.

Houston's employment base has become increasingly diverse. In the early 80's, 85% of all jobs were energy-related. Today, nearly half of all jobs are in non-energy fields, including business services, technology, aerospace, medicine and manufacturing. In 2004, Houston employment grew by 33,900 new jobs, ranking 2nd in employment growth for the 10 most populous MSA's in the nation.

Another promising statistic is that the average household income in 2004 for the MSA was $70,032. This is 10.6% greater than the national average of $63,301. Additionally, Houston has one of the lowest costs of living among major U.S. cities and in the State of Texas. The Cost of Living Index for Houston is 91.3 based on a nationwide average of 100.0.

As of year end 2004 there was 141.6MM SF of existing retail space in the Houston Market indicating a 3.16% supply growth since 1996. Retail supply has grown at an average 3.2%/year, while growth rates were almost twice the annual average in 2001 and 2003. There is over 2MM SF of retail space under construction among 19 facilities and another 8.6MM SF proposed among 44 additional projects. By year end 2005, the total Houston retail space could exceed 152MM SF among more than 1,452 centers. About one-half of the proposed space are likely to remain proposed until such time that they are about 50% pre-leased. So the actual amount of space developed next year is likely to be about 6.35MM SF or about a 4.6% supply growth. Approximately 26% of the space under construction is in the same West sub-market and 42% of the proposed space is in the West submarket. Over the past five years the majority of the retail growth has been in the southwest, west, and northwest sectors, corresponding to the areas experiencing the most substantial residential growth. . The majority of the new multi-tenant shopping centers under construction (518,875 SF) will be added to the West submarket, followed by the inner-northeast submarket (410,000 SF).

As of year end 2004, the average occupancy in Houston was 86.5%. This represents a significant increase in vacancy from year end 2000 when occupancy was 94%, yet is an slight decline from year-end 2003 occupancy of 87.7%. Occupancy levels for regional malls increased from 88.6% to 88.9% during the 2003 to 2004 period. Regional Malls such as the subject have had somewhat higher occupancy than the other retail categories as exhibited below:

WACH-MCHALE    000008024

**Shopping Center Gross Occupancy**

| Center Type | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|
| All Centers | 84.6% | 87.0% | 89.5% | 92.5% | 94.0% | 93.0% | 88.4% | 86.7% | 86.5% |
| Neighborhood | 83.8% | 84.1% | 86.8% | 90.4% | 91.2% | 92.5% | 88.6% | 87.3% | 86.5% |
| Community | 85.1% | 87.2% | 88.8% | 92.3% | 94.0% | 92.3% | 87.9% | 85.4% | 85.2% |
| Regional | 84.9% | 89.6% | 93.8% | 95.4% | 96.9% | 94.9% | 89.4% | 88.6% | 88.9% |

A total of 1.98MM SF of retail GLA was absorbed in the Houston retail market in 2003 and 3.57MM SF was absorbed in 2004, both indicative of improving economic and market conditions as compared to average annual absorption of 1.77MM SF from 1996 through 2004.

Rental rates have also increased 2.9% since 1990, although the average rate of increase has diminished to only 1.49% annually as a result of the slowed economy and substantial supply growth. The year-end 2004 average rental rate of $19.42/SF marks a 1.6% increase over year-end 2003. The Houston CBD submarket has the highest average rental rate at $24.30/sf followed by the Southwest (Galleria) submarket at $24.15 with the lowest in the inner South submarket with an average of $9.12/sf. Following a stagnant period of rental growth from 2001 to 2003, the Houston retail market is now posting a 2.97% annual rental rate increase at year end 2004. The long term outlook for the Houston retail market is promising as both net job growth and the increase in housing starts were both strong, which are vital for long term strength in the retail sector.

The subject's retail trade area is well positioned. The chart below exhibits the strength of the primary (5 mile) trade radius with over 60% of the households having income of $35,000 to $149,999. This demographic represents a strong consumer shopping base that has ready highway access (via rts). Claritas, Inc. reports add further support to this trade area as the growth of the primary trade area grew a compound rate of 2.08% from 2000 and 2004, with continued growth anticipated through 2009 at an estimated 1.84% annual rate.

**Retail Trade Area**

| Household Income Category | Primary 5 mile Radius | Secondary 7 Mile Radius | Tertiary Houston MSA | Texas | United States |
|---|---|---|---|---|---|
| Income less than $15,000 | 8.85% | 10.38% | 17.42% | 15.65% | 14.67% |
| Income $15,000 to $24,999 | 8.54% | 9.77% | 12.90% | 11.78% | 11.28% |
| Income $25,000 to $34,999 | 12.33% | 12.68% | 14.16% | 12.86% | 12.27% |
| Income $35,000 to $49,999 | 17.02% | 16.25% | 16.21% | 15.62% | 15.39% |
| Income $50,000 to $74,999 | 20.31% | 18.94% | 16.50% | 18.27% | 19.10% |
| Income $75,000 to $99,999 | 12.55% | 11.90% | 9.02% | 10.91% | 11.61% |
| Income $100,000 to $149,999 | 11.46% | 11.33% | 7.62% | 8.97% | 9.43% |
| Income $150,000 to $249,999 | 6.58% | 6.30% | 4.08% | 4.14% | 4.36% |
| Income $250,000 to $499,999 | 1.74% | 1.72% | 1.36% | 1.24% | 1.29% |
| Income $500,000 and more | 0.62% | 0.74% | 0.72% | 0.55% | 0.55% |

**Competition:**

West Oaks Mall's competitive setting is comprised of regional malls that are intercept locations for mall shoppers within the trade area. The following properties are considered competitors due to the regional draw of their tenant base and their geographic location to location shoppers in the primary and extended trade areas.

Memorial City Mall – A 1,800,000 Regional Mall owned by Metro national Corp. and located 11 miles NorthEast of the subject. The mall was built in 1966 and renovated in 2003. Anchors include Foley's, Dillard's, Sears, Mervyn's and Target. Other features include a new food court, an ice hockey/skating arena, a 1,200 person auditorium and Venetian double-decker carousel. A 140,000 SF foot Lord & Taylor, which opened March 2002 as one of May Department Stores' prototype stores, closed May 2005 as part of the company's overall departure from the Houston market.

WACH-MCHALE   000008025

The mall is located approximately 25 minutes from West Oaks and requires travel through congested residential and commercial corridors. The property is sandwiched between two demographic extremes; one white collar residential district to the south and large low income district extending several miles north. Parking is reportedly difficult to navigate and the center's primary entry ways are congested creating difficult ingress and egress. Moreover, the mall will be impeded by major construction on Hwy 10 along the north side of the property. Despite the renovation, there appears to be growing vacancy, and declining mall sales.

First Colony Mall – A 1,100,000 SF Regional Mall owned by General Growth Properties and located 10 miles South of the subject. First Colony Mall is in the in the initial stages of an expansion of up to 120,000 SF to accommodate new tenants including: The Cheesecake Factory (within a new outdoor plaza), Williams-Sonoma, Ann Taylor, Banana Republic, Chico's and Talbot's. This mall primarily serves the markets in Sugarland in addition to areas further south and east. Thus, West Oaks Mall maintains the resident base of Katy and its housing base such as Cinco Ranch and Royal Oaks Country Club.

A prominent challenge for First Colony Mall shoppers is the low ratio of parking spaces per square footage of retail space. The mall is also impeded by poor visibility due to the large structures surrounding the property and the difficult ingress and egress (particularly with the property's abutment along Hwy 59). It was very difficult finding any available parking space close to the mall and it was equally difficult finding convenient exit to the major thoroughfares leading away from the property. While the center mirrors West Oak Mall's tenant mix, the common areas are not as attractive with aging and badly stained carpets covering the floors throughout the common area.

Katy Mills – A 1,300,000 SF Regional Outlet Mall owned by Mills Corporation and located 13 miles NorthWest of the subject. This mall provides an alternative shopping experience via discount-oriented retailers and entertainment themed shopping. The retail mix at this center is not considered to significant competition to West Oaks Mall as Katy Mills is not considered a preferred shopping destination for area residents.

Proposed Simon Property Group Development – In 1999, Simon Property Group had announced plans to construct a large regional mall at the northeast corner of I-10 and Grand Parkway. Simon had claimed that Dillard's and Foley's were still committed and Sears as an additional anchor. However these and other details announce five years ago including that the development would be an enclosed mall are no longer definite. The property is now speculated to be some form of an open air center and no other tenants have been announced. There are no immediate plans to commence construction, which may be as far out as 2008 or 2009.

WACH-MCHALE    000008026

# WEST OAKS MALL - Project Economics

| Assumptions | |
|---|---|
| Initial Loan Amount | 77,625,000 |
| Capital Reserve | 3,000,000 |
| Total Loan | 80,625,000 |
| **Actual Rate** | |
| Libor | 3.68% |
| Spread | 2.00% |
| | 5.68% |
| **Market Rate** | |
| 10-YR UST | 4.37% |
| Spread | 1.50% |
| | 5.87% |
| Sensitized Rate | 7.00% |
| Amortization (YRS) | 25 |

|  |  |  |  | NET LOAN |
|---|---|---|---|---|
|  | Year 1 | Year 2 | Year 3 | Year 3 |
|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2007 |
| Base Rental Revenue | $8,090,095 | $8,372,646 | $8,672,943 | $8,672,943 |
| Reimbursement Revenue | 3,927,567 | 4,588,733 | 4,959,326 | 4,959,326 |
| Specialty Leasing Income | 805,000 | 829,150 | 854,024 | 854,024 |
| ATM Revenue | 73,300 | 73,300 | 109,950 | 109,950 |
| Percentage Rent | 394,000 | 405,820 | 417,995 | 417,995 |
| Total Rental Revenue | 13,289,962 | 14,269,649 | 15,014,238 | 15,014,238 |
| - Turnover & General Vacancy | -881,816 | -935,331 | -1,074,778 | -1,074,778 |
|  | 7% | 7% | 7% | 7% |
| Effective Gross Revenue | 12,408,146 | 13,334,318 | 13,939,460 | 13,939,460 |
| Expenses: | | | | |
| Cleaning | 365,000 | 375,950 | 387,229 | 387,229 |
| R&M | 625,000 | 643,750 | 663,063 | 663,063 |
| Landscaping | 144,000 | 148,320 | 152,770 | 152,770 |
| Security | 650,000 | 669,500 | 689,585 | 689,585 |
| Utilities | 409,000 | 421,270 | 433,908 | 433,908 |
| Admin | 300,000 | 309,000 | 318,270 | 318,270 |
| Food Court CAM | 84,000 | 86,520 | 89,116 | 89,116 |
| RE Taxes | 1,683,800 | 1,734,314 | 1,786,343 | 1,786,343 |
| Insurance | 115,000 | 118,450 | 122,004 | 122,004 |
| Misc. Expenses | 146,000 | 150,380 | 154,891 | 154,891 |
| Mgmt. Fee | 224,000 | 230,720 | 237,642 | 237,642 |
| Specialty Leasing Costs | 97,000 | 99,910 | 102,907 | 102,907 |
| Legal | 20,000 | 20,600 | 21,218 | 21,218 |
| Owner's Expenses | 327,400 | 285,722 | 242,794 | 242,794 |
| Total Expenses | 5,190,200 | 5,294,406 | 5,401,738 | 5,401,738 |
| NOI | 7,237,946 | 8,039,912 | 8,537,722 | 8,537,722 |
| Loan Outstanding | 77,625,000 | 79,125,000 | 80,625,000 | 75,096,960 |
| Loan/SF | 155.61 | 158.62 | 161.63 | 150.55 |

| ACTUAL DSCR | RATE | AMORT | | | | |
|---|---|---|---|---|---|---|
| Libor + 2.00% | 5.68% | 25 | | | | |
| Actual DS | | | 5,820,787 | 5,933,266 | 6,045,745 | 5,631,220 |
| Actual DSCR | | | 1.24 | 1.36 | 1.41 | 1.52 |
| Actual NCF | | | 1,397,159 | 2,106,646 | 2,491,977 | 2,906,502 |

| MARKET DSCR | RATE | AMORT | | | | |
|---|---|---|---|---|---|---|
| 10-yr UST + 1.50% | 5.87% | 25 | | | | |
| Market DS | | | 5,927,863 | 6,042,411 | 6,156,959 | 5,734,808 |
| Market DSCR | | | 1.22 | 1.33 | 1.39 | 1.49 |
| Market NCF | | | 1,290,083 | 1,997,501 | 2,380,763 | 2,802,914 |

| SENSITIZED DSCR | RATE | AMORT | | | | |
|---|---|---|---|---|---|---|
| Market + 100bps Cushion | 6.87% | 25 | | | | |
| Sensitized DS | | | 6,506,600 | 6,632,332 | 6,758,063 | 6,294,698 |
| Sensitized DSCR | | | 1.11 | 1.21 | 1.26 | 1.36 |
| Sensitized NCF | | | 711,346 | 1,407,580 | 1,779,659 | 2,243,024 |

| Estimated Value | CAP RATE | | | | | |
|---|---|---|---|---|---|---|
| Value/SF | 7.50% | | | $107,198,827 | $113,836,291 | $113,836,291 |
| LTV | | | | 73.82% | 70.83% | 65.97% |
| B/E Occupancy (Actual DS) | | | 76% | 69% | 65% | 60% |
| B/E Occupancy (MKT DS) | | | 77% | 70% | 66% | 61% |
| B/E Occupancy (STZD DS) | | | 83% | 76% | 72% | 67% |
| B/E Rental Rate (Actual DS) | | | $22.07 | $22.51 | $22.95 | $22.12 |
| B/E Rental Rate (MKT DS) | GROSS RATES | | $22.29 | $22.73 | $23.17 | $22.33 |
| B/E Rental Rate (STZD DS) | | | $23.45 | $23.91 | $24.38 | $23.45 |
| B/E Interest Rate | | | 8.05% | 9.11% | 9.63% | 10.55% |

WACH-MCHALE    000008027

As previously mentioned, the Property is currently 90% leased and is projected to produce $7.2MM in NOI for the 12-month period ending 12/31/05. NOI is projected to increase to $8MM in 2006 due to execution of pending leases and scheduled rent step-ups (also includes a 7% vacancy factor). Based upon the $8MM NOI figure and a $84.5MM loan amount (assumes the leasing reserve is 50% funded), the Actual DSCR (L+225bps, 25-year amort.) is 1.26X, Market DSCR (UST+150bps, 25-year amort.) is 1.25X and the Sensitized DSCR (Market + 100bps cushion, 6.87%, 25-year amort.) is 1.14X. NOI is projected to improve to $8.5MM in 2007, resulting in a Market DSCR of 1.30X on a fully funded loan and a Sensitized DSCR of 1.18X. The Borrower will be subject to comply with a quarterly Minimum DSCR covenant of 1.20x tested quarterly commencing with the period ending 3/31/06 (with NOI calculated based on the prior quarter annualized NOI and Debt Service calculated based upon the principal then outstanding, less any amounts on deposit within the assigned Wachovia Collateral Account that have not yet been applied to reduce the principal balance, and utilizing an interest rate equivalent to the greater of: the then 10-year Treasury plus 150 bps, or the actual rate then in effect, and a 25-year amortization schedule).

**Downside:** The primary risk of the transaction is if the sponsor is unable to raise the $35MM in TIC equity during the loan term. In this downside scenario, the Bank would look towards the unconditional guaranty provided from Edward Okun to resize the loan (if necessary) for takeout in the permanent market. According to Kevin Hicks of Wachovia Maher Partners, conduits would finance the property at 75%-80% LTV at UST+120bps to 150bps subject to a 1.25X minimum DSCR. Additionally, Kevin indicated there would be several mezzanine providers that would fund another 5% above the conduit loan. In the event the full $80,625M loan was funded, a $5MM principal reduction from Mr. Okun ($7MM minimum liquidity covenant) would result in a net loan amount of $75,625M, representing a 74% of the as-is LTV, and 67% of the stabilized LTV. The DSCR based upon 2006 NOI, Market Interest Rate and a 25-year amortization schedule (includes a 30bps cushion) and the net loan amount, is 1.39X. As such, given these parameters compared to the permanent market, the net loan could be readily refinanced.

<u>GUARANTOR:</u>
Mr. Edward H. Okun will provide a full and unconditional guaranty for 100% of the loan principal, interest, expense carry, tenant improvements and leasing expenses. A full environmental indemnity will also be provided. As noted, Mr. Okun is the President of Investment Properties of America (IPA). Mr. Okun's guaranty provides support to the loan. As of 12/31/04, Mr. Okun reported total assets of $95.7MM. Mr. Okun reported liquid assets of $7.13MM (7%); notes receivable of $27MM (28%) from Mr. Okun's interest in TIC investments; and real estate investments of $37MM (38%). Mr. Okun reported a 2004 annual salary of $172M. Mr. Okun's personal financial statement is presented below. The guarantor will be subject to comply with a $7MM minimum liquidity covenant and a $30MM minimum net worth covenant as a condition to the loan closing and on a semi-annual basis thereafter.

| Edward H. Okun  9-7-05 | | | |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash & Short Term Investments | $7,130,000 | Taxes Payable | $500,000 |
| Notes receivable | $27,062,007 | Life Insurance Policy Loan | $3,500,000 |
| Personal Property | $1,000,000 | Mortgages Payable | $19,555,000 |
| Automobiles | $547,429 | Notes & Accounts Payable | $1,880,000 |
| Personal Real Estate | $13,400,000 | Legal Claims | $649,400 |
| Real Estate Investments | $36,750,000 | Total Liabilities | $26,084,400 |
| Other Assets | $9,815,000 | | |
| TOTAL ASSETS | $95,704,436 | Net Worth | $69,620,036 |
| | | | |
| Annual Salary | $172,400 | Annual Salary | $172,400 |
| Capital Gains | $21,500,000 | Capital Gains | $21,500,000 |
| 2004 Gross Income | $21,672,400 | 2004 Gross Income | $21,672,400 |

WACH-MCHALE    000008028

## REPAYMENT SOURCES:

### Primary Source of Repayment

The primary source of repayment will be derived from refinancing the outstanding principal balance with a permanent market lender. The $35MM of anticipated TIC equity that will be raised will retire the Boulder Capital/McDowell mezzanine loan; repay TIC costs start-up costs and minimum investor returns; with the balance of the funds split on a 50/50 basis with IPA (up to a $4.5MM maximum distribution to IPA) and the Bank to repay the loan principal balance. Repayment via refinance is a sound source of repayment as the year 2 NOI of $8,040M is adequate to support a loan of approximately $84MM (subject to a 75% LTV and a 1.25x DSCR with the DSCR based upon a 10-yr UST + 150bps spread and 25 year amortization) which is $4MM in excess of the proposed loan amount. Note that a conduit loan could also be obtained at 80% LTV which would provide a loan of $100MM.

The Property is projected to produce $7.2MM in NOI for the 12-month period ending 12/31/05. NOI is projected to increase to $8MM in 2006 due to execution of pending leases and scheduled rent step-ups (also includes a 7% vacancy factor). Based upon the $8MM NOI figure and the full $80.625MM loan amount, the Actual DSCR (L+200bps, 25-year amort.) is 1.36X, Market DSCR (UST+150bps, 25-year amort.) is 1.33X and the Sensitized DSCR (Market + 100bps cushion, 6.87%, 25-year amort.) is 1.21X. Further, project stabilization is projected to improve NOI to $8.5MM in 2007, resulting in a Market DSCR of 1.39X on a fully funded loan and a Sensitized DSCR of 1.26X. The net loan amount after the TIC raise is complete will be approximately $75.1MM, a 67% LTV. The net loan amount will be fully repaid via a permanent loan. IPA in the past has done most of its financing via a relationship with Morgan Stanley. The writer talked to Kevin Hicks at Wachovia Maher Partners, Kevin indicated a conduit would readily provide senior financing at 75%-80% LTV at UST+120bps – 130bps subject to a 1.25X min. DSCR.

### Secondary Source of Repayment

The secondary source of repayment is the sale of the property upon stabilization. Based upon the REVS approved stabilized appraised value of $112MM (72% LTV), the property could be sold at a price that is 28% less than the stabilized value to attain repayment. In addition the loan carries an unconditional personal guaranty from Edward H. Okun that would be available to support any potential deficiency realized from a discounted sale of the property.

## SENSITIVITY:

Please refer to break-even analysis in the Project Economics section.

## KEY RISKS AND MITIGANTS:

**TIC Execution / Repayment Risk**- The primary risk is the sponsor's ability to execute the TIC raise and refinance the loan. This risk is mitigated by the initial $26.875MM (26% of purchase price/25% of total project costs), the experience of IPA in raising TIC equity, the property type (established retail), and the unconditional personal guaranty provided from Ed Okun. The risk of a successful TIC raise is mitigated by the experience of Mr. Okun and IPA. Mr. Okun indicated he has already received a commitment for a $8MM unit in the Property from a single investor who has invested with him in the past. Mr. Okun also indicated he has several other large investors with tax-exchange capital they need to immediately invest. This experience, coupled with the existing NOI of $7.2MM and proforma stabilized NOI of $8.5MM mitigate repayment risk as market DSC is projected to provide 1.30x market DSC (1.18x Sensitized) as the property attains stabilization.

WACH-MCHALE  000008029

The following strengths/mitigants are associated with this transaction:

**Market/Location:** West Oaks Mall benefits from a convenient and well traveled location in a growth market with strong demographic:

- Trade area population of 550,481 - projected to grow 13.6% in the next five years;
- Trade area average household income of $81,871 - projected to reach $93,000 by 2009;
- 75% of trade area workers are white collar professionals;
- Over 276 housing developments within a 10-mile radius of the center with prices ranging from $100,000 to $1.5 million;
- Over 207,220 motorists pass West Oaks daily.

**Positive Sales Trends:** Total in-line sales increased 5.6% in May trending to $281 PSF. Cumulative comparable in-line sales for April and May 2005 increased 11.0% over the same period from prior year.

**Sponsorship:** Experienced TIC sponsorship is provided from Ed Okun / Investment Properties of America, which has raised over $150MM in TIC equity of the past three years. Strong secondary sponsorship is provided from Roy MacDowell, is a Tier I Prospect of Boston REFS, who has an excellent track record of identifying quality real estate assets with strong upside potential. IPA is a seasoned TIC sponsor, having raised over $150MM in TIC equity of the past three years.

<u>SERVICING ISSUES:</u>
Servicing level "NC5 – Income Property Non-Stabilized" is recommended for the subject loan in addition to semi-annual tests of the Guarantor covenants and quarterly DSCR tests, and monitoring of cash flow sweep payments.

<u>GRADE SUMMARY:</u>
**BDG:** 5.8 Proforma stabilized market DSC of 1.39x (sensitized DSC of 1.26x)
**FDG:** 5.8 Initial LTV is 76% of the As-Is value, stabilized 72% LTV on the full loan amount, not to exceed BDG.
**LGD:** 4

Please see credit grade worksheets in electronic credit file for grading justification.

WACH-MCHALE   000008030

**FACILITY GRADE WORKSHEET (Real Estate - 2004)**

| Borrower:<br>West Oaks Indiana Trust | Obligor #: | Obligation #: | Grader's Name:<br>Peter Leahy | Date:<br>9/8/05 | Borrower Default Grade:<br>5.8 | Facility Default Grade:<br>5.8 | LGD Grade:<br>4 |
|---|---|---|---|---|---|---|---|

**Facility Default Grade (FDG)** Reflects the value added to a transaction based upon structural characteristics that materially strengthen the credit and thereby reduce the default risk.

Generally, the FDG cannot be worse than the BDG. However, if the facility involves a multi-asset entity and is structured so there is no recourse to the borrower, or the facility is subordinate to other debt, it may be appropriate to make the FDG worse than the BDG.

**LIQUID COLLATERAL/LETTER OF CREDIT**

**FDG**
Is the facility fully collateralized (LTV≤ 100%) by cash in possession?
- WB Deposits     - LTV ≤ 100%     improve FDG to     25
- Liquid Collateral – LTV within Policy (monitored in line with policy - at least monthly if value fluctuates)     improve FDG to     35
- Liquid Collateral – LTV within Policy (monitored less frequently than policy)     improve FDG to     45
- Liquid Collateral – LTV > Policy ≤ 100% (monitored in line with policy - at least monthly if value fluctuates)     improve FDG to     45
- Liquid Collateral – LTV > Policy ≤ 100% (monitored less frequently than policy)     improve FDG to     55
- Standby LC that is "clean" and has been approved per policy     improve FDG to     35

**If Leased to a Credit Tenant**
The FDG can be improved from one to two full grades worse than the BDG of the Credit Tenant if based upon the income from the Tenant(s) and the debt service coverage is at least 1:1.

Credit Tenant BDG     N/A

**GUARANTOR**
     Enter the Guarantor Grade     [ 5 2 ]
If the Guarantor Grade is 6.2 or worse, the FDG must equal the BDG of the Borrower. If the Guarantor Grade is 5.8 or better, review the parameters below to determine the impact to the FDG

Do we have a high degree of confidence the Guarantor has both the **ability** and **willingness** to keep the facility from going to non-accrual?
- If yes, the FDG may be improved up to one full grade worse than the Guarantor Grade. (Ex. 4.2 Guarantor Grade = 5.2 FDG)
- If not, make the FDG equal to the BDG of the Borrower.

Note: If multiple Guarantors and the guaranty structure is joint and several, use the best Guarantor Grade to determine the impact on the FDG. If multiple, but not joint and several, use the Guarantor Grade for the weakest individual required to cover ≥100% of the debt to determine the impact on the FDG

**Take-Out** (internal or external). The FDG may be improved up to 1 grade worse than the take-out source, provided:
- Construction completion is only condition
- Credit quality of take-out party is reliable based upon performance and financial strength
- If tri-party documents are executed, the reliability of the commitment may be considered to be higher

The FDG cannot be improved if the take-out is open-ended, conditional, or there is no take-out source
BDG of Take-Out Source     N/A

FACILITY DEFAULT GRADE (FDG):     [ 5 8 ]

---

**Loss Given Default Grade (LGD)** Measures our average loss in the event of default based upon the value of the collateral and any third party support available.  Insert actual LTV in appropriate LTV blank.

**1) COLLATERAL**

| Category I Liquid Collateral | LTV |
|---|---|
| WB Deposits (CD/Savings/MMDA/DDA) | |
| WB Brokerage/Trust | |
| Other Financial Institution Deposits | |
| Other Financial Institution Brokerage/Trust | |
| Stocks/Bonds/Mutual Funds/Commercial Paper | |
| Cash Value Life Insurance | |

| | Value |
|---|---|
| LTV within policy guidelines | 95 |
| LTV > policy guidelines ≤ 100% | 80 |
| LTV > 100% ≤ 150% | 70 |

| Category II | LTV |
|---|---|
| Income-producing Real Estate | |
| For Sale Real Estate | |
| Other non income-producing Real Estate | |
| Machinery & Equipment | |
| Other Transferable business assets | |

| | Value |
|---|---|
| Income-producing real estate with LTV ≤ 55% | 85 |
| For sale property with pre-sales providing full payout. | 85 |
| LTV ≥ 10 percentage points below policy | 80 |
| LTV within policy guidelines | 75 |
| LTV > policy guidelines ≤ 85% | 70 |
| LTV > 85% ≤ 125% | 65 |

| Category III | LTV |
|---|---|
| Special Purpose Real Estate | |
| Vehicles | |
| All Other Assets with Documented Value | 65 |

| | Value |
|---|---|
| LTV ≤ 50% | 70 |
| LTV within policy guidelines | 65 |

| Category IV | Value |
|---|---|
| Unsecured, but borrowing base in place with reasonable covenants | 75 |
| Unsecured or no points in Categories I, II or III above | 60 |

---

**2) GUARANTEE / LETTER OF CREDIT**
     Guarantor Grade     5.2
     L/C Counterparty Grade     N/A

| Guarantor/ L/C Counterparty Grade | Value |
|---|---|
| L/C Counterparty with BDG of 4.8 or better | 95 |
| L/C Counterparty with BDG of 5.2 to 6.8 | 85 |
| Guarantor Grades 1.5 to 4.8 | 15 |
| Guarantor Grades 5.2 to 5.8 | 10 |
| Guarantor Grades 6.2 to 6.8 | 5 |
| Guarantor Grades 7.5 or worse | 0 |

---

**LOSS GIVEN DEFAULT GRADE CALCULATION**

| | |
|---|---|
| 1) Collateral | 65 |
| 2) Guarantee/Letter of Credit | 10 |

If aggregate Guarantees are not full, multiply the percentage guaranteed by the appropriate point value in 2) Guarantee/ Letter of Credit

If the guarantee is conditional, score = 0
If there are multiple guarantees and they are joint and several, enter the number of points for the best guarantee

| | | |
|---|---|---|
| TOTAL 1) and 2) above (Maximum 100) | a) | 75 |
| Are there significant issues with the loan documentation that could jeopardize our lien position or ability to collect? | b) | 75 |

- If yes, multiply [a] above by 50% and enter result in [b]
- If no, re-enter the result shown in [a]

---

| Value Shown in [b] Above<br>(select one) | | Equals<br>LGD<br>Grade |
|---|---|---|
| 95 Points     (LGD = 5%) | | ☐ 1 |
| Must be secured by Liquid Collateral within Policy or L/C from a counterparty with a BDG of 4.8 or better to be assigned LGD 1 | | |
| 83+ Points     (LGD = 15%) | | ☐ 2 |
| 78 to 82 Points     (LGD = 20%) | | ☐ 3 |
| 73 to 77 Points     (LGD = 25%) | | ☒ 4 |
| 68 to 72 Points     (LGD = 30%) | | ☐ 5 |
| 63 to 67 Points     (LGD = 35%) | | ☐ 6 |
| 62 Points or Less     (LGD = 40%) | | ☐ 7 |

---

REFER TO "GRADING CONSISTENCY GUIDELINES" DOCUMENTATION FOR ADDITIONAL GUIDANCE

WAL    JHALE    00000803I

# BORROWER DEFAULT GRADE WORKSHEET - INCOME PROPERTY (Real Estate)

| Borrower: | West Oaks Indiana Trust | Obligor #: | | Borrower Default Grade: | 5 . 8 |

| Grader's Name: | Peter Leahy | | Date: | 9/6/2005 |

*Note: Insert the most appropriate grade (one digit) for each of the four determinants. Then consider the Project Analysis components and select any characteristics that apply before assigning an overall Borrower Default Grade (2 digits). Borrower Default Grades 2.x to 6.x have been further subdivided into three levels each (2,5,8) to provide more granularity in risk (i.e., the strongest 5.x borrowers will be graded 5.2, average will be graded 5.5 and weakest 5.8 and 9.x will always be 5.*

## BORROWER ANALYSIS

| Insert Grade for each section | Overall Debt Service Coverage/Earnings (Borrowing Entity) | Balance Sheet (Borrowing Entity) | Management and Control | Financial Flexibility |
|---|---|---|---|---|
| | **Determinant (Grade = 5.8)** The DSC ratio should receive the most weight when determining the BDG. To calculate, use actual numbers for existing properties, and pro-forma numbers for projects under development. NOI considerations should include effective rents, market occupancy rates, management fees, reserves, commissions and up-lift costs. | **Determinant (Grade = 5.8)** This section should receive the 2nd most weight when determining the grade and focuses on the Borrower's liquidity, quality of the owned assets and the mix of liabilities vs. market value based net worth used to support assets. (For single asset entities calculate the LTV using the subject debt vs. market value. For multiple asset entities use a weighted average.) | **Determinant (Grade = 5.2)** This section focuses on the experience of the borrower with the proposed product type, including length of experience, level of success though economic cycles, depth of talent and infrastructure of management. | **Determinant (Grade = 5.2)** This section focuses on the borrower's ability and access to capital. Real estate companies with good access to institutional investors where demand is relatively stable through market changes may warrant a higher BDG. |
| | Comments: Borrower is an SPE formed to acquire the subject mall with leasing in place to effect market DSC of 1.25x at 12/31/05. | Comments: The loan will fund an initial 76% LTV, reducing to 72% stabilized LTV. | Comments: The sponsor is Investment Properties of America (Ed Okun). IPA has similar TIC investment and retail management experience. | Comments: In addition to Wachovia, IPA (Okun) has banking relationships with J.P. Morgan. The company has access to permanent debt via relationships with conduit lenders, including J.P. Morgan and access to capital from TIC investors. Edward H. Okun (100% Guarantor) added financial support to the transaction with a reported liquidity of $5.41MM (to be increased to no less than $7MM prior to closing from an identified receivable to be collected) and Net Worth of $29MM (to be no less than $50MM prior to close). |
| 2 Represents Minimal Risk | DSC > 3.00. Consistently generates exceptional cash flow and interest coverage. Diverse sources of cash flow with extremely high probability of continuing. | Portfolio quality is class A+. Exceptionally high liquidity compared to needs/structure. | Excellent experience in property development, management, and real estate sales/leasing. Excellent internal controls, operations, risk management systems and reporting. Top tier developer with continuity and depth in management team. High success rate while working through economic cycles. | Long-term debt rating of AA- to AA+ or equivalent. Strong capacity to meet all obligations direct and contingent. Substantial debt capacity. |

551360 (Rev 03 – 04/04)

Grade_in.doc

WACH-MCHALE   000008032

BORROWER DEFAULT GRADE WORKSHEET - INCOME PROPERTY (Real Estate)

| 3<br>Represents<br>Moderate Risk | DSC 2.01 – 3.00<br><br>Consistently generates excess cash flow and interest coverage. Diverse sources of cash flow with a high probability of continuing. | D/NW 0.50 – 0.99<br><br>Loan to value > 35% but ≤ 50%<br><br>Portfolio quality is class A on average.<br><br>High liquidity compared to needs/structure. | Very good experience in property development, management, and real estate sales/leasing. Very good internal controls, operations, risk management systems and reporting.<br><br>Top tier developer/builder with good management team depth.<br><br>Successful in working through economic cycles. | Ample debt capacity.<br><br>Long-term debt rating of A- to A+ or equivalent.<br><br>Adequate capacity to meet all obligations direct and contingent. |
|---|---|---|---|---|
| | **Overall Debt Service Coverage/Earnings (Borrowing Entity)** | **Balance Sheet (Borrowing Entity)** | **Management and Controls** | **Financial Flexibility** |
| 4<br>Represents<br>Better Than<br>Average Risk | DSC 1.51 to 2.00<br><br>Positive cash flow trends, with excess cash flow and interest coverage. Predictable cash flow (through lease terms, tenant credit quality, financial performance etc.). | D/NW 1.0 to 1.50<br><br>Loan to value > 50% but ≤ 65%.<br><br>Strong liquidity.<br><br>Portfolio quality is above average. | Above average experience in property development, management, and real estate sales/leasing. Above average internal controls, operations, risk management systems and reporting.<br><br>Reputable developer/builder with good management team depth.<br><br>Successful in working through economic cycles.<br><br>Highly competent in estimation, management of costs and coordination of all aspects of "for lease" projects.<br><br>Highly competent to manage multiple projects at the same time.<br><br>Performance of Subcontractors is highly reliable for timelines, quality and availability.<br><br>Strong liquidity to handle multiple projects, unforeseen cost overruns, or slower leasing projects. | Good access to other well-regarded banks, insurance companies, private placements, and other financial institutions.<br><br>Long-term debt rating BBB- to BBB+ or equivalent.<br><br>Strong repayment history and ability to meet current commitments, (including trade for builders). |

WAO.    IALE    00000033

551360 (Rev 03 – 04/04)

Grade_in.doc

## BORROWER DEFAULT GRADE WORKSHEET - INCOME PROPERTY (Real Estate)

| | | | | |
|---|---|---|---|---|
| **5**<br><br>Represents<br>Average Risk | DSC 1.21 to 1.50<br><br>Average confidence in certitude of cash flow and debt service. Trends are positive, but may be somewhat inconsistent. Lease renewals/sales history is good. Existing property(ies) with history of positive cash flow. | D/NW 1.51 to 3.0<br><br>Loan to value > 65% but ≤ 75%.<br><br>Good liquidity.<br>Average quality assets. | Average level of experience in property development, management, and real estate sales/leasing. Average internal controls, operations, risk management systems and reporting.<br><br>Reputable developer /builder with limited management team depth.<br><br>Limited, but successful, cycle experience<br><br>Performance of subcontractors is above average for timelines, quality and availability.<br><br>Above average competence in estimation, management of costs and coordination of all aspects of "for lease" projects.<br><br>Above average competence in managing more than one project at the same time.<br><br>Sufficient liquidity to handle multiple projects, unforeseen cost overruns, or slower leasing projects. | Readily able to finance debt at other institutions at similar rates and terms.<br><br>Long-term debt rating of BB to BB+ or equivalent.<br><br>Good repayment history and high confidence in ability to meet repayment of debt, including trade. |
| | **Overall Debt Service Coverage/Earnings<br>(Borrowing Entity)** | **Balance Sheet<br>(Borrowing Entity)** | **Management and Controls** | **Financial Flexibility** |
| **6**<br><br>Represents<br>Acceptable Risk | DSC 1.10 to 1.20<br><br>1.05 if single credit tenant under long-term (minimum 10 years) lease.<br><br>Earnings, cash flow and debt service coverage positive but somewhat strained and subject to volatility. | D/NW 3.01 to 4.0<br><br>Loan to value > 75% but ≤ 80%.<br><br>Acceptable liquidity and portfolio quality. | Acceptable level of experience in property development, management, and sales/leasing. Acceptable internal controls, operations, risk management systems and reporting.<br><br>Reputable developer with no depth in management team.<br><br>No or limited cycle experience<br><br>Performance of subcontractors is generally reliable for timelines, quality and availability, but subject to volatility.<br><br>Adequate competence in estimation, management of costs and coordination of all aspects of "for lease" projects<br><br>Adequate competence in managing more than one project at the same time.<br><br>Acceptable liquidity to handle multiple projects, unforeseen cost overruns, or slower leasing projects. | Limited ability to refinance debt at other institutions.<br><br>Long-term debt rating of B+ to BB- or equivalent.<br><br>Adequate payment history and ability to meet current obligations. Some potential for vulnerability in ability to meet intermediate and long-term financial obligations. |

WACH  ALE  00008034

**BORROWER DEFAULT GRADE WORKSHEET - INCOME PROPERTY** (Real Estate)

| 7<br><br>Other Assets Especially Mentioned Includes OAEM<br><br>These loans are currently protected but potentially weak. | DSC 1.0 to 1.09.<br><br>Earnings and cash flow are significantly strained and subject to volatility, with negative trends (near break-even). | D/NW 4.01 to 8.0.<br><br>Loan to value > 80% ≤ 90%.<br><br>Marginal liquidity.<br>Below average asset quality.<br><br>Age of product is high compared to levels of reserves. | Marginal level of experience in property development, management, sales/leasing. Marginal internal controls, operations, risk management systems and reporting.<br><br>Poor cycle experience.<br><br>Marginal level of experience in estimation, management of costs, coordination of all aspects of "for lease" projects.<br><br>Not competent to handle more than one project at one time due to lack of depth of management and or experience.<br><br>Marginal liquidity to handle multiple projects, unforeseen cost overruns, or slower leasing projects. | Little or no access to large banks but access to other sources of financing.<br><br>Long-term debt rating of B or equivalent. |

Note- OAEM credits are categorized as having undue or unwarranted risk, but not to the point of being classified as being substandard. Level of risk is increasing beyond that at which the loan originally would have been granted. The credit contains potential weaknesses that may weaken the asset or inadequately protect the banks credit position at some future date if not checked or corrected.

|  | Overall Debt Service Coverage/Earnings (Borrowing Entity) | Balance Sheet (Borrowing Entity) | Management and Controls | Financial Flexibility |
|---|---|---|---|---|
| 8<br><br>Paying Capacity Of The Borrower Or Value Of The Collateral Provide Inadequate Protection | DSC >.90 and <1.00<br><br>Cash flow does not cover debt service or is not expected to in the near future. | D/NW >8.0<br><br>Loan to value > 90%.<br><br>No liquidity or liquidity is insufficient to support negative cash flow. Review impact of any delinquent real estate taxes or liens filed on existing properties without liquidity to cover the debt. | Insufficient level of experience in property development, management, and sales/leasing.<br><br>Insufficient internal controls, operations, risk management systems and reporting.<br><br>Poor or no cycle experience. | No access to large banks and little or no access to financial institutions. May exhibit chronic delinquency and overdrafts.<br><br>Long-term debt rating or equivalent of B- or worse. |

Note: This category includes "Substandard" credits. Substandard credits are characterized by inadequate protection by the current sound worth and paying capacity of the obligor or of the collateral pledged, if any. There is a distinct possibility of loss if deficiencies are not corrected. Credits in this category have a well-defined weakness that may jeopardize the liquidation of the debt.

| 9<br><br>Borrower Is In Default And Facility Is On Non-Accrual Status | DSC <.90<br><br>Cash flow does not cover debt service. |  |  | No access to any financing.<br><br>Excessive risk. |

This category includes both non-accruing Substandard and Doubtful transactions. Substandard assets are described above. Doubtful assets have all the weaknesses inherent in those classified Substandard with the added characteristic that the weaknesses may make collection or liquidation in full, on the basis of currently existing facts, conditions and values, highly questionable and improbable.

Comments from UW or PM (optional):

WACI    ALE    00000008035

**BORROWER DEFAULT GRADE WORKSHEET - INCOME PROPERTY** (Real Estate)

| PROJECT ANALYSIS | | |
|---|---|---|
| These blocks are not cumulative in adjusting the BDG | | |
| **Improves** | **Neutral** | **Detracts** |

**INCOME PROPERTIES**

| | | |
|---|---|---|
| ☐ Pre-Leasing exceeds policy, tenor of leases are acceptable and credit quality of tenants is strong.<br>☐ Leases in place to high quality tenants and tenors match or exceed loan amortization. | ☒ Pre-leasing meets policy.<br>☒ Acceptable tenants, lease terms, and existing DSC. | ☐ Pre-leasing does not meet policy (speculative).<br>☐ Tenant quality and lease tenor less than desirable. |

**REPAYMENT**

| | | |
|---|---|---|
| ☐ Term significantly shorter than policy and/or amortization quicker than policy. | ☒ Term and amortization in line with policy. | ☐ Term and/or amortization exceed policy.<br>☐ Interest rate below market and loan matures in 6 - 12 months. |

**COST-BASED EQUITY** (Cannot improve the BDG if the only factor present. Level of enhancement or detraction is based on amount of equity. A significant contribution can offset risks found in the detract columns.)

| | | |
|---|---|---|
| ☐ "Up-front" cash equity invested is significant and more than appropriate in view of the nature of the project. | ☐ Cash equity invested is equal to policy, and appropriate in view of the nature of the project. | ☒ Cash equity is less than policy and is marginally adequate in view of the nature of the project.<br>☐ Timing of equity does not meet policy. |

**MARKET**

| | | |
|---|---|---|
| ☐ Little or no vacancy; very strong absorption, sales prices/rent levels and market conditions. | ☒ Low vacancies; acceptable absorption, sales prices/rent levels and market conditions. | ☐ Above average vacancies exist; stale inventory, slow absorption; stagnant or declining sales prices/rent levels and weakening demand. Outlook is uncertain or declining.<br>☐ Existing project rents greater than market. |

**PROJECT ATTRIBUTES** (Cannot improve the BDG if the only factor present.)

| | | |
|---|---|---|
| ☐ Project's physical characteristics, location and quality exceed those of other projects competing for same target market. | ☒ Project's physical characteristics, location and quality are consistent with those of other projects competing for same target market. | ☐ Project's physical characteristics, location and/or quality do not meet those of other projects competing for same target market.<br>☐ Property type is discouraged by policy. |

**CONSTRUCTION/BRIDGE LOANS:** Budget Adequacy and Contractor Risk

| | | |
|---|---|---|
| Cannot Improve BDG | ☒ Budget adequate, approved by CLA or outside consultant and reserves are acceptable<br>☐ Contractor bonded or credit approved. | ☐ Some inadequacies (e.g., interest, contingency, and/or operating reserves may be minimal).<br>☐ Budget not approved by CLA or outside consultant<br>☐ Contractor neither bonded nor credit approved.<br>Note: if the budget is not properly approved and Contractor is not credit approved or bonded you must lower the BDG by at least .5. |

WACI ALE 00000036

# EXHIBIT 5

**Deal Concept Memo #1**

To:     Mike Kelley, Bob Grigg, John Raymond, Joe Armeen

From:   John Cassis

Date:   August 31, 2006

Re:     $6MM Mortgage Override

This memo serves to establish preliminary discussion for a new credit request from Ed Okun. He has purchased a modern 11M SF home ("The Home") on Lake Winnipesaukee near the town of Wolfeboro, New Hampshire, for $6MM (cash of $4MM and seller-financed note of $2MM). He is also under contract to close on the acquisition of 3 adjacent lots comprising 28 acres ("The Acreage") for $4.1MM by October 22, 2006. Override and possibly exception approval will be required on the new request.

- Mr. Okun has requested a total financing package of $6MM by October 22, to be secured by The Home and The Acreage.
- Combined cost is $10.1MM, but Mr. Okun believes the two properties are worth $22MM.
- The Home has its own website: http://www.afterglowonthelake.com. In the interest of brevity, the contents of the website will serve to provide additional details on The Home (note: in your browser, you may need to select the menu sequence "View > Text Size > Medium" in order to properly view the text on this site).
- The Acreage is reportedly comprised of three separate lots.
    - It is improved with a 5-bedroom cottage with 3-car garage, a Vermont-style barn, and a 2-slip boathouse.
- What is unclear at this time is a) whether the three lots are platted separately or if they've been previously joined, and b) whether or not Mr. Okun intends to join title between The Acreage and The Home.
    - According to his attorney in New Hampshire, ordinance allows only one home per lot; thus, Mr. Okun is being advised to forego unity of title to preserve future building rights.
    - Mr. Okun has taken title to The Home jointly in his and his wife Simone's name but may take title to The Acreage in a different name (this too remains unclear at this point).
- Both properties are reportedly zoned residential.
- Mr. Okun presently owns an unencumbered home in New Hampshire.
    - It is listed for sale at $2,695M, and he expects a final sale price of about $2.5MM.
- The product mix for the proposed financing is also unclear at this time.
    - The writer has begun dialog with Mortgage Direct on a $6MM mortgage.
    - However, the mix may change between mortgage/PEL/HEL by the time of closing, and may depend upon his anticipated holding period for the properties.
    - Mortgage Direct has been provided the prior PCF analysis and Pre-Screen Memorandum for review.
- The RM has been invited to The Home for an inspection of both properties. The plan is to conduct a satisfactory inspection prior to closing.

WACH-MCHALE    000007557

Deal Concept Memo #1
Ed Okun – $6MM Mortgage Override

*Other Debt:*

$28,400M Term Loan to IPofA Salina managed by REFS, Boston – FDG of 5.8, Indirect Debt
$ 8,150M Term Loan on M/Y Simone, managed by Equipment Finance – FDG of 3.8, Indirect Debt
$ 3,000M Term Loan to IPofA WOM JCP managed by REFS, Boston – FDG of 6.2, Indirect Debt
$ 2,980M Mortgage Loan to Ed Okun managed by Fort Lauderdale Wealth
$ 1,080M PEL to Ed Okun managed by Fort Lauderdale Wealth
$     5M Standby L/C's to IPofA Salina managed by REFS, Boston – FDG of 5.8, Related Debt
$     1M ACH Debit to IPofA Richmond Square managed by REFS, Boston – FDG of 6.5, Related Debt
$43,616M  Total Other Debt
$ 6,000M Proposed Mortgage/Consumer Debt
$49,616M  Total Debt

Proposed Loan Grade:
- N/A on the proposed transaction.
- However, Mr. Okun's BDG remains to be determined.

WAFDG Calculation (Worksheet also appended in CATools under Customer):
$28,400M X 5.8
$ 8,150M X 3.8
$ 3,000M X 6.2
$     5M X 5.8
$     1M X 6.5
$ 3,000M Mortgage – N/A
$ 1,080M PEL – N/A
$ 6,000M Proposed Mortgage/PEL – N/A

Raw WAFDG:          5.418 vs. 5.551 in prior memo
Rounded WAFDG:      5.5 vs. 5.8

*Relationship Background & History:*
- Earlier this year, the Bank approved an $8MM yacht loan for Mr. Okun.
- Background and history was detailed in the Pre-screen Memorandum dated March 23, 2006. It can be found in CATools under Deal #675085, and is incorporated herein by reference.

*Updates and Due Diligence for Subject Loan Request*
- At this point, the writer, team leader, and RM are prepared to approach Mr. Okun for updates to certain representations made earlier in the year and incorporated into the decision process for the $8MM yacht loan.
    - What follows are some updates already provided by Mr. Okun, as well as a running list of questions we plan to address with him as part of this underwriting (questions indicated in **bold**).
    - We have been unable to locate Mr. Okun's CFO, Lara Coleman, to address some of the more pressing questions. However, out of respect for the work required for a timely closing, we wish to begin the dialog at this point.
        - To this end, I would like to request that the approvers add any additional requests for information at this time.
- Since the March pre-screen memorandum:
    - Mr. Okun paid off the REFS debt on the West Oaks Mall with the conduit refinancing of this property, except for a $3MM mortgage on the JC Penney outparcel.
    - Mr. Okun closed on a $28MM loan with REFS for a mall in Salina, KS (population: 46,000)

WACH-MCHALE    000007558

Deal Concept Memo #1                                                    Page 3
Ed Okun – $6MM Mortgage Override                            August 31, 2006

- The writer has obtained a current PFS dated 8/4/06
  - The PCF spreadsheet has been revised using this information only, with all other components of the worksheet unchanged.
  - Preliminarily, the grade has changed from 3.8 to 4.8; however, additional adjustments to the model are likely as we obtain answers to some outstanding questions.
    - The 2005 PTR is reportedly on extension until 10/15/06.
  - Ed purchased a 1996 Bell 206 helicopter with 330 operating hours for $850M.
  - How much did Ed net from the refinancing of the West Oaks Mall?
    - What happened to those proceeds?
    - The last analysis said we expected higher liquidity (more than $9MM) by December, 2006, due to gains on TIC funds...will we still see this?
      - Or will these new cash calls (the NH homes, First Montauk, new QI's) interfere with that?
  - Can we get a current, actual bank statement instead of just the one-page web printout?
- Escrow deposits for the two qualified intermediary (QI) ventures are up to $350MM now & should reach $1B by year end.
  - How are the AEC & SOS QI's doing?
  - Why are both AEC & SOS valued $500M less (each) than on the last PFS?
  - How are they competing with QI's who are now offering to pay the interest on escrow money back to the client?
  - Can we obtain a first-year's financial statements on the QI's to compare against projections?
    - Ideally, the statements would be independently prepared, and even more ideally they would be consolidated with consolidating notes.
    - At a minimum, please provide balances sheets for all QI's dated as of the same date.
  - NES 1031, IXG 1031, and Crossroads Trucking & Logistics are 3 new companies on the current PFS
    - The first two appear to be two new QI's...are they, and if not what are they?
    - The first two are valued at $12MM on the PFS...how did Ed finance these?
    - What are the projections for these companies?
  - Has Ed permanently ceased the practice of borrowing from the QI escrow accounts?
- Mortgage Direct:
  - Are they underwriting any exceptions (esp. DTI) on this request, and if so what?
- Equipment Leasing:
  - Is the current yacht loan paying as agreed?
  - What was the final P&I Payment on this loan?
- Mr. Okun closed on 49.96% ownership of Montauk Securities. He expects to complete the privatization in October/November.
  - Why hasn't the $20MM purchase price for First Montauk been reflected on the PFS (or at least the first 49.96% of it)?
    - Where will Ed get the money for this?
  - What are the future plans for this company now (i.e. have the changed since last time)?
    - $5MM of investment by Ed into First Montauk was planned...has this been injected yet?
    - Will Ed be running his own deals through this entity as planned...and if so, what types of deals since he'll no longer be in the TIC business?
  - Will it go S-corp once it goes private and, if so, are there any tax consequences?
  - Do they have any financial projections or pro-formas for the first year of control?
    - Still predicting a future profit of $10MM per year?
    - If so, what lines of business are expected to produce that, and how much of that will stem from Ed's transactions?

WACH-MCHALE    000007559

Deal Concept Memo #1                                                  Page 4
Ed Okun – $6MM Mortgage Override                              August 31, 2006

- Please provide updates on the following in-process activities as of the last time we spoke:
    - Exiting the TIC Fund business and anticipated regulatory scrutiny
        - Any impact on IPofA:
            - Reputationally for exiting this business, or
            - Regulatorially?
    - IPofA was going to be undertaking the buy-back of its prior TIC's:
        - Any time estimate for completion?
        - Any idea which properties this will happen to?
        - Any idea the financial or other impact these will have?
    - Please provide an update on the Direct Capital lawsuit & expected settlement of $649M.
        - Are they still asking for $1MM?
        - What is delaying this matter getting settled?
    - What is the status of IPofA's new venture with Stuart Title Co.?
        - Has this occurred yet?
        - What will be the financial calls on Mr. Okun for this new venture, both today and deferred?
    - Please explain what Ed's strategy is with respect to the New Hampshire homes:
        - Does he plan to hold these long-term or "flip" them?
        - Is Ed planning to expand his real estate business into residential homes now?
            - If so, is he targeting only prestige properties?
    - Property-specific questions:
        - Can we obtain surveys on both properties?
            - Is the 28-acre property platted as 3 separate lots or as one?
                - If they're separate:
                    - Will they remain that way?
                    - Are any of the lots unimproved?
        - In whose names are the two properties being titled?
        - In light of the one-home-per-lot limitation in the area, does Ed still intend to get unity of title for the two properties?
        - What product is Ed looking for:
            - Fixed rate, floating rate, or mixed?
            - Maturity?
            - Mortgage/HEL/PEL?

Additional Questions After 9/1/06 conference call:

- Please confirm that the $8MM yacht loan will still be paid in full at maturity in March (i.e. no extension)
- Previously there was conversation of a $60MM note placement through Montauk:
    - Did that ever take place?
    - What property was that on (Columbus maybe)?
- Please estimate real estate taxes, insurance, and other/maintenance expenses related to both New Hampshire properties.
- Does Ed anticipate any regulation of QI's in the near future due to the risk of escrow money disappearing?
    - **Also, check the web (internally) for any signs of this
- **Added a note in the request for FS's on the QI's above about FS quality.
- **Trish to discuss Ed Okun with REFS Credit/Risk to "build out" our knowledge of Ed with respect to:
    - His last 2 decades as a real estate operator
    - His organization
- Are there existing appraisals on the two NH properties?
- Please confirm that the $2MM seller-financed note will be paid off with proceeds of the Bank's $6MM loan, and that Ed's equity in the properties will remain $4MM.
- Ed purchased the properties for $10.1MM but he feels they'll be worth $22MM…what does he base his estimated $12MM gain upon?

WACH-MCHALE   000007560

Deal Concept Memo #1
Ed Okun – $6MM Mortgage Override

Page 5
August 31, 2006

- **Can the Financial Planning Group provide us with any information on Ed?**
- **Does the $6MM contract price for The Home and the $4.1MM contract price for the acreage include the price of any furniture or other personal items (which typically are excluded from financing and the appraised value)?**
  - o Note: The Home's estimated age is about 3-7 years

*Credit Considerations*

- The Home is a prestige property in an area Wachovia doesn't understand well.
- Are we exceeding LTV limits if one or more the The Acreage's parcels is unimproved?
  - o We need to order appraisal(s) and thus need to know how the properties are laid out.
- The enduring key risk identified in the prior memo was:
  - Fluidity of Mr. Okun's business activities and inability to confirm significant assumptions in the PCF analysis – the future buy-back of TIC properties calls into question Mr. Okun's future liquidity. Will he have enough liquidity to pay off this loan one year from now? This uncertainty is exacerbated by the absence of information on the planned buybacks. Mitigants include ample cash flow to service debt on this loan and to support a quick term-out if needed, as well as three principal repayment source independent of personal cash flow and liquidity.
  - This risk should be sufficiently addressed and updated with answers to some of the questions above.

WACH-MCHALE   000007561

# EXHIBIT 6

**Deal Concept Memo #2**

To:      Mike Kelley, Bob Grigg, John Raymond, Joe Armeen, Trish Bracci

From:   John Cassis

Date:    October 17, 2006

Re:      $6MM Mortgage Override

---

Today the writer spoke with Ed Okun and received information and answers to questions highlighted in Deal Concept Memo #1 dated August 31st. Also, Mr. Okun's agent Lara Coleman provided some answers to prior questions. Also provided were actual 2005 income statements on the two qualified intermediaries purchased in that year, as well as a 2005 PTR. The open questions and additional information are addressed below, and the PCF has been re-spread and updated to reflect both the new PTR and new information.

*Open Questions*
1. **How much did Ed net from the refinancing of the West Oaks Mall?**
   - The West Oaks Mall is in process of being sold through a 1031-qualified private LP offering for $170MM ($16MM more than previously discussed).
   - The $86MM mortgage owed to Greenwich Capital will remain with the property, resulting in an $84MM purchase of equity from Ed Okun.
   - **What happened to those proceeds?**
     - Ed has $15MM of these proceeds earmarked for First Montauk ($12MM as purchase capital and $3MM as additional working capital).
     - Since original cost was $107MM, capital gains on the sale will be approximately $63MM, resulting in long-term capital gains of tax c. $13MM.
     - The remaining $56MM will accrue to Mr. Okun free-and-clear. At this time, these funds are not earmarked for anything in particular, but he does expect to re-deploy the proceeds into new investments.
     - This offering is expected to be completed by the end of 2006:
       - So far there are $10MM in commitments.
       - The project has not been actively marketed as Ed wanted to own the property for at least thirteen months prior to selling, thus benefiting from an enhanced capital gains tax rate.
       - When I spoke with him, he was in Las Vegas at a trade show. He was preparing for a presentation the same evening to potential investors. He knows that there is considerable interest in this offering, and he is not concerned about his ability to place the units within the next three months or so.

2. **The last analysis said we expected higher liquidity (more than $9MM) by December, 2006, due to gains on TIC funds…will we still see this?**
   - Not at this point in time. The expected increase in liquidity was actually used to purchase additional qualified intermediaries (three purchased in 2006 for a total cost of $18.25MM, and the two purchased in 2005 for a total cost of $7.1MM).
   - It is apparent, as discussed in #1 above, that liquidity for Mr. Okun will fluctuate substantially at any point in time.

WACH-MCHALE    000007562

3.  **Can we get a current, actual bank statement instead of just the one-page web printout?**
    - Provided to the Bank was a screen print from Wachovia Connection showing a DDA balance of $2.8MM (current verified balance of $2.5MM). This is similar to the $4.1MM calculated on the PFS analysis.

4.  **How are the AEC & SOS QI's doing?**
    - Ed has purchased three more QI's in 2006. He now owns 100% interests in five QI's, which he is merging into SOS 1031 Exchange Company.
    - Actual 2005 income statements were provided for AEC & SOS. However, due to the recent roll-up of QI's, the accounting systems could not yet provide fiscal year-to-date statements on the entities either combined or separate.
        - Ed owned SOS for five weeks in 2005 and reported a net profit of $30M. Annualized, this equates to approximately $295M.
        - Ed owned Atlantic Exchange Company (AEC) beginning 8/25/05 and reported a net profit of $383M. Annualized, this equates to approximately $1,148M.
    - The three QI's purchased in 2006 were REES based in Tampa, NES based in San Antonio, and IXG based in Denver.
    - The current float of all five companies is $180MM:
        - REES is at $12MM today vs. a $20MM to $60MM average float.
        - NES is at $53MM today, and this float is steady
        - IXG is at $65MM today and is growing.
        - SOS and AEC collectively are at $50MM today.
    - About a year ago, Ed had provided float projections of $1 billion by the end of 2006:
        - The strategy for reaching this goal was through both acquisition and organic growth.
            - He has indeed acquired more QI's.
            - He has hired 23 salespeople from other successful QI's to market services to a small base, mostly in the northeast and in the southest U.S. Twenty-one of these reps are currently successful.
            - In addition, when he acquired IXG, he also acquired a 60-person sales force which is entirely commission-based, as well as the principal of the company who was one of the first in the QI business.
            - Representatives can sell in all 50 states, as physical presence is not important in successfully selling QI products.
            - However, business has declined for reasons detailed immediately below.
    - Ed reports that overall QI business is down 30% from earlier this year due to a significant slowdown in Florida.
        - Apparently there is a serious insurance crisis arising in this state, experienced quite frequently as of late by the writer's clients as well.
        - In certain areas of Dade, Broward, and Palm Beach Counties, as well as along the west coast, all insurance carriers approved to write policies in Florida have stopped writing coverage for windstorm on commercial real estate. In certain locations (especially those east of I-95), the state JUA (i.e. Citizens) is still writing policies. For all other owners, policies can be had only through companies not licensed to write policies in Florida.
            - Many of these companies are writing policies with premiums that exceed 10% of the replacement value of the property.
            - In cases where the premium is lower, there are strange clauses in the policies such as penalties to the owner if actual losses exceed insured value.
        - This crisis has seriously impaired deal flow, as potential buyers of new properties are unable to obtain reasonably priced policies. Thus the advantage of selling a substantially depreciated property for one obtained through tax-deferred exchange is being overshadowed by this new, higher cost.
        - Ed reports that the State of Florida is considering providing reinsurance guarantees of $3 billion in the near-term to help solve the problem, but that no permanent solution is proposed at this time.

WACH–MCHALE   000007563

Deal Concept Memo #2                                             Page 3
Ed Okun – $6MM Mortgage Override                     October 17, 2006

- o However, Ed reports that activity is still high in Northern Florida where policies are more easily obtained. It's also booming in many other areas of the country, especially in Texas.
- o Ed indicated that he is considering one more QI purchase this year to provide him with entry into California.
- Ed also provided additional insight into strategy:
  - o QI revenue is derived from float income (net interest earned on float in excess of the amount paid to the client), transaction fees of about $800 to $1,000, and ancillary fees from other services such as locating replacement properties.
    - Fees vary by region. In slower parts of the country, such as southern Florida, higher rates are offered on the escrow money and lower fees are charged.
  - o He is focusing on smaller transactions, $200M to $350M. This is typified, for example, by the owner of a duplex.
  - o He says that these transactions are stable, and that the money usually remains on deposit with the QI for nearly the full 180-day replacement-search period.
  - o He says that larger deals usually result in more concessions on pricing and fees.
  - o IXG has expertise in reverse exchanges and safe harbor exchanges.
    - Most QI's, Wachovia included, typically will not do these types of exchanges. They are perceived as risky because, if the detailed documentation is not completed correctly, the exchange will not be successful.
    - Ed says that these transactions are relatively large, usually about $3MM to $8MM in his experiences, and the fees range from about $75M to $125M per exchange.
    - About 80% of IXG's business is in these kinds of exchanges, and about 80% of this business comes as referrals from other QI's that won't engage in it.

5. **Why are both AEC & SOS valued $500M less (each) than on the last PFS?**
   - This question was not addressed. Actual cost figures have been provided above, and impairment in reported value may have been intended to reflect the overall slowdown in business.

6. **How are they competing with QI's who are now offering to pay the interest on escrow money back to the client?**
   - Ed's QI's have always paid interest on escrow money to the client (contrary to our prior understanding), and at relatively competitive rates.
   - He is currently paying an average of 2.25% on the combined float of all five QI's, though it does vary by geography between 0% and 4.25%.
   - There have been no adverse or positive trends in rate spreads over time, and the QI's have been performing "right on" relative to his expectations.

7. **Can we obtain a first-year's financial statements on the QI's to compare against projections?**
   - Partial year's 2005 income statements have been provided (see above).
     - Ideally, the statements would be independently prepared, and even more ideally they would be consolidated with consolidating notes.
       - o The statements were company-prepared.
     - At a minimum, please provide balances sheets for all QI's dated as of the same date.
       - o Although we asked for this, it was not provided.

8. **Has Ed permanently ceased the practice of borrowing from the QI escrow accounts?**
   - I did not address this question directly with Ed, nor did Lara Coleman directly address it either.
   - However, RM Steve Cooney has recently discussed this matter with them. It is his understanding that Ed does not intend to borrow from the escrow accounts again.

WACH–MCHALE   000007564

9. **NES 1031, IXG 1031, and Crossroads Trucking & Logistics are 3 new companies on the current PFS**
   - The first two appear to be two new QI's...are they, and if not what are they?
     - They are QI's (discussed above)
   - The first two are valued at $12MM on the PFS...how did Ed finance these?
     - Lara indicates that these acquisitions were not financed. However, purchase and installment terms, if any, have not been discussed.
   - **What are the projections for these companies?**
     - While there are no projections at this time, the QI business is expected to grow mostly through new business development (though the acquisition of a California QI is a distinct near-term possibility).
     - Crossroads Trucking & Logistics is a company that was formed to purchase the assets of Cantrell Logistics. Cantrell was the tenant of the 459M SF property called 5201 West 86th Street. This company also occupies another recently acquired property in Shreveport.
     - Crossroads is currently profitable and is expected to become even moreso, though no projections were available.

10. **Why hasn't the $20MM purchase price for First Montauk been reflected on the PFS (or at least the first 49.96% of it)?  Where will Ed get the money for this?**
    - The purchase has not been completed yet. $2MM is in escrow, $6MM in stock (representing 25% of ownership but 51% of voting rights) has been obtained already, and the additional $15MM to complete the stock purchase and to provide working capital will be obtained either from the sale of the West Oaks Mall or the refinancing of a newly acquired property in Shreveport, LA.
      - **What are the future plans for this company now (i.e. have they changed since last time)?**
        - First Montauk will continue as a regional broker-dealer serving the northeast.
        - The business platform will be "beefed up" from what is now, primarily stocks and bonds, to include management money through Registered Investment Advisors as well as insurance.
          - The new CEO & COO have years of experience in the insurance industry, and at one pint the CEO owned an insurance agency that was sold to Fleet/BofA.
        - In addition to the purchase of the stock (which is not accretive to the company itself, just to its former owners), Ed will also inject a total of $10MM of equity into the company.
          - $3MM as a direct investment in the form of the planned working capital.
          - $7MM from the private placement of the building the company occupies in Red Bank, NJ. Ed purchased this property (Waterview) for the business. He paid $6.1MM and it is currently worth $15MM.
        - This $10MM base of capital will allow First Montauk to do things it wasn't able to do before:
          - For example, it will offer underwriting services, for both private and public placements of stocks and bonds. This is something the company was unable to do successfully on a much smaller capital base.
      - **$5MM of investment by Ed into First Montauk was planned...has this been injected yet?**
        - This amount is now $3MM and will be invested in the start of 2007.
      - **Will Ed be running his own deals through this entity as planned...and if so, what types of deals since he'll no longer be in the TIC business?**
        - It is likely. However, Ed's deals are not expected to exceed 1% of the company's overall business.

WACH-MCHALE   000007565

- ○ Will it go S-corp once it goes private and, if so, are there any tax consequences?
  - ▪ The corporate structure is currently being worked on.
  - ▪ The company recently hired a new head of compliance from Morgan Stanley and a new COO previously with Mutual of New York and AXA broker/dealers. As a result, these individuals need time to help develop strategy for the company.
- ○ Do they have any financial projections or pro-formas for the first year of control?
  - ▪ Projections will be available soon once the new executives have mapped out a path for the business.
- ○ Still predicting a future profit of $10MM per year?
  - ▪ Ed estimates a profit of $5MM in 2007:
    - ● The company is currently operating at breakeven.
    - ● Ed indicated that the company will save $2.5MM by going private, that $1.5MM in costs have been trimmed through expense reduction, and that the balance will be obtained through increased business.
  - ▪ Beyond 2007, the new COO is estimating a doubling of the current $55MM revenue within two years. Of this $110MM in projected revenue, it is estimated that 15% will be net profit.
- ○ If so, what lines of business are expected to produce that, and how much of that will stem from Ed's transactions?
  - ▪ Discussed above.

11. **Please provide updates on the following in-process activities as of the last time we spoke:**
- • Exiting the TIC Fund business and anticipated regulatory scrutiny
  - ○ Any impact on IPofA:
    - ▪ Reputationally for exiting this business?
      - ● No. IPofA has not done a TIC deal recently, but is in the process of syndicating deals that qualify for 1031 tax deferral. The company is simply changing the vehicle from tenant-in-common to partnership.
    - ▪ Regulatorially?
      - ● None are expected to impact IPofA from it's prior TIC's.
      - ● The new syndications are in the form of limited partnerships and are not deemed to be securities.
- • IPofA was going to be undertaking the buy-back of its prior TIC's:
  - ○ Any time estimate for completion? Any idea which properties this will happen to?
    - ▪ 5201 West 86th Street (i.e. the logistics building) is being appraised, and IPofA is planning to buy this property back during Q4 2006 or Q1 2007.
  - ○ Any idea the financial or other impact these will have?
    - ▪ The property is valued in excess of the master lease by approximately $6MM, which will accrue to IPofA. It is anticipated that this incremental value earned upon the cancellation of the master lease will be enough to satisfy equity requirements to finance the full purchase price of the property back from the TIC.
- • Please provide an update on the Direct Capital lawsuit & expected settlement of $649M.
  - ○ This was settled for $750M earlier this year.
- • What is the status of IPofA's new venture with Stuart Title Co.?
  - ○ Has this occurred yet? What will be the financial calls on Mr. Okun for this new venture, both today and deferred?
    - ▪ Ed does not have a title company currently. He has looked at the industry, but has not made any firm commitments to date.

WACH-MCHALE    000007566

- Please explain what Ed's strategy is with respect to the New Hampshire homes:
  - Does he plan to hold these long-term or "flip" them?
    - He plans to hold the properties.
  - Is Ed planning to expand his real estate business into residential homes now? If so, is he targeting only prestige properties?
    - No.
- Property-specific questions:
  - Can we obtain surveys on both properties?
    - They have been provided, reviewed, and forwarded to Mortgage Direct.
  - Is the 28-acre property (i.e. "The Acreage") platted as 3 separate lots or as one?
    - The previous owner had prepared a plat to make the larger property into three lots, but the plat was never recorded. Thus, The Acreage is and has always been one lot (and The Home is a separate lot).
  - In whose names are the two properties being titled?
    - Both properties will be titled in the name of Ed's revocable trust. Ed Okun will be the borrower on the loans.
  - In light of the one-home-per-lot limitation in the area, does Ed still intend to get unity of title for the two properties?
    - No
  - What product is Ed looking for: Fixed rate, floating rate, or mixed? Maturity? Mortgage/HEL/PEL?
    - 7/1 ARM, interest-only for 10 years with a 30-year maturity; floating rate, currently 6.50%.

12. **Mortgage Direct:**
    - Are they underwriting any exceptions (esp. DTI) on this request, and if so what?
      - 1) LTV > 60%, 2) One loan > $3MM, 3) Credit Score < 700, 4) possibly DTI

13. **Equipment Leasing:**
    - Is the current yacht loan paying as agreed?
      - Yes
    - What was the final P&I Payment on this loan?
      - Interest only with principal due at maturity

14. **Please confirm that the $8MM yacht loan will still be paid in full at maturity in March (i.e. no extension)**
    - This has been confirmed by Lara Coleman.

15. **Previously there was conversation of a $60MM note placement through Montauk:**
    - Did that ever take place? What property was that on (Columbus maybe)?
      - This was for the West Oaks Mall. After discussion with the firm, the various brokers, lenders, etc., the company opted for a private placement offering, which is currently being syndicated.

16. **Please estimate real estate taxes, insurance, and other/maintenance expenses related to both New Hampshire properties.**
    - Taxes are $32M for The Home and $21M for The Acreage.
    - Maintenance is expected to be nominal:
      - The Home was constructed in 1999.
      - On The Acreage, the boathouse is three years old, the cabin is new, and the barn was disassembled from another town on the lake and reassembled like new on this property.
    - Insurance is $3,500 for both properties, including $500M coverage for contents.

WACH-MCHALE   000007567

Deal Concept Memo #2                                                                                    Page 7
Ed Okun – $6MM Mortgage Override                                                          October 17, 2006

- Some notes on these improvements:
  - The boathouse on The Acreage property can house two boats of 40' length. It is made of poured concrete with a high dome, and it's fully illuminated.
  - The boathouse on The Home property is similar but houses two boats of 30' in length.
  - As of three years ago, local government forbids the construction of new boathouses on the lake.
  - With 450' of combined waterfront, two boathouses, a barn, a house, a guest house, and a cottage, Ed believes he has the only private compound on the lake (though he will not seek unity of title). It is for this reason he believes he could sell the two properties together for $22MM next summer.

**17. Does Ed anticipate any regulation of QI's in the near future due to the risk of escrow money disappearing?**
- The only regulation they are aware of is 468B. This is an attempt to regulate the rate that QI's pay to clients.
  - Currently many QI's pay no interest at all to clients. These are mostly the small QI firms formed by attorneys and accountants.
  - This regulation is supported by many larger QI's. It will hurt the smaller operator, but it will also cause many unscrupulous QI's to exit the business.

**18. Trish Bracci to discuss Ed Okun with REFS Credit/Risk to "build out" our knowledge of Ed with respect to a) his last 2 decades as a real estate operator, and b) his organization.**
- Trish recently spoke with Peter Leahy, REFS Credit approver. He indicated that REFS is comfortable with Ed and his management team as operators. Their concern remains the same as Wealth's, in that they really don't understand his other businesses. They consider his transactions deal-by-deal.

**19. Are there existing appraisals on the two NH properties?**
- None were provided.
- However, the new appraisals on the two properties were received today and are discussed below.

**20. Please confirm that the $2MM seller-financed note will be paid off with proceeds of the Bank's $6MM loan, and that Ed's equity in the properties will remain $4MM.**
- Yes, this has been confirmed.

**21. Ed purchased the properties for $10.1MM but he feels they'll be worth $22MM...what does he base his estimated $12MM gain upon?**
- See Q #16 above.

**22. Can the Financial Planning Group provide us with any information on Ed?**
- While the Financial Planning group has had information on Ed and his businesses for a year, Ed has not yet made arrangements to meet with them and discuss needed details.

**23. Does the $6MM contract price for The Home and the $4.1MM contract price for The Acreage include the price of any furniture or other personal items (which typically are excluded from financing and the appraised value)?**
- They do not. The contracts only account for fixtures, appliances, timber and stone walls (though The Home also includes window treatments & electronic components).

*Additional Information*
- Ed expects synergies between First Montauk, the TIC/private placement business, and the QI business. He can now qualify QI clients as candidates for private placements, and cross referrals between all three units are possible (e.g. he can refer First Montauk clients to the QI's).

WACH-MCHALE   000007568

- Ed describes himself as one of the top five qualified intermediaries in the U.S. The ability to do reverse exchanges and safe-harbor exchanges helps to further set him apart.
- First Montauk has been selling TIC funds prior to Ed's purchase of the company.
  - One of the top producers has been selling $50MM (equity) worth of TIC funds each year for the last three years.
  - Such a producer provides profit of $500M to $700M to the company.
  - Ed's goal is to have eight such producers selling for the company by year end (he has offers out to two others right now).
- Today First Montauk makes its money through brokerage.
  - The company has several "big stock producers".
  - Red Bank, the company's headquarters, is an affluent area and provides a good base of business.
  - Every broker is the owner of his own company, doing business under the First Montauk name.
    - There are 385 reps nationwide with no overhead.
    - This is a concept reportedly originated by First Montauk in 1994.
- Ed believes he got a "great bargain" for First Montauk:
  - This company had some very sloppy oversight and, as a result, serious compliance issues.
  - When the regulators investigated the company, top management was less than truthful with them.
  - There were several rogue brokers who were largely responsible for problems at the company.
- Ed has obtained full ownership interest in a property located in Shreveport, LA:
  - He purchased it for a total of $7.5MM from his partners. The partnership had acquired it for $15MM.
  - The reason for the discount is because one of the partners caused the existing, substantial tenant to not renew the lease, leaving the property vacant.
  - Upon his purchase, Ed got his logistics company to occupy the property.
  - He is now in the process of refinancing this property for $35MM in debt (estimated value of $50MM), which should yield Ed about $27.5MM above his cost.
- Ed is presently attending a trade show in Las Vegas. He said that this year, for the first time, there are many investors at the show. Interest among smaller operators has expanded as the media has begun to popularize the virtue of tax-deferred exchanges and the concept of managed real estate as a substitute for the "headaches" of direct ownership.


*Revised Personal Cash Flow*

- The most recent PFS is still the 8/4/06 PFS discussed in Deal Concept Memo #1. Thus, there is no further discussion at this time.
- The writer obtained a recently-filed 2005 PTR. This and other information provided by the client have been used to prepare a 2005 PTR and a revised, projected 2006 cash flow:
  - The 2005 PCF is substantially more negative than the 2004 PCF.
    - This is due to large losses shown for many single-member LLC's that were not reflected on the 2004 PTR.
    - According to Mr. Okun, the 2005 losses were due, in part, to cost segregation of expenses from the West Oaks property across these entities. Since West Oaks is in the process of being sold, these costs are deemed non-recurring and have thus been added back. The total of the costs is estimated at $5MM based on information provided by Ed Okun.
    - This notwithstanding, the new LLC's still appear to be generating actual cash losses of about $7.8MM.
    - In the 2005 results, this has not been offset by any other activities. As a result, 2005 PCF is reported as negative.
- The 2006 projection encompasses the 2005 actual results, but also includes additional information and analysis in an attempt to convert Ed's activities into usable, recurring results.
  - Additional income taxes of $745M were estimated on annualized QI income and deducted.

WACH-MCHALE  000007569

| Balance Sheet - Edward H. Okun | February, 2007 |
|---|---|
| **Assets** | |
| Cash & Short-Term Investments | $4,700,000 |
| Stocks and Bonds | $2,450,651 |
| Unlisted Securities | $29,242,815 |
| Notes & Accounts Receivable | $41,969,812 |
| Personal Property | $4,100,000 |
| Automobiles | $1,798,500 |
| Boats | $18,469,900 |
| Planes | $7,760,000 |
| Real Estate - Personal Residences | $43,295,000 |
| Real Estate - Investments | $324,848,945 |
| **Total Assets** | **$478,635,623** |
| | |
| **Liabilities** | |
| Taxes Payable | $23,000 |
| Mortgages & Obligations Due | $139,810,000 |
| Notes & Accounts Payable | $162,100,000 |
| Letters of Credit | $101,253 |
| Deferred Tax (on Columbus Works Lease) | $38,349,578 * |
| **Total Liabilities** | **$340,383,831** |
| | |
| **Net Worth** | **$138,251,792** |
| | |
| **Liquidity** | **$7,150,651** |

*Note-This is tax on master lease if Ed Okun were to liquidate.
In reality, will pay over time on income from lease.

WACH-MCHALE   000007555

- ○ $327M in real estate taxes & insurance were estimated on personal residences and the new homes in New Hampshire.
- ○ The $1.4MM in cash flow from the West Oaks Mall is expected to disappear once the property is syndicated, though it's possible some residual income will be retained if a master lease is required.
- ○ Nearly replacing this cash flow, however, is approximately $900M in cash flow from the Shreveport property, the Salinas, KS property, and the Viking Mall.
- ○ Estimated income of $600M is still being projected from the Richmond Square mall.
- ○ QI profit has been annualized based on a) the actual, partial-year 2005 results for AEC and SOS, b) those companies' current floats relative to those of the other newly acquired QI's, and c) an overall reduction of the resulting number by 30% to account for the observed decrease in business largely due to a slower Florida market.
- ○ Yacht expenses are estimated at 10% of cost.
- ○ Most challenging this year was the estimate of cash flow from the sale and monetization of real estate properties.
  - ▪ It is clear that selling properties to TIC's/limited partnerships for a profit is an enduring part of Ed's business, as is refinancing owned property to remove accrued equity.
  - ▪ Ordinarily gains are treated as non-recurring and non-operating. However, for finance companies such as IPofA, the purchase and sale of real estate is likely treated as ordinary revenue and expenses, as this is now not an ancillary but a primary way of earning revenue. As a result, consideration had to be given to treating capital gains at least as partly recurring.
  - ▪ 2005 capital gains exceeded $25MM. Since it is not appropriate to consider gains originated from a two to three year holding period in full in just one year, these gains were divided by three to reflect an averaging over an estimated three-year holding period. As a result, credit of $8,120M was granted in the cash flow as a conservative, best effort to recognize the fact that capital gains will recur regularly by virtue of Ed's purchasing distressed properties & improving/leasing them up to create value. It is also easier to give such credit this year, because Ed has repeated this success several times, and it has now revealed itself on the PTR. The planned syndication of West Oaks alone is expected to yield Ed $84MM for his equity stake. Plus, the syndication of the Red Bank property will yield $7MM (though that will be fully reinvested into First Montauk).
  - ▪ I have not given any credit for Ed's tendency to monetize by borrowing against newly appreciated properties. However, this too will likely continue to generate cash flow to Ed in the future. The refinance of the Shreveport property alone is expected to yield Ed $27.5MM above his cost.
  - ▪ I have also not given any credit to First Montauk for cash flow. Ed reported that the business is currently break-even, and I believe it prudent to allow another full year's operation and proof of solid profitability before giving credit for this potential cash flow stream.
  - ▪ Overall, global DSC is 1.95X with $1,509M in cash flow remaining after debt service.

*Property Appraisals:*
- ▪ Appraisals dated 10/13/06 and prepared by Catherine Smith have been provided.
- ▪ The Home (with address at 39 Aaron Road, Wolfeboro, NH), which was purchased for $6,000M, was appraised for $5,500M.
- ▪ The Acreage (with address at 49 Aaron Road, Wolfeboro, NH), which is under contract for $4,100M, was appraised for $3,600M.

WACH-MCHALE   000007570

Deal Concept Memo #2
Ed Okun – $6MM Mortgage Override

Page 10
October 17, 2006

- According to the appraiser, the reasons for the difference from price are a) a lack of comparables on the lake (applies to both property), and b) cross-easements on each property granted by the other property (applies to The Home only).
  - According to Ed, the cross-easements will be eliminated when he takes ownership of both properties. Vacating easements apparently is an easy thing to do in Wolfeboro.
  - As discussed, the easements that impair value are access easements relative to road ownership common to the properties.
  - The appraiser prepared a letter discussing the $500M discount from cost she applied to The Home. However, in the writer's opinion, the letter did not provide sufficient comfort to view the diminishment as temporary. While the easements would effectively be eliminated with Ed's ownership, the Bank will want easements to remain.
    - Since we are requesting two separate loans, and since The Home is effectively landlocked without the easement through The Acreage, we are requiring that access to The Home not be vacated with Ed's ownership and that it remain permanently.
    - The Bank is amenable to having that access easement relocated to a more convenient location.
    - The Bank is also amenable to having the cross-easement which runs from near the lake on The Acreage through the upper-right quadrant of The Home's land vacated. This easement is superfluous, as The Acreage already has access to Aaron Road without needing a second path through The Home's lot.

*Loan Request:*
- The requested financing package remains at $6MM, resulting in a combined 65.9% LTV.
  - $3,600M is being requested on The Home valued at $5,500M.
  - $2,400M is being requested on The Acreage, valued at $3,600M. Also, the barn on this property was considered to have many superadequacies and is an overimprovement (though specific value impairment for this was not readily evident).

*Credit Grade Recommendation & Revised WAFDG:*
- The model-assigned grade of 5.5 is recommended for override to a 5.2.
  - The 1.95X DSC suggests superior repayment ability of 1.5 vs. the 6.2 debt capacity portion of grade assigned by the model.
  - When accounted for this way, the standard weighted result is 3.5 and then adjusted for lack of liquidity to 4.2. It is recommended that this be reduced by one full point to 5.2 to account for the continued uncertainty, complexity, and velocity of Ed Okun's businesses.
- The WAFDG calculation is then revised as follows:

    WAFDG Calculation (Worksheet also appended in CATools under Customer):
    $28,400M X 5.8
    $ 8,150M X 5.2
    $ 3,000M X 6.2
    $     5M X 5.8
    $     1M X 6.5
    $ 3,000M Mortgage – N/A
    $ 1,080M PEL – N/A
    $ 6,000M Proposed Mortgage/PEL – N/A

    Raw WAFDG:        5.50019
    **Rounded WAFDG:**    5.5

WACH-MCHALE   000007571

*Conclusion:*

- Based on my conversation with Ed Okun, current and prior dealings with Lara Coleman, and increasing familiarity with Mr. Okun's real estate ventures and operating methods, I am gaining confidence that Ed's talents are verifiable. Many of his projections, especially those of value, are in fact being proven out and often exceeded (e.g. West Lakes Mall).
  - Nothing discussed has surfaced any irregularities or bothersome contradictions from representations made in the past.
- While the financial analysis still includes some uncertainties, ambiguities, and necessary assumptions, there are less of them than last year, and they are made with more certainty this year. Furthermore, it does in fact appear that the projected cash flow will be conservative compared to actual 2006/2007 results, as the planned syndications and monetizations will substantially exceed that cash flow.
- The value/cost differential on the collateral is a limited concern.
  - The 5.9% increase in proposed LTV (from 60% to 65.9%) represents $590M, which is a small fraction of Ed's typical transactions and just over 15% of recurring cash flow before debt service. It is expected that Ed will maintain deposits (albeit business deposits) with the Bank in excess of this amount at all times.
  - In lieu of the size of the Bank's overall relationship (nearly $50MM in credit), and additional Bank products utilized by Ed, a relationship case can be made to take on the additional $590M risk.
- In consideration of these facts and the continued favorable PCF analysis, I recommend approval of this request.

WACH-MCHALE   000007572

# EXHIBIT 7



| EVIDENCE OF INSURANCE |
|---|

| FIDELITY BOND PROGRAM |
|---|

This document certifies that:

**1031 ADVANCE INC.**

is insured under a Fidelity Bond underwritten by Continental Casualty Company,
a member of the CNA Insurance Companies, for the effective period of:

**February 21, 2007 – August 15, 2007**

Description of Coverage:    The Fidelity Bond insures against losses resulting from dishonest acts, such as embezzlement, conversion, fraud, theft, etc., of the insured's employees against the insured, as well as the insured's employees, partners and owners against the insured's clients.

Policy Number:        287014434            **Continental Casualty Company**
                      8207-2761            **Federal Insurance Company**
                      57FA0241088 07       **Twin City Fire Insurance Company**

Amount of Coverage:   **$20,000,000**   Per Occurrence

Insurance Broker:     Claudia Porras
                      Lockton Insurance Brokers, Inc.
                      Two Embarcadero Center, Suite 1700
                      San Francisco, CA  94111
                      Tel: (415) 568-4037 / Fax: (415) 992-4000

LOCKTON INSURANCE BROKERS, INC.

*Claudia Porras*
_____
Authorized Representative



---

### EVIDENCE OF INSURANCE

### FIDELITY BOND PROGRAM

This document certifies that:

**1031 Tax Group, LLC**
**Atlantic Exchange Company**
**Investment Exchange Group**
**National Exchange Services**
**Real Estate Exchange Services**
**Security 1031 Services, Inc.**
**SOS Holdings, Inc.**

is insured under a Fidelity Bond underwritten by Continental Casualty Company,
a member of the CNA Insurance Companies for the effective period of

November 11, 2006 – August 15, 2007

| | |
|---|---|
| Description of Coverage: | The Fidelity Bond insures against losses resulting from dishonest acts, such as embezzlement, conversion, fraud, theft, etc., of the insured's employees against the insured, as well as the insured's employees, partners and owners against the insured's clients. |
| Policy Number: | CNA       268117856 |
| | Chubb     6801-8602 |
| Amount of Coverage: | $10,000,000    Per Occurrence |
| Insurance Broker: | Claudia Porras |
| | Lockton Insurance Brokers, Inc. |
| | Two Embarcadero Center, Suite 1700 |
| | San Francisco, CA 94111 |
| | Tel: (415) 568-4037 / Fax: (415) 992-4037 |

LOCKTON INSURANCE BROKERS, INC

*Claudia Porras*

Authorized Representative

---

## Audit Protection Statement

We understand the importance of your security. We guarantee our exchanges in wri
for your peace of mind. The following excerpt is taken directly from our 1031 client
exchange documents. 8.2 QI covenants, represents and warrants to Exchanger that

(a) QI takes full responsibility for the correct preparation of documents that are, or should hav
been, prepared for this exchange. If any penalty arises from QI's failure to prepare, or correctl
prepare, any document required for the exchange, QI agrees to pay such penalties arising from
negligence.

# EXHIBIT 8

# REAL PROPERTY EXCHANGE AGREEMENT

THIS REAL PROPERTY EXCHANGE AGREEMENT (Agreement) is made and entered into as of March 12, 2007, by and between Anita Hunter, (Exchanger) and 1031 Advance, Inc., a California corporation as the Qualified Intermediary (QI).

This Agreement is made and entered into with reference to the following facts:

A. Exchanger is the present fee owner of that certain real property located in the County of Santa Clara, State of California, commonly known as 3189 Cadillac Drive, San Jose, California, (Relinquished Property).

B. Exchanger desires to make a qualified tax-deferred exchange of Exchanger's interest in the Relinquished Property for other property or properties of like kind in accordance with Internal Revenue Code §1031, the Treasury Regulations promulgated under that section, and corresponding provisions of state tax legislation.

C. Exchanger has entered into a written Sale Contract with Bhogilal G. Suthar and Premila B. Suthar, Trustees of the Suthar Living Trust dated July 26, 2000, (Buyer) by which Exchanger has agreed to convey and Buyer has agreed to acquire Exchanger's interest in the Relinquished Property on the terms and conditions set forth in the Sale Contract.

D. QI is willing to act as a qualified intermediary, as that term is defined in Regulation §1.1031(k)-1(g)(4), in connection with Exchanger's exchange.

NOW, THEREFORE, in consideration of the mutual covenants, conditions, and agreements set forth in this Agreement, Exchanger and QI each agree as follows:

1. Exchange of Properties. Exchanger agrees to transfer Exchanger's interest in the Relinquished Property to QI in consideration of, and in exchange for, the transfer by QI to Exchanger of other property (or properties) of like kind (Replacement Property) to be identified by Exchanger and transferred to QI under the terms of this Agreement. QI agrees to transfer Exchanger's interest in the Relinquished Property to Buyer in a sale transaction and to acquire the Replacement Property from the Seller of the Replacement Property in a purchase transaction in furtherance of the exchange described in this Agreement.

2. Assignment and Assumption of Sale Contract.

   2.1    Exchanger hereby conditionally assigns all of its right, title and interest in the Sale Contract and certain of its obligations thereunder to Intermediary. More particularly, Exchanger assigns its obligation to sell the Relinquished Property specifically conditioned upon Exchanger's performing all other obligations required of Exchanger to Buyer and any obligations surviving the close and transfer of title to Buyer. Intermediary agrees to assume this obligation and perform said obligation in the manner provided for herein.

01-0701349                                    1

2.2    All representations, covenants, and warranties, express or implied, made by Exchanger or Buyer with respect to the transfer of Exchanger's interest in the Relinquished Property and the transactions contemplated by the Sale Contract and this Agreement shall survive the transfer of Exchanger's interest in the Relinquished Property by Exchanger to QI and by QI to Buyer. All rights, remedies, liabilities, and obligations arising therefrom shall be deemed to be assigned and delegated by QI to Exchanger and assumed by Exchanger effective simultaneously with the closing of the sale of the Relinquished Property to Buyer.

2.3    The assignment and assumption provided in this Agreement shall be null and void if Buyer or its assignee does not acquire title to Exchanger's interest in the Relinquished Property because of the Buyer's or assignee's breach or if either fails to waive any contingencies or if there is a failure of any condition precedent to the obligations of either Exchanger or Buyer to perform the Sale Contract.

3. Relinquished Property Closing.

3.1    Closing Agent. First American Title Company, (Closing Agent) shall handle the processing of the exchange and sale of Exchanger's interest in the Relinquished Property. Exchanger and QI each covenant and agree to execute instructions to Closing Agent consistent with this Agreement for the purpose of effecting the exchange provided for in this Agreement and the subsequent sale of Exchanger's interest in the Relinquished Property to Buyer.

3.2    Prorations: Insurance. All property taxes, insurance premiums, rents, and interest on Exchanger's interest in the Relinquished Property shall be prorated as of the closing.

3.3    Direct Deeding. Without in any way affecting QI's obligation to acquire Exchanger's interest in the Relinquished Property, in order to save transfer taxes, title insurance premiums, and additional closing costs, QI shall direct Exchanger at the closing to execute a deed conveying legal title of Exchanger's interest in the Relinquished Property directly to the Buyer.

3.4    Timely Closing. If QI does not transfer the Relinquished Property to Buyer on or before the date set forth in the Sale Contract, and the parties to this Agreement do not mutually agree to extend the closing date, this Agreement shall be rescinded, and Exchanger's assignment to QI of the Sale Contract shall be deemed null and void.

4. QI's Fee. Exchanger agrees to compensate Intermediary for the performance of the services of such as described herein in the amount of $500.00 which will be collected from the Relinquished Property closing. Exchanger and QI expressly agree that any cash proceeds received from the disposition of the Relinquished Property (Exchange Proceeds) shall be held in the account of QI with a nationally insured bank or savings institution. QI agrees to credit to the account of Exchanger interest on funds held by QI at QI's prevailing rate. Said account shall be in the name of QI and shall require the signature of an authorized officer of QI to permit the withdrawal of any portion thereof.

5. Identification and Acquisition of Replacement Property.

5.1    Identification of Replacement Property.  Before the end of the 45-day period beginning on the date of the transfer of Exchanger's interest in the Relinquished Property to QI, or at QI's direction, to the Buyer, the (Identification Period), Exchanger shall give written notice to QI of all property that may constitute Replacement Property. Any such identification may be revoked and a new Replacement Property identified on Exchanger's written notice to QI before the end of the Identification Period.

5.2    Contracts To Acquire Replacement Property.  Exchanger shall establish the terms of acquisition with the Seller(s) of any identified Replacement Property and shall provide QI with the form of acquisition agreement(s) acceptable to Exchanger. QI shall thereafter accept an assignment of Exchanger's contract rights to purchase any of the identified Replacement Property or, at Exchanger's direction, shall enter into a binding written contract in the form approved by Exchanger with such Seller(s) to acquire any identified Replacement Property.

6. Terms for Acquisition of the Replacement Property.

6.1    Acquisition and Exchange.  All costs of acquiring the Replacement Property, including cash payments toward the purchase price and all other acquisition fees incident thereto shall be borne first from the Exchange Proceeds held by QI from the sale of the Relinquished Property and then, to the extent necessary, from funds of Exchanger. QI shall acquire all Replacement Property specified by Exchanger through escrow/closing procedures specified in the relevant acquisition agreement. Concurrent with acquisition of each Replacement Property, QI shall cause the transfer and conveyance of the same to Exchanger. To facilitate the transfer of Replacement Property to Exchanger and to save additional transfer taxes and escrow fees, QI shall be deemed to have satisfied its obligations under this Agreement if it causes the Seller of any Replacement Property to transfer legal title of the same directly to Exchanger rather than QI first acquiring legal title and then conveying it to exchanger.

6.2    Effect of Identified Replacement Property Remaining Unacquired.  Exchanger expressly acknowledges that if, after the end of the Identification Period, and before the end of the Exchange Period, any identified Replacement Property that has not been acquired by Exchanger within the Exchange Period, for any reason other than for reasons beyond Exchanger's control, then any Exchange Proceeds that are not used during the Exchange Period to acquire any identified Replacement Property, and the interest on the entire Exchange Proceeds, shall not be disbursed to Exchanger until the end of the Exchange Period.

6.3    Number of Properties To Be Acquired May Be Limited.  If Exchanger specifically states in the Identification Form that Exchanger intends to acquire less than all of the identified Replacement Property (e.g., "Exchanger intends to acquire only one [two] of the three properties identified here"), then after Exchanger has, before the end of the Exchange Period, acquired that number of identified Replacement Property, Exchanger shall not be entitled to acquire any other property as Replacement Property, regardless of whether it is identified to QI.

01-0701349                                3

7. Termination of Exchange.

7.1    Exchanger's Right to Cash. Except as expressly provided in this Agreement, Exchanger shall have no right to request or receive anything other than like-kind property before expiration of the Exchange Period. Exchanger shall have no right, except as provided in paragraph 7.2, to receive, pledge, borrow, or otherwise obtain the benefits of the Exchange Proceeds including, without limitation, any interest income earned on the proceeds held in trust by QI under this Agreement, or other property held by Intermediary under this Agreement prior to the end of the Exchange Period.

7.2    Events Giving Right to Cash Before End of Exchange Period. On expiration of the Identification Period, Exchanger shall have the right to require QI to distribute a sum equal to any unexpended portions of the Exchange Proceeds to Exchanger if (i) there remains no identified Replacement Property that has not been acquired; or (ii) QI has acquired all Replacement Property that was identified under Section 5 of this Agreement; (iii) Exchanger has acquired all Replacement Property that it is entitled to acquire under this Agreement; or (iv) it is impossible for QI to acquire any of the remaining identified Replacement Property because of material and substantial circumstances beyond Exchanger's control. The parties to this Agreement intend that these conditions be interpreted and imposed in a manner consistent with the limitations in Regulation §1.1031(k)-1(g)(6).

7.3    At End of Exchange Period. The period within which the Exchanger must receive the Replacement Property (Exchange Period) begins on the date on which the Relinquished Property is transferred to Buyer and ends on the earlier of 180 days or the due date (including extensions) for the Exchanger's tax return for the taxable year in which the transfer of the Relinquished Property occurs. At the expiration of the Exchange Period, QI shall distribute to Exchanger a sum equal to any balance of the Exchange Proceeds and interest that QI has not already used to acquire Replacement Property for conveyance to Exchanger. The payment of such amounts shall be made in cash; provided, however, that to the extent that QI holds any Purchase Note, payment shall be made by QI's assignment, without recourse, of such Purchase Note to Exchanger (and the assignment of all security given with respect to such Purchase Note), plus the delivery to Exchanger of all payments of interest or principal on the Purchase Note that have been actually received by QI.

8. Indemnity by Exchanger.

8.1    General Indemnity. Exchanger shall, and agrees to, hold QI harmless and indemnify QI, its directors, officers, employees, attorneys, and agents from any claim, liability, demand, expense, tax, or assessment of any nature or kind, expressed or implied, whether sounding in tort or in contract that may be asserted against QI, its directors, officers, employees, and agents, by any person (other than Exchanger), firm, corporation, governmental agency, or taxing authority, including but not limited to any and all supplemental tax bills issued by the tax collector in any county in which any transaction contemplated by this Agreement is consummated, that may arise from any acts or omissions, active or passive, related to carrying out the terms of this Agreement or from participation in this transaction, except any that arise from the gross negligence or willful misconduct of QI or any other person to be indemnified. Exchanger's obligations shall include, without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, cleanup, or detoxification or decontamination of any of the Relinquished Property or

Replacement Property or any improvements on these Properties, and the preparation and implementation of any closure, remedial action, or other required plans in connection with these Properties. These obligations to indemnify QI shall survive the transfer of any such Property or improvements to QI's successor in interest. For purposes of these indemnity provisions, any acts or omissions of, or by employees, agents, assignees, or representatives of Exchanger or others acting for or on behalf of Exchanger (whether or not they are negligent, intentional, willful, or unlawful) shall be strictly attributable to Exchanger.

9. <u>Conflict With Prior Agreements</u>. If and to the extent that this Agreement conflicts with any prior written or oral agreement or understanding between the parties to this Agreement, the terms of this Agreement shall prevail. No modification or waiver of the terms of this Agreement shall be valid unless made in a writing signed by both parties.

10. <u>Attorney Fees</u>. Should suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover as an element of its costs and not as damages, reasonable attorneys fees to be fixed by the court.

11. <u>Survival</u>. The terms of this Agreement shall survive the closing and the delivery of Exchanger's interest in the Relinquished Property to QI and of the Replacement Property to Exchanger.

12. <u>Time</u>. Time is of the essence of this Agreement.

13. <u>Assignment</u>. This Agreement shall inure to the benefit of, and shall be binding on, the parties to this Agreement, their estates, heirs, representatives, successors in interest, and assigns; provided, however, that neither party shall have any right to assign this Agreement or any of that party's rights under it without the prior written consent of the other party, which such party may withhold in its sole discretion.

14. <u>Notices</u>. Any notice to be given hereunder shall be given by personal delivery or by depositing such notice in the United States Mail postage prepaid, and addressed to the respective party at the following address:

To Exchanger:

                Anita Hunter
                14107 Taos Drive
                Saratoga, CA 95070

To QI:

                1031 Advance, Inc.
                1884 The Alameda
                San Jose, CA 95126

Either party may change its address for notice by giving notice to the other party in accordance with this section.

01-0701349                         5

15. <u>No Agency</u>. Exchanger acknowledges QI is acting as a principal in all the transactions contemplated by this Agreement and in no way shall be deemed an agent of Exchanger and to such extent, QI shall not have any obligations to Exchanger as an agent of Exchanger nor shall Exchanger have any obligations to QI as a principal of QI.

16. <u>Counterparts</u>. This Agreement may be executed in counterpart and shall be of the same force and effect as if one document had been signed by all parties.

17. <u>No Warranty on Tax Consequences</u>. QI makes no representation or warranty, nor shall QI bear any responsibility or liability concerning the federal or state tax consequences to Exchanger of the transaction contemplated in this Agreement, including, without limitation, the status of any Replacement Property as like-kind property or the qualification of this transaction as a like-kind exchange under Internal Revenue Code §1031 or applicable state tax laws.

18. <u>Force Majeure</u>. Intermediary shall not be liable to Exchanger for any failure or delay in performance including, but not limited to power failure, rolling blackouts, earthquake, fire, flood, war, insurrection, Acts of God, accident, strike or other labor disturbance, or interruption of or delay in transportation. Accordingly, Exchanger is strongly urged to take steps to schedule the acquisition of all Replacement Property sufficiently before the expiration of the Exchange Period so that any unforeseen delay will not result in a violation of the time constraints imposed.

19. <u>Governing Law</u>. This Agreement shall be interpreted under and governed by the laws of the State of California.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EXCHANGER

Date: 3-27-07

Anita Hunter

QI

1031 ADVANCE, INC.,
a California corporation

Date: 3-12-07

By:

Steven Allred, Vice President

01-0701349                                6

## ASSIGNMENT OF PURCHASE AND SALE AGREEMENT

### (Relinquished Property)

This Assignment is entered into by and between Anita Hunter, (Exchanger) and 1031 Advance, Inc. as qualified intermediary (QI).

Exchanger, as Seller, entered into that certain Real Estate Purchase and Sale Agreement with Bhogilal C. Suthar and Premila B. Suthar, Trustees of the Suthar Living Trust dated July 26, 2000, (Buyer) for the property commonly known as 3189 Cadillac Drive, San Jose, California, (Relinquished Property). The Purchase and Sale Agreement, together with any and all amendments thereof collectively the Sale Agreement (Sale Agreement), is incorporated herein by this reference.

Exchanger and QI have executed an Exchange Agreement in which Exchanger has agreed to transfer the Relinquished Property to QI, in consideration of QI's acquisition of suitable replacement property and the transfer of the replacement property to Exchanger.

NOW, THEREFORE, the parties agree:

1. Exchanger hereby conditionally assigns all of its right, title and interest in the Sale Agreement and certain of its obligations thereunder to QI. More particularly, Exchanger assigns its obligations to sell the Relinquished Property specifically conditioned upon Exchanger's performing all other obligations required of Exchanger to Buyer and any obligations surviving the close and transfer of title to Buyer. QI agrees to assume this obligation and perform said obligation in the manner provided for herein.

All representations, covenants, and warranties, express or implied, made by Exchanger or Buyer with respect to the transfer of Exchanger's interest in the Relinquished Property and the transactions contemplated by the Sale Agreement shall survive the transfer of Exchanger's interest in the Relinquished Property by Exchanger to QI and by QI to Buyer.

2. QI hereby requests and directs Exchanger to deed the Relinquished Property directly to Buyer.

IN WITNESS WHEREOF, the parties have executed this agreement as their free and voluntary act and deed, on the date indicated by each signature.

EXCHANGER:

Date: __3-27-07__          By: _____

Anita Hunter

*\* Signatures continued on next page \**

QI:

1031 ADVANCE, INC.,
a California corporation

Date: 3-12-07          By: _____
                            Steven Allred, President

Acknowledged:

BUYER:

The Suthar Living Trust dated July 26, 2000

Date: 3/26/07          By: _____
                            Bhogilal G. Suthar, Trustee

Date: 3/26/07          By: _____
                            Premila B. Suthar, Trustee

01-0701349                    2